JWP/bh/6/13/08                                          Attorney No. 6216706

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRUCE ROGERS,

     Plaintiff,

vs.

ROTHBART PROPERTIES, PRECISION       NO. 08 CV 0822
LABORATORIES, INC., ROTHBART REALTY
COMPANY, 977 NORTHPOINT VENTURES,     JUDGE GOTSCHALL
LLC., a/k/a 977 NORTHPOINT VENTURES
FUND, SLJ PROPERTIES, LLC, ROTHBART     MAGISTRATE JUDGE DENLOW
CONSTRUCTION COMPANY, INC. and
ROTHBART CONSTRUCTION COMPANY, INC.
a/k/a ROTHBART CONSTRUCTION REALTY,

     Defendants,

-----------------------------------------------------------

ROTHBART REALTY COMPANY, 977
NORTHPOINT VENTURES, LLC. AND SLJ
PROPERTIES, LLC.

     Third-Party Plaintiff,

vs.

SWIFT TRANSPORTATION COMPANY, INC.

     Third-Party Defendant.

-----------------------------------------------------------

ROTHBART REALTY COMPANY, 977
NORTHPOINT VENTURES, LLC. AND SLJ
PROPERTIES, LLC.

     Cross-Plaintiff,

vs.

PRECISION LABORATORIES, INC.

     Cross-Defendant.

**ROTHBART REALTY COMPANY, 977 NORTHPOINT VENTURES, LLC.
AND SLJ PROPERTIES, LLC.'S RESPONSE TO CROSS-DEFENDANT PRECISION
LABORATORIES INC.'s MOTION TO DISMISS.**

NOW COMES the Defendant/Cross-Plaintiffs, ROTHBART REALTY COMPANY, 977

NORTHPOINT VENTURES, LLC. AND SLJ PROPERTIES, LLC., by and through their attorneys,

LAW OFFICES OF BRUNO J. PARA, and in response to the Third Party Defendant's Motion to Dismiss

Cross-claims Pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6), states the following:

## I. INTRODUCTION

Cross-Defendant, PRECISION LABORATORIES, INC. ("Precision") has responded to

Defendants/Cross-Plaintiffs, ROTHBART REALTY COMPANY, 977 NORTHPOINT VENTURES,

LLC. AND SLJ PROPERTIES, LLC.'s ("Rothbart") Crossclaim for Contribution with a Motion to

Dismiss. In the Memorandum of Law in Support of Its Motion to Dismiss, Precision argues for dismissal

on the grounds Precision was not properly served and Rothbart failed to state a claim upon which relief

can be granted pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6), respectively. (See

Exhibit A attached to the Response.) The allegations asserted by Precision are without basis, as Precision

waived its Rule 12(b)(5) defense when it filed a responsive pleading on this matter. Further, the prior

adjudication in state court was in error and is not a bar to Rothbart's ability to bring a Crossclaim for

Contribution in Federal Court. Therefore, Rothbart respectfully requests the Motion be denied.

## II. ARGUMENT

**A.    Pursuant to Rule 12(h)(1), Precision Waived Its Rule 12(b)(5) Defense by Asserting It in a
Responsive Pleading.**

Precision contends Rothbart's Crossclaim for Contribution fails to conform to Federal Rule of

Civil Procedure 4 regarding proper service of summons. (Exhibit A at 2.) Indeed, under Rule 4(c), a copy

of the complaint must include a summons. In addition, service upon a corporation must be served to either

an officer or authorized agent of the corporation, as required under Rule 4(h). Any failure to comply with

these rules is grounds for dismissal under Rule 12(b)(5) for insufficient service of process. However,

pursuant to Rule 12(h)(1), any such Rule 12(b)(2)-(5) defense is waived if the party asserts it in a

responsive pleading. Once that defense is waived and the party submits to the jurisdiction of the court,

"the court is powerless to dismiss the suit for lack of personal jurisdiction." *O'Brien v. R.J. O'Brien &*

*Associates, Inc*, 998 F.2d 1394, 1399 (7th Cir. 1993).

It is Precision's argument that it was never served at all by Rothbart. (Exhibit A at 3.) If so,

Precision should have filed a Motion to Dismiss solely on the merits of its Rule 12(b)(5) defense. Instead,

2

Precision's Motion to Dismiss also included a substantive argument as to whether or not it had a duty to the Plaintiff. (Exhibit A at 3-4.) As such, it waived its right to assert a Rule 12(b)(5) defense for insufficient service under Rule 12(h)(1).

Under the Federal Rules of Civil Procedure, Precision waived its right to a Rule 12(b)(5) defense and thus may not assert insufficient service as a grounds for dismissal. By failing to properly assert a Rule 12(b)(5) defense, Precision in fact voluntarily submitted to the court's jurisdiction.

**B.      The Previous Adjudication of Precision in State Court Does Not Bar Rothbart from Filing a Crossclaim for Contribution in Federal Court.**

Precision was previously granted a Motion for Involuntary Dismissal against the Plaintiff's ("Rogers") claim by the state court on May 4, 2007. (See Exhibit B attached to the Response.) It is upon this Order that Precision stands its Rule 12(b)(6) failure to state a claim upon which relief can be granted defense. (Exhibit A at 4.) However, under Illinois Supreme Court Rule 304(a), "any judgment that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before the entry of judgment adjudicating all the claims, rights, and all the liabilities of all the parties." This rule was patterned after Federal Rule of Civil Procedure 54(b). *Ariola v. Nigro*, 148 N.E.2d 787, 789 (Ill. App. Ct. 1958). Under Rule 54(b), "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a final judgment adjudicating all the claims and all the parties' rights and liabilities."

The court has the authority under both Illinois Supreme Court Rule 304(a) and Federal Rule of Civil Procedure 54(b) to modify any order prior to the entry of a final order of adjudication of all claims. Indeed, an order that does not dispose of a case in its entirety is interlocutory and may be vacated by a subsequent judge upon careful consideration. *Balciuas v. Duff*, 446 N.E.2d 242, 246 (Ill. App. Ct. 1983). As the grant of Involuntary Dismissal did not adjudicate all claims among all parties, it is not a Final Order under Illinois Supreme Court Rule 304(a). Further, this court retains jurisdiction over all claims and parties under Federal Rule of Civil Procedure 54(b) and may set aside a prior order if justice requires.

The state court's grant of Involuntary Dismissal was in error. The lone reason cited by the state court in granting the Motion was that the accident did not occur on Precision's premises. (Exhibit B.) However, under Illinois law, a business owner has a duty to provide a reasonable safe means of ingress and egress within both the confines of her premises as well as "within limitations dictated by the facts of the case, beyond precise boundaries of such premises." *McDonald v. Frontier Lanes, Inc.*, 272 N.E.2d 369, 372 (Ill. App. Ct. 1971). In *McDonald*, the court held the defendant bowling alley owed a duty to patron who injured herself while traversing a parkway that was not owned by the defendant but was nevertheless used by customers to gain access to and from the defendant's premises. *Id.* at 350.

Further, a business owner assumes a duty to safeguard invitees when the means of entrance serves as a "necessary adjunct" to the premises. *Cooley v. Maske*, 196 N.E.2d 396, 398 (Ill. App. Ct. 1964). The court in *Cooley* ruled that while the sidewalk where the plaintiff tripped over some bricks was not on the defendant tavern operator's premises, the walkway provided the sole access to the tavern's front door. *Id.* Therefore, a duty of care was established upon the tavern operator to ensure the means of entry was safe, even though the walkway was off the defendant's premises.

Indeed, this responsibility to provide a safe means of ingress and egress exists regardless of whether or not a party is the actual owner or in possession of the area where the injury occurs. *Bloom v. Bistro Restaurant, Ltd. Pshp.*, 710 N.E.2d 121, 124 (Ill. App. Ct. 1999). In *Bloom*, a patron was struck by falling ice as she exited the defendant restaurant. *Id.* at 122. The court held that while the ice had accumulated on a structural entity beyond the defendant's possession, the duty to ensure a safe means of egress and ingress included taking reasonable precautions against such defects. *Id.* at 124.

In the case at bar, the facts lay bare the fact that Precision's duty to Rogers extended beyond the demised property line. Rogers gave a sworn deposition on November 13, 2007. (See Exhibit C attached to the Response.) Rogers testified that while making a delivery to Precision, he was directed to use a specific entrance by a sign on Precision's door. (Exhibit C at 57.) As he walked the directed route, he slipped and fell. (Exhibit C at 61-63.) By so dictating the means of entry to its premises, Precision directed Plaintiff to walk through the alleged defect, and therefore, Precision assumed a responsibility for safe ingress at the location of the alleged defect. Thus, Precision's duty of care extended beyond the prescribed property

boundaries as recognized under Illinois law, and the decision to grant Involuntary Dismissal by the State Court was in error. As the court in *Cooley* held, when deciding on the liability of a landlord and the liability of tenant, "[t]hey either hang from the same limb, or they do not hang at all." *Cooley,* 196 N.E.2d at 398. Therefore, Precision's Rule 12(b)(6) motion should be denied.

### III. CONCLUSION

Precision waived its right to a Rule 12(b)(5) defense and the prior adjudication in state court does not bar this Court from hearing the Crossclaim for Contribution. Finally, Cross-Defendant's 12(b)(6) Motion to Dismiss should be denied, as Precision owed a duty of care to the Plaintiff when it directed Plaintiff over the alleged defect.

WHEREFORE, the Defendant/Cross-Plaintiff, ROTHBART REALTY COMPANY, 977 NORTHPOINT VENTURES, LLC. AND SLJ PROPERTIES, LLC., moves this Honorable Court to enter an order denying the Motion to Dismiss Rothbart's Crossclaim for Contribution filed by PRECISION LABORATORIES, INC.

Respectfully submitted,

by:    s/ John W. Potter

LAW OFFICES OF BRUNO G. PARA
225 West Washington Street, Suite 1400
Chicago, IL 60606
(312) 827-2300

5

1750007022

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRUCE ROGERS, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Gottschall |
| | ) | |
| v. | ) | Magistrate Judge Denlow |
| | ) | |
| ROTHBART PROPERTIES, et al. | ) | Case No. 08 C 0822 |
| | ) | |
| Defendants. | ) | |

### PRECISION LABORATORIES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS CROSSCLAIMS

Cross-Defendant PRECISION LABORATORIES, INC. hereby submits its Memorandum of Law in Support of its Motion to Dismiss Crossclaims Pursuant to Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6).

**I.     Background**

Plaintiff initially filed his complaint at law in the Circuit Court of Cook County, Illinois, claiming that he was injured and sustained damages as a result of a slip and fall accident on June 25, 2004. One of the original defendants in the case pending in Cook County was cross-defendant PRECISION LABORATORIES, INC. ("Precision"). Upon service of the complaint, Precision filed its Motion for Involuntary Dismissal pursuant to 735 ILCS 5/2-615(a) and 735 ILCS 5/2-619(a)(9) on July 14, 2006. The basis for the motion was that based on plaintiff's complaint, Precision did not owe him a duty of care. Plaintiff was given leave to conduct discovery on the issue prior to briefing Precision's Motion for Involuntary Dismissal. Written discovery was conducted. Additionally, the depositions were taken of Precision's person most knowledgeable, Terry Culp, and co-defendant Rothbart Realty Company's person most

1



knowledgeable, Gary Rothbart. Once written discovery and depositions of party defendants were taken. the motion was briefed and oral arguments were heard by Judge Ronald Davis on May 4, 2007. On that date, Judge Davis entered an order granting Precision's Motion for Involuntary Dismissal. (See Exhibit A attached to the motion.) Plaintiff subsequently filed a motion for reconsideration, which was fully briefed. Judge Davis heard oral arguments on plaintiff's motion for reconsideration on July 12, 2007. Following the arguments, Judge Davis entered an order denying the motion for reconsideration. (See Exhibit B attached to the motion.) The order further indicated that the language of the May 4, 2007 order would stand. To date, plaintiff has not appealed the orders of May 4, 2007 or July 12, 2007.

Precision has learned that this matter was ultimately removed to the United States District Court for the Northern District of Illinois in February 2008. At the time of removal, Precision was not a party to the action. On May 5, 2008, ROTHBART CONSTRUCTION COMPANY, INC., ROTHBART REALTY COMPANY, 977 NORTHPOINT VENTURES, LLC and SLJ PROPERTIES, LLC filed two separate Crossclaims for Contribution against Precision. (See Exhibits D and E, respectively, attached to the motion.) Precision files its motion and supporting memorandum in response to the Crossclaims for Contribution.

**II.     ARGUMENT**

     **1.     The Crossclaims Must Be Dismissed Pursuant to Rule 12(b)(5) as They Have Not Been Properly Served.**

Neither crossclaim against Precision complies with Federal Rule of Civil Procedure 4 concerning summons and service. Rule 4(c) requires that a summons be served with a copy of the complaint. Rule 4(h) requires that service on a corporation must be served on an officer, managing or general agent, or authorized agent of the corporation. If crossclaimant requests a waiver of service, it is to serve a request for waiver of service pursuant to Rule 4(d).

2

In the present matter, the cross-claims of ROTHBART CONSTRUCTION COMPANY, INC., ROTHBART REALTY COMPANY, 977 NORTHPOINT VENTURES, LLC and SLJ PROPERTIES, LLC were not properly served on Precision according to the terms set forth in Rule 4 of the Federal Rules of Civil Procedure. Rather, ROTHBART CONSTRUCTION COMPANY, INC. simply mailed a copy of the Crossclaim for Contribution to Precision's counsel as of the time of the dismissal order—attorney Daniel Cray of the firm formerly known as Iwan Cray, (now Cray Huber), at 303 W. Madison, Suite 2200, Chicago, Illinois 60606. (See the Notice of Filing attached to the motion as Exhibit C.) No summons was included with the Crossclaim for Contribution as required by Rule 4. Additionally, no request for a waiver of service was included with the Crossclaim for Contribution as required by Rule 4.

The Crossclaim for Contribution filed by ROTHBART REALTY COMPANY, 977 NORTHPOINT VENTURES, LLC and SLJ PROPERTIES, LLC has never been served on either Precision or its counsel.

Pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure, the Crossclaims for Contribution filed by ROTHBART CONSTRUCTION COMPANY, INC., ROTHBART REALTY COMPANY, 977 NORTHPOINT VENTURES, LLC and SLJ PROPERTIES, LLC must be stricken for failure to comply with service requirements set forth in the Federal Rules of Civil Procedure.

      **2.**      **The Fact That Precision Owed No Duty to Plaintiff Has Already Been Adjudicated in State Court in Illinois, and Therefore, the Crossclaims Fail to State a Claim Upon Which Relief Can Be Granted.**

The Crossclaims for Contribution seek contribution from Precision based on its "duty" to plaintiff. In Paragraph 3 of ROTHBART CONSTRUCTION COMPANY, INC.'s Crossclaim, it alleges that Precision "had a duty to the plaintiff to provide a safe area for ingress and egress to

their premises and to maintain their premises including areas beyond their demised area in a safe manner." (Exhibit C, ¶ 3.) Crossclaimants ROTHBART CONSTRUCTION COMPANY, INC., ROTHBART REALTY COMPANY, 977 NORTHPOINT VENTURES, LLC and SLJ PROPERTIES, LLC make the exact same allegation in paragraph 3 of their Crossclaim for Contribution. (Exhibit D, ¶ 3.)

The decision of Judge Davis in the Law Division of Cook County has already adjudicated this very issue. In fact, in ROTHBART CONSTRUCTION COMPANY, INC., ROTHBART REALTY COMPANY, 977 NORTHPOINT VENTURES, LLC and SLJ PROPERTIES, LLC's Motion to File Amended Crossclaim for Contribution Claim Against Precision Laboratories, Inc. and Correct the Record, the crossclaimants allege that Precision had been dismissed "from the State Court case, but that the parties believe that the order was entered in error." (See Exhibit E, ¶ 4.) Crossclaimants simply are attempting a second bite at the apple and are attempting an end run around a court order dismissing Precision Laboratories, Inc.

WHEREFORE for the foregoing reasons Cross-Defendant PRECISION LABORATORIES, INC. respectfully requests this Court dismiss Crossclaimants' Crossclaims for Contribution Against Precision Laboratories, Inc. pursuant to FRCP 12(b)(5) or pursuant to FRCP 12(b)(6), or convert the motion to a Rule 56 Motion pursuant to FRCP 12(d) or for such other and further relief as this Court deems appropriate.

Respectfully submitted,

CRAY HUBER HORSTMAN HEIL
& VanAUSDAL LLC

By: _____
Adam C. Carter
ARDC # 6274669

4

CRAY HUBER HORSTMAN HEIL
& VanAUSDAL LLC
303 W. Madison Street
Suite # 2200
Chicago, IL  60606
(312) 332-8450
Attorneys for PRECISION LABORATORIES, INC.

05/27/2008   10:30   16302328549                    ADAMS SWATEK                          PAGE  02/03
r312 332 8452        IWAN GRAY                                         02 16 33 p m   05-04-2007        2/2

Order                                              CCG N002-300M·2/24/05 (

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

B. Rogers

v.                                        } No.  06 L 5376

Precision Laboratories, Inc. et al

### ORDER

This cause coming to be heard on Precision Laboratories, Inc.'s Motion to Dismiss, pursuant to 735 ILCS 5/2-615(a) and 735 ILCS 5/2-619(a)(9), the motion having been fully briefed and the Court having heard oral arguments,

It is hereby ordered:

1) Precision Laboratories, Inc.'s Motion to Dismiss Counts III and IV of Plaintiff's Complaint is granted pursuant to 735 ILCS 5/2-619. Counts III and IV of Plaintiff's Complaint are dismissed with prejudice. Precision Laboratories, Inc. owed no duty to plaintiff as to plaintiff's fall on the common area since said area was not located on the defendant Precision Laboratories, Inc.'s premises.

Atty. No.: 36699

Name: Iwan Gray

Atty. for: Precision Laboratories, Inc.

Address: 303 W. Madison #2200

City/State/Zip: Chicago IL 60606

Telephone: 312 332-8450

ENTERED: Assoc. Judge Ronald S. Davis

Dated: MAY 04 2007

Circuit Court - 553

Judge                                  Judge's No.

EXHIBIT "B"

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1  STATE OF ILLINOIS   )
 2                      )  SS:
 3  COUNTY OF C O O K   )
 4     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
 5          COUNTY DEPARTMENT - LAW DIVISION
 6  BRUCE ROGERS,                )
 7                 Plaintiff,    )
 8      vs.                      ) Case No. 06L 005376
 9  ROTHBART PROPERTIES, PRECISION )
10  LABORATORIES, INC., ROTHERBART )
11  REALTY COMPANY, 977 NORTHPOINT )
12  VENTURES, LLC, a/k/a 977       )
13  NORTHPOINT VENTURES FUND, SLJ  )
14  PROPERTIES, LLC, ROTHBART      )
15  CONSTRUCTION COMPANY, INC., and)
16  ROTHBART CONSTRUCTION COMPANY, )
17  INC a/k/a ROTHBART CONSTRUCTION)
18  REALTY.                        )
19                 Defendants.    )      ORIGINAL
20
21        The deposition of BRUCE ROGERS, called
22  for examination, taken pursuant to the provisions of
23  the Code of Civil Procedure and the Rules of the
24  Supreme Court of the State of Illinois pertaining to
```

EXHIBIT
"A"

2

BRUCE ROGERS,  NOVEMBER 13, 2007

1    the taking of depositions for the purpose of

2    discovery taken before RACHEL SMITH, CSR No.

3    84-4161, a Certified Shorthand Reporter of said

4    state, at Suite 3750, 70 West Madison, Chicago,

5    Illinois, on the 13th Day of November, A.D. 2007, at

6    10:00.

7

8    APPEARANCES:

9

10        CUTLER & HULL,

11        (Three First National Plaza,

12        70 West Madison, Suite 3750,

13        Chicago, Illinois 60602,

14        312-726-0777), by:

15        MR. EDWIN J. HULL, III,

16            appeared on behalf of the Plaintiff;

17

18        ADAMS SWATEK, LLC, ATTORNEYS AT LAW,

19        (22 West State Street,

20        Geneva, Illinois 60134,

21        630-232-6440), by:

22        MR. STEVEN M. TEFFT,

23            appeared on behalf of Rothbart

24            Construction.

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1   Cont'd:

 2

 3       LAW OFFICE OF STEPHEN HASZTO,

 4       (225 West Washington Street, Suite 1400,

 5       Chicago, Illinois 60602,

 6       312-827-2300), by:

 7       MR. JOHN POTTER,

 8            appeared on behalf of Rothbart

 9            Construction.

10

11

12   REPORTED BY:  RACHEL SMITH, C.S.R.

13            CERTIFICATE NO. 84-4161

14

15

16

17

18

19

20

21

22

23

24
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1          (WHEREUPON, the witness was duly

2          sworn.)

3          BRUCE ROGERS,

4 called as a witness herein, having been first duly

5 sworn, was examined and testified as follows:

6          EXAMINATION

7 BY MR. POTTER:

8     Q.    Could you please tell us your name and

9 spell your name for the court reporter?

10    A.    Bruce Rogers, B-R-U-C-E, R-O-G-E-R-S.

11    MR. POTTER:  Please let the record reflect

12 this is the discovery deposition of Bruce Rogers

13 taken pursuant to notice and pursuant to the laws of

14 the state of Illinois and county of Cook.

15 BY MR. POTTER:

16    Q.    Sir, have you ever given a deposition

17 before?

18    A.    Yes.

19    Q.    What context?  What was it for?

20    A.    It was for an accident with Gonnella

21 Trucking Company.

22    Q.    Were you injured in the accident?

23    A.    No.

24    Q.    Let me go over some basic ground rules

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1  for you.  I need you to give us verbal responses
 2  because this nice lady cannot pick up a nod of the
 3  head or shrug of the shoulders, all right?
 4       A.   Yes.
 5       Q.   I would ask that you refrain from nods of
 6  the head as well.  Yes or no or verbal answers, all
 7  right?
 8       A.   All right.
 9       Q.   I would ask that you stay away from
10  mm-hmms or uh-huhs because when we read the
11  transcript, we have no idea what you meant, all
12  right?
13       A.   Yes.
14       Q.   If you don't understand a question,
15  please don't answer it.
16       A.   Yes.
17       Q.   And if you need to take a break at any
18  time to talk to your attorney, you need to use the
19  restroom, as long as we are not in the middle of a
20  question, just speak up, we are happy to accommodate
21  you.
22       A.   All right.
23       Q.   I have to ask basic background
24  information.  I ask this of everyone.  We might be
```

BRUCE ROGERS, NOVEMBER 13, 2007

```
 1  able to speed this up.  Why don't we mark this as
 2  Exhibit No. 1?
 3                  (WHEREUPON, a certain document was
 4                  marked Roger Deposition Exhibit No.
 5                  1, for identification, as of
 6                  11-13-07.)
 7  BY MR. POTTER:
 8      Q.    I'm showing you what we have marked as
 9  Exhibit 1.  These are your answers to one of the
10  defendant's interrogatories.  Do you see that?
11      A.    Yes.
12      Q.    If we go to the very last page, there is
13  a verification.  I believe that is your signature
14  there?
15      A.    Yes.
16      Q.    And did you read through these questions
17  to confirm their accuracy before you answered --
18  before you signed them?
19      A.    Yes.
20      Q.    All right.  In the Answer to
21  Interrogatory No. 1 you provide your name, your
22  address, your Social Security number, and your date
23  of birth.  Is that information current?
24      A.    Yes.
```

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1        Q.    And is it accurate?
 2        A.    Yes.
 3        Q.    All right.  How long have you lived at 22
 4  Sunset Road in Moriarty, New Mexico?
 5        A.    This is November what?
 6        Q.    This is November 13.
 7        A.    Two more days, 12 years.
 8        Q.    Who do you live there with?
 9        A.    Myself.
10        Q.    Are you married?
11        A.    No.
12        Q.    Do you have any children?
13        A.    No, not living with me.
14        Q.    Are you divorced?
15        A.    Widowed.
16        Q.    All right.  I'm sorry to hear that, sir.
17  How old are your children?
18        A.    Oldest would be 44.
19        Q.    How many children do you have?
20        A.    Five.
21        Q.    What is the youngest, what age?
22        A.    31 I believe.
23        Q.    What is the highest level of education
24  that you have completed?
```

BRUCE ROGERS,  NOVEMBER 13, 2007

```
1       A.      Probably 14-and-a-half years.

2       Q.      Did you complete high school?

3       A.      Yes.  Well, GED.

4       Q.      All right, and did you go on and get any

5  college courses?

6       A.      Yes.

7       Q.      What did you take, what courses?

8       A.      Welding, psychology, algebra, mechanical

9  engineering.

10      Q.      Where did you take those?

11      A.      Columbia Payton College in Pasco,

12  Washington.

13      Q.      Did you get a degree?

14      A.      No.

15      Q.      Did you go to any vocational training

16  beyond what you have described?

17      A.      Only military.

18      Q.      Were you in the Army, Navy?

19      A.      Air Force.

20      Q.      What did you do in the Air Force?

21      A.      Reciprocating engine mechanic.

22      Q.      What is that?

23      A.      A mechanic that works on gasoline

24  propelled engines.
```

9

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.    What types of engines for what type of
2  vehicles?
3      A.    For aircraft.
4      Q.    All right.  Were they jet, propeller
5  planes?
6      A.    Propeller driven.
7      Q.    When were you discharged?
8      A.    1956.
9      Q.    How long were you in the military?
10     A.    Four years, 11 months, 29 days, and --
11     Q.    You were honorably discharged?
12     A.    Correct.
13     Q.    What rank were you discharged?
14     A.    E1.
15     Q.    And at some point you became a truck
16  driver, correct?
17     A.    Yes.  Well, my dad had one when I grew up
18  on the ranch.
19     Q.    He had a tractor?
20     A.    Semi, yes.
21     Q.    And did you drive it with your dad?
22     A.    Yes, since I was 12.
23     Q.    You have a C commercial driver's license?
24     A.    CDL, yes.

1    Q.    Do you have any Hazmat or any specialty?

2    A.    Yes.

3    Q.    Do you have the license on you?

4    A.    Yes.  It's not a commercial license

5  anymore.

6    Q.    All right.  Let's talk about your license

7  at the time of the accident.  You said you had all

8  of the --

9    A.    All the Hazmat, everything.  I was

10  endorsed for all combinations.

11    Q.    So can you --

12    A.    The TX on it was endorsement.

13    Q.    What is the TX endorsement?

14    A.    Everything.

15    Q.    What does it allow you to do?

16    A.    Anything.

17    Q.    So you can do those three truck

18  combinations?

19    A.    Yes.

20    Q.    You can haul hazardous chemicals?

21    A.    Yes.

22    Q.    What else?  Can you give me some other

23  examples?

24    A.    Triple, double, tanks, hazardous

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1   materials, anything that -- dynamite, high value
 2   loads, anything like that.
 3        Q.   All right.  How long had you been a truck
 4   driver as of the day of the accident?
 5        A.   I believe I got my combination license in
 6   1969 or '70, something like that.
 7        Q.   All right.  So approximately 35 years,
 8   something like that?
 9        A.   Somewhere in there.
10        Q.   You filed income tax returns?
11        A.   Yes.
12        Q.   And from -- how far -- what do you have
13   at your house?  How far do they go back, the returns
14   that you keep?
15        A.   Maybe two years.
16        Q.   Do you have an accountant that does your
17   income tax returns?
18        A.   I go to the University and get it done.
19        Q.   So you think at home you would probably
20   have your '06 and '05 returns, right?
21        A.   Probably.
22        Q.   You think you might have your '04s?
23        A.   I don't know.  I really don't.
24        Q.   All right.  You may have given them to
```

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1  me, but I couldn't find them in my file.  I don't
 2  know if you have tax returns.
 3      MR. HULL:  You sent to me the authorization.
 4  He signed them because he didn't have the returns.
 5      MR. POTTER:  I was looking.  I issued a
 6  subpoena to Swift.
 7  BY MR. POTTER:
 8      Q.    Swift Transportation Company, is that who
 9  you were employed by at the time of the accident?
10      A.    Yes.
11      Q.    And I'm just looking through here.  If I
12  can find --
13      A.    They're not very cooperative about
14  anything.
15      Q.    Understood.  I'm trying to get your wages
16  at the time of the accident, the date of the -- do
17  you know the date?
18      MR. HULL:  June, June 23 or 24, something like
19  that, '04.
20      MR. POTTER:  I'm looking at --
21      MR. TEFFT:  The 23rd.
22  BY MR. POTTER:
23      Q.    I'm looking at Page 84.  It looks like
24  this represents gross pay.  Let me ask you a
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1  question.  Do you know what this is?  Did they tell

2  you anything about what you were making at the time

3  of the accident?  Let me ask you this, off the top

4  of your head what was your paycheck at the time of

5  the accident?

6      A.    It varied.

7      Q.    What caused it to vary?  Did you get paid

8  by miles?

9      A.    Yes.

10     Q.    How much did you get paid per mile?

11     A.    28 cents a mile.

12     Q.    Were you driving a Swift tractor trailer?

13     A.    Yes.

14     Q.    So they would pay for the gas and

15 maintenance on the vehicle?

16     A.    Yes.

17     Q.    You would obviously give your time and

18 for every mile you drove you got 28 cents?

19     A.    Yes.

20     Q.    And can you tell me in an average year --

21 there might be an answer in this interrogatory.

22     MR. HULL:  I think there is.  I know we put

23 the stuff in there about lost wages.

24 BY MR. POTTER:

BRUCE ROGERS,  NOVEMBER 13, 2007

1       Q.      Let's look at Interrogatory No. 10.  It
2  says, "as a result of said personal injuries, were
3  you unable to work.  If so, state the name and
4  address of the company," that you put down as Swift
5  Transportation Company, that sounds correct, right?
6       A.      Yes.
7       Q.      "The date or inclusive dates on which you
8  were unable to work."  It says here, "tried to
9  return to light duty, unable to return to previous
10 job duty."  So would I be accurate in saying from
11 the date of the accident to present you were never
12 able to return to full duty?
13      A.      To present?
14      Q.      To present.
15      A.      Yes.
16      Q.      And did you try to go back as light duty?
17      A.      Yes.
18      Q.      I saw a reference in your file that you
19 wanted to do some local deliveries, is that what you
20 went back to do?
21      A.      No.  Well, I went -- that's what I went
22 back to do, but I ended up handing out towels and
23 answering phones.
24      Q.      So you were back at the Swift

BRUCE ROGERS,  NOVEMBER 13, 2007

1    headquarters?

2         A.    Terminal.

3         Q.    All right.  Would you hand out towels to

4    the other truck drivers?

5         A.    Yes.

6         Q.    Did they have wash-up facilities?

7         A.    Yes, showers and --

8         Q.    What else did you do?  You said --

9         A.    Answered the telephone.

10        Q.    All right.  And did you have problems

11   handing out towels?

12        A.    Well, that's all I had to do.  I sat like

13   right here (indicating), and I have to get up and

14   walk around to the window right there, hand out

15   towels.

16        Q.    Were you able to do that?

17        A.    Yes.

18        Q.    Did you have any difficulties doing that?

19        A.    No, other than that's not something that

20   I would want to do.

21        Q.    Understood.  And were you able to answer

22   the phones?

23        A.    Yes.

24        Q.    Did you have any difficulties answering

BRUCE ROGERS,  NOVEMBER 13, 2007

1  the phones?

2      A.      No.

3      Q.      Did they -- was this a job that was

4  already there or did they create this job for you,

5  if you know?

6      A.      No.  It was something they made up I

7  believe.

8      Q.      All right, and how long did you work this

9  light duty job that you just described?

10     A.      I don't know, maybe three months, two

11  months.

12     Q.      All right, and why did you stop?

13     A.      Just not able to continue.  Mostly it was

14  the rate of pay, and I lived 54 miles from the

15  terminal and driving in and driving back out on a

16  daily basis, that is, my pay didn't cover my gas,

17  so --

18     Q.      All right.  So it was the cost of

19  transportation to get to the facility in conjunction

20  with the rate of pay that caused you to stop working

21  light duty job, would that be accurate?

22     A.      Yes, the rate of pay, yes.  It wasn't

23  even a third of what I made previously.  I wouldn't

24  even say a third, maybe a tenth.

BRUCE ROGERS,  NOVEMBER 13, 2007

1    Q.    So what did you make at the light duty

2 job?  Did they pay you hourly?

3    A.    Yes, $9.50 an hour.

4    Q.    How many hours a week would they give

5 you?

6    A.    Eight if they would.  Sometimes I

7 couldn't -- if they had a busy influx of drivers,

8 sometimes I wouldn't be able to perform my duties

9 because my hip would start hurting.

10    Q.    Would that be eight hours a day they

11 would try to get you?

12    A.    Try to, yes.

13    Q.    Five days a week?

14    A.    Five days.

15    Q.    They tried to get you 40 hours?

16    A.    Yes.

17    Q.    Would you get 40 hours most of the time?

18    A.    Most of the time, no.

19    Q.    And from your testimony it sounds like

20 that was, in your mind about one tenth of what you

21 were making before your accident?

22    A.    Yes.

23    Q.    Now you also said that your hip bothered

24 you sometimes when it was really busy?

18

BRUCE ROGERS,  NOVEMBER 13, 2007

1    A.    Yes.

2    Q.    Which hip is that?

3    A.    Right.

4    Q.    And tell me about what would cause it to

5  bother you?  Would it be your increased activity?

6    A.    Getting up, getting down.

7    Q.    And so were you able to do the duties of

8  answering the phone and handing out the towels

9  although with pain or could you just not do them?

10    A.    It was mostly because of the pain.

11    Q.    You could do them but it hurt?

12    A.    Yes.

13    Q.    So was that a reason why you stopped this

14  light duty job, the pain?

15    A.    One of the reasons, yes.

16    Q.    The -- another reason we talked about the

17  pay, correct?

18    A.    Yes.

19    Q.    And then were there any other reasons?

20    A.    No.

21    Q.    Okay.  Now, looking down here for C, it

22  says, "the amount of wage or income loss claimed by

23  you," and it says, "from date of injury to

24  retirement, $350,000 plus."  Do you know how that

BRUCE ROGERS,  NOVEMBER 13, 2007

1  number was calculated?

2        A.      Yes, I calculated it.

3        Q.      And how did you calculate it?

4        A.      My yearly pay is around $35 or $36,000

5  per year, and I figure on a ten-year period, I

6  figure I would work another ten years prior to that.

7        Q.      All right.  Let me back up here a little

8  bit.  How did you get the $35 to $36,000 figure?

9  Did you go back, look at your tax returns?

10        A.      Yes.

11        Q.      Pay stubs, what did you do?

12        A.      Pay -- I believe it was my tax returns

13  that showed I made $36, $37,000 or something like

14  that.

15        Q.      Do you remember what years you looked at

16  to come up with this?

17        A.      Just one.

18        Q.      Which one?

19        A.      My last one.

20        Q.      That would be '04?

21        A.      Probably yes.  No.

22        Q.      Or '03 because it was a complete year?

23        A.      Yes, a complete year.

24        Q.      Did you look at '02?

BRUCE ROGERS,  NOVEMBER 13, 2007

1        A.     No.

2        Q.     All right.  How old are you now?

3        A.     62.

4        Q.     And so you're talking ten years '04 to

5    2014, correct?

6        A.     Yes.

7        Q.     So it's now '07.  How old were you in

8    '04?  It would have made you 59?

9        A.     No, 57 or 58, I believe.

10       Q.     So it was your plan or intent before this

11   accident to work until you were 67 or 68 years old?

12       A.     Or 70.

13       Q.     Why did you settle on that 67 through 70,

14   why that rank?

15       A.     I just figured that would probably be

16   enough time to get everything in order, that I could

17   just do whatever I wanted.

18       Q.     All right.  You're wearing an oxygen tank

19   today, correct?

20       A.     I am wearing oxygen, yes.

21       Q.     Why do you need the oxygen?

22       A.     I just -- my lungs do not produce enough

23   oxygen.

24       Q.     Are you a smoker?

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1        A.      I was.

 2        Q.      How many packs a day would you smoke?

 3        A.      One and a half maybe.

 4        Q.      And over what time period?

 5        A.      I have no idea.

 6        Q.      When did you start smoking?

 7        A.      I believe I was like 14 or 15.

 8        Q.      So you smoked -- when did you stop

 9 smoking?

10        A.      Two-and-a-half-years ago.

11        Q.      So you smoked for about 48 years, does

12 that sound right?

13        A.      Probably.

14        Q.      And was it always about a pack and a half

15 or was it more or less?

16        A.      It was less way up until -- I don't even

17 know when it increased.

18        Q.      What is your diagnosis as far as your

19 breathing condition, if you know it?

20        A.      I don't know.

21        Q.      Emphysema or do they have a name for it?

22        A.      I believe the last report that I read was

23 symptoms like COPD.

24        Q.      Do you know what COPD stands for?
```

1      A.     I believe it's chronic obstructive

2  pulmonary disease.

3      Q.     When did you start using the oxygen?

4      A.     I'm not sure.

5      Q.     Was it before your accident or after your

6  accident?

7      A.     Probably after my accident, maybe two

8  years maybe after the accident.

9      Q.     All right.  Were you on the oxygen when

10 you went back for light duty?

11     A.     No.

12     Q.     Was that after?

13     A.     After.

14     Q.     Is it your belief that had you not

15 fractured your hip and suffered the injuries from

16 the accident that you could still drive a truck

17 today even though you have the oxygen?

18     A.     Yes.

19     Q.     You flew here for this deposition?

20     A.     Yes.

21     Q.     And you were able to bring the oxygen

22 tank on the plane, correct?

23     A.     No.

24     Q.     What did you have to do?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.     I had to rent this (indicating).

2      Q.     You're pointing at this, what?

3      A.     The POC.  It's a private or personal

4  oxygen concentrator.

5      Q.     All right, and were you -- if you had not

6  had this accident and you were driving trucks, would

7  you be able to bring your oxygen tank with you?

8      A.     Yes.

9      Q.     In the truck?

10     A.     Yes, I would not but I could.

11     Q.     What does that mean, "I wouldn't but I

12  could"?

13     A.     I would take something of this nature

14  because it will plug into a cigarette adaptor.  You

15  would just plug it in and have it 24 hours a day,

16  seven days a week rather than change and carry

17  and --

18     Q.     Understood.  Are there any Department of

19  Transportation restrictions for people with COPD

20  such as your condition, or is it COPD?

21     A.     COPD.

22     Q.     Are there any Department of

23  Transportation restrictions regarding truck drivers

24  who have COPD?

24

BRUCE ROGERS,   NOVEMBER 13, 2007

1    A.    No.

2    Q.    You're not aware of any?

3    A.    I am not aware of any, no.

4    Q.    Have you looked into that issue?

5    A.    No.

6    Q.    What does -- if you don't have your

7  oxygen, how does it affect you?

8    A.    I don't know.

9    Q.    Do you have difficulty breathing?

10   A.    Yes, I do.

11   Q.    So could you say, walk out of the office,

12 go down the elevator and walk out to the street

13 without your oxygen?

14   A.    Could I?

15   Q.    Yes.

16   A.    Yes.

17   Q.    How would you feel without your oxygen if

18 you did that?

19   A.    You said go down the stairs or elevator?

20   Q.    Go down the elevator.

21   A.    I would probably -- other than it's like

22 smoking or drinking, it's all in your mind.  If you

23 just do what you're going to do and do not think

24 about it, there is no concern about it other than I

BRUCE ROGERS,  NOVEMBER 13, 2007

1  can't walk very far.  I just walk maybe 150 feet and

2  I have to rest.

3       Q.    Who was treating you for your COPD?

4       A.    I was at the VA Hospital, is the primary.

5       Q.    Which VA Hospital?

6       A.    The one in Albuquerque, New Mexico.

7       Q.    I don't think we have those records.  We

8  may ask you to sign a release to get those since the

9  VA -- who do you see at the Albuquerque, New Mexico

10 VA Hospital?

11      A.    How often?

12      Q.    Who?  What is the name of the doctor or

13 doctors?

14      A.    Dr. Horowitz.

15      Q.    Do you know how to spell it?

16      A.    H-O-R-I-W-O-R-T-Z, I think, O-T-I-Z.

17      Q.    Do you know what specialty Dr. Horowitz

18 is?

19      A.    I believe he is -- I think he's my

20 primary caregiver or for me he is.

21      Q.    Do you see any other doctors that

22 specialize in COPD?

23      A.    No.

24      Q.    Have you in the past seen other doctors

26

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1  that specialize in COPD?
 2       A.    It's hard for me to answer because I
 3  don't know what -- I have been there for therapy,
 4  you know, to a different area of the hospital.
 5       Q.    Was that therapy for your hip injury?
 6       A.    Yes.
 7       Q.    Now, have you seen anyone outside of the
 8  Albuquerque, New Mexico VA Hospital for the COPD?
 9       A.    No.
10       Q.    Do you have any other medical conditions
11  that are unrelated to the accident?
12       A.    I don't have enough money.
13       Q.    All right.  My question is -- well, let
14  me ask you this.  You fractured, as you understand
15  it, you fractured your hip in this accident,
16  correct?
17       A.    Yes.
18       Q.    Did you fracture some ribs as well, if
19  you know?
20       A.    I don't know.
21       Q.    Do you know of any other injuries you
22  sustained beyond the hip injury as a result of the
23  accident?
24       A.    No, I don't.
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1    Q.    Prior to this accident -- you said it was
2  your right hip, correct?
3    A.    Yes.
4    Q.    Prior to the accident did you have any
5  problems with your right hip at any time during the
6  course of your life?
7    A.    No.
8    Q.    Prior to this accident did you have any
9  problems, fractures, sprains, things like that to
10 your lower extremities at any time that you recall?
11   A.    What is lower?
12   Q.    Your legs, your feet, your knees.
13   A.    No.  Oh, I broke my leg once.
14   Q.    Was it your left leg or right leg?
15   A.    Left leg.
16   Q.    And did that have any accompanying right
17 hip problems?
18   A.    No.
19   Q.    When was that?
20   A.    I don't believe I know.  Maybe it was '89
21 or '88, somewhere around there.
22   Q.    Did you go to the Albuquerque, New Mexico
23 VA Hospital for that?
24   A.    Yes.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.     Since this accident have you had any

2   falls or injuries or accidents that caused you to

3   suffer injuries?

4      A.     No.

5      Q.     Since this accident have you looked for

6   another job?

7      A.     Since the accident?

8      Q.     Yes.

9      A.     No.

10      Q.     Why is that?

11      A.     I didn't feel that -- well, I went to --

12   the doctor sent me to a therapist for, I believe

13   it's a job performance evaluation thing, and when

14   that came back I went to it, and they shortly after

15   that is when they terminated me.

16      Q.     All right.  That was from the light duty

17   position?

18      A.     Yes.

19      Q.     So you were terminated as opposed to

20   quitting?

21      A.     Yes, I was terminated.

22      Q.     Do you know why they terminated you, if

23   you know?

24      A.     Nonperform -- unable to perform job

BRUCE ROGERS,  NOVEMBER 13, 2007

1   duties.

2        Q.    Did they tell you specifically what you

3   were unable to perform that you were supposed to be

4   doing?

5        A.    No.  It's written -- they sent me the

6   papers indicating that I had been discharged due to

7   lack of -- unable to perform job duties.

8        Q.    All right.  Who terminated your light

9   duty employment?

10       A.    I don't know.

11       Q.    You don't know?

12       A.    No.

13       Q.    Who told you about your termination?

14       A.    They mailed it to me.

15       Q.    All right.  Who was your direct

16  supervisor when you were on light duty?

17       A.    It's hard to tell.

18       Q.    Are there several people that could have

19  done it?

20       A.    Yes.

21       Q.    Can you give me their names and titles,

22  if you know them?

23       A.    Chris Ryan.  He is the terminal manager.

24  Could have been Vic.  I don't know what his last

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1  name is.  He's Spanish or --
 2       Q.    What was Vic's job title?
 3       A.    He was the assistant terminal manager.
 4       Q.    Anybody else?
 5       A.    And truck boss and team leader and I
 6  don't know, he has about five or six different jobs.
 7       Q.    So that's Vic?
 8       A.    Yes.
 9       Q.    So it was probably either Chris Ryan or
10  Vic, correct?
11       A.    I believe the decision was made down at
12  Swift headquarters in Phoenix, Arizona is what I
13  think.
14       Q.    Do you have an idea as to who might have?
15       A.    No.  Could have been somebody in
16  personnel.  Could be somebody that just does that.
17  Could have been somebody who works in workers
18  compensation.  Could have been anybody.  I don't
19  have any -- any idea.
20       Q.    All right.  How much do you currently
21  weigh?
22       A.    226.
23       Q.    How much did you weigh at the time of the
24  accident?
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.      Probably 208 or 210.

2      Q.      Is there anything that you attribute your

3  approximate 18 pounds in weight gain to?

4      A.      Probably stopping smoking.  That would be

5  my guess.

6      Q.      Did you start to lose the weight --

7  strike that.

8              Did you start to gain the weight soon

9  after you stopped smoking?

10     A.      I believe so.  They put me on what they

11  call the Health Buddy Program with the VA.  Every

12  morning they print this strip thing like she has,

13  and every morning a light blinks and it asks you

14  about 15 different questions.  They give you a thing

15  to check your blood pressure and your heartbeat and

16  they would give you a digital scale to weigh

17  yourself on.

18     Q.      So you weigh yourself everyday?

19     A.      Everyday.

20     Q.      Yesterday morning, when you weighed

21  yourself --

22     A.      225.

23     Q.      All right.  That has been pretty

24  consistent over the last couple years?

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1      A.    Well actually, I have only had that
 2 machinery probably just over a year.
 3      Q.    All right.  Is there a reason why they
 4 are giving you this machinery?
 5      A.    I believe it's some type of a pilot
 6 program, I believe, they are trying to implement to
 7 better serve the veterans, I guess.
 8      Q.    Does the information get electronically
 9 sent somewhere?
10      A.    Yes.  Everyday it goes through the phone
11 line.  If I answer a question I have a nurse
12 practitioner that calls me up and says, "what's the
13 deal here" if it's iffy.
14      Q.    At the time of the accident did you
15 have -- strike that.
16           Let's take the day before your accident.
17 Did you have any difficulty walking?
18      A.    No.
19      Q.    Did you have a regular exercise routine
20 that you would go through during the days and weeks
21 before the accident?
22      A.    No.
23      Q.    What types of hobbies did you have before
24 the accident, physical-type hobbies?
```

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1       A.     None.
 2       Q.     What types of hobbies in general did you
 3  have before the accident?
 4       A.     I didn't have any time for hobbies.
 5       Q.     You drove your truck, right?
 6       A.     That's it.  Then I got two days off then
 7  I done it again.
 8       Q.     When you drive your truck, you would have
 9  to get up on the truck, and put tarps forward and
10  backwards?
11       A.     No.
12       Q.     Who would do that?
13       A.     Not for Swift.
14       Q.     Who does that for Swift?
15       A.     Well, people that drive flatbeds.
16       Q.     So you didn't drive a flatbed?
17       A.     No.
18       Q.     What did you drive for Swift?
19       A.     A van.
20       Q.     What's a van?
21       A.     A van is a 52-foot trailer that's 13 feet
22  tall and 52 feet long, 8 feet wide.
23       Q.     How many feet tall?
24       A.     13 feet.
```

BRUCE ROGERS, NOVEMBER 13, 2007

```
1        Q.     Did you have to pull the pallets out off
2   the van?
3        A.     Not unless I was being beaten.
4        Q.     What does that mean, in other words?
5        A.     That means no.
6        Q.     So you would show up at the facility?
7        A.     No.
8        Q.     Where would you --
9        A.     From the time I went to the terminal at
10  my home terminal in Albuquerque, New Mexico, I was
11  at work until I come home three weeks later, then I
12  was back.
13       Q.     All right.  So you would show up at the
14  terminal?
15       A.     Get in my truck.
16       Q.     Get right in your truck.
17       A.     From that point on everything was done
18  over a computer unless I was fueling or driving.
19       Q.     And you would drive to wherever the
20  computer told you?
21       A.     Pick up my load.  Generally I would pick
22  up -- I would go to Vollen, New Mexico, pick up a
23  load of styrofoam, come and take them to Brandywine,
24  Maryland.
```

BRUCE ROGERS, NOVEMBER 13, 2007

1        Q.     You would get to the destination that the
2    computer told you to.  You would get out of your
3    truck and someone else would load your truck?
4        A.     Generally there was a trailer that was
5    already loaded on our computer.  It would tell you
6    what -- where to go to pick up your load.  You would
7    go down there and tell them who you were and what
8    you was there for.  They would tell you, "here is
9    your paperwork.  Drop your empty here.  Here is your
10   load."
11       Q.     So to drop your empty, would you have to
12   get out of your truck?
13       A.     Yes.
14       Q.     And what would you have to physically do
15   to drop your empty?
16       A.     Get out, unplug your air lines.  Go
17   around the other side, screw the landing gear down
18   and pull the fifth wheel pin.
19       Q.     Anything else?
20       A.     And set the brakes on your trailer and
21   pull forward.
22       Q.     Today, let's assume that you didn't have
23   the oxygen issue, but you do have the problems
24   related to your fall and your hip.  Today could you

BRUCE ROGERS,  NOVEMBER 13, 2007

1  drop your empty?

2      A.     I don't believe I could.

3      Q.     Why not?

4      A.     Because I would have to climb in and out

5  of the truck, and I don't believe I can do that, put

6  that much strain on my right leg.

7      Q.     Other than climbing in and out of the

8  truck, would there be anything else that would

9  prevent you from dropping an empty today excluding

10  the oxygen issue?

11      A.     I don't believe so.  That's all you do

12  is -- if you do it right, you should just pull it

13  out.

14      Q.     Now let's include the oxygen issue.

15  Would you agree with me that today you could not

16  drop an empty even if you did not have the hip

17  problem because of the oxygen issue, right?

18      A.     Could I drop it?

19      Q.     Could you drop a load today?  Let's -- I

20  want to give you a hypothetical.  If you did not

21  have the hip problem today, could you drop an empty?

22      A.     Yes.

23      Q.     Even with the oxygen issue?

24      A.     Yes.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.      So you could climb in and out of the cab
2  of the truck even with the oxygen issue?
3      A.      There would be -- you said excluding the
4  hip injury, right?
5      Q.      Excluding the hip injury.
6      A.      Sure.  You really wouldn't have to take
7  the oxygen out.  You can get different sizes of
8  hoses for your -- this at home I have two hoses that
9  I use for my concentrator where I live, and one of
10  them goes through and hangs, and the other one is
11  hooked up.  It's a 25-foot lead.  It let's me go to
12  the restroom, my office, my kitchen, living room,
13  and then unplug that and hook the other one, and it
14  lets me go into my bedroom and take a shower, do
15  whatever.
16      Q.      When you're sitting in the seat, the
17  driver's seat of the tractor, how high up are you
18  from the ground in your typical Swift van?
19      A.      I don't know.  I'm guessing at --
20      Q.      I don't want you to guess on anything.  I
21  want your best estimate if you have one.
22      A.      Head level.
23      Q.      Your butt, how high above the ground is
24  your butt as you sit in the driver's seat for the

1    track or pulling the van?

2        A.    Six feet.

3        Q.    So it's your testimony here today that

4    you believe that you could climb up six feet and get

5    into that seat with the oxygen issues if you didn't

6    have the hip problem?

7        A.    Yes.

8        Q.    Have you tried that?

9        A.    No.

10       Q.    Obviously the hip problem would prevent

11   you anyway so there is no point in trying.

12       A.    Unless I want to risk further injury.

13       Q.    Now, when you're driving, is there

14   anything about the hip that would cause you

15   problems?  Strike that.

16            Let's assume you're in the tractor

17   trailer.  Is there anything about your hip that

18   would cause you difficulty in driving the tractor

19   trailer?

20       A.    No.

21       Q.    Do you have problems sitting for long

22   periods of time?

23       A.    No.

24       Q.    Would you agree with me that there are

1  jobs where you would work a cash register or other

2  customer service type jobs and you could perform

3  from a seated position?

4      A.    I don't believe that I'm trained, you

5  know in -- have the capability to do that type of

6  job.  I've never tried it, never been associated

7  with it.  I wouldn't have any idea where to start on

8  something like that.

9      Q.    Let's put aside the training issue, but

10  just from a physical standpoint you could sit for

11  six or eight hours a day, correct?

12      A.    I could probably -- I'm -- I never tried

13  to sit for that length of time.

14      Q.    You can -- you know basic math, right?

15      A.    Yes.

16      Q.    So you could give change and work a cash

17  register if you were trained on it, correct?

18      A.    Yes.

19      Q.    So with the right training would you

20  agree with me that in your opinion you could

21  probably find some type of gainful employment?

22      A.    What would be gainful employment?

23      Q.    Working at a cash register and something

24  where you could sit while you did your job?

BRUCE ROGERS,  NOVEMBER 13, 2007

1    A.    I don't believe I would consider

2 something like that because I'm not -- I've never

3 been associated with anything like that.  I just

4 like to be -- I like traveling.  I like new things.

5 I don't like -- if I was going to be like a parking

6 lot attendant, you know, that you just sat in there

7 and take tickets?

8    Q.    Right.

9    A.    I don't believe I could do that.

10    Q.    Why is that?

11    A.    Well, because number one, I would be

12 pretty cold.

13    Q.    All right.  What if you were doing it in

14 New Mexico?

15    A.    No, it wouldn't matter.  I don't think I

16 would sit in something that small for that length of

17 time.  It's just not -- there isn't variation in it

18 to keep me active anyway.

19    Q.    Have you ever been diagnosed with

20 claustrophobia or anything regarding small spaces?

21    A.    Not that I know of.

22    Q.    Is it your belief that you have such a

23 condition that you prevents you from sitting in a

24 small space for a long period of time?

BRUCE ROGERS,  NOVEMBER 13, 2007

1    A.    You mean smaller than a truck cab?

2    Q.    Correct.

3    A.    I don't know whether I would be or not,

4  but I just -- I don't feel trapped in there.  If you

5  want to stop you can stop.  You can get out and

6  stretch your legs and go to the rest area.  You can

7  do pretty much whatever you want to do.

8    Q.    How do you currently get around?  Do you

9  have a walker, a wheelchair, cane?  Do you walk

10  without assistance, what?

11    A.    I walk without assistance.

12    Q.    How far can you walk before you have to

13  sit down on an average day?

14    A.    Generally not a matter of sitting.  My

15  lower back hurts.  I have to lean against something

16  or I can stand leaning on something.  One of the

17  things I had to do at the therapy was stand for 30

18  minutes.

19    Q.    All right.  Was it difficult to do?

20    A.    I couldn't do it without leaning on

21  something.  He said, "if you want to lean on

22  something you can" so I did.

23    Q.    So after you stand for a significant

24  length of time, your lower back starts to hurt,

BRUCE ROGERS,  NOVEMBER 13, 2007

1    correct?

2         A.    Mm-hmm.

3         Q.    Is that a yes?

4         A.    Yes.

5         Q.    And the way that you would gain relief

6    from that lower back pain is to lean on something,

7    correct?

8         A.    Yes.

9         Q.    If you sit down, that doesn't give you

10   relief for your lower back?

11        A.    It does also.

12        Q.    It does also?

13        A.    Yes.

14        Q.    So can you go and do your grocery

15   shopping?

16        A.    Briefly.  I'm a man.  I -- I know what I

17   want when I go in there.  I don't spend hours.  I go

18   in and get -- if I want bread and ice cream and

19   lunchmeat, I go in there and get bread, ice cream,

20   and lunchmeat and I'm out of there.

21        Q.    Get a normal shopping cart?

22        A.    Yes.

23        Q.    You push the shopping cart?

24        A.    I leaned on it.  Sometimes I take a small

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1   oxygen bottle with me and put it in the little frame
 2   where they put their kids.
 3        Q.    All right, and do you do all of your own
 4   shopping?
 5        A.    98%.
 6        Q.    Who does the other 2%?
 7        A.    Somebody I can con into it.
 8        Q.    All right.  Can you drive your car?
 9        A.    Yes.
10        Q.    Can you drive your car to the shopping
11   center?
12        A.    Yes.
13        Q.    There was a period of time when you had
14   to use a wheelchair?
15        A.    In the hospital.
16        Q.    Once you were out of the hospital, did
17   you no longer need a wheelchair?
18        A.    I needed one yesterday.
19        Q.    What was that for?
20        A.    To go five miles from the airplane to
21   the -- out of the terminal at the airport.
22        Q.    So when -- let me back up here.
23              In New Mexico when you went to the
24   airport, were you able to walk from the curb outside
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1  of the airport to the plane?

2      A.    I did.

3      Q.    And did you have problems?

4      A.    You could do it in -- I'm guessing.

5      Q.    Don't guess on anything.  Give me

6  estimates.

7      A.    I estimate you could do it in 15 minutes.

8  It took me the better part of 45 minutes to -- well,

9  because I go -- I have two bags and this, and I have

10 to go a ways, stop, rest, go for a ways, stop, rest.

11     Q.    Did your bags have wheels on them?

12     A.    This one does (indicating).

13     Q.    All right, and so the one with the

14 oxygenator?

15     A.    It has it on it.

16     Q.    Then the other bag had your clothes and

17 things like that?

18     A.    This one, I carry that one, and it

19 probably weighs 20 pounds.  Then my shaving gear and

20 stuff that I brought.

21     Q.    All right.  So what kind of distance do

22 you think it was from the curb to the airplane in

23 New Mexico?

24     A.    500, 600 feet.

BRUCE ROGERS,  NOVEMBER 13, 2007

```
1        Q.    And how did you feel when you finally got
2   to the airplane?
3        A.    Good.
4        Q.    Did your lower back hurt?
5        A.    Yes.
6        Q.    On a one-to-ten scale can you give me a
7   number, ten being the most extreme pain you can
8   imagine?
9        A.    Seven.
10       Q.    Did the pain then subside once you were
11  sitting on the airplane for a while?
12       A.    Yes.
13       Q.    How long did it take for the pain to go
14  away?
15       A.    About three or four minutes.
16       Q.    Once you got to O'Hare you had to get
17  from the plane out to the curb to your
18  transportation, correct?
19       A.    About five miles, yes.
20       Q.    And did they meet you with a wheelchair
21  at the plane?
22       A.    No.  I told the attendant, I said, "we
23  are not doing this over here.  I left out of here on
24  a walker, and it took me three hours to get from
```

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1   curbside over to where I was supposed to catch the
 2   airplane and most of it was waiting on somebody to
 3   help me."
 4        Q.    This is some prior trip?
 5        A.    Well, when I got out of the hospital
 6   here.
 7        Q.    So at O'Hare they pulled up a wheelchair
 8   for you?
 9        A.    Yes, I had somebody take me because we
10   just barely made the flight and it's a long ways.
11        Q.    You're talking about the prior time you
12   flew?
13        A.    Well, it's the same when I came back this
14   time.  It was the same.  I imagine it to be the same
15   when I got there, and I -- I needed somebody to help
16   me with my bags, then I needed a wheelchair.
17        Q.    All right.  I want to focus on your
18   eyesight at the time of the accident.  Did you wear
19   glasses or contacts?
20        A.    No.
21        Q.    Do you currently wear glasses or
22   contacts?
23        A.    To read.
24        Q.    Do you know what your vision is?
```

BRUCE ROGERS, NOVEMBER 13, 2007

1      A.      No.

2      Q.      When is the last time you went to an eye

3  doctor?

4      A.      About a month.

5      Q.      Did they check your eyes?

6      A.      Yes.

7      Q.      What did they tell you about your eyes?

8      A.      I need glasses.

9      Q.      For reading only?

10      A.      No.  He said I need glasses for my left

11  eye.

12      Q.      What was wrong with your left eye, far

13  sighted or nearsighted?

14      A.      No.  He said under the VA evaluation for

15  it, he said, "your left eye will qualify you for

16  corrective surgery.  Your right eye will disqualify

17  you for -- you have -- together the two have to have

18  a diminishing effect on you.  I mean, you can't see

19  or something," I don't know.

20      Q.      It looks like you get $500 a month from

21  Social Security as supplemental security income.

22  Does that sound right?

23      A.      No.

24      Q.      I'm just looking at Page 14 of Swift.

BRUCE ROGERS,  NOVEMBER 13, 2007

1    What do you get from Social Security?  Does that

2    make any sense?

3        A.    One thing that doesn't make no sense is

4    Sandra King on it.

5        Q.    So that's the wrong person.  So do you

6    get Social Security benefits on it?

7        A.    Yes.

8        Q.    What do they give you?

9        A.    Currently $949.

10        Q.    Were you declared disabled by the Social

11    Security Administration?

12        A.    I don't know.

13        Q.    Are you getting early retirement

14    benefits?  Is that what the $949 is?

15        A.    No.  I'm getting -- I took the records

16    that I received from the physical therapist, and the

17    records from the -- my company terminating me for

18    unable to perform my job to the Social Security

19    office, applied for disability benefits, and they

20    sent me things saying I had been approved for $391 a

21    month.

22        Q.    And did you see any Social Security

23    doctors?

24        A.    No.

BRUCE ROGERS,  NOVEMBER 13, 2007

1       Q.      Did you see any Social Security

2   vocational rehabilitation people that evaluated what

3   your job abilities are?

4       A.      I don't know whether I have or not.  I

5   talked to one lady in there that I don't know

6   whether she was -- what she did.

7       Q.      What kinds of questions was she asking

8   you?

9       A.      "Can you do this, can you do that."

10      Q.      All right.

11      A.      "Are you able to do this," or --

12      Q.      Did she write up a report as far as you

13   know?

14      A.      Not to my knowledge.  I don't remember.

15   She said it was a screening or something.

16      Q.      All right.  So the date of the accident

17   what kind of shoes were you wearing?

18      A.      Same ones I got on now, except not the

19   same shoes.

20      Q.      So you're wearing -- what's the name of

21   these, moccasins?

22      A.      Yes.

23      Q.      They have a rubber sole, correct?

24      A.      Yes.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.      And they have no heel, correct?

2      A.      No.

3      Q.      Just a flat bottom to it?

4      A.      Yes.

5      Q.      You had come from the -- the depot, what

6  do you call it?

7      A.      I believe that particular load came out

8  of Texas.

9      Q.      Where in Texas?

10     A.      I keep Ludlow, I believe, I'm not sure.

11     Q.      And you were headed to --

12             (WHEREUPON, a certain document was

13             marked Roger Deposition Exhibit No.

14             2, for identification, as of

15             11-13-07.)

16  BY MR. POTTER:

17     Q.      Two, does this look like you were headed

18  to here or is this the wrong building?  This may be

19  across the street (indicating).

20     A.      I don't know what that is.  Doesn't say

21  nothing to me that I would --

22     Q.      Were you headed to Precision?

23     A.      Yes.

24     Q.      What -- do you know the full name of the

BRUCE ROGERS,  NOVEMBER 13, 2007

1    company?

2        A.    Precision Tools or Laboratories, I

3    believe.

4        Q.    Do you know what you were hauling?

5        A.    Not sure, but I was told that it was some

6    sort of a chemical that they use to clean the

7    underneath of vehicles with.

8        Q.    Was that then a hazardous material?

9        A.    I don't believe so.  It could have been.

10       Q.    It sounds like it was some kind of

11   solvent.

12       A.    It was dry material.  It was something

13   they used.  I believe he told me it was in a spray

14   of some sort they use to spray under vehicles to

15   clean the salt off or something like that.

16                   (WHEREUPON, a certain document was

17                   marked Roger Deposition Exhibit No.

18                   3, for identification, as of

19                   11-13-07.)

20   BY MR. POTTER:

21       Q.    We have marked as Exhibit 3, this is a

22   southeast view of the rear of 953 through 977

23   property.  Does that look familiar to you?

24       A.    Possibly.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.    I was looking for your complaint.  Do you
2  know the address you were going to?
3      A.    Not off the top of my head.
4      MR. POTTER:  Do you know the address?
5      MR. HULL:  Yes, I think it was the 959
6  building.  Yes, 959, that was Precision.  They might
7  have been 959 and 966 or something like that.
8      MR. POTTER:  They had two suites.
9      MR. HULL:  959 was the first door I know
10  coming in from the street.
11  BY THE WITNESS:
12      A.    The thing that I was looking for on this
13  is for identification in this area someplace from
14  the street like a 9 or 6 or 4 or something like that
15  to identify, like 900 or 800.
16  BY MR. POTTER:
17      Q.    Were you hauling a van that day?
18      A.    Yes.
19      Q.    Had you been to the location before?
20      A.    No.
21      Q.    What was the weather like that day?
22      A.    Sunny.
23      Q.    Approximately what time did you arrive at
24  the place where the accident occurred?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.      Around 1:00 I believe.

2      Q.      Is that 1:00 p.m.?

3      A.      Yes.

4      Q.      And did you pull into a parking lot and

5  park your truck and get out and try to figure out

6  where you needed to go?

7      A.      No.

8      Q.      What did you do when you first arrived?

9      A.      I looked at the building and markers, and

10  it indicated to me that it could be one of these

11  areas, and I didn't want to pull in there and have

12  to pull back out because of the narrowness of the

13  turn.  So I just pulled my vehicle off to the side

14  and put my forward flashers on, and got my bill of

15  lading and went over to check to see if the address

16  was correct.

17      Q.      Where did you go to check?

18      A.      The -- over to the door, the closest door

19  to the street.

20      Q.      And so was this a door in the rear by

21  some loading base or was it --

22      A.      It would be like a door like this, only

23  it would be over here someplace, I would guess.

24      Q.      I don't want you to guess on anything.

54

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.    Well, I don't know.  I'm just saying I

2   don't know because it doesn't show me something that

3   I recognize.

4      Q.    Looking at --

5      A.    This could be -- I recognize this,

6   something like that or that, you know.  Those were

7   there (indicating).

8      Q.    All right.  So looking at Exhibit 3, the

9   darker -- it looks like a green door on the right

10  side of the photograph.  That was the door similar

11  to what you were headed toward?

12     A.    Similar, yes.

13     Q.    Why don't I do this?  Here is my -- here

14  is black and white copies of all my photos and here

15  is color copies of most of those.  What I want you

16  to do is go through these, and if you can, if there

17  is one, show me a photograph that would show me

18  where you parked your tractor trailer that

19  afternoon.  Just take your time.  I have to use the

20  restroom, then we can go off the record.

21     MR. HULL:  Yes.

22  BY MR. POTTER:

23     Q.    Let me ask -- you pulled out a couple

24  photos, one where you parked your truck, and two, if

BRUCE ROGERS,  NOVEMBER 13, 2007

1    you see the photo where the door is that you headed

2    towards, and let me ask you this.  Did your accident

3    occur between the time when you parked your truck

4    and before you arrived at that door or did you get

5    to that door?

6        A.    I got to the door that had a note on it

7    that said, "drivers, use the other door," with an

8    arrow on it, and I was enroute when the accident

9    occurred.

10       Q.    Understood.  So if you could pull out, if

11   there is photos that show where your tractor trailer

12   was parked, the door that you first walked to, and

13   the door that you were walking to at the time of

14   your fall, if they're in there.

15                   (WHEREUPON, discussion was had off

16                   the record.)

17                   (WHEREUPON, a certain document was

18                   marked Rogers Group Exhibit Nos. 4-5

19                   for identification, as of

20                   11-13-07.).

21   BY MR. POTTER:

22       Q.    Looking at Exhibit 5, what we have marked

23   here today, in the righthand portion of this photo

24   you see a door.  Is that what you believe to be the

BRUCE ROGERS,  NOVEMBER 13, 2007

1  959 back entrance?

2      A.     That is the entrance I went to.

3      Q.     All right.  I'm going to ask you to draw

4  a circle around that entrance and draw your initials

5  next to it with a one.

6      MR. POTTER:  Please let the record reflect

7  that the deponent drew a circle around a door in

8  Exhibit 5 with his initials next to it and a number

9  1.

10 BY MR. POTTER:

11     Q.     Within that circle, is that the door that

12 you were headed to right after you parked your

13 truck?

14     A.     Yes.

15     Q.     Did you have anything in your hands at

16 that time?

17     A.     I believe I had my bill of lading in my

18 hand with the address on it.

19     Q.     Would that be on a clipboard?

20     A.     No.

21     Q.     Would that just be a piece of paper?

22     A.     Piece of paper.

23     Q.     You're indicating your left hand?

24     A.     Yes.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.      Are you left or right handed?

2      A.      Right handed.

3      Q.      And did you have anything else in your

4 hand?

5      A.      No.

6      Q.      Were you, as you walked toward this door,

7 were you looking at the door?

8      A.      Yes.

9      Q.      Was there anything unusual that happened

10 that caught your attention as you walked to the

11 door?

12      A.      No, other than that piece of paper on it.

13 I couldn't go -- going toward it I didn't see what

14 it said until I got up close to it.

15      Q.      So you observed in the distance a piece

16 of paper on the door that you circled?

17      A.      Mainly I was looking for the number.

18      Q.      All right, and when you got up close to

19 the door, what did the piece of paper say?

20      A.      "Drivers use other door."

21      Q.      Did it have an arrow?

22      A.      Yes.

23      Q.      If you were facing the door, it would

24 have been an arrow to your left?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.      Yes.

2      Q.      All right.  As you approached this door,

3   did you familiarize yourself with your surroundings?

4      A.      Always.

5      Q.      So in addition to looking where you were

6   walking to, you were also paying attention to the

7   ground in front of you, correct?

8      A.      Yes.

9      Q.      Was that ground wet or dry?

10      A.      Going toward the door?

11      Q.      Yes.

12      A.      Dry.

13      Q.      And did you see anything unusual about

14   that ground as you walked to the door?

15      A.      No, other than it was cement.

16      Q.      All right, and as you were walking toward

17   the door, did you see the white PVC tube headed

18   toward the drain as depicted in the center of the

19   photo?

20      A.      Maybe out of the corner of my eye, but my

21   focus was on going to the door, seeing what it said.

22      Q.      All right, and what was the temperature?

23   You said it was warm and sunny or just warm?

24      A.      It was warm and sunny.  It was probably

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1  maybe upper 70s.
 2      Q.    Is there any reason why you parked your
 3  truck remotely as opposed to pulling it back into
 4  one of these loading docks?
 5      A.    Lazy.
 6      Q.    You're saying you were lazy?
 7      A.    Yes.
 8      Q.    And how would that indicate that you were
 9  lazy?
10      A.    I don't want to pull it in there and pull
11  it out of there and find out I'm in the wrong place
12  and waste all of that for no reason.
13      Q.    So this loading dock that's in the middle
14  of the photograph, but if you were to walk up to it
15  goes into the ground, correct?
16      A.    Yes.
17      Q.    So that the rear of your van would be
18  level with the entrance to the loading dock,
19  correct?
20      A.    Yes.
21      Q.    Then you could just use a -- somebody
22  could just use a pallet jack to unload the truck,
23  correct?
24      A.    Yes.
```

1    Q.    Now would it have been your obligation to

2  unload the truck once you had backed it into the

3  loading dock?

4    A.    No.

5    Q.    It would have been the Precision people's

6  obligation to unload?

7    A.    Or a lumper service.

8    Q.    What is a lumper service?

9    A.    A lumper is engaged by different

10  companies here and there that have a contract with

11  the company to load and unload trucks for them.

12    Q.    Is that in your contract or anywhere in

13  this writing that you're not unloading these trucks?

14    A.    Verbally.  When I was hired I told them I

15  don't do unloading.

16    Q.    You don't do unloading at any of your

17  destinations?

18    A.    Two in two years.

19    Q.    Okay.  That would have been the two years

20  prior to the accident?

21    A.    Yes.

22    Q.    So you read the sign.  You realized, "I

23  gotta go to another door," right?

24    A.    Yes.

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1       Q.    Did you knock on that door with the paper
 2  on it?
 3       A.    No.
 4       Q.    Did you see anyone out in the parking lot
 5  when you arrived?
 6       A.    No.
 7       Q.    Were there any other tractor trailers in
 8  the parking lot when you arrived?
 9       A.    No.
10       Q.    Were there any other vehicles parked --
11  that you saw parked in the parking lot when you
12  arrived?
13       A.    I don't remember.  There could have been
14  some in that area over here (indicating).  If they
15  were, they were small vehicles, not tractor
16  trailers.
17       Q.    You couldn't walk parallel to the
18  building to get to that next door because of the
19  loading dock, right?
20       A.    Right.
21       Q.    You had to go around the loading dock
22  because the loading dock goes into the ground.  It
23  has a metal handrail that prevents you from walking
24  directly parallel to the building?
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1        A.     And falling into the hole.

2        Q.     All right.  In fact, you did start to

3   walk around the loading dock, correct?

4        A.     Correct.

5        Q.     As you were walking up to the point where

6   you fell, were you distracted by anything?

7        A.     No.

8        Q.     Did anything unusual happen that caught

9   your eye or drew your attention away from where you

10  were walking?

11       A.     No.

12       Q.     Did you hear any loud noises?

13       A.     No.

14       Q.     Did you see anything that caught your

15  attention?

16       A.     No.  I just noticed that it was wet up

17  there in that area.

18       Q.     So as you were walking around the loading

19  dock, you see it's wet up ahead, correct?

20       A.     Yes.

21       Q.     And would you agree with me that you

22  could have, if you so chose, walked around the area

23  that was wet?

24       A.     Well, I wouldn't because there is no

BRUCE ROGERS,  NOVEMBER 13, 2007

1   reason to.  It's not very far from here to there.

2        Q.    I understand and --

3        A.    Water is water.

4        Q.    I understand, but if you wanted to you

5   could have walked around the wet spot?

6        A.    Correct, I could, correct.

7        Q.    Point in fact, you chose to walk through

8   the wet spot, correct?

9        A.    Yes.

10       Q.    That was the shortest distance, correct?

11       A.    Yes.

12       Q.    That's why you chose to walk through the

13   wet spot?

14       A.    Correct.

15       Q.    When you looked and saw that it was wet,

16   did you then examine the wet spot a little closer?

17       A.    No.

18       Q.    At the time that you started to fall,

19   where were you looking?

20       A.    Probably in front of me.

21       Q.    All right.  How far were you from the wet

22   spot before -- strike that.

23            How far were you from the wet spot when

24   you first saw it?

BRUCE ROGERS, NOVEMBER 13, 2007

1       A.      Around 20 feet.

2       Q.      Now, as you walked through the wet spot,

3   how many steps into the wet spot did you get before

4   you started to fall?

5       A.      First step.

6       Q.      Can you describe for me the size of the

7   wet spot?

8       A.      Roughly two foot across, you know, to

9   step over.  Probably three feet from edge to edge.

10      Q.      So it was probably two feet by three

11  feet?

12      A.      No.  It was two to three feet from this

13  edge to that edge of it.

14      Q.      All right.  So taking the dimensions

15  going from --

16      A.      This one here would be I don't know how

17  many feet.  It was just out there, probably 15, 20

18  feet.

19      Q.      So it was approximately 2 to 3 feet by

20  approximately 15 feet?

21      A.      Yes.

22      Q.      Before you fell, did you look at the

23  white PVC tube?

24      A.      I noticed it was there.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.    Did -- before you fell did you notice
2  whether it was broken in any way?
3      A.    I didn't see any other wet spots.
4      Q.    In the area of the wet pavement, would
5  you agree with me that there was a drain?
6      A.    No, I wouldn't.  I didn't see a drain.
7      Q.    Did the water flow toward the drain?
8      A.    I don't know.
9      Q.    Do you know when -- you drove in from
10 Texas, right?
11     A.    Yes.
12     Q.    That day, right?
13     A.    No.  Well, I drove in from Texas.  I
14 don't remember how long it took me to drive.
15     Q.    Did you have a place that you stopped to
16 rest or --
17     A.    You stop wherever you want to.  It's
18 driver's prerogative.  You have so many hours you
19 can drive by law, but usually, when you get -- pick
20 up a load, it tells you when it's due.  If I have
21 five days to go from Nex Mexico to Pennsylvania, if
22 I'm taking my girlfriend with me, I take off then,
23 and then when I get there I go to a motel because I
24 can reset my time.  It will take me like three days

1  to get over there, but then I'll have a day and a

2  half that I can use to reset my time so I can make

3  more money.

4      Q.    All right.  Did you stop somewhere

5  between Mexico and where the accident occurred?

6      A.    I don't remember.

7      Q.    Do you know if it had rained recently in

8  the location where the accident occurred?

9      A.    I don't believe it did because it was all

10 dry except for that one area.

11     Q.    For the tube from which the water was

12 coming out of, do you know where that water came

13 from?

14     A.    No.

15     Q.    But it was your impression that water

16 didn't come from rain runoff from the roof or

17 anything like that because everything else was dry,

18 right?

19     A.    It comes from rain, I agree with, because

20 all of it would have been wet.

21     Q.    All right.

22     MR. TEFFT:  I'm sorry, could you read that

23 back?

24              (WHEREUPON, the record was read by

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1                     the reporter.)
 2   BY MR. POTTER:
 3       Q.    You're saying it didn't come from rain
 4   otherwise it would all have been wet?
 5       A.    Yes.
 6       MR. POTTER:  Can we mark this as an exhibit
 7   number?
 8                     (WHEREUPON, a certain document was
 9                     marked Potter Exhibit No. 6, for
10                     identification, as of 11-13-07.)
11   BY MR. POTTER:
12       Q.    Looking at what we have marked as Exhibit
13   6, do you see in the foreground of the photograph,
14   the drain?
15       A.    I don't know whether that's a drain or
16   not.  I have seen this type many times and it's a
17   manhole cover.  I didn't see this, no.
18       Q.    So let me ask the question.  You know
19   what I'm going to ask.  Do you remember seeing a
20   manhole cover such as the one depicted in Exhibit 6
21   on the day of your accident?
22       A.    No.
23       Q.    So let's get back to the wet spot.  You
24   stepped into the wet spot with your left or right
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1   foot?

2        A.     I don't remember.

3        Q.     And what happened to your foot when you

4   stepped?

5        A.     I fell and hit the ground.  I fell so

6   fast I hit before my mind even said "you're

7   slipping."

8        Q.     Did your foot slip or did you trip on

9   something?

10       A.     Slipped.

11       Q.     And when it slipped, did your foot go

12   forward or backwards in slipping?

13       A.     Actually I believe it went sideways.

14       Q.     When you say "sideways," was it to your

15   left or right?

16       A.     It would have gone to my left, I believe.

17       Q.     Were you facing -- when you stepped and

18   your foot slipped, were you facing parallel with

19   this building to the left, away from the building,

20   toward the building?  Where were you facing?

21       A.     I would have been facing probably like

22   about 45 degrees right here, because I would have

23   went around it then went across.  When I stepped in

24   it, it was from an angle from that door to here when

BRUCE ROGERS, NOVEMBER 13, 2007

1    I slipped and fell.

2         Q.    So what you're indicating is you were

3    just rounding the corner where the loading dock is,

4    correct?

5         A.    Yes.

6         Q.    And you were on a 45-degree angle away

7    from the building and as you looked at the photo to

8    the left of the building, correct?

9         A.    Yes.

10        Q.    When your foot slipped, what happened to

11   your body?

12        A.    Hit the ground.

13        Q.    Which side of your body hit the ground?

14        A.    My right hip hit the ground because I

15   didn't -- like I said, I hit the ground before I

16   even knew I was slipping.  Step, bam, just that

17   quick.

18        Q.    Did any other part of your body in

19   addition to your right hip hit the ground?

20        A.    At the time when the initial contact?

21        Q.    Yes.

22        A.    I don't believe so.

23        Q.    Was there a second contact with the

24   ground?

70

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.      Probably my right arm.

2      Q.      All right, and did you injure your right

3   arm as a result of the contact?

4      A.      No.  I may have scraped it or something.

5   I don't remember.

6      Q.      When you hit the ground with your right

7   hip, did you hear anything?

8      A.      Yes.

9      Q.      What did you hear?

10     A.      Something like that (indicating).

11     Q.      Do you believe in your mind, in your

12  opinion that was the bone breaking?

13     A.      Yes.

14     Q.      All right.

15     A.      Although I don't believe it was, but in

16  my mind that's what it was.

17     Q.      So what you think it was, it was just you

18  hitting the ground, that's what you heard?

19     A.      No.  I did hear something.  I don't know

20  what it was, whether it was the bone or whether it

21  was my impact.  I don't know.  I heard that sound.

22     Q.      All right, and what happened to you next?

23  Did you lay there?

24     A.      I rolled out of the wet spot and laid

BRUCE ROGERS,  NOVEMBER 13, 2007

1   there, yes.

2         Q.      And how long did you lay there before

3   somebody found you?

4         A.      20 minutes probably.

5         Q.      Were you saying anything?

6         A.      These doors were open and there was, for

7   example, lifts running back and forth in there.   I

8   was waving my arm.   They didn't wave back or

9   nothing.   They just kept right on doing whatever

10  they were doing.

11        Q.      Now, while you were laying there, were

12  you laying in the wet spot?

13        A.      No.   I rolled out of it.

14        Q.      Did you intentionally roll out of it or

15  did you just -- that's the way you fell and you

16  rolled out of it?

17        A.      That's probably just the way I fell.   I

18  rolled out of it.

19        Q.      Was any part of your body wet after you

20  had fallen?

21        A.      My right side was.

22        Q.      Was that -- were you wearing a jacket?

23        A.      No.

24        Q.      Were you wearing jeans?   What were you

1  wearing?

2        A.        Wearing sweat pants probably.

3        Q.        And were you wearing a t-shirt or --

4        A.        T-shirt probably.

5        Q.        Was that water wet?  Was it oil wet?

6  What was the substance as far as you can tell?

7        A.        When I was laying there on the ground I

8  could see kind of a greenish mossy looking

9  underneath the water.

10        Q.        So did you look at the location where

11  your foot slipped or just the general area?

12        A.        No, I looked at it.  I seen the water

13  when I was getting close to it, and from when I was

14  walking.  It had a clarity to it kind of, from the

15  sun.  There was nothing visible as far -- nothing

16  that would alarm you, you know.  I grew up on a

17  ranch.  I know what's dangerous and what ain't.

18        Q.        Was the whole wet spot, did it have a

19  mossy greenish look to it or was it just one area of

20  the wet spot?

21        A.        It looked like maybe the inner two-thirds

22  of it maybe.

23        Q.        When you stepped into the wet spot, did

24  you step into the inner two-thirds of it?

1        A.      On the edge of it, I would guess.

2        Q.      I don't want you to guess anything.  If

3    you don't know, say "I don't know."  Or if you give

4    me your estimate, give me your estimate.

5        A.      The nearer of the two-thirds.

6        Q.      So was your foot, as that slipped, was

7    that foot landing in the two-thirds area or outside

8    of the two-thirds area?

9        A.      Inside.

10       Q.      Was it just barely inside, a portion of

11   it inside?  Can you give me any specifics?

12       A.      No.

13       Q.      Were you in pain as you laid there?

14       A.      Not specifically.  I don't believe I was.

15       Q.      Was there a reason why you didn't get up?

16       A.      Yes, because I didn't know what was

17   wrong.  I tried to move.  That's when I was having

18   problems getting my body to cooperate, so I just

19   decided that I would just wait until -- I didn't

20   have my cell phone with me.  Somebody pulled in that

21   area over here (indicating), and I yelled for him.

22       Q.      So you tried to get up?

23       A.      Yes.

24       Q.      But you couldn't because your body wasn't

BRUCE ROGERS,  NOVEMBER 13, 2007

1    cooperating?

2         A.    Yes.

3         Q.    And ultimately you learned that you

4    fractured your hip, and that's why your body wasn't

5    cooperating, correct?

6         A.    Yes.

7         Q.    Was there anything concealing this wet

8    spot?

9         A.    Just the glare of the sun.  It wasn't

10   glaring off of it enough to bounce into your face

11   but to look at it.  It had a glassy look to it.

12        Q.    So you knew the wet spot was there?

13        A.    Oh, yes.

14        Q.    You knew you were stepping in the wet

15   spot?

16        A.    Yes.

17        Q.    There was no garbage or paper covering

18   the wet spot?

19        A.    No.

20        Q.    You're agreeing with me?

21        A.    Yes.

22        Q.    You knew you were stepping into the wet

23   spot, and you made a conscious decision to step into

24   the wet spot, correct?

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1        A.      Yes.

 2        Q.      Do you know who eventually came up to

 3   you?  Do you know the gentleman's name?

 4        A.      No.

 5        Q.      Or the lady's name?

 6        A.      No.

 7        Q.      Did you say anything to anyone at the

 8   scene as far as how it happened?

 9        A.       I believe the -- well, I believe whoever

10   made the delivery at that time was -- he came over

11   and he said, "what's the matter?"  I said, "I think

12   I broke my hip."  I said, "could you call an

13   ambulance?"  He said, "why don't those guys call?"

14   I said, "I don't know, maybe they're blind."

15        Q.      All right.  Let's look at what we have

16   marked as Group Exhibit No. 4.  The first page is

17   the cover letter from your attorney.  Were you

18   present when Exhibits A through F were taken?

19        A.      No.

20        Q.      Do you know when these photos were taken?

21        A.      No.

22        Q.      Do these -- let me ask you.

23              Look at Exhibit 5.  Does this photograph

24   truly and accurately show how the door and the
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1  loading dock area appeared at the time of your

2  accident?

3       A.    Except for the lighting on it.

4       Q.    How was the lighting different?

5       A.    Just don't appear to be -- this would be

6  closer, but not showing exactly, you know, it's more

7  brighter because of the sunlight.

8       Q.    You're looking at 6 and saying this is

9  more indicative of the sunlight?

10      A.    The appearance of it.

11      Q.    In Exhibit 6, correct?

12      A.    It's not as light.  I mean, it's lighter.

13      Q.    Exhibit 6 is lighter, correct?  Is that

14  what you're saying?

15      A.    Yes.

16      Q.    So this is closer to what the lighting

17  looked like at the time of your accident, Exhibit 6,

18  is that what you're saying?

19      A.    Closer.

20      Q.    All right, but it was even brighter than

21  that, correct?

22      A.    Yes.

23      Q.    So looking at Exhibit 5, you can see a

24  wet spot in the middle of the photo, correct?

BRUCE ROGERS,  NOVEMBER 13, 2007

1       A.      Yes.

2       Q.      Can you tell me is that about the size of

3  the wet spot when you fell?  Was that a different

4  size?

5       A.      I don't know.

6       Q.      Fair enough.  You can see the white PVC

7  pipe coming up alongside of the loading dock,

8  correct?

9       A.      Yes.

10       Q.      Is that in about the same condition it

11  was as the time when you fell?

12       A.      I looked at it.  I didn't examine it.  I

13  mean, I just --

14       Q.      Generally speaking though, this is about

15  how it looked when you fell, correct?  The wet spot

16  may have been bigger or smaller but generally this

17  is how it looked?

18       A.      Generally.

19       Q.      All right, and can you tell me was the

20  wet spot bigger, smaller, or you just don't know?

21       A.      I don't know.

22       Q.      Were there any pallets?  Like if you look

23  at Exhibit 1, did you see the pallet?  Do you

24  remember seeing any pallets like that stand out?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.     No.

2      Q.     You're saying "no, I don't remember"?

3      A.     No, I don't remember.

4      Q.     All right, so do you know who took these

5 photographs, Exhibits A through F in Group 4?

6      A.     No.

7      Q.     All right.  Looking at A through F in

8 Group 4, is there a photograph that shows where your

9 tractor trailer was parked when you fell?

10      A.     I don't see anything if I was going to

11 guess.

12      Q.     I don't want you to guess anything.  When

13 you say -- as soon as you say "I guess," that means

14 that nobody can use it for any purpose because

15 guesses are not allowed at trials, but you can give

16 me estimates.  Those are allowed.  Do you have an

17 estimate, looking at these photographs, where your

18 truck would have been parked?

19      A.     No.

20      Q.     All right.  Now, I showed you the

21 photographs.  Was there a photo that showed where

22 your truck would have been parked?

23      A.     No.

24      Q.     For example, this is just a very broad

1   view leading into this parking area.  Can you tell

2   me was your truck parked on the left side of the

3   photograph, the right side of the photo?

4        A.    Left side.

5        Q.    All right, so let's mark this then.

6                    (WHEREUPON, a certain document was

7                    marked Rogers Deposition Exhibit No.

8                    7, for identification, as of

9                    11-13-07.)

10  BY MR. POTTER:

11       Q.    We have marked that as Exhibit 7.  You're

12  saying that your truck would have been parked on the

13  left side of Exhibit 7, correct?

14       A.    I don't understand what left side you're

15  talking about.

16       Q.    I think the left side would be to you

17  over here, your left looking at the photo.

18       A.    If this is the entrance to the facility,

19  then I would have been parked over --

20       Q.    You're indicating to the left?

21       A.    Yes.

22       Q.    All right, and can you tell me the

23  entrance where you eventually were headed to?  Is

24  that on the left side of exhibit 7 or the right side

BRUCE ROGERS,  NOVEMBER 13, 2007

1  of Exhibit 7?

2      A.    This is a correct -- the facility would

3  have been on the right side.

4      Q.    All right, and can you tell me the

5  distance?  Did I already ask, the distance from your

6  cab that you got out of to the door that you walked

7  up to that had the piece of paper saying use the

8  other door on it, your best estimate?

9      A.    150 feet.

10      Q.    So the ambulance comes, and they take you

11  to the hospital, right?

12      A.    Yes.

13      Q.    Which hospital did they take you to?

14      A.    I don't know.  To me a hospital.

15      Q.    Fair enough.

16      A.    I don't know.

17      Q.    And you were admitted as an inpatient at

18  the hospital, correct?

19      A.    I assume I was.

20      Q.    You stayed there overnight?

21      A.    Yes.

22      Q.    How many days did you stay there?

23      A.    I don't know.  Maybe I was in there --

24  they told me I would be up at 7:00 at night.  They

BRUCE ROGERS,  NOVEMBER 13, 2007

1  told me -- I think they told me I was going to be
2  there for two weeks or something like two.
3       Q.    Were you there for two weeks?
4       A.    I was there -- I don't know when I was
5  discharged.
6       Q.    Did you have surgery at the hospital?
7       A.    I guess I did.  I was pretty much under
8  the influence of their medication.
9       Q.    All right, and at some point you flew
10 back to New Mexico?
11      A.    Yes, after discharge from the hospital.
12      Q.    Did someone come out to Chicago and pick
13 you up?
14      A.    No.  Well, no, they sent me by limousine
15 from the hospital to the airport.  I flew back, and
16 then I had some friends pick me up at the airport.
17      Q.    I saw somewhere in the records, correct
18 me if I'm wrong, I thought that your wife was living
19 with you when you returned back home initially, is
20 that not right?
21      A.    That's not right.
22      Q.    All right.  Did you have anyone to help
23 you when you returned to New Mexico?
24      A.    My girlfriend was living there.

82

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.      All right.  Does she still live with you?

2      A.      No.

3      Q.      Now when you went back to New Mexico, did

4   you go home or did you go to another hospital?

5      A.      Home.

6      Q.      And it looks like there was some people

7   that came in to your home and made sure that certain

8   things were in place to help you get in and out of

9   the tub, bars to use the bathroom, things like that,

10   correct?

11      A.      No.  There was some people that came.  My

12   understanding at this hospital through the therapy

13   and everything, I couldn't leave.  That I had to

14   give a detailed description of my home, and I wasn't

15   allowed to leave the hospital until I could perform

16   anything that I would encounter when I returned

17   home, like I have steps I have to climb up.

18      Q.      How many steps do you have?

19      A.      Three.

20      Q.      So when you were discharged from the

21   hospital in Chicago you were able to climb three

22   steps?

23      A.      Yes, with assistance from my -- I think I

24   had -- at the time I had a walker.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.    All right, so you needed assistance from

2   a walker to climb those three stairs?

3      A.    The walker and the handrail.

4      Q.    At home you have a handrail for those

5   three stairs?

6      A.    Yes.

7      Q.    And you were able to navigate those three

8   stairs?

9      A.    Yes.

10      Q.    Anything else?

11      A.    No.  Before I was ready to be discharged,

12   that lady told me that I had to use a handrail

13   getting in and out of the tub.  I said, "why, I

14   don't have one at home."

15      Q.    You have a shower at home?

16      A.    Yes, but it's still in a tub, but I don't

17   have the bars so what's the point?

18      Q.    You don't need the bars?

19      A.    Well, I've got a -- what do they call it,

20   a bathing stool that you use.

21      Q.    You sit on?

22      A.    It fits in the bathtub.  It has a rail on

23   it to help you get in and out of the tub, to sit on.

24      Q.    You live in a trailer, correct?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.     Yes.

2      Q.     Is there a name to the trailer, you know,

3 you hear the term like "double wide" or what type of

4 trailer?

5      A.     Single wide.

6      Q.     And can you give me an idea as to how big

7 it is?

8      A.     40 -- 16 by 65.

9      Q.     And it has a restroom?

10      A.     Two.

11      Q.     Two restrooms, and you're able to do all

12 of the daily chores around the house such as

13 cleaning, cooking, and things like that, correct?

14      A.     Well, I don't do much cleaning.  I do

15 some cooking but not much.

16      Q.     So who does the cleaning?

17      A.     Well, usually I can talk my girlfriend

18 into doing it once in awhile.

19      Q.     All right.  So your girlfriend just moved

20 in with you temporarily to help you until you were

21 able to?

22      A.     No.  She was there for quite a while, but

23 then she decided she had bigger things to do I

24 guess.

BRUCE ROGERS,  NOVEMBER 13, 2007

1        Q.    All right.  So who currently does your
2    cleaning around the house?
3        A.    Currently she's doing it.  She's there
4    while I'm back here.
5        Q.    All right, and when you go back home, she
6    will come in periodically and help you?
7        A.    Maybe.
8        Q.    So if nobody does the cleaning it just
9    doesn't get done is what you're saying?
10       A.    Or until I get tired of looking at it.
11       Q.    Who does your laundry?
12       A.    I do.
13       Q.    Do you have to bring it somewhere?
14       A.    From the bedroom to my washer.
15       Q.    All right, you have a little stackable
16   washer and --
17       A.    No.  This is a 16 foot-wide trailer.
18   It's bigger than that room wide so I get around.  To
19   me it's roomy.
20       Q.    So you have a washer and dryer in the
21   unit, and you can do your own laundry?
22       A.    Yes.
23       Q.    And you primarily cook your meals for
24   yourself?

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1      A.     Sometimes, yes.
 2      Q.     Or else your girlfriend will cook for
 3 you?
 4      A.     Or I eat out.
 5      Q.     Are there issues that you have with
 6 cooking?
 7      A.     Not besides being lazy.
 8      Q.     Is there a yard that you need to maintain
 9 or is that somebody else does?
10      A.     Well, that's -- I live on two-and-a-half
11 acres.  I got two donkeys that do my lawnmowing for
12 me.
13      Q.     What's a donkey?
14      A.     A donkey is a little animal that's about
15 that tall (indicating).  They're miniatures.
16      Q.     So you own miniature donkeys?
17      A.     Yes, two of them.
18      Q.     What are their names?
19      A.     Black Jack and Jimmy is the other one.
20 They're like puppies.
21      Q.     Are you able to -- you feed them hay or
22 oats?
23      A.     Both.
24      Q.     And you're able to get the hay without
```

1   problems?

2        A.    It's not a problem because I take my

3   pickup and go to the place where I bought them, and

4   he's got a -- he owns -- there's a corporation, so

5   it's a pretty large scale outfit.  I buy hay.  I go

6   over there and he -- I give him money.  He puts it

7   on my pickup.  I tow it, go home and pull it to the

8   gate into the yard and go get my tractor and lasso

9   it with a rope and tie it to my tractor and drive

10  up.

11       Q.    What kind of tractor?

12       A.    Ford.

13       Q.    You're talking about a tractor trailer?

14       A.    No, a farm tractor.

15       Q.    How high do you sit up in the farm

16  tractor?

17       A.    Steps is about that high, about that high

18  (indicating).

19       Q.    So what's the difference between getting

20  into the tractor trailer that you use to drive and

21  getting into your farm tractor?

22       A.    The steps.

23       Q.    Is it half the distance, three quarters

24  of the distance?

BRUCE ROGERS,  NOVEMBER 13, 2007

1        A.      Larger distance.

2        Q.      Can you quantify that at all, the

3   distance?

4        A.      No.  It's farther, more of a stretch.

5        Q.      Do you have any problems getting into the

6   farm tractor?

7        A.      I don't get into it.  I just step on it.

8        Q.      Do you have any problem stepping on it?

9        A.      It would be like getting on a bicycle

10  more or less.  It's the same.

11       Q.      Do you have any problems stepping onto

12  the tractor?

13       A.      Not as long as I get on it with my left

14  foot.

15       Q.      So you have to lead with your left foot?

16       A.      Yes, and get on with my left foot.

17       Q.      Understood.  You can do that without

18  assistance?

19       A.      Yes.

20       Q.      Now, you had some physical therapy while

21  you were in New Mexico?

22       A.      Yes.  Well, I don't remember how long it

23  was, four months, five months.

24       Q.      Did you go somewhere or did they come to

1   you?

2        A.    No.  Well, initially they had someone

3   come to the house, and then she had me to walk with

4   my walker out to my gate.  I got a gate that I open

5   and close, and she had me walk out there with my

6   walker and back, and she says that's all I need to

7   do.  She says, "I'll set you up with therapy with

8   some provider here in the town."

9        Q.    All right.  So you did four or five

10  months of physical therapy?

11       A.    Yes.

12       Q.    Did that help you?

13       A.    Well, that was a continuation of the

14  therapy that I received here in the hospital.

15       Q.    And it helped, right?

16       A.    Yes.

17       Q.    You got a little bit better, right?

18       A.    Yes.

19       Q.    So I want to talk about what you can do

20  today, what you cannot do today compared to before

21  the accident.  So are there certain activities that

22  you used to do before the accident that you don't do

23  today because of the accident?

24       A.    Yes.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.     What are they?

2      A.     I can't like climb up and down a ladder

3   or climb up on a building to do repairs.  Stuff like

4   that that I normally do myself, now I have to hire

5   somebody to do for me.  Moving heavy objects.

6      Q.     All right, and --

7      A.     If I have to go any distance I need to

8   drive.  I can't walk, you know, very far.

9      Q.     So how far can you walk?

10      A.     150 feet.

11      Q.     Have you tried to go up on a ladder?

12      A.     Yes.

13      Q.     What happened when you tried to go up?

14      A.     The first step was great.  That was it.

15      Q.     All right.

16      A.     Second step I decided wasn't a very good

17   idea.

18      Q.     All right, so you got off the ladder?

19      A.     Yes.

20      Q.     Without incident?

21      A.     Yes.

22      Q.     Have you tried to go up on a roof?

23      A.     No.  Well, all of my roofs are higher

24   than -- well, you can't step on them so you need a

1   ladder to get up on them.

2                    (WHEREUPON, a certain document was

3                    marked Rogers Exhibit No. 8 for

4                    identification, as of 11-13-07.)

5   BY MR. POTTER:

6        Q.    Is there anything else that you used to

7   do before the accident that you don't do now because

8   of the accident?

9        A.    You mean like enjoy a lot of lively

10  entertainment?

11       Q.    Sure, social, workwise, anything?

12       A.    Both.

13       Q.    So --

14       A.    I can't drive anymore so that limits my

15  traveling and my working capacity.  I got dropped

16  from $3,000 a week down to -- or $3,000 a month down

17  to not even a thousand dollars a month.

18       Q.    When you say you can't drive, you're

19  talking about over the road tractor trailer, hauling

20  a van?

21       A.    Yes, and meeting their qualifications

22  for -- they have DOT requirements that have to be

23  met in order to qualify for that kind of work.

24       Q.    And what is it that you said, getting up

1   into the cab is the problem?

2       A.      Getting up into the cab or if I

3   encountered something that was unusual, like if I

4   had to lift or lower a trailer that was loaded, I

5   don't believe I could do that.  Even with the gear

6   reduction in the crank, I couldn't do it because of

7   the movement, you know, cranking it.

8       Q.      So let's talk about socially.  Has your

9   social life changed as a result of the accident?

10      A.      Well, I'm limited to what I can do.  If I

11  want to go bowling, that's not in --

12      Q.      Did you used to bowl before the accident?

13      A.      Yes.

14      Q.      How often?

15      A.      Probably four or five times a year.

16      Q.      And have you tried to go bowling since

17  this accident?

18      A.      No.

19      Q.      Why not?

20      A.      Because I know that I couldn't.

21      Q.      What other types of social activities

22  have changed as a result of the accident?

23      A.      Well, I don't go out and go dancing or

24  night clubbing or --

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1        Q.     Did you used to go dancing before this
 2   accident?
 3        A.     Yes, quite a bit.
 4        Q.     How often?
 5        A.     Couple times a month.
 6        Q.     Would you go night clubbing before this
 7   accident?
 8        A.     Only for the dancing.  I don't drink,
 9   so --
10        Q.     Since the accident have you tried to go
11   night clubbing or dancing?
12        A.     No.
13        Q.     Why not?
14        A.     Because I know I can't.
15        Q.     Would you agree with me that your
16   situation with your oxygen would prevent you from
17   dancing at this point?
18        A.     Currently?
19        Q.     Yes.
20        A.     Yes, possibly.  They have -- I have a
21   small one that I could carry that's good for two or
22   three hours that you can put on your -- like a
23   woman's purse kind of thing that contains the bag
24   and --
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.      Even with the oxygen though, when you're
2  dancing, that would put a strain on your breathing,
3  correct?
4      A.      More than likely, yes.
5      Q.      You would agree with me it would probably
6  be difficult to dance given your COPD?
7      A.      Currently, yes.
8      Q.      Anything else that you used to do
9  socially that you don't do now because of the
10 accident?
11     A.      Working mostly.  I was able to generate
12 the working capital that I have grown to enjoy over
13 the years.
14     Q.      Understood and acknowledge that.  You're
15 saying that work is dramatically altered.  Anything
16 else?
17     A.      Just -- no.  Just that and some of my --
18 some of the physical things that I can't do like
19 climbing a ladder and --
20     Q.      You have already mentioned those.  I'm
21 looking for things that you haven't mentioned yet,
22 if there are any?
23     A.      No.  Well, I don't ride a bicycle or
24 anything like that.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.      Did you used to ride a bike before?

2      A.      Yes.

3      Q.      How often would you go bike riding

4 before?

5      A.      Daily.

6      Q.      Daily?

7      A.      To my mailbox.

8      Q.      How far is your mailbox?

9      A.      Half a mile.

10      Q.      And have you tried to ride a bicycle

11 since your accident?

12      A.      I tried to get on one once, and I felt

13 that if I lost my balance or something, if I lost my

14 balance to the right side, I would be in alot of

15 trouble.

16      Q.      Were you able to ride the bike?

17      A.      No.

18      Q.      How do you get your mail now?

19      A.      Drive down to get it.

20      Q.      Anything else that you used to do before

21 the accident that you don't do now because of the

22 accident?

23      A.      I can't -- well, I used to do alot of

24 sightseeing and stuff like that, too.

  
BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1        Q.     Where would you go sightseeing?

 2        A.     Well, up in the mountains.  I like to go

 3  up in the mountains, go hiking and stuff like that.

 4        Q.     How often would you do that before your

 5  accident?

 6        A.     Whenever I got a chance.

 7        Q.     Was this --

 8        A.     Not in the wintertime.

 9        Q.     Prior to your accident when was the last

10  time you had gone hiking up in the mountains?

11        A.     Two weeks before.

12        Q.     Where did you go?

13        A.     Went up on Sandia Mountain.

14        Q.     Who did you go with?

15        A.     My girlfriend and her daughter.

16        Q.     How old is her daughter?

17        A.     21.  She's handicapped.

18        Q.     What's her handicap?

19        A.     She's -- she suffers from that drinking

20  while you're pregnant, something alcoholic syndrome.

21        Q.     So did you spend the night up in the

22  camp?

23        A.     Yes, we did.

24        Q.     How far did you hike?
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.      We went up this one ravine, up the side

2  of the mountain, crossed over and headed back down

3  the other side back to where our camp was, and the

4  next day we went the other way.

5      Q.      Would you agree with me that given your

6  COPD currently, that a trip such as that hiking that

7  you just described would not be enjoyable anyway?

8      A.      Well, it wouldn't probably not even be

9  possible.  You would have to carry it.  Besides the

10  footage would be different.

11      Q.      All right.  Is there anything else that

12  you used to do before this accident that you don't

13  do now because of the accident?

14      A.      Well, I don't go visiting very much.

15  Like I said, it's mostly because of the availability

16  of the oxygen, you know.  It's pretty much a

17  constant companion.

18      Q.      And so if it's something that's changed

19  in your life that is unrelated to the accident, then

20  I don't want to know about it.  I'm just looking for

21  the stuff that's related to the accident that

22  changed in your life.  Is there anything else that

23  you can think of?

24      A.      No.  Just some of my physical

BRUCE ROGERS,  NOVEMBER 13, 2007

1  capabilities have been changed because of the

2  accident.

3      Q.    We have already gone through those,

4  right?

5      A.    Yes, and I haven't been able to do what I

6  normally do.

7      Q.    All right.  So would you -- at this point

8  would you agree with me that you have described

9  those activities that have changed as a result of

10  the accident?

11      A.    Yes, most is work.  To me that's the most

12  important part.

13      Q.    All right.  We have marked this as

14  Exhibit 8.  The reason why I marked this one is

15  because I could see it looks like this is the unit

16  at issue, right?

17      MR. HULL:  It sort of looks like 959 which

18  would have been the first.  What was the next, 965

19  or 3?

20  BY MR. POTTER:

21      Q.    So looking at this photograph, does this

22  truly and accurately reflect how the area looked at

23  the time of your fall?

24      A.    No.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.     What's different about it?

2      A.     This area over here is not -- wasn't

3  there.

4      Q.     The -- you're pointing to the loading

5  dock over here?

6      A.     They weren't there, not to my knowledge

7  anyway.

8      Q.     All right.  So is it your recollection

9  that the door you were going into was on the very

10  edge of the building?

11      A.     Near the edge.  I know there was no docks

12  on that side of the door.

13      Q.     You're pointing to the two docks on the

14  right side, on your right of the photo?  You're

15  agreeing with me, right?

16      A.     Yes, it looks like about how the water

17  looked.

18      Q.     Is that about how the water -- the size

19  of the water area as well, as you look at it in

20  Exhibit A, or you're not sure?

21      A.     I'm not sure.

22      Q.     In looking at Exhibit 5, does this look

23  like the correct door or can you not tell because of

24  the photo?

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1        A.     I can't tell because there's nothing
 2   here.
 3        Q.     You're pointing to the right side of the
 4   photo?
 5        A.     Yes.
 6        Q.     So you're not sure if Exhibit 5 is
 7   actually the door you were headed to?
 8        A.     No.  You said is it -- does it look like
 9   it.  I said yes, it looks like it.
10        Q.     Agreed and understood.  I'm just asking
11   you right now, you're not sure if that's the actual
12   door, right?
13        A.     No.
14        Q.     You're agreeing with me, right?
15        A.     Yes.
16               (WHEREUPON, discussion was had off
17               the record.)
18   BY MR. POTTER:
19        Q.     Back on the record.  Here is Culp Exhibit
20   No. 2.  This gentleman who worked for Precision drew
21   the circle with the initials over to the side
22   indicating where he found you.  Does it look about
23   accurate as far as the general location?
24        MR. HULL:  This is taken from the -- the
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1  building.  Here would be the bottom of the photo

2  (indicating).

3       MR. POTTER:  He would have been standing here,

4  this door (indicating).

5       MR. HULL:  You would have been walking toward

6  that?

7       MR. POTTER:  Yes.

8  BY THE WITNESS:

9       A.    The door would have been over in this

10  area then (indicating).

11  BY MR. POTTER:

12       Q.    I think so.

13       A.    Yes, that looks generally the -- it looks

14  about the same here.

15       Q.    And looking at the circle that he drew,

16  would you agree with me that the location where the

17  gentleman found you was within that circle?

18       A.    I believe.  Well, his circle is edging

19  the water, so I don't --

20       Q.    Do you believe it would have been to the

21  right or the left?

22       A.    It would have been to the right.

23       MR. HULL:  You're talking about when the guy

24  found him?

BRUCE ROGERS,  NOVEMBER 13, 2007

1     MR. POTTER:  Right, when the guy found him.

2  BY MR. POTTER:

3     Q.    Can I get you to draw a circle where the

4  guy would have found you on this photo and put your

5  initials off to the side?

6     A.    How big a circle?

7     Q.    A circle that would contain your entire

8  body when the guy found you and draw your initials

9  off to the side.

10     MR. POTTER:  So for the record the deponent

11  has drawn a circle on Culp Exhibit No. 2 with his

12  initials off to the side.  He's using the heavy

13  black marker.

14  BY MR. POTTER:

15     Q.    This circle would have contained the

16  location where your body was when the gentleman

17  found you, correct?

18     A.    I believe so, yes.

19     Q.    And looking at the photo you can see

20  where you would have stepped when your foot slipped.

21  Let me show you this.  From the other direction -- I

22  believe that this is the same photo from the other

23  direction.

24     MR. HULL:  It doesn't look the same to me.