```
 1   STATE OF ILLINOIS   )
 2                       )  SS:
 3   COUNTY OF C O O K   )
 4      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
 5            COUNTY DEPARTMENT - LAW DIVISION
 6   BRUCE ROGERS,                 )
 7                 Plaintiff,      )
 8      vs.                        ) Case No. 06L 005376
 9   ROTHBART PROPERTIES, PRECISION )
10   LABORATORIES, INC., ROTHERBART )
11   REALTY COMPANY, 977 NORTHPOINT )
12   VENTURES, LLC, a/k/a 977       )
13   NORTHPOINT VENTURES FUND, SLJ  )
14   PROPERTIES, LLC, ROTHBART      )
15   CONSTRUCTION COMPANY, INC., and)
16   ROTHBART CONSTRUCTION COMPANY, )
17   INC a/k/a ROTHBART CONSTRUCTION)
18   REALTY.                        )
19                 Defendants.      )
20
21        The deposition of BRUCE ROGERS, called
22   for examination, taken pursuant to the provisions of
23   the Code of Civil Procedure and the Rules of the
24   Supreme Court of the State of Illinois pertaining to
```

COPY

EXHIBIT

2

1    the taking of depositions for the purpose of

2    discovery taken before RACHEL SMITH, CSR No.

3    84-4161, a Certified Shorthand Reporter of said

4    state, at Suite 3750, 70 West Madison, Chicago,

5    Illinois, on the 13th Day of November, A.D. 2007, at

6    10:00.

7

8    APPEARANCES:

9

10        CUTLER & HULL,

11        (Three First National Plaza,

12        70 West Madison, Suite 3750,

13        Chicago, Illinois 60602,

14        312-726-0777), by:

15        MR. EDWIN J. HULL, III,

16            appeared on behalf of the Plaintiff;

17

18        ADAMS SWATEK, LLC, ATTORNEYS AT LAW,

19        (22 West State Street,

20        Geneva, Illinois 60134,

21        630-232-6440), by:

22        MR. STEVEN M. TEFFT,

23            appeared on behalf of Rothbart

24            Construction.

```
 1   Cont'd:

 2

 3        LAW OFFICE OF STEPHEN HASZTO,

 4        (225 West Washington Street, Suite 1400,

 5        Chicago, Illinois 60602,

 6        312-827-2300), by:

 7        MR. JOHN POTTER,

 8             appeared on behalf of Rothbart

 9             Construction.

10

11

12   REPORTED BY:  RACHEL SMITH, C.S.R.

13             CERTIFICATE NO. 84-4161

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                  (WHEREUPON, the witness was duly

 2                  sworn.)

 3                  BRUCE ROGERS,

 4   called as a witness herein, having been first duly

 5   sworn, was examined and testified as follows:

 6                  EXAMINATION

 7   BY MR. POTTER:

 8        Q.    Could you please tell us your name and

 9   spell your name for the court reporter?

10        A.    Bruce Rogers, B-R-U-C-E, R-O-G-E-R-S.

11        MR. POTTER:  Please let the record reflect

12   this is the discovery deposition of Bruce Rogers

13   taken pursuant to notice and pursuant to the laws of

14   the state of Illinois and county of Cook.

15   BY MR. POTTER:

16        Q.    Sir, have you ever given a deposition

17   before?

18        A.    Yes.

19        Q.    What context?  What was it for?

20        A.    It was for an accident with Gonnella

21   Trucking Company.

22        Q.    Were you injured in the accident?

23        A.    No.

24        Q.    Let me go over some basic ground rules
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1  for you.  I need you to give us verbal responses

2  because this nice lady cannot pick up a nod of the

3  head or shrug of the shoulders, all right?

4      A.    Yes.

5      Q.    I would ask that you refrain from nods of

6  the head as well.  Yes or no or verbal answers, all

7  right?

8      A.    All right.

9      Q.    I would ask that you stay away from

10  mm-hmms or uh-huhs because when we read the

11  transcript, we have no idea what you meant, all

12  right?

13     A.    Yes.

14     Q.    If you don't understand a question,

15  please don't answer it.

16     A.    Yes.

17     Q.    And if you need to take a break at any

18  time to talk to your attorney, you need to use the

19  restroom, as long as we are not in the middle of a

20  question, just speak up, we are happy to accommodate

21  you.

22     A.    All right.

23     Q.    I have to ask basic background

24  information.  I ask this of everyone.  We might be

BRUCE ROGERS,  NOVEMBER 13, 2007

1   able to speed this up.   Why don't we mark this as

2   Exhibit No. 1?

3                    (WHEREUPON, a certain document was

4                    marked Roger Deposition Exhibit No.

5                    1, for identification, as of

6                    11-13-07.)

7   BY MR. POTTER:

8       Q.    I'm showing you what we have marked as

9   Exhibit 1.   These are your answers to one of the

10  defendant's interrogatories.   Do you see that?

11      A.    Yes.

12      Q.    If we go to the very last page, there is

13  a verification.   I believe that is your signature

14  there?

15      A.    Yes.

16      Q.    And did you read through these questions

17  to confirm their accuracy before you answered --

18  before you signed them?

19      A.    Yes.

20      Q.    All right.   In the Answer to

21  Interrogatory No. 1 you provide your name, your

22  address, your Social Security number, and your date

23  of birth.   Is that information current?

24      A.    Yes.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.     And is it accurate?

2      A.     Yes.

3      Q.     All right.  How long have you lived at 22

4  Sunset Road in Moriarty, New Mexico?

5      A.     This is November what?

6      Q.     This is November 13.

7      A.     Two more days, 12 years.

8      Q.     Who do you live there with?

9      A.     Myself.

10     Q.     Are you married?

11     A.     No.

12     Q.     Do you have any children?

13     A.     No, not living with me.

14     Q.     Are you divorced?

15     A.     Widowed.

16     Q.     All right.  I'm sorry to hear that, sir.

17  How old are your children?

18     A.     Oldest would be 44.

19     Q.     How many children do you have?

20     A.     Five.

21     Q.     What is the youngest, what age?

22     A.     31 I believe.

23     Q.     What is the highest level of education

24  that you have completed?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.      Probably 14-and-a-half years.

2      Q.      Did you complete high school?

3      A.      Yes.  Well, GED.

4      Q.      All right, and did you go on and get any

5 college courses?

6      A.      Yes.

7      Q.      What did you take, what courses?

8      A.      Welding, psychology, algebra, mechanical

9 engineering.

10      Q.      Where did you take those?

11      A.      Columbia Payton College in Pasco,

12 Washington.

13      Q.      Did you get a degree?

14      A.      No.

15      Q.      Did you go to any vocational training

16 beyond what you have described?

17      A.      Only military.

18      Q.      Were you in the Army, Navy?

19      A.      Air Force.

20      Q.      What did you do in the Air Force?

21      A.      Reciprocating engine mechanic.

22      Q.      What is that?

23      A.      A mechanic that works on gasoline

24 propelled engines.

1     Q.    What types of engines for what type of

2  vehicles?

3     A.    For aircraft.

4     Q.    All right.  Were they jet, propeller

5  planes?

6     A.    Propeller driven.

7     Q.    When were you discharged?

8     A.    1956.

9     Q.    How long were you in the military?

10     A.    Four years, 11 months, 29 days, and --

11     Q.    You were honorably discharged?

12     A.    Correct.

13     Q.    What rank were you discharged?

14     A.    E1.

15     Q.    And at some point you became a truck

16  driver, correct?

17     A.    Yes.  Well, my dad had one when I grew up

18  on the ranch.

19     Q.    He had a tractor?

20     A.    Semi, yes.

21     Q.    And did you drive it with your dad?

22     A.    Yes, since I was 12.

23     Q.    You have a C commercial driver's license?

24     A.    CDL, yes.

1　　　Q.　　Do you have any Hazmat or any specialty?

2　　　A.　　Yes.

3　　　Q.　　Do you have the license on you?

4　　　A.　　Yes.　It's not a commercial license

5　anymore.

6　　　Q.　　All right.　Let's talk about your license

7　at the time of the accident.　You said you had all

8　of the --

9　　　A.　　All the Hazmat, everything.　I was

10　endorsed for all combinations.

11　　　Q.　　So can you --

12　　　A.　　The TX on it was endorsement.

13　　　Q.　　What is the TX endorsement?

14　　　A.　　Everything.

15　　　Q.　　What does it allow you to do?

16　　　A.　　Anything.

17　　　Q.　　So you can do those three truck

18　combinations?

19　　　A.　　Yes.

20　　　Q.　　You can haul hazardous chemicals?

21　　　A.　　Yes.

22　　　Q.　　What else?　Can you give me some other

23　examples?

24　　　A.　　Triple, double, tanks, hazardous

1  materials, anything that -- dynamite, high value

2  loads, anything like that.

3      Q.    All right.  How long had you been a truck

4  driver as of the day of the accident?

5      A.    I believe I got my combination license in

6  1969 or '70, something like that.

7      Q.    All right.  So approximately 35 years,

8  something like that?

9      A.    Somewhere in there.

10     Q.    You filed income tax returns?

11     A.    Yes.

12     Q.    And from -- how far -- what do you have

13 at your house?  How far do they go back, the returns

14 that you keep?

15     A.    Maybe two years.

16     Q.    Do you have an accountant that does your

17 income tax returns?

18     A.    I go to the University and get it done.

19     Q.    So you think at home you would probably

20 have your '06 and '05 returns, right?

21     A.    Probably.

22     Q.    You think you might have your '04s?

23     A.    I don't know.  I really don't.

24     Q.    All right.  You may have given them to

BRUCE ROGERS,  NOVEMBER 13, 2007

1   me, but I couldn't find them in my file.  I don't

2   know if you have tax returns.

3        MR. HULL:  You sent to me the authorization.

4   He signed them because he didn't have the returns.

5        MR. POTTER:  I was looking.  I issued a

6   subpoena to Swift.

7   BY MR. POTTER:

8        Q.    Swift Transportation Company, is that who

9   you were employed by at the time of the accident?

10       A.    Yes.

11       Q.    And I'm just looking through here.  If I

12   can find --

13       A.    They're not very cooperative about

14   anything.

15       Q.    Understood.  I'm trying to get your wages

16   at the time of the accident, the date of the -- do

17   you know the date?

18       MR. HULL:  June, June 23 or 24, something like

19   that, '04.

20       MR. POTTER:  I'm looking at --

21       MR. TEFFT:  The 23rd.

22   BY MR. POTTER:

23       Q.    I'm looking at Page 84.  It looks like

24   this represents gross pay.  Let me ask you a

BRUCE ROGERS,  NOVEMBER 13, 2007

1   question.  Do you know what this is?  Did they tell

2   you anything about what you were making at the time

3   of the accident?  Let me ask you this, off the top

4   of your head what was your paycheck at the time of

5   the accident?

6        A.    It varied.

7        Q.    What caused it to vary?  Did you get paid

8   by miles?

9        A.    Yes.

10       Q.    How much did you get paid per mile?

11       A.    28 cents a mile.

12       Q.    Were you driving a Swift tractor trailer?

13       A.    Yes.

14       Q.    So they would pay for the gas and

15   maintenance on the vehicle?

16       A.    Yes.

17       Q.    You would obviously give your time and

18   for every mile you drove you got 28 cents?

19       A.    Yes.

20       Q.    And can you tell me in an average year --

21   there might be an answer in this interrogatory.

22       MR. HULL:  I think there is.  I know we put

23   the stuff in there about lost wages.

24   BY MR. POTTER:

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.    Let's look at Interrogatory No. 10.  It

2  says, "as a result of said personal injuries, were

3  you unable to work.  If so, state the name and

4  address of the company," that you put down as Swift

5  Transportation Company, that sounds correct, right?

6      A.    Yes.

7      Q.    "The date or inclusive dates on which you

8  were unable to work."  It says here, "tried to

9  return to light duty, unable to return to previous

10  job duty."  So would I be accurate in saying from

11  the date of the accident to present you were never

12  able to return to full duty?

13      A.    To present?

14      Q.    To present.

15      A.    Yes.

16      Q.    And did you try to go back as light duty?

17      A.    Yes.

18      Q.    I saw a reference in your file that you

19  wanted to do some local deliveries, is that what you

20  went back to do?

21      A.    No.  Well, I went -- that's what I went

22  back to do, but I ended up handing out towels and

23  answering phones.

24      Q.    So you were back at the Swift

BRUCE ROGERS,  NOVEMBER 13, 2007

1  headquarters?

2       A.     Terminal.

3       Q.     All right.  Would you hand out towels to

4  the other truck drivers?

5       A.     Yes.

6       Q.     Did they have wash-up facilities?

7       A.     Yes, showers and --

8       Q.     What else did you do?  You said --

9       A.     Answered the telephone.

10      Q.     All right.  And did you have problems

11 handing out towels?

12      A.     Well, that's all I had to do.  I sat like

13 right here (indicating), and I have to get up and

14 walk around to the window right there, hand out

15 towels.

16      Q.     Were you able to do that?

17      A.     Yes.

18      Q.     Did you have any difficulties doing that?

19      A.     No, other than that's not something that

20 I would want to do.

21      Q.     Understood.  And were you able to answer

22 the phones?

23      A.     Yes.

24      Q.     Did you have any difficulties answering

BRUCE ROGERS,  NOVEMBER 13, 2007

1    the phones?

2        A.    No.

3        Q.    Did they -- was this a job that was

4    already there or did they create this job for you,

5    if you know?

6        A.    No.  It was something they made up I

7    believe.

8        Q.    All right, and how long did you work this

9    light duty job that you just described?

10       A.    I don't know, maybe three months, two

11   months.

12       Q.    All right, and why did you stop?

13       A.    Just not able to continue.  Mostly it was

14   the rate of pay, and I lived 54 miles from the

15   terminal and driving in and driving back out on a

16   daily basis, that is, my pay didn't cover my gas,

17   so --

18       Q.    All right.  So it was the cost of

19   transportation to get to the facility in conjunction

20   with the rate of pay that caused you to stop working

21   light duty job, would that be accurate?

22       A.    Yes, the rate of pay, yes.  It wasn't

23   even a third of what I made previously.  I wouldn't

24   even say a third, maybe a tenth.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.      So what did you make at the light duty
2  job?  Did they pay you hourly?
3      A.      Yes, $9.50 an hour.
4      Q.      How many hours a week would they give
5  you?
6      A.      Eight if they would.  Sometimes I
7  couldn't -- if they had a busy influx of drivers,
8  sometimes I wouldn't be able to perform my duties
9  because my hip would start hurting.
10      Q.      Would that be eight hours a day they
11  would try to get you?
12      A.      Try to, yes.
13      Q.      Five days a week?
14      A.      Five days.
15      Q.      They tried to get you 40 hours?
16      A.      Yes.
17      Q.      Would you get 40 hours most of the time?
18      A.      Most of the time, no.
19      Q.      And from your testimony it sounds like
20  that was, in your mind about one tenth of what you
21  were making before your accident?
22      A.      Yes.
23      Q.      Now you also said that your hip bothered
24  you sometimes when it was really busy?

BRUCE ROGERS,  NOVEMBER 13, 2007

1    A.    Yes.

2    Q.    Which hip is that?

3    A.    Right.

4    Q.    And tell me about what would cause it to

5 bother you?  Would it be your increased activity?

6    A.    Getting up, getting down.

7    Q.    And so were you able to do the duties of

8 answering the phone and handing out the towels

9 although with pain or could you just not do them?

10    A.    It was mostly because of the pain.

11    Q.    You could do them but it hurt?

12    A.    Yes.

13    Q.    So was that a reason why you stopped this

14 light duty job, the pain?

15    A.    One of the reasons, yes.

16    Q.    The -- another reason we talked about the

17 pay, correct?

18    A.    Yes.

19    Q.    And then were there any other reasons?

20    A.    No.

21    Q.    Okay.  Now, looking down here for C, it

22 says, "the amount of wage or income loss claimed by

23 you," and it says, "from date of injury to

24 retirement, $350,000 plus."  Do you know how that

1  number was calculated?

2      A.      Yes, I calculated it.

3      Q.      And how did you calculate it?

4      A.      My yearly pay is around $35 or $36,000

5  per year, and I figure on a ten-year period, I

6  figure I would work another ten years prior to that.

7      Q.      All right.  Let me back up here a little

8  bit.  How did you get the $35 to $36,000 figure?

9  Did you go back, look at your tax returns?

10     A.      Yes.

11     Q.      Pay stubs, what did you do?

12     A.      Pay -- I believe it was my tax returns

13  that showed I made $36, $37,000 or something like

14  that.

15     Q.      Do you remember what years you looked at

16  to come up with this?

17     A.      Just one.

18     Q.      Which one?

19     A.      My last one.

20     Q.      That would be '04?

21     A.      Probably yes.  No.

22     Q.      Or '03 because it was a complete year?

23     A.      Yes, a complete year.

24     Q.      Did you look at '02?

BRUCE ROGERS,  NOVEMBER 13, 2007

1    A.    No.

2    Q.    All right.  How old are you now?

3    A.    62.

4    Q.    And so you're talking ten years '04 to

5    2014, correct?

6    A.    Yes.

7    Q.    So it's now '07.  How old were you in

8    '04?  It would have made you 59?

9    A.    No, 57 or 58, I believe.

10    Q.    So it was your plan or intent before this

11    accident to work until you were 67 or 68 years old?

12    A.    Or 70.

13    Q.    Why did you settle on that 67 through 70,

14    why that rank?

15    A.    I just figured that would probably be

16    enough time to get everything in order, that I could

17    just do whatever I wanted.

18    Q.    All right.  You're wearing an oxygen tank

19    today, correct?

20    A.    I am wearing oxygen, yes.

21    Q.    Why do you need the oxygen?

22    A.    I just -- my lungs do not produce enough

23    oxygen.

24    Q.    Are you a smoker?

1      A.    I was.

2      Q.    How many packs a day would you smoke?

3      A.    One and a half maybe.

4      Q.    And over what time period?

5      A.    I have no idea.

6      Q.    When did you start smoking?

7      A.    I believe I was like 14 or 15.

8      Q.    So you smoked -- when did you stop

9  smoking?

10      A.    Two-and-a-half-years ago.

11      Q.    So you smoked for about 48 years, does

12  that sound right?

13      A.    Probably.

14      Q.    And was it always about a pack and a half

15  or was it more or less?

16      A.    It was less way up until -- I don't even

17  know when it increased.

18      Q.    What is your diagnosis as far as your

19  breathing condition, if you know it?

20      A.    I don't know.

21      Q.    Emphysema or do they have a name for it?

22      A.    I believe the last report that I read was

23  symptoms like COPD.

24      Q.    Do you know what COPD stands for?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.      I believe it's chronic obstructive
2 pulmonary disease.
3      Q.      When did you start using the oxygen?
4      A.      I'm not sure.
5      Q.      Was it before your accident or after your
6 accident?
7      A.      Probably after my accident, maybe two
8 years maybe after the accident.
9      Q.      All right.  Were you on the oxygen when
10 you went back for light duty?
11      A.      No.
12      Q.      Was that after?
13      A.      After.
14      Q.      Is it your belief that had you not
15 fractured your hip and suffered the injuries from
16 the accident that you could still drive a truck
17 today even though you have the oxygen?
18      A.      Yes.
19      Q.      You flew here for this deposition?
20      A.      Yes.
21      Q.      And you were able to bring the oxygen
22 tank on the plane, correct?
23      A.      No.
24      Q.      What did you have to do?

BRUCE ROGERS,  NOVEMBER 13, 2007

1        A.      I had to rent this (indicating).

2        Q.      You're pointing at this, what?

3        A.      The POC.  It's a private or personal

4    oxygen concentrator.

5        Q.      All right, and were you -- if you had not

6    had this accident and you were driving trucks, would

7    you be able to bring your oxygen tank with you?

8        A.      Yes.

9        Q.      In the truck?

10       A.      Yes, I would not but I could.

11       Q.      What does that mean, "I wouldn't but I

12   could"?

13       A.      I would take something of this nature

14   because it will plug into a cigarette adaptor.  You

15   would just plug it in and have it 24 hours a day,

16   seven days a week rather than change and carry

17   and --

18       Q.      Understood.  Are there any Department of

19   Transportation restrictions for people with COPD

20   such as your condition, or is it COPD?

21       A.      COPD.

22       Q.      Are there any Department of

23   Transportation restrictions regarding truck drivers

24   who have COPD?

1     A.     No.

2     Q.     You're not aware of any?

3     A.     I am not aware of any, no.

4     Q.     Have you looked into that issue?

5     A.     No.

6     Q.     What does -- if you don't have your

7  oxygen, how does it affect you?

8     A.     I don't know.

9     Q.     Do you have difficulty breathing?

10    A.     Yes, I do.

11    Q.     So could you say, walk out of the office,

12  go down the elevator and walk out to the street

13  without your oxygen?

14    A.     Could I?

15    Q.     Yes.

16    A.     Yes.

17    Q.     How would you feel without your oxygen if

18  you did that?

19    A.     You said go down the stairs or elevator?

20    Q.     Go down the elevator.

21    A.     I would probably -- other than it's like

22  smoking or drinking, it's all in your mind.  If you

23  just do what you're going to do and do not think

24  about it, there is no concern about it other than I

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1  can't walk very far.  I just walk maybe 150 feet and
 2  I have to rest.
 3      Q.    Who was treating you for your COPD?
 4      A.    I was at the VA Hospital, is the primary.
 5      Q.    Which VA Hospital?
 6      A.    The one in Albuquerque, New Mexico.
 7      Q.    I don't think we have those records.  We
 8  may ask you to sign a release to get those since the
 9  VA -- who do you see at the Albuquerque, New Mexico
10  VA Hospital?
11      A.    How often?
12      Q.    Who?  What is the name of the doctor or
13  doctors?
14      A.    Dr. Horowitz.
15      Q.    Do you know how to spell it?
16      A.    H-O-R-I-W-O-R-T-Z, I think, O-T-I-Z.
17      Q.    Do you know what specialty Dr. Horowitz
18  is?
19      A.    I believe he is -- I think he's my
20  primary caregiver or for me he is.
21      Q.    Do you see any other doctors that
22  specialize in COPD?
23      A.    No.
24      Q.    Have you in the past seen other doctors
```

1  that specialize in COPD?

2      A.    It's hard for me to answer because I

3  don't know what -- I have been there for therapy,

4  you know, to a different area of the hospital.

5      Q.    Was that therapy for your hip injury?

6      A.    Yes.

7      Q.    Now, have you seen anyone outside of the

8  Albuquerque, New Mexico VA Hospital for the COPD?

9      A.    No.

10      Q.    Do you have any other medical conditions

11  that are unrelated to the accident?

12      A.    I don't have enough money.

13      Q.    All right.  My question is -- well, let

14  me ask you this.  You fractured, as you understand

15  it, you fractured your hip in this accident,

16  correct?

17      A.    Yes.

18      Q.    Did you fracture some ribs as well, if

19  you know?

20      A.    I don't know.

21      Q.    Do you know of any other injuries you

22  sustained beyond the hip injury as a result of the

23  accident?

24      A.    No, I don't.

BRUCE ROGERS,  NOVEMBER 13, 2007

1    Q.    Prior to this accident -- you said it was

2  your right hip, correct?

3    A.    Yes.

4    Q.    Prior to the accident did you have any

5  problems with your right hip at any time during the

6  course of your life?

7    A.    No.

8    Q.    Prior to this accident did you have any

9  problems, fractures, sprains, things like that to

10  your lower extremities at any time that you recall?

11    A.    What is lower?

12    Q.    Your legs, your feet, your knees.

13    A.    No.  Oh, I broke my leg once.

14    Q.    Was it your left leg or right leg?

15    A.    Left leg.

16    Q.    And did that have any accompanying right

17  hip problems?

18    A.    No.

19    Q.    When was that?

20    A.    I don't believe I know.  Maybe it was '89

21  or '88, somewhere around there.

22    Q.    Did you go to the Albuquerque, New Mexico

23  VA Hospital for that?

24    A.    Yes.

1      Q.      Since this accident have you had any

2   falls or injuries or accidents that caused you to

3   suffer injuries?

4      A.      No.

5      Q.      Since this accident have you looked for

6   another job?

7      A.      Since the accident?

8      Q.      Yes.

9      A.      No.

10      Q.      Why is that?

11      A.      I didn't feel that -- well, I went to --

12   the doctor sent me to a therapist for, I believe

13   it's a job performance evaluation thing, and when

14   that came back I went to it, and they shortly after

15   that is when they terminated me.

16      Q.      All right.  That was from the light duty

17   position?

18      A.      Yes.

19      Q.      So you were terminated as opposed to

20   quitting?

21      A.      Yes, I was terminated.

22      Q.      Do you know why they terminated you, if

23   you know?

24      A.      Nonperform -- unable to perform job

BRUCE ROGERS,  NOVEMBER 13, 2007

1  duties.

2      Q.     Did they tell you specifically what you

3  were unable to perform that you were supposed to be

4  doing?

5      A.     No.  It's written -- they sent me the

6  papers indicating that I had been discharged due to

7  lack of -- unable to perform job duties.

8      Q.     All right.  Who terminated your light

9  duty employment?

10     A.     I don't know.

11     Q.     You don't know?

12     A.     No.

13     Q.     Who told you about your termination?

14     A.     They mailed it to me.

15     Q.     All right.  Who was your direct

16  supervisor when you were on light duty?

17     A.     It's hard to tell.

18     Q.     Are there several people that could have

19  done it?

20     A.     Yes.

21     Q.     Can you give me their names and titles,

22  if you know them?

23     A.     Chris Ryan.  He is the terminal manager.

24  Could have been Vic.  I don't know what his last

BRUCE ROGERS,  NOVEMBER 13, 2007

1  name is.  He's Spanish or --

2       Q.    What was Vic's job title?

3       A.    He was the assistant terminal manager.

4       Q.    Anybody else?

5       A.    And truck boss and team leader and I

6  don't know, he has about five or six different jobs.

7       Q.    So that's Vic?

8       A.    Yes.

9       Q.    So it was probably either Chris Ryan or

10  Vic, correct?

11       A.    I believe the decision was made down at

12  Swift headquarters in Phoenix, Arizona is what I

13  think.

14       Q.    Do you have an idea as to who might have?

15       A.    No.  Could have been somebody in

16  personnel.  Could be somebody that just does that.

17  Could have been somebody who works in workers

18  compensation.  Could have been anybody.  I don't

19  have any -- any idea.

20       Q.    All right.  How much do you currently

21  weigh?

22       A.    226.

23       Q.    How much did you weigh at the time of the

24  accident?

1      A.      Probably 208 or 210.

2      Q.      Is there anything that you attribute your

3 approximate 18 pounds in weight gain to?

4      A.      Probably stopping smoking.  That would be

5 my guess.

6      Q.      Did you start to lose the weight --

7 strike that.

8              Did you start to gain the weight soon

9 after you stopped smoking?

10      A.      I believe so.  They put me on what they

11 call the Health Buddy Program with the VA.  Every

12 morning they print this strip thing like she has,

13 and every morning a light blinks and it asks you

14 about 15 different questions.  They give you a thing

15 to check your blood pressure and your heartbeat and

16 they would give you a digital scale to weigh

17 yourself on.

18      Q.      So you weigh yourself everyday?

19      A.      Everyday.

20      Q.      Yesterday morning, when you weighed

21 yourself --

22      A.      225.

23      Q.      All right.  That has been pretty

24 consistent over the last couple years?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.    Well actually, I have only had that

2  machinery probably just over a year.

3      Q.    All right.  Is there a reason why they

4  are giving you this machinery?

5      A.    I believe it's some type of a pilot

6  program, I believe, they are trying to implement to

7  better serve the veterans, I guess.

8      Q.    Does the information get electronically

9  sent somewhere?

10      A.    Yes.  Everyday it goes through the phone

11  line.  If I answer a question I have a nurse

12  practitioner that calls me up and says, "what's the

13  deal here" if it's iffy.

14      Q.    At the time of the accident did you

15  have -- strike that.

16          Let's take the day before your accident.

17  Did you have any difficulty walking?

18      A.    No.

19      Q.    Did you have a regular exercise routine

20  that you would go through during the days and weeks

21  before the accident?

22      A.    No.

23      Q.    What types of hobbies did you have before

24  the accident, physical-type hobbies?

1       A.      None.

2       Q.      What types of hobbies in general did you

3  have before the accident?

4       A.      I didn't have any time for hobbies.

5       Q.      You drove your truck, right?

6       A.      That's it.  Then I got two days off then

7  I done it again.

8       Q.      When you drive your truck, you would have

9  to get up on the truck, and put tarps forward and

10 backwards?

11      A.      No.

12      Q.      Who would do that?

13      A.      Not for Swift.

14      Q.      Who does that for Swift?

15      A.      Well, people that drive flatbeds.

16      Q.      So you didn't drive a flatbed?

17      A.      No.

18      Q.      What did you drive for Swift?

19      A.      A van.

20      Q.      What's a van?

21      A.      A van is a 52-foot trailer that's 13 feet

22 tall and 52 feet long, 8 feet wide.

23      Q.      How many feet tall?

24      A.      13 feet.

BRUCE ROGERS,  NOVEMBER 13, 2007

1    Q.    Did you have to pull the pallets out off
2  the van?

3    A.    Not unless I was being beaten.

4    Q.    What does that mean, in other words?

5    A.    That means no.

6    Q.    So you would show up at the facility?

7    A.    No.

8    Q.    Where would you --

9    A.    From the time I went to the terminal at
10 my home terminal in Albuquerque, New Mexico, I was
11 at work until I come home three weeks later, then I
12 was back.

13    Q.    All right.  So you would show up at the
14 terminal?

15    A.    Get in my truck.

16    Q.    Get right in your truck.

17    A.    From that point on everything was done
18 over a computer unless I was fueling or driving.

19    Q.    And you would drive to wherever the
20 computer told you?

21    A.    Pick up my load.  Generally I would pick
22 up -- I would go to Vollen, New Mexico, pick up a
23 load of styrofoam, come and take them to Brandywine,
24 Maryland.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.     You would get to the destination that the
2   computer told you to.  You would get out of your
3   truck and someone else would load your truck?
4      A.     Generally there was a trailer that was
5   already loaded on our computer.  It would tell you
6   what -- where to go to pick up your load.  You would
7   go down there and tell them who you were and what
8   you was there for.  They would tell you, "here is
9   your paperwork.  Drop your empty here.  Here is your
10  load."
11     Q.     So to drop your empty, would you have to
12  get out of your truck?
13     A.     Yes.
14     Q.     And what would you have to physically do
15  to drop your empty?
16     A.     Get out, unplug your air lines.  Go
17  around the other side, screw the landing gear down
18  and pull the fifth wheel pin.
19     Q.     Anything else?
20     A.     And set the brakes on your trailer and
21  pull forward.
22     Q.     Today, let's assume that you didn't have
23  the oxygen issue, but you do have the problems
24  related to your fall and your hip.  Today could you

BRUCE ROGERS,  NOVEMBER 13, 2007

1   drop your empty?

2       A.    I don't believe I could.

3       Q.    Why not?

4       A.    Because I would have to climb in and out

5   of the truck, and I don't believe I can do that, put

6   that much strain on my right leg.

7       Q.    Other than climbing in and out of the

8   truck, would there be anything else that would

9   prevent you from dropping an empty today excluding

10  the oxygen issue?

11      A.    I don't believe so.  That's all you do

12  is -- if you do it right, you should just pull it

13  out.

14      Q.    Now let's include the oxygen issue.

15  Would you agree with me that today you could not

16  drop an empty even if you did not have the hip

17  problem because of the oxygen issue, right?

18      A.    Could I drop it?

19      Q.    Could you drop a load today?  Let's -- I

20  want to give you a hypothetical.  If you did not

21  have the hip problem today, could you drop an empty?

22      A.    Yes.

23      Q.    Even with the oxygen issue?

24      A.    Yes.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.      So you could climb in and out of the cab
2  of the truck even with the oxygen issue?
3      A.      There would be -- you said excluding the
4  hip injury, right?
5      Q.      Excluding the hip injury.
6      A.      Sure.  You really wouldn't have to take
7  the oxygen out.  You can get different sizes of
8  hoses for your -- this at home I have two hoses that
9  I use for my concentrator where I live, and one of
10 them goes through and hangs, and the other one is
11 hooked up.  It's a 25-foot lead.  It let's me go to
12 the restroom, my office, my kitchen, living room,
13 and then unplug that and hook the other one, and it
14 lets me go into my bedroom and take a shower, do
15 whatever.
16     Q.      When you're sitting in the seat, the
17 driver's seat of the tractor, how high up are you
18 from the ground in your typical Swift van?
19     A.      I don't know.  I'm guessing at --
20     Q.      I don't want you to guess on anything.  I
21 want your best estimate if you have one.
22     A.      Head level.
23     Q.      Your butt, how high above the ground is
24 your butt as you sit in the driver's seat for the

BRUCE ROGERS,  NOVEMBER 13, 2007

1    track or pulling the van?

2        A.    Six feet.

3        Q.    So it's your testimony here today that

4    you believe that you could climb up six feet and get

5    into that seat with the oxygen issues if you didn't

6    have the hip problem?

7        A.    Yes.

8        Q.    Have you tried that?

9        A.    No.

10       Q.    Obviously the hip problem would prevent

11   you anyway so there is no point in trying.

12       A.    Unless I want to risk further injury.

13       Q.    Now, when you're driving, is there

14   anything about the hip that would cause you

15   problems?  Strike that.

16             Let's assume you're in the tractor

17   trailer.  Is there anything about your hip that

18   would cause you difficulty in driving the tractor

19   trailer?

20       A.    No.

21       Q.    Do you have problems sitting for long

22   periods of time?

23       A.    No.

24       Q.    Would you agree with me that there are

BRUCE ROGERS,  NOVEMBER 13, 2007

1  jobs where you would work a cash register or other

2  customer service type jobs and you could perform

3  from a seated position?

4      A.    I don't believe that I'm trained, you

5  know in -- have the capability to do that type of

6  job.  I've never tried it, never been associated

7  with it.  I wouldn't have any idea where to start on

8  something like that.

9      Q.    Let's put aside the training issue, but

10 just from a physical standpoint you could sit for

11 six or eight hours a day, correct?

12     A.    I could probably -- I'm -- I never tried

13 to sit for that length of time.

14     Q.    You can -- you know basic math, right?

15     A.    Yes.

16     Q.    So you could give change and work a cash

17 register if you were trained on it, correct?

18     A.    Yes.

19     Q.    So with the right training would you

20 agree with me that in your opinion you could

21 probably find some type of gainful employment?

22     A.    What would be gainful employment?

23     Q.    Working at a cash register and something

24 where you could sit while you did your job?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.    I don't believe I would consider

2  something like that because I'm not -- I've never

3  been associated with anything like that.  I just

4  like to be -- I like traveling.  I like new things.

5  I don't like -- if I was going to be like a parking

6  lot attendant, you know, that you just sat in there

7  and take tickets?

8      Q.    Right.

9      A.    I don't believe I could do that.

10     Q.    Why is that?

11     A.    Well, because number one, I would be

12  pretty cold.

13     Q.    All right.  What if you were doing it in

14  New Mexico?

15     A.    No, it wouldn't matter.  I don't think I

16  would sit in something that small for that length of

17  time.  It's just not -- there isn't variation in it

18  to keep me active anyway.

19     Q.    Have you ever been diagnosed with

20  claustrophobia or anything regarding small spaces?

21     A.    Not that I know of.

22     Q.    Is it your belief that you have such a

23  condition that you prevents you from sitting in a

24  small space for a long period of time?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.    You mean smaller than a truck cab?

2      Q.    Correct.

3      A.    I don't know whether I would be or not,

4  but I just -- I don't feel trapped in there.  If you

5  want to stop you can stop.  You can get out and

6  stretch your legs and go to the rest area.  You can

7  do pretty much whatever you want to do.

8      Q.    How do you currently get around?  Do you

9  have a walker, a wheelchair, cane?  Do you walk

10  without assistance, what?

11      A.    I walk without assistance.

12      Q.    How far can you walk before you have to

13  sit down on an average day?

14      A.    Generally not a matter of sitting.  My

15  lower back hurts.  I have to lean against something

16  or I can stand leaning on something.  One of the

17  things I had to do at the therapy was stand for 30

18  minutes.

19      Q.    All right.  Was it difficult to do?

20      A.    I couldn't do it without leaning on

21  something.  He said, "if you want to lean on

22  something you can" so I did.

23      Q.    So after you stand for a significant

24  length of time, your lower back starts to hurt,

1  correct?

2      A.    Mm-hmm.

3      Q.    Is that a yes?

4      A.    Yes.

5      Q.    And the way that you would gain relief

6  from that lower back pain is to lean on something,

7  correct?

8      A.    Yes.

9      Q.    If you sit down, that doesn't give you

10 relief for your lower back?

11     A.    It does also.

12     Q.    It does also?

13     A.    Yes.

14     Q.    So can you go and do your grocery

15 shopping?

16     A.    Briefly.  I'm a man.  I -- I know what I

17 want when I go in there.  I don't spend hours.  I go

18 in and get -- if I want bread and ice cream and

19 lunchmeat, I go in there and get bread, ice cream,

20 and lunchmeat and I'm out of there.

21     Q.    Get a normal shopping cart?

22     A.    Yes.

23     Q.    You push the shopping cart?

24     A.    I leaned on it.  Sometimes I take a small

BRUCE ROGERS,  NOVEMBER 13, 2007

1   oxygen bottle with me and put it in the little frame

2   where they put their kids.

3        Q.    All right, and do you do all of your own

4   shopping?

5        A.    98%.

6        Q.    Who does the other 2%?

7        A.    Somebody I can con into it.

8        Q.    All right.  Can you drive your car?

9        A.    Yes.

10       Q.    Can you drive your car to the shopping

11   center?

12       A.    Yes.

13       Q.    There was a period of time when you had

14   to use a wheelchair?

15       A.    In the hospital.

16       Q.    Once you were out of the hospital, did

17   you no longer need a wheelchair?

18       A.    I needed one yesterday.

19       Q.    What was that for?

20       A.    To go five miles from the airplane to

21   the -- out of the terminal at the airport.

22       Q.    So when -- let me back up here.

23            In New Mexico when you went to the

24   airport, were you able to walk from the curb outside

BRUCE ROGERS,  NOVEMBER 13, 2007

1   of the airport to the plane?

2       A.    I did.

3       Q.    And did you have problems?

4       A.    You could do it in -- I'm guessing.

5       Q.    Don't guess on anything.  Give me

6   estimates.

7       A.    I estimate you could do it in 15 minutes.

8   It took me the better part of 45 minutes to -- well,

9   because I go -- I have two bags and this, and I have

10  to go a ways, stop, rest, go for a ways, stop, rest.

11      Q.    Did your bags have wheels on them?

12      A.    This one does (indicating).

13      Q.    All right, and so the one with the

14  oxygenator?

15      A.    It has it on it.

16      Q.    Then the other bag had your clothes and

17  things like that?

18      A.    This one, I carry that one, and it

19  probably weighs 20 pounds.  Then my shaving gear and

20  stuff that I brought.

21      Q.    All right.  So what kind of distance do

22  you think it was from the curb to the airplane in

23  New Mexico?

24      A.    500, 600 feet.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.    And how did you feel when you finally got

2   to the airplane?

3      A.    Good.

4      Q.    Did your lower back hurt?

5      A.    Yes.

6      Q.    On a one-to-ten scale can you give me a

7   number, ten being the most extreme pain you can

8   imagine?

9      A.    Seven.

10     Q.    Did the pain then subside once you were

11   sitting on the airplane for a while?

12     A.    Yes.

13     Q.    How long did it take for the pain to go

14   away?

15     A.    About three or four minutes.

16     Q.    Once you got to O'Hare you had to get

17   from the plane out to the curb to your

18   transportation, correct?

19     A.    About five miles, yes.

20     Q.    And did they meet you with a wheelchair

21   at the plane?

22     A.    No.  I told the attendant, I said, "we

23   are not doing this over here.  I left out of here on

24   a walker, and it took me three hours to get from

BRUCE ROGERS, NOVEMBER 13, 2007

1   curbside over to where I was supposed to catch the

2   airplane and most of it was waiting on somebody to

3   help me."

4        Q.    This is some prior trip?

5        A.    Well, when I got out of the hospital

6   here.

7        Q.    So at O'Hare they pulled up a wheelchair

8   for you?

9        A.    Yes, I had somebody take me because we

10  just barely made the flight and it's a long ways.

11       Q.    You're talking about the prior time you

12  flew?

13       A.    Well, it's the same when I came back this

14  time.  It was the same.  I imagine it to be the same

15  when I got there, and I -- I needed somebody to help

16  me with my bags, then I needed a wheelchair.

17       Q.    All right.  I want to focus on your

18  eyesight at the time of the accident.  Did you wear

19  glasses or contacts?

20       A.    No.

21       Q.    Do you currently wear glasses or

22  contacts?

23       A.    To read.

24       Q.    Do you know what your vision is?

BRUCE ROGERS,  NOVEMBER 13, 2007

1        A.      No.

2        Q.      When is the last time you went to an eye

3   doctor?

4        A.      About a month.

5        Q.      Did they check your eyes?

6        A.      Yes.

7        Q.      What did they tell you about your eyes?

8        A.      I need glasses.

9        Q.      For reading only?

10       A.      No.  He said I need glasses for my left

11   eye.

12       Q.      What was wrong with your left eye, far

13   sighted or nearsighted?

14       A.      No.  He said under the VA evaluation for

15   it, he said, "your left eye will qualify you for

16   corrective surgery.  Your right eye will disqualify

17   you for -- you have -- together the two have to have

18   a diminishing effect on you.  I mean, you can't see

19   or something," I don't know.

20       Q.      It looks like you get $500 a month from

21   Social Security as supplemental security income.

22   Does that sound right?

23       A.      No.

24       Q.      I'm just looking at Page 14 of Swift.

BRUCE ROGERS,  NOVEMBER 13, 2007

1  What do you get from Social Security?  Does that

2  make any sense?

3      A.    One thing that doesn't make no sense is

4  Sandra King on it.

5      Q.    So that's the wrong person.  So do you

6  get Social Security benefits on it?

7      A.    Yes.

8      Q.    What do they give you?

9      A.    Currently $949.

10     Q.    Were you declared disabled by the Social

11 Security Administration?

12     A.    I don't know.

13     Q.    Are you getting early retirement

14 benefits?  Is that what the $949 is?

15     A.    No.  I'm getting -- I took the records

16 that I received from the physical therapist, and the

17 records from the -- my company terminating me for

18 unable to perform my job to the Social Security

19 office, applied for disability benefits, and they

20 sent me things saying I had been approved for $391 a

21 month.

22     Q.    And did you see any Social Security

23 doctors?

24     A.    No.

BRUCE ROGERS, NOVEMBER 13, 2007

1    Q.    Did you see any Social Security
2 vocational rehabilitation people that evaluated what
3 your job abilities are?
4    A.    I don't know whether I have or not.  I
5 talked to one lady in there that I don't know
6 whether she was -- what she did.
7    Q.    What kinds of questions was she asking
8 you?
9    A.    "Can you do this, can you do that."
10    Q.    All right.
11    A.    "Are you able to do this," or --
12    Q.    Did she write up a report as far as you
13 know?
14    A.    Not to my knowledge.  I don't remember.
15 She said it was a screening or something.
16    Q.    All right.  So the date of the accident
17 what kind of shoes were you wearing?
18    A.    Same ones I got on now, except not the
19 same shoes.
20    Q.    So you're wearing -- what's the name of
21 these, moccasins?
22    A.    Yes.
23    Q.    They have a rubber sole, correct?
24    A.    Yes.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.     And they have no heel, correct?

2      A.     No.

3      Q.     Just a flat bottom to it?

4      A.     Yes.

5      Q.     You had come from the -- the depot, what

6  do you call it?

7      A.     I believe that particular load came out

8  of Texas.

9      Q.     Where in Texas?

10      A.     I keep Ludlow, I believe, I'm not sure.

11      Q.     And you were headed to --

12             (WHEREUPON, a certain document was

13             marked Roger Deposition Exhibit No.

14             2, for identification, as of

15             11-13-07.)

16  BY MR. POTTER:

17      Q.     Two, does this look like you were headed

18  to here or is this the wrong building?  This may be

19  across the street (indicating).

20      A.     I don't know what that is.  Doesn't say

21  nothing to me that I would --

22      Q.     Were you headed to Precision?

23      A.     Yes.

24      Q.     What -- do you know the full name of the