BRUCE ROGERS,  NOVEMBER 13, 2007

1  company?

2      A.      Precision Tools or Laboratories, I

3  believe.

4      Q.      Do you know what you were hauling?

5      A.      Not sure, but I was told that it was some

6  sort of a chemical that they use to clean the

7  underneath of vehicles with.

8      Q.      Was that then a hazardous material?

9      A.      I don't believe so.  It could have been.

10     Q.      It sounds like it was some kind of

11 solvent.

12     A.      It was dry material.  It was something

13 they used.  I believe he told me it was in a spray

14 of some sort they use to spray under vehicles to

15 clean the salt off or something like that.

16                  (WHEREUPON, a certain document was

17                  marked Roger Deposition Exhibit No.

18                  3, for identification, as of

19                  11-13-07.)

20 BY MR. POTTER:

21     Q.      We have marked as Exhibit 3, this is a

22 southeast view of the rear of 953 through 977

23 property.  Does that look familiar to you?

24     A.      Possibly.

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1        Q.     I was looking for your complaint.  Do you
 2   know the address you were going to?
 3        A.     Not off the top of my head.
 4        MR. POTTER:  Do you know the address?
 5        MR. HULL:  Yes, I think it was the 959
 6   building.  Yes, 959, that was Precision.  They might
 7   have been 959 and 966 or something like that.
 8        MR. POTTER:  They had two suites.
 9        MR. HULL:  959 was the first door I know
10   coming in from the street.
11   BY THE WITNESS:
12        A.     The thing that I was looking for on this
13   is for identification in this area someplace from
14   the street like a 9 or 6 or 4 or something like that
15   to identify, like 900 or 800.
16   BY MR. POTTER:
17        Q.     Were you hauling a van that day?
18        A.     Yes.
19        Q.     Had you been to the location before?
20        A.     No.
21        Q.     What was the weather like that day?
22        A.     Sunny.
23        Q.     Approximately what time did you arrive at
24   the place where the accident occurred?
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.     Around 1:00 I believe.

2      Q.     Is that 1:00 p.m.?

3      A.     Yes.

4      Q.     And did you pull into a parking lot and

5  park your truck and get out and try to figure out

6  where you needed to go?

7      A.     No.

8      Q.     What did you do when you first arrived?

9      A.     I looked at the building and markers, and

10 it indicated to me that it could be one of these

11 areas, and I didn't want to pull in there and have

12 to pull back out because of the narrowness of the

13 turn.  So I just pulled my vehicle off to the side

14 and put my forward flashers on, and got my bill of

15 lading and went over to check to see if the address

16 was correct.

17     Q.     Where did you go to check?

18     A.     The -- over to the door, the closest door

19 to the street.

20     Q.     And so was this a door in the rear by

21 some loading base or was it --

22     A.     It would be like a door like this, only

23 it would be over here someplace, I would guess.

24     Q.     I don't want you to guess on anything.

54

1    A.    Well, I don't know.  I'm just saying I
2  don't know because it doesn't show me something that
3  I recognize.
4    Q.    Looking at --
5    A.    This could be -- I recognize this,
6  something like that or that, you know.  Those were
7  there (indicating).
8    Q.    All right.  So looking at Exhibit 3, the
9  darker -- it looks like a green door on the right
10  side of the photograph.  That was the door similar
11  to what you were headed toward?
12    A.    Similar, yes.
13    Q.    Why don't I do this?  Here is my -- here
14  is black and white copies of all my photos and here
15  is color copies of most of those.  What I want you
16  to do is go through these, and if you can, if there
17  is one, show me a photograph that would show me
18  where you parked your tractor trailer that
19  afternoon.  Just take your time.  I have to use the
20  restroom, then we can go off the record.
21    MR. HULL:  Yes.
22  BY MR. POTTER:
23    Q.    Let me ask -- you pulled out a couple
24  photos, one where you parked your truck, and two, if

BRUCE ROGERS, NOVEMBER 13, 2007

1  you see the photo where the door is that you headed

2  towards, and let me ask you this.  Did your accident

3  occur between the time when you parked your truck

4  and before you arrived at that door or did you get

5  to that door?

6       A.    I got to the door that had a note on it

7  that said, "drivers, use the other door," with an

8  arrow on it, and I was enroute when the accident

9  occurred.

10      Q.    Understood.  So if you could pull out, if

11 there is photos that show where your tractor trailer

12 was parked, the door that you first walked to, and

13 the door that you were walking to at the time of

14 your fall, if they're in there.

15                 (WHEREUPON, discussion was had off

16                 the record.)

17                 (WHEREUPON, a certain document was

18                 marked Rogers Group Exhibit Nos. 4-5

19                 for identification, as of

20                 11-13-07.).

21 BY MR. POTTER:

22      Q.    Looking at Exhibit 5, what we have marked

23 here today, in the righthand portion of this photo

24 you see a door.  Is that what you believe to be the

1  959 back entrance?

2      A.    That is the entrance I went to.

3      Q.    All right.  I'm going to ask you to draw

4  a circle around that entrance and draw your initials

5  next to it with a one.

6      MR. POTTER:  Please let the record reflect

7  that the deponent drew a circle around a door in

8  Exhibit 5 with his initials next to it and a number

9  1.

10 BY MR. POTTER:

11     Q.    Within that circle, is that the door that

12 you were headed to right after you parked your

13 truck?

14     A.    Yes.

15     Q.    Did you have anything in your hands at

16 that time?

17     A.    I believe I had my bill of lading in my

18 hand with the address on it.

19     Q.    Would that be on a clipboard?

20     A.    No.

21     Q.    Would that just be a piece of paper?

22     A.    Piece of paper.

23     Q.    You're indicating your left hand?

24     A.    Yes.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.      Are you left or right handed?

2      A.      Right handed.

3      Q.      And did you have anything else in your

4   hand?

5      A.      No.

6      Q.      Were you, as you walked toward this door,

7   were you looking at the door?

8      A.      Yes.

9      Q.      Was there anything unusual that happened

10  that caught your attention as you walked to the

11  door?

12     A.      No, other than that piece of paper on it.

13  I couldn't go -- going toward it I didn't see what

14  it said until I got up close to it.

15     Q.      So you observed in the distance a piece

16  of paper on the door that you circled?

17     A.      Mainly I was looking for the number.

18     Q.      All right, and when you got up close to

19  the door, what did the piece of paper say?

20     A.      "Drivers use other door."

21     Q.      Did it have an arrow?

22     A.      Yes.

23     Q.      If you were facing the door, it would

24  have been an arrow to your left?

BRUCE ROGERS,  NOVEMBER 13, 2007

1    A.    Yes.

2    Q.    All right.  As you approached this door,

3    did you familiarize yourself with your surroundings?

4    A.    Always.

5    Q.    So in addition to looking where you were

6    walking to, you were also paying attention to the

7    ground in front of you, correct?

8    A.    Yes.

9    Q.    Was that ground wet or dry?

10   A.    Going toward the door?

11   Q.    Yes.

12   A.    Dry.

13   Q.    And did you see anything unusual about

14   that ground as you walked to the door?

15   A.    No, other than it was cement.

16   Q.    All right, and as you were walking toward

17   the door, did you see the white PVC tube headed

18   toward the drain as depicted in the center of the

19   photo?

20   A.    Maybe out of the corner of my eye, but my

21   focus was on going to the door, seeing what it said.

22   Q.    All right, and what was the temperature?

23   You said it was warm and sunny or just warm?

24   A.    It was warm and sunny.  It was probably

1  maybe upper 70s.

2      Q.    Is there any reason why you parked your

3  truck remotely as opposed to pulling it back into

4  one of these loading docks?

5      A.    Lazy.

6      Q.    You're saying you were lazy?

7      A.    Yes.

8      Q.    And how would that indicate that you were

9  lazy?

10      A.    I don't want to pull it in there and pull

11  it out of there and find out I'm in the wrong place

12  and waste all of that for no reason.

13      Q.    So this loading dock that's in the middle

14  of the photograph, but if you were to walk up to it

15  goes into the ground, correct?

16      A.    Yes.

17      Q.    So that the rear of your van would be

18  level with the entrance to the loading dock,

19  correct?

20      A.    Yes.

21      Q.    Then you could just use a -- somebody

22  could just use a pallet jack to unload the truck,

23  correct?

24      A.    Yes.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.     Now would it have been your obligation to
2  unload the truck once you had backed it into the
3  loading dock?
4      A.     No.
5      Q.     It would have been the Precision people's
6  obligation to unload?
7      A.     Or a lumper service.
8      Q.     What is a lumper service?
9      A.     A lumper is engaged by different
10 companies here and there that have a contract with
11 the company to load and unload trucks for them.
12     Q.     Is that in your contract or anywhere in
13 this writing that you're not unloading these trucks?
14     A.     Verbally.  When I was hired I told them I
15 don't do unloading.
16     Q.     You don't do unloading at any of your
17 destinations?
18     A.     Two in two years.
19     Q.     Okay.  That would have been the two years
20 prior to the accident?
21     A.     Yes.
22     Q.     So you read the sign.  You realized, "I
23 gotta go to another door," right?
24     A.     Yes.

1    Q.    Did you knock on that door with the paper
2  on it?
3    A.    No.
4    Q.    Did you see anyone out in the parking lot
5  when you arrived?
6    A.    No.
7    Q.    Were there any other tractor trailers in
8  the parking lot when you arrived?
9    A.    No.
10    Q.    Were there any other vehicles parked --
11  that you saw parked in the parking lot when you
12  arrived?
13    A.    I don't remember.  There could have been
14  some in that area over here (indicating).  If they
15  were, they were small vehicles, not tractor
16  trailers.
17    Q.    You couldn't walk parallel to the
18  building to get to that next door because of the
19  loading dock, right?
20    A.    Right.
21    Q.    You had to go around the loading dock
22  because the loading dock goes into the ground.  It
23  has a metal handrail that prevents you from walking
24  directly parallel to the building?

1      A.      And falling into the hole.

2      Q.      All right.  In fact, you did start to

3  walk around the loading dock, correct?

4      A.      Correct.

5      Q.      As you were walking up to the point where

6  you fell, were you distracted by anything?

7      A.      No.

8      Q.      Did anything unusual happen that caught

9  your eye or drew your attention away from where you

10  were walking?

11     A.      No.

12     Q.      Did you hear any loud noises?

13     A.      No.

14     Q.      Did you see anything that caught your

15  attention?

16     A.      No.  I just noticed that it was wet up

17  there in that area.

18     Q.      So as you were walking around the loading

19  dock, you see it's wet up ahead, correct?

20     A.      Yes.

21     Q.      And would you agree with me that you

22  could have, if you so chose, walked around the area

23  that was wet?

24     A.      Well, I wouldn't because there is no

BRUCE ROGERS,  NOVEMBER 13, 2007

1  reason to.  It's not very far from here to there.

2       Q.    I understand and --

3       A.    Water is water.

4       Q.    I understand, but if you wanted to you

5  could have walked around the wet spot?

6       A.    Correct, I could, correct.

7       Q.    Point in fact, you chose to walk through

8  the wet spot, correct?

9       A.    Yes.

10      Q.    That was the shortest distance, correct?

11      A.    Yes.

12      Q.    That's why you chose to walk through the

13  wet spot?

14      A.    Correct.

15      Q.    When you looked and saw that it was wet,

16 did you then examine the wet spot a little closer?

17      A.    No.

18      Q.    At the time that you started to fall,

19 where were you looking?

20      A.    Probably in front of me.

21      Q.    All right.  How far were you from the wet

22 spot before -- strike that.

23            How far were you from the wet spot when

24 you first saw it?

1      A.      Around 20 feet.

2      Q.      Now, as you walked through the wet spot,

3   how many steps into the wet spot did you get before

4   you started to fall?

5      A.      First step.

6      Q.      Can you describe for me the size of the

7   wet spot?

8      A.      Roughly two foot across, you know, to

9   step over.  Probably three feet from edge to edge.

10     Q.      So it was probably two feet by three

11   feet?

12     A.      No.  It was two to three feet from this

13   edge to that edge of it.

14     Q.      All right.  So taking the dimensions

15   going from --

16     A.      This one here would be I don't know how

17   many feet.  It was just out there, probably 15, 20

18   feet.

19     Q.      So it was approximately 2 to 3 feet by

20   approximately 15 feet?

21     A.      Yes.

22     Q.      Before you fell, did you look at the

23   white PVC tube?

24     A.      I noticed it was there.

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.    Did -- before you fell did you notice
2  whether it was broken in any way?
3      A.    I didn't see any other wet spots.
4      Q.    In the area of the wet pavement, would
5  you agree with me that there was a drain?
6      A.    No, I wouldn't.  I didn't see a drain.
7      Q.    Did the water flow toward the drain?
8      A.    I don't know.
9      Q.    Do you know when -- you drove in from
10 Texas, right?
11     A.    Yes.
12     Q.    That day, right?
13     A.    No.  Well, I drove in from Texas.  I
14 don't remember how long it took me to drive.
15     Q.    Did you have a place that you stopped to
16 rest or --
17     A.    You stop wherever you want to.  It's
18 driver's prerogative.  You have so many hours you
19 can drive by law, but usually, when you get -- pick
20 up a load, it tells you when it's due.  If I have
21 five days to go from Nex Mexico to Pennsylvania, if
22 I'm taking my girlfriend with me, I take off then,
23 and then when I get there I go to a motel because I
24 can reset my time.  It will take me like three days

1    to get over there, but then I'll have a day and a

2    half that I can use to reset my time so I can make

3    more money.

4        Q.    All right.  Did you stop somewhere

5    between Mexico and where the accident occurred?

6        A.    I don't remember.

7        Q.    Do you know if it had rained recently in

8    the location where the accident occurred?

9        A.    I don't believe it did because it was all

10   dry except for that one area.

11       Q.    For the tube from which the water was

12   coming out of, do you know where that water came

13   from?

14       A.    No.

15       Q.    But it was your impression that water

16   didn't come from rain runoff from the roof or

17   anything like that because everything else was dry,

18   right?

19       A.    It comes from rain, I agree with, because

20   all of it would have been wet.

21       Q.    All right.

22       MR. TEFFT:  I'm sorry, could you read that

23   back?

24                (WHEREUPON, the record was read by

```
 1                    the reporter.)
 2  BY MR. POTTER:
 3      Q.    You're saying it didn't come from rain
 4  otherwise it would all have been wet?
 5      A.    Yes.
 6      MR. POTTER:  Can we mark this as an exhibit
 7  number?
 8                    (WHEREUPON, a certain document was
 9                    marked Potter Exhibit No. 6, for
10                    identification, as of 11-13-07.)
11  BY MR. POTTER:
12      Q.    Looking at what we have marked as Exhibit
13  6, do you see in the foreground of the photograph,
14  the drain?
15      A.    I don't know whether that's a drain or
16  not.  I have seen this type many times and it's a
17  manhole cover.  I didn't see this, no.
18      Q.    So let me ask the question.  You know
19  what I'm going to ask.  Do you remember seeing a
20  manhole cover such as the one depicted in Exhibit 6
21  on the day of your accident?
22      A.    No.
23      Q.    So let's get back to the wet spot.  You
24  stepped into the wet spot with your left or right
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1    foot?

2         A.    I don't remember.

3         Q.    And what happened to your foot when you

4    stepped?

5         A.    I fell and hit the ground.  I fell so

6    fast I hit before my mind even said "you're

7    slipping."

8         Q.    Did your foot slip or did you trip on

9    something?

10        A.    Slipped.

11        Q.    And when it slipped, did your foot go

12   forward or backwards in slipping?

13        A.    Actually I believe it went sideways.

14        Q.    When you say "sideways," was it to your

15   left or right?

16        A.    It would have gone to my left, I believe.

17        Q.    Were you facing -- when you stepped and

18   your foot slipped, were you facing parallel with

19   this building to the left, away from the building,

20   toward the building?  Where were you facing?

21        A.    I would have been facing probably like

22   about 45 degrees right here, because I would have

23   went around it then went across.  When I stepped in

24   it, it was from an angle from that door to here when

1    I slipped and fell.

2        Q.    So what you're indicating is you were

3    just rounding the corner where the loading dock is,

4    correct?

5        A.    Yes.

6        Q.    And you were on a 45-degree angle away

7    from the building and as you looked at the photo to

8    the left of the building, correct?

9        A.    Yes.

10       Q.    When your foot slipped, what happened to

11   your body?

12       A.    Hit the ground.

13       Q.    Which side of your body hit the ground?

14       A.    My right hip hit the ground because I

15   didn't -- like I said, I hit the ground before I

16   even knew I was slipping.  Step, bam, just that

17   quick.

18       Q.    Did any other part of your body in

19   addition to your right hip hit the ground?

20       A.    At the time when the initial contact?

21       Q.    Yes.

22       A.    I don't believe so.

23       Q.    Was there a second contact with the

24   ground?

1       A.      Probably my right arm.

2       Q.      All right, and did you injure your right

3  arm as a result of the contact?

4       A.      No.  I may have scraped it or something.

5  I don't remember.

6       Q.      When you hit the ground with your right

7  hip, did you hear anything?

8       A.      Yes.

9       Q.      What did you hear?

10      A.      Something like that (indicating).

11      Q.      Do you believe in your mind, in your

12  opinion that was the bone breaking?

13      A.      Yes.

14      Q.      All right.

15      A.      Although I don't believe it was, but in

16  my mind that's what it was.

17      Q.      So what you think it was, it was just you

18  hitting the ground, that's what you heard?

19      A.      No.  I did hear something.  I don't know

20  what it was, whether it was the bone or whether it

21  was my impact.  I don't know.  I heard that sound.

22      Q.      All right, and what happened to you next?

23  Did you lay there?

24      A.      I rolled out of the wet spot and laid

1  there, yes.

2      Q.    And how long did you lay there before

3  somebody found you?

4      A.    20 minutes probably.

5      Q.    Were you saying anything?

6      A.    These doors were open and there was, for

7  example, lifts running back and forth in there.  I

8  was waving my arm.  They didn't wave back or

9  nothing.  They just kept right on doing whatever

10  they were doing.

11      Q.    Now, while you were laying there, were

12  you laying in the wet spot?

13      A.    No.  I rolled out of it.

14      Q.    Did you intentionally roll out of it or

15  did you just -- that's the way you fell and you

16  rolled out of it?

17      A.    That's probably just the way I fell.  I

18  rolled out of it.

19      Q.    Was any part of your body wet after you

20  had fallen?

21      A.    My right side was.

22      Q.    Was that -- were you wearing a jacket?

23      A.    No.

24      Q.    Were you wearing jeans?  What were you

1  wearing?

2      A.     Wearing sweat pants probably.

3      Q.     And were you wearing a t-shirt or --

4      A.     T-shirt probably.

5      Q.     Was that water wet?  Was it oil wet?

6  What was the substance as far as you can tell?

7      A.     When I was laying there on the ground I

8  could see kind of a greenish mossy looking

9  underneath the water.

10     Q.     So did you look at the location where

11 your foot slipped or just the general area?

12     A.     No, I looked at it.  I seen the water

13 when I was getting close to it, and from when I was

14 walking.  It had a clarity to it kind of, from the

15 sun.  There was nothing visible as far -- nothing

16 that would alarm you, you know.  I grew up on a

17 ranch.  I know what's dangerous and what ain't.

18     Q.     Was the whole wet spot, did it have a

19 mossy greenish look to it or was it just one area of

20 the wet spot?

21     A.     It looked like maybe the inner two-thirds

22 of it maybe.

23     Q.     When you stepped into the wet spot, did

24 you step into the inner two-thirds of it?

1     A.     On the edge of it, I would guess.

2     Q.     I don't want you to guess anything.  If

3 you don't know, say "I don't know."  Or if you give

4 me your estimate, give me your estimate.

5     A.     The nearer of the two-thirds.

6     Q.     So was your foot, as that slipped, was

7 that foot landing in the two-thirds area or outside

8 of the two-thirds area?

9     A.     Inside.

10     Q.     Was it just barely inside, a portion of

11 it inside?  Can you give me any specifics?

12     A.     No.

13     Q.     Were you in pain as you laid there?

14     A.     Not specifically.  I don't believe I was.

15     Q.     Was there a reason why you didn't get up?

16     A.     Yes, because I didn't know what was

17 wrong.  I tried to move.  That's when I was having

18 problems getting my body to cooperate, so I just

19 decided that I would just wait until -- I didn't

20 have my cell phone with me.  Somebody pulled in that

21 area over here (indicating), and I yelled for him.

22     Q.     So you tried to get up?

23     A.     Yes.

24     Q.     But you couldn't because your body wasn't

BRUCE ROGERS,  NOVEMBER 13, 2007

1   cooperating?

2        A.    Yes.

3        Q.    And ultimately you learned that you

4   fractured your hip, and that's why your body wasn't

5   cooperating, correct?

6        A.    Yes.

7        Q.    Was there anything concealing this wet

8   spot?

9        A.    Just the glare of the sun.  It wasn't

10  glaring off of it enough to bounce into your face

11  but to look at it.  It had a glassy look to it.

12       Q.    So you knew the wet spot was there?

13       A.    Oh, yes.

14       Q.    You knew you were stepping in the wet

15  spot?

16       A.    Yes.

17       Q.    There was no garbage or paper covering

18  the wet spot?

19       A.    No.

20       Q.    You're agreeing with me?

21       A.    Yes.

22       Q.    You knew you were stepping into the wet

23  spot, and you made a conscious decision to step into

24  the wet spot, correct?

1       A.      Yes.

2       Q.      Do you know who eventually came up to

3  you?  Do you know the gentleman's name?

4       A.      No.

5       Q.      Or the lady's name?

6       A.      No.

7       Q.      Did you say anything to anyone at the

8  scene as far as how it happened?

9       A.      I believe the -- well, I believe whoever

10 made the delivery at that time was -- he came over

11 and he said, "what's the matter?"  I said, "I think

12 I broke my hip."  I said, "could you call an

13 ambulance?"  He said, "why don't those guys call?"

14 I said, "I don't know, maybe they're blind."

15      Q.      All right.  Let's look at what we have

16 marked as Group Exhibit No. 4.  The first page is

17 the cover letter from your attorney.  Were you

18 present when Exhibits A through F were taken?

19      A.      No.

20      Q.      Do you know when these photos were taken?

21      A.      No.

22      Q.      Do these -- let me ask you.

23              Look at Exhibit 5.  Does this photograph

24 truly and accurately show how the door and the