1  building.  Here would be the bottom of the photo

2  (indicating).

3       MR. POTTER:  He would have been standing here,

4  this door (indicating).

5       MR. HULL:  You would have been walking toward

6  that?

7       MR. POTTER:  Yes.

8  BY THE WITNESS:

9       A.    The door would have been over in this

10  area then (indicating).

11  BY MR. POTTER:

12       Q.    I think so.

13       A.    Yes, that looks generally the -- it looks

14  about the same here.

15       Q.    And looking at the circle that he drew,

16  would you agree with me that the location where the

17  gentleman found you was within that circle?

18       A.    I believe.  Well, his circle is edging

19  the water, so I don't --

20       Q.    Do you believe it would have been to the

21  right or the left?

22       A.    It would have been to the right.

23       MR. HULL:  You're talking about when the guy

24  found him?

 1      MR. POTTER:   Right, when the guy found him.

 2  BY MR. POTTER:

 3      Q.    Can I get you to draw a circle where the

 4  guy would have found you on this photo and put your

 5  initials off to the side?

 6      A.    How big a circle?

 7      Q.    A circle that would contain your entire

 8  body when the guy found you and draw your initials

 9  off to the side.

10      MR. POTTER:  So for the record the deponent

11  has drawn a circle on Culp Exhibit No. 2 with his

12  initials off to the side.  He's using the heavy

13  black marker.

14  BY MR. POTTER:

15      Q.    This circle would have contained the

16  location where your body was when the gentleman

17  found you, correct?

18      A.    I believe so, yes.

19      Q.    And looking at the photo you can see

20  where you would have stepped when your foot slipped.

21  Let me show you this.  From the other direction -- I

22  believe that this is the same photo from the other

23  direction.

24      MR. HULL:  It doesn't look the same to me.

1    The pipe doesn't go all the way to the concrete.

2        MR. POTTER:   Okay.

3    BY MR. POTTER:

4        Q.     In any of these photos before you, can

5    you see the location where you would have stepped

6    when your foot slipped?  Take your time, you can go

7    through them all.  You can use the photo from your

8    attorney.  How about close up like that in reference

9    to the pipe?  Let me ask this way.  Can you tell me

10   how far your foot was when it slipped, how far it

11   was from the white PVC pipe?

12       A.     No, I don't know.  All I know is I was

13   walking around that area (indicating).

14       Q.     Looking at Culp Exhibit 2, can you see

15   where you would have stepped when your foot slipped?

16       A.     Inside of this circle right here

17   (indicating).

18       Q.     Right inside of the circle drawn by the

19   prior deponent?

20       A.     Right.

21       Q.     All right.

22       MR. HULL:  With the initials "TLC."

23   BY MR. POTTER:

24       Q.     Did you have Medicare or Medicaid?  How

BRUCE ROGERS,  NOVEMBER 13, 2007

1  were your bills paid?

2      A.    VA, the VA paid them.  I don't know,

3  but -- how my medical bills were paid.  I know that

4  I don't have any medical insurance because I'm a

5  veteran.  All that is provided by the VA.

6      Q.    Did Swift provide you with medical

7  insurance while you were employed with them?

8      A.    I don't think so unless you pay for it.

9      Q.    Who paid your hospital bills in Chicago?

10     A.    I imagine workmen's compensation.

11     Q.    Would you agree with me that you're not

12 getting any bills in the mail at this time?

13     A.    Am I getting any bills in the mail, no.

14     Q.    Do you know of any outstanding bills that

15 you have from your medical treatment?

16     A.    Not to my knowledge.

17     Q.    As far as you know all your bills have

18 been paid?

19     A.    As near as I know.

20     Q.    Nobody has been calling you, no bill

21 collectors or anything like that?

22     A.    No.

23     Q.    At any time were bill collectors calling

24 you?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.      Oh, yes.

2      Q.      For the medical bills?

3      A.      Not for that, no.

4      Q.      All right.

5                      EXAMINATION

6  BY MR. TEFFT:

7      Q.      When you said bill collectors were

8  calling you, that wasn't for medical bills, is it?

9      A.      No.

10     Q.      Did you give any testimony for a workers

11  compensation case?

12     A.      I don't understand what you're saying.

13     Q.      Let me back up.  Did you file a workers

14  compensation claim as a result of the accident?

15     A.      I don't know whether I did or not.  I

16  don't believe I did.  I think it was taken care of

17  by my other company.

18     Q.      All right.  You didn't have an attorney

19  for the workers compensation then?

20     A.      No.

21     Q.      All right, but workers comp paid some

22  bills as far as you know?

23     A.      As far as I know, yes.

24     Q.      You never gave any testimony in a workers

BRUCE ROGERS,  NOVEMBER 13, 2007

1   compensation hearing, did you?

2       A.    I don't remember having any hearing of

3   any sort.

4       Q.    All right.  Other than today with your

5   attorney, I don't want to hear about that, have you

6   ever talked to anybody about how the accident

7   happened?

8       A.    Not really.  It's nobody's business but

9   mine and my attorney's, I guess.

10      Q.    Did you ever tell Swift how the accident

11  happened?

12      A.    I may have.  I might have told the

13  manager what happened, but I don't -- maybe when I

14  called him when it happened, and I had one of the

15  drivers call when I was laying there and asked him

16  to get the cell phone out of my truck, and I called

17  him and told him what happened before the ambulance

18  came.

19      Q.    All right.  Do you remember talking to

20  anybody at Swift about how the accident happened

21  other than before the ambulance came?

22      A.    I don't believe so because my driver

23  manager got transferred, and there was -- I never

24  went back to that position, so --

BRUCE ROGERS,  NOVEMBER 13, 2007

1      Q.      What was his name, the driver manager?

2      A.      I think his name is Mike something or

3  other.

4      Q.      As best as you can tell, what did you say

5  to Mike, what did he say to you on the phone?

6      A.      I just told him that I was making a

7  delivery, and I slipped and fell and was

8  incapacitated, and he would have to make

9  arrangements for the delivery and the -- everything

10  was there.

11      Q.      All right.

12      A.      Keys, bill of lading, all that was there.

13      Q.      Did you give him any details about how or

14  why you slipped?

15      A.      No.

16      Q.      The people who were operating the

17  forklift, the people who were kind of ignoring you

18  as you lay there, did you find out who they worked

19  for?

20      A.      No.

21      Q.      You didn't see any uniform on them?

22      A.      I don't believe so, no.

23      Q.      Did you come to learn other than what

24  your attorney told you that you fell right outside

BRUCE ROGERS,  NOVEMBER 13, 2007

1  the Precision facility?

2      A.    If I fell outside of it?

3      Q.    Yes, is that where you fell?

4      A.    I don't know.  I just know that I went to

5  that one door, and it said, "drivers use the other

6  door."  I started in that direction, and that's when

7  it happened.

8      Q.    All right, but that was Precision's door

9  as far as you knew?

10     A.    As for as I knew, yes.

11     Q.    Because you were there to make the

12 delivery for Precision?

13     A.    Yes.

14     Q.    And that arrow was pointing you to

15 another Precision door?

16     A.    As far as I know.

17     Q.    You were directed by Precision by virtue

18 of the note to go from one door to the other?

19     A.    Yes.

20     Q.    And that was their sign?

21     A.    As far as I know.

22     Q.    Was there any other stationary that said

23 like -- that said Precision?

24     A.    Yes.

1    Q.    But you understood it to be Precision?

2    A.    Somebody put a sign up there.  He could

3  have put it up, you could.  I don't know.

4    Q.    All right.

5    A.    There was just a sign on the door.

6    Q.    In any event, the bill of lading said go

7  to Precision and the address matched the bill of

8  lading?

9    A.    Correct.

10    Q.    Now, I'm sorry to skip around on you.

11  When you had your physical therapy after the

12  accident did you have any trouble breathing?

13    A.    I don't believe so, no.

14    Q.    So you didn't have any difficulty

15  performing your physical therapy due to the

16  breathing as far as you know?

17    A.    Due to breathing?

18    Q.    Yes.

19    A.    I don't believe so.

20    Q.    All right, because I think you said

21  you -- were you done with physical therapy by the

22  time you had to go on oxygen?

23    A.    Oh, yeah.

24    Q.    The clubs and nightclubs that you go to

1  dance, was there smoke in those clubs, cigarette

2  smoke?

3      A.    All of them I believe had that.

4      Q.    All right.  In New Mexico did they still

5  have -- those clubs have smoking in them, if you

6  know?

7      A.    That's kind of iffy.  I don't really

8  know.  I think the mayor of the city of Albuquerque

9  banned smoking everywhere, even on the golf course.

10     Q.    But in any event, did your doctor ever

11 tell you to stay out of the smoking area?

12     A.    He didn't even tell me to stop smoking

13 but I quit.

14     Q.    Dr. Horowitz, I think you mentioned he's

15 your general doctor?

16     A.    Yes.

17     Q.    Did you ever have a lung doctor or a

18 pulmonary specialist?

19     A.    I don't remember if they sent me for a --

20 I know one of those times I had one of those scans

21 that go all the way around your body in the

22 hospital, but I don't remember when that was or what

23 it was for.  Not to my knowledge would probably be

24 my answer to that.

BRUCE ROGERS,  NOVEMBER 13, 2007

1        Q.    All right.  So you don't remember a

2   doctor specifically being a lung specialist or

3   pulmonary specialist then that you saw?

4        A.    No.

5        Q.    All right.  Did any doctor ever tell you

6   the cause of your lung problems?

7        A.    I don't believe so.

8        Q.    Now, I think you said earlier you can

9   walk 150 feet, is that correct?

10       A.    Yes.

11       Q.    And after you hit that 150 feet, you have

12  problems breathing, problems with your hip, or both?

13       A.    My lower back.

14       Q.    All right, so it's the lower back.  Did

15  you hurt your lower back in the fall?

16       A.    I don't think so.  Maybe.

17       Q.    Did you have back problems before the

18  accident that we are here for?

19       A.    No, but then I don't remember having any

20  problems right after here.

21       Q.    All right.  You don't know the

22  relationship between any of the defendants in the

23  case as far as Rothbart defendants or tenants or --

24       A.    I don't know anybody here.

1    Q.    All right.  In the past year have you

2    physically -- I don't want to know about what you

3    don't want to do or that, but physically have you

4    had any trouble doing any housework or chores on the

5    trailer?

6    A.    I have tried to get some -- an allowance

7    for that to get somebody to do that because it's

8    difficult for me to perform any of those, like

9    vacuuming and stuff like that where you have to be

10   on your feet, you know, for --

11   Q.    All right.

12   A.    Not -- I couldn't vacuum my entire room

13   without stopping and resting.

14   Q.    All right.  How about like doing the

15   dishes?  Are you able to do your own dishes?

16   A.    Yes, there ain't many of them.

17   Q.    What happens if there is alot of dishes?

18   Do you get fatigued?

19   A.    Yes, from standing up.

20   Q.    All right.  Now earlier you said --

21   strike that.

22        As you first approached the door, in

23   other words, when you went to the door and saw the

24   sign to go to the other door, did you walk through

BRUCE ROGERS,  NOVEMBER 13, 2007

1   that water as you approached the first time?

2        A.     I wasn't aware that I approached it more

3   than once.

4        Q.     So in other words --

5        MR. HULL:   I think he was a little confused.

6   You might want to try that again.

7   BY MR. TEFFT:

8        Q.     On No. 5 of your deposition you went up

9   to that door that circled, correct?

10       A.     Is -- if that's the right door.

11       Q.     All right.  And then there was a sign on

12  that, then you started toward the left of the

13  picture when you had the accident, correct?

14       A.     Yes.

15       Q.     All I'm after is as you approached that

16  door the first time to read the sign, did you go

17  through that water at all?

18       A.     No.

19       Q.     All right.  So you would have come from

20  the right side?

21       A.     I come from over here to -- which would

22  be the street side (indicating).

23       Q.     All right.  I think you said you noticed

24  the water about 20 feet away?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.     No.   Left the door going that way

2  (indicating).

3      Q.     Did you notice the moss before you

4  stepped into it?

5      A.     No, not visible.

6      Q.     Was there anything else in the water

7  besides that that you know of?

8      A.     That I know of?

9      Q.     Right.

10     A.     No, no to me.  It was just water.

11     Q.     Was there anything on your clothing after

12  the accident?

13     A.     I don't know.

14     Q.     You didn't see the water coming out or

15  discharging any time you were there, did you?

16     A.     I don't remember.

17     Q.     All right.  Did you have any training

18  from Swift as far as how to make deliveries, hazards

19  to avoid, anything like that?

20     A.     I had orientation.

21     Q.     Was there any safety during that

22  orientation?

23     A.     I imagine there was.  I'm not saying

24  there was or was not.  I just don't -- I've been

BRUCE ROGERS,  NOVEMBER 13, 2007

1    doing it for a number of years, and there has been

2    safety seminars that have -- I've gone to regarding

3    that.

4        Q.    All right.  Anything about how to avoid

5    hazards at a delivery site that you recall?

6        A.    Specifically that, no.

7        Q.    All right.  Did Swift have any guidelines

8    or regulations as far as footwear to wear?

9        A.    Not to my knowledge.

10       Q.    All right.

11       A.    Well, there is some but like muscle

12   shirts, you know, muscle shirts, stuff like that.

13   Probably bandanas, no bandanas.

14       Q.    You're talking about a dress code now?

15       A.    Yes.

16       Q.    I'm wondering if anything about safety

17   footwear or safety outerwear, anything pertaining to

18   safety?

19       A.    No.

20       Q.    All right.  How long did you drive for

21   Swift before the accident?

22       A.    I believe I was hired in '02.

23       Q.    All right, and you were a truck driver

24   before that?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.     Yes.

2      Q.     How many years did you drive before the

3 accident all told?

4      A.     How many years have I driven a truck?

5      Q.     Yes.

6      A.     Since I was 12 year old, except for my

7 military.

8      Q.     All right.  When you said the truck, I

9 recall you were driving for Swift and you referred

10 to it as a van.

11      A.     Not a van, tractor trailer.

12      Q.     So it's an 18 wheeler?

13      A.     Yes.

14      Q.     And -- but it's an encased or enclosed

15 tractor trailer, correct?

16      A.     Yes, it is.  Well, it's conventional

17 style with -- it has bunkbeds in the cab for

18 sleeping.

19      Q.     All right.

20      MR. POTTER:  I think he said the trailer was a

21 van.

22      MR. TEFFT:  All right.

23 BY THE WITNESS:

24      A.     That's what they call the enclosed

BRUCE ROGERS,  NOVEMBER 13, 2007

1   trailer is the van.

2   BY MR. TEFFT:

3        Q.    All right, so those big boxy trailers we

4   see on the highway, that's called the van trailer?

5        A.    Right.

6        Q.    Do you remember how much sleep you had

7   before the accident?

8        A.    No.  I know that I had plenty of time to

9   make the delivery because I -- initially the address

10  on the delivery was someplace else and it ended up

11  being a used car place.

12       Q.    All right.

13       A.    And I said, "what the hell did they send

14  me over here for?"  They got to checking a little

15  bit, and they sent me over to this other area.  But

16  I know I was here already in the city before the

17  madhouse starts, before traffic starts, where I can

18  go and make my delivery when it comes time.

19       Q.    All right.  I think you said you got to

20  the location of the accident with your truck about

21  1:00.  I'm assuming the accident happened shortly

22  after that?

23       A.    Yes, I believe, yes.

24       Q.    Within a few minutes?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.    Yes.

2      Q.    It was a nice sunny, June day?

3      A.    Sunny, yes.

4      Q.    You drive a pickup now, correct?

5      A.    Generally I drive my car.

6      Q.    Do you have any trouble with long

7  distance in driving the car?

8      A.    Not unless I drove a long distance to Las

9  Vegas.  That was about nine years ago.

10     Q.    Did you do that straight?

11     A.    No, except for stopping for necessities,

12  and I believe we stopped and got something to eat on

13  the way.

14     Q.    But you didn't stay overnight?  You made

15  it straight through?

16     A.    No, we didn't spend the night.  We left

17  early in the morning, got over there maybe in the

18  evening.

19     Q.    You said "we."  Did your girlfriend go

20  with you?

21     A.    Yes.

22     Q.    Who did most of the driving, you did?

23     A.    I did.

24     Q.    Did she do any?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.    I did all of it.  I'm not letting her

2  drive my car.

3      Q.    The return trip was the same way?

4      A.    Yes.

5      Q.    How long ago did you make that trip?

6      A.    Last year, year before.

7      Q.    All right.  Any problems after the trip

8  with the hip?

9      A.    No.

10     Q.    Any other training that we have talked

11  about that you have besides what you have talked

12  about?  We have talked about the mechanic, Air

13  Force.  Did they have any vocational training?

14     A.    Welding.

15     Q.    Did you ever work as a welder?

16     A.    Yes.

17     Q.    How long did you work as a welder?

18     A.    I don't know, two or three years, five,

19  five years.

20     Q.    And you got out of it because you didn't

21  like it?

22     A.    No.  I wanted to go back to driving

23  trucks.

24     Q.    All right.  Where did you go to high

```
 1   school?
 2        A.     Pasco, Washington.
 3        Q.     What town is that in?
 4        A.     That was Pasco, Washington State.
 5        Q.     Massa High School?
 6        A.     Yes.
 7        MR. POTTER:  Is that by Tacoma?
 8        THE WITNESS:  It's the southeast corner of
 9   Washington.
10   BY MR. TEFFT:
11        Q.     All right.  What kind of grades did you
12   get in high school?
13        A.     In what?
14        Q.     Well, what was your -- just overall.  Do
15   you remember what your grade point average was?
16        A.     Probably a C, maybe.
17        Q.     So you were a C student?
18        A.     Maybe.
19        Q.     All right.
20        A.     Except for English.
21        Q.     Did you take the ACT after you graduated,
22   you know?
23        A.     They didn't have that then.
24        Q.     How about the SAT?
```

1      A.      They didn't have that then either.

2      Q.      All right.  When you had your welding

3  classes and welding training in college, did you

4  have any problems with those?

5      A.      No.

6      Q.      You took algebra in college?

7      A.      Yes.

8      Q.      Did you get a grade?

9      A.      Yes, a B.

10      Q.      What about the other college courses?

11  What were your grades in them?

12      A.      B or B plus.

13      Q.      You did pretty well in college?

14      A.      Yes.

15      Q.      You were a little bit older?

16      A.      Older and I didn't have an eight-hour

17  day.  I had just like two hours with this class and

18  an hour with that class.

19      Q.      All right.  Did you ever get anything

20  less than a C in your college classes that you told

21  us about?

22      A.      I don't believe so.

23      Q.      You filed tax returns for '02, '03, '04,

24  '05, '06?

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1        A.    I'm sure I did.
 2        Q.    In the year 2002 do you remember how much
 3   you made about, maybe a couple years before the
 4   accident?
 5        A.    No.  I'm guessing between $28 and
 6   $34,000.
 7        Q.    Same question for '03?
 8        MR. POTTER:  Was that your best estimate?
 9        THE WITNESS:  Yes.
10        MR. POTTER:  But you said you were guessing
11   again.
12        THE WITNESS:  Well, I am.
13        MR. POTTER:  There is a difference between a
14   guess and estimate, so it's your best estimate?
15        THE WITNESS:  Yes.
16        MR. TEFFT:  You're right.
17   BY MR. TEFFT:
18        Q.    What do you think you made in '03?
19        A.    Generally speaking it was progressively
20   better.
21        Q.    All right.
22        A.    Better.
23        Q.    Well, so '03 would have been a little
24   better than '02 maybe?
```

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.    Yes.

2      Q.    Were those pretty typical years, '02, '03

3  as far as your income around the time of the

4  accident?

5      A.    Pretty much.  I believe that '03 I think

6  would be the last complete year, and it was around

7  $36, $37,000, something like that from my gross

8  income.

9      Q.    Now the whole time you drove for Swift,

10  did you get a mileage fee?

11      A.    All the time.

12      Q.    All right.  It was a certain mileage fee

13  per mile, correct?

14      A.    Yes.

15      Q.    Did you ever get paid by the hour or by

16  any other time?

17      A.    Yes, there's times that we got paid by

18  the hour.  Like if you went -- if you was due to

19  deliver at 6:00 in the morning, and you were there

20  at 5:30, and they didn't unload you until 10:00, you

21  would apply for demerit charges for 6:00 until the

22  time they unloaded you.  Got like an hour window.

23      Q.    But predominantly in a few years before

24  the accident you were paid by the mile?

1      A.     Yes.

2      Q.     For the most part?

3      A.     Yes.   Either mile or trip.

4      Q.     All right.   When you were working light

5   duty for Swift, if you know, was the plan for you to

6   go back -- to go back to full duty or was the plan

7   for you to keep the job indefinitely?

8      A.     Whose plan?

9      Q.     Your employer?

10      A.     I believe they wanted a maid.

11      Q.     Did they ever tell you, "we're going to

12   try and get you back into the saddle with the full

13   duty" or "this would be a permanent job"?  Did they

14   ever give you any indication?

15      A.     None.   They didn't say they were going to

16   try to get me back into it, try to get me in or out

17   of it or keep me around for a while or look at me,

18   whatever they were going to do.   No plan was ever

19   presented.

20      Q.     But you had that -- you know what I mean

21   by functional capacity exam?   The examination you

22   had with the doctor who tried to see what you could

23   or could not do?

24      A.     Yes.

1      Q.      You had that exam over two days?

2      A.      I believe so.

3      Q.      Then after that exam is when you were let

4  go from Swift, correct?

5      A.      Yes.

6      Q.      Did you ever talk to anybody at the

7  workers compensation carrier, a nurse or rehab

8  expert about going back to a different type of job?

9      A.      I talked to -- I don't remember who I

10  talked to, but I did talk to somebody about applying

11  for and receiving some kind of compensative

12  vocational training, but I don't remember who I

13  asked about it, somebody.  I don't remember who it

14  was.

15      Q.      Did you ever get evaluated as far as what

16  type of jobs you might be suitable for as far as

17  skills and --

18      A.      No.

19      MR. TEFFT:  All right.  That's all I have,

20  thank you.

21      MR. POTTER:  I have a few.

22                   FURTHER EXAMINATION

23  BY MR. POTTER:

24      Q.      I have to ask you some background

BRUCE ROGERS,  NOVEMBER 13, 2007

1    questions that I ask everybody.  Have you ever been

2    convicted of a felony?

3         A.    Not to my knowledge.

4         Q.    Have you ever been convicted of a

5    misdemeanor involving dishonesty?

6         A.    Shoplifting.

7         Q.    That would be a misdemeanor involving

8    dishonesty.

9         A.    Yes.

10        Q.    When was that?

11        A.    I don't know.

12        Q.    Was it within the last ten years?

13        A.    No.

14        Q.    Was it within the last 20 years?

15        A.    Maybe.

16        Q.    Did you plead?  Did you enter a plea?

17   Did you say, "I'm guilty or not guilty"?

18        A.    I believe I entered a not guilty plea and

19   was found guilty anyway.

20        Q.    Do you know what town that was in?

21        A.    Albuquerque, New Mexico.

22        Q.    What was your sentence?

23        A.    I don't know.  30 days with work release

24   or something like that.

1    Q.    Did you have to -- actually have to go to

2  jail?

3    A.    Yes.  They put you in jail as soon as

4  you're arrested.

5    Q.    And do you remember when you were

6  released?

7    A.    No.

8    Q.    Do you remember what it was you were

9  accused of shoplifting?

10    A.    No, I don't remember.

11    Q.    Did you ever actually do the shoplifting?

12    A.    More than likely.  I was a drunk.

13    Q.    All right.  Is this the only misdemeanor

14  involving dishonesty that you have been involved in

15  or are there more?

16    A.    I don't recall any.

17    Q.    All right.  When is the last time you

18  sought medical treatment for your right hip?

19    A.    I don't know.

20    Q.    Was it within the last month?

21    A.    No.

22    Q.    Last year?

23    A.    I'm not sure.

24    Q.    What was that last treatment, if you

1  recall?

2      A.    I believe I went to the hospital for

3  something.  I don't remember what it was for, and I

4  asked them about the lower back pain and stuff like

5  that, and they asked me about my injury, and I told

6  them.  They said they would look into it or

7  something, and that was probably --

8      Q.    Was that in the emergency room?

9      A.    I don't remember.

10     Q.    What were you in the hospital for on that

11  day?

12     A.    I think it was some kind of flu or

13  something like that.

14     Q.    Do you remember which hospital you went

15  to?

16     A.    VA.

17     Q.    Same one in Albuquerque?

18     A.    Always.

19     Q.    Is there more than one in Albuquerque?

20     A.    No.

21     Q.    I want to talk a little bit about the

22  water, the wet spot we have been calling it.  Where

23  did the water come from, if you know?

24     A.    I don't know.

BRUCE ROGERS,  NOVEMBER 13, 2007

1       Q.      Was the water flowing toward any
2   direction?
3       A.      I don't know that either.
4       Q.      When you saw the water was it stationary?
5       A.      Yes.
6       Q.      It was like a puddle, right?
7       A.      To me, yes.
8       Q.      Would a puddle be an accurate
9   description?
10      A.      Roughly, yes.
11      Q.      And you would agree with me the puddle
12  wasn't flowing into a sewer, correct?
13      A.      Not to my knowledge, no.
14      Q.      And the puddle was not -- the water for
15  the puddle wasn't coming out of a tube as far as
16  what you saw?
17      A.      I don't remember.
18      Q.      All right.  I want to look at the Answers
19  to Interrogatories, which we marked as your
20  exhibit -- Deposition Exhibit No. 1.  If you look at
21  No. 17, it says, "state with particularity the
22  nature of the alleged defect, object, substance, or
23  condition which caused the alleged occurrence giving
24  the exact dimensions and physical description of

1  such, including the size, shape, color, length,

2  height, and depth of such defect on it."  The answer

3  says, "drainage pipe depositing water on

4  entrance/exit walkway."  That's the first sentence.

5  Is that accurate or do you not know?

6        A.      I don't know.

7        Q.      Second sentence in the answer,

8  "accumulation of drainage water with algae, dirt,

9  and debris underneath -- not visible from a standing

10  position.  See pictures and documents produced."  Is

11  that accurate, that sentence?  You can look back,

12  take your time and look at it.

13        A.      That sounds pretty accurate.

14        Q.      All right.  So I heard you testify

15  about -- well, first of all, do you know if it was

16  an accumulation of drainage water?

17        A.      Drainage, I don't know if it was drainage

18  water or not.

19        Q.      All right.  You already mentioned the

20  algae, right?  That was the green substance that you

21  saw in an area inside the puddle, correct?

22        A.      Yes, when I was laying down.

23        Q.      All right.  How about dirt and debris

24  underneath?  Do you remember seeing any dirt and

1  debris in this puddle?

2      A.    I seen different colors there.

3      Q.    What colors did you see?

4      A.    Brown and greenish, that's about it.

5      Q.    So brown and green are the colors you

6  saw, correct?

7      A.    Greenish, yes, ugly green.

8      Q.    All right.  So brown and greenish, ugly

9  green color, correct?

10     A.    Yes.

11     Q.    Any other colors?

12     A.    Are you talking about standing or --

13     Q.    Standing, laying down, seeing it,

14  anything?

15  MR. HULL:  He's talking about any time you

16  might have seen it.

17  BY THE WITNESS:

18     A.    No, just seen the flat look of the water

19  when I was approaching, and outside of that, no.

20  BY MR. POTTER:

21     Q.    Would it be fair to say that you're not

22  sure if there was any dirt or debris in the puddle?

23     A.    I don't know.

24     Q.    All right, but it does -- your testimony

BRUCE ROGERS,  NOVEMBER 13, 2007

1    does seem to be that the algae was not visible from

2    a standing position, correct?

3        A.    Yes.

4        Q.    So when you looked at the water you said

5    it looked shiny?

6        A.    Correct.

7        Q.    You couldn't see the algae, correct?

8        A.    No.

9        Q.    You're agreeing with me, right?

10       A.    Yes.

11       Q.    I want to look at a list that was

12   attached to your Answers to Interrogatories entitled

13   "Bruce Roger's medical care provider and bills."  I

14   want you to look through this and let me know if you

15   see anything that should be added to this.  Do you

16   think this is a complete list?  Are there things on

17   there that should not be?  Just take a minute.

18       MR. TEFFT:  That's a good question.  Why

19   didn't I think about that?

20       THE WITNESS:  I'm still thinking about the

21   restroom.

22       MR. POTTER:  Do you need to take a break?

23       THE WITNESS:  Yes.

24

1              (WHEREUPON, a break was taken.)

2    BY MR. POTTER:

3         Q.    Last few questions.  Does it look like a

4    complete list of the medical providers?

5         A.    I wouldn't know.

6         Q.    The white PVC pipe, how far was it from

7    the edge of the wet spot?

8         A.    I don't know.  The water runs right out

9    of it.

10        Q.    It was your impression?

11        A.    That was my impression.

12        Q.    Can you give me a distance as to how far

13   the water had to run from the pipe to the wet spot?

14        A.    Probably all the way.

15        Q.    Are we talking feet?  Are we talking 10

16   feet, 50 feet, what kind of distance?

17        A.    I'm not following what you're --

18        Q.    Well, if you look in these photos, there

19   is -- you can see on the edge here, the very tip of

20   the pipe, or here, here is the pipe (indicating).

21   You said the wet spot was -- strike that.

22              How far was the tip of the pipe from the

23   wet spot?  Was it in the wet spot, a few feet from

24   the wet spot, a few inches?

1    A.    No.  It would have been -- well, I would

2  guess this would show what the wet spot is there,

3  and the pipe is there.

4    Q.    You said "I guess" again.  Is that your

5  best estimate that Culp Exhibit 2 is depicting how

6  close the pipe was from the wet spot?

7    A.    Yes.

8    MR. POTTER:  That's all I have.

9    MR. HULL:  I have a few questions.

10                    EXAMINATION

11  BY MR. HULL:

12    Q.    Bruce, the shoplifting conviction that

13  you told us about, you thought that was something

14  more than ten years ago?

15    A.    I believe so, yes.

16    Q.    And but you thought that was something

17  that occurred while you were drinking?

18    A.    It was.

19    Q.    All right, and how long ago did you quit

20  drinking?

21    A.    '91 I think.

22    Q.    So it would have been some time before

23  1991?

24    A.    Yes.

1       Q.    I just want to set the timeframe.  There

2  was questioning about you getting out of your truck

3  and going up to the first door, the door that had

4  the sign on it that said go to the other door.  I

5  want to focus on the time when you were leaving that

6  door and going to the other door.  At that time were

7  you hurrying in any way?

8       A.    No.

9       Q.    Did you have plenty of time to do what

10 you needed to do?

11      A.    Yes.

12      Q.    Were you behind schedule in any way?

13      A.    No.

14      Q.    While you were walking from going from

15 the door with the sign on it, to where the -- where

16 you eventually fell, were you looking where you were

17 going?

18      A.    Yes.

19      Q.    And I think you told us that -- that as

20 you approached the spot where you fell, you could

21 see that it was wet, is that correct?

22      A.    Yes.

23      Q.    After you fell when you're laying on the

24 ground, did you notice anything different about that

BRUCE ROGERS,  NOVEMBER 13, 2007

1  spot where you fell than when you were standing up

2  before you fell?

3      A.    I turned, I was laying on my side.  I

4  could see that it had a greenish look to it and

5  brown and probably dirt, and I don't know what else

6  it was.

7      Q.    Was that stuff you were noticing that was

8  in the spot where you fell?

9      A.    Yes, in the water.

10     Q.    All right.  As you were approaching the

11 wet spot from that door that had the sign on it, did

12 you perceive any danger when you stepped into that

13 wet spot?

14     A.    No.

15     Q.    And why not?

16     A.    I'm a truck driver.  I drive in rain and

17 snow and ice and everything.  It's -- that's just --

18 Texas has billions of miles of cement roads, they're

19 not slick.  I drive 75 miles an hour.

20     Q.    The water wasn't causing you a concern?

21     A.    No.  Water is not slick on cement by

22 itself.

23     Q.    Do you have a thought or a recollection

24 about what you believe caused you to fall?

BRUCE ROGERS,  NOVEMBER 13, 2007

1      A.      The material in the water, under the

2 water was what made me fall.  Water would not make

3 me fall.  On cement, water is not slick but the

4 debris and stuff underneath it.  When I looked down

5 it had algae and dirt and stuff in it.  That's what

6 made me fall.

7      Q.      Is it your belief that's what caused you

8 to slip when you described how your foot slipped so

9 quickly and down you went?

10      A.      Yes, it was that slick.

11      Q.      Had you had any kind of surgery or work

12 or physical therapy done on your right leg prior to

13 this fall?

14      A.      No.

15      Q.      Had you ever had any medical care,

16 treatment, or physical therapy because of any

17 problems with your right hip or right leg prior to

18 this injury?

19      A.      No.

20      Q.      Was there a reason that you -- when you

21 were going from the door that had the sign on it

22 that said go to the other door, was there a reason

23 that you walked and took the route that you took?

24      A.      Yes because I didn't want to walk all the

BRUCE ROGERS,  NOVEMBER 13, 2007

1  way around it, an additional 15 or 20 feet down and

2  20 feet back.  I just walked straight across.

3      Q.    Was that the most direct road that you

4  walked?

5      A.    Yes.

6      MR. HULL:  I don't think I have anything else.

7              FURTHER EXAMINATION

8  BY MR. POTTER:

9      Q.    Was there any oil in the water that you

10  saw as you were lying there?

11      A.    I don't believe so.

12      Q.    How about any antifreeze or any chemicals

13  that you could tell?

14      A.    No.

15      MR. POTTER:  All right, that's all I have.

16              FURTHER EXAMINATION

17  BY MR. TEFFT:

18      Q.    How deep was the water that you stepped

19  in?

20      A.    I'm going to estimate less than a quarter

21  of an inch.

22      Q.    All right.  Did it seem uniform if its

23  depth if you could tell throughout the whole puddle

24  or some areas deeper than others?

1        A.    No.   Just like less than a quarter in the

2   center and tapering into just nothingness.

3        Q.    All right, that's all I have.   Thank you.

4        MR. HULL:   We will reserve.

5

6

7             FURTHER DEPONENT SAITH NOT.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1   STATE OF ILLINOIS     )

 2                         )  SS:

 3   COUNTY OF C O O K     )

 4      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 5           COUNTY DEPARTMENT - LAW DIVISION

 6   BRUCE ROGERS,                 )

 7           Plaintiff,            )

 8      vs.                        )   Case No. 06 L 005376

 9   ROTHBART PROPERTIES, et al,   )

10           Defendants.           )

11

12        I hereby certify that I have read the

13   foregoing transcript of my deposition given at the

14   time and place aforesaid, consisting of Pages 1 to

15   139, inclusive, and I do again subscribe and

16   make oath that the same is a true, correct and

17   complete transcript of my deposition so given as

18   aforesaid, and includes changes, if any, so made by

19   me.

20                            BRUCE ROGERS

21   SUBSCRIBED AND SWORN TO before me

22   this        day of                 , A.D. 2007.

23

24           Notary Public
```

BRUCE ROGERS,  NOVEMBER 13, 2007

```
 1  STATE OF ILLINOIS )

 2                    )  SS:

 3  COUNTY OF COOK    )

 4

 5          I, RACHEL SMITH, a Certified Shorthand

 6  Reporter of said state, do hereby certify:

 7          That previous to the commencement of the

 8  examination of the witness, the witness was duly

 9  sworn to testify the whole truth concerning the

10  matters herein;

11          That the foregoing deposition transcript

12  was reported stenographically by me, was thereafter

13  reduced to typewriting under my personal direction

14  and constitutes a true record of the testimony given

15  and the proceedings had;

16          That the said deposition was taken before

17  me at the time and place specified;

18          That I am not a relative or employee or

19  attorney or counsel, nor a relative or employee of

20  such attorney or counsel for any of the parties

21  hereto, nor interested directly or indirectly in the

22  outcome of this action.

23          IN WITNESS WHEREOF, I do hereunto set my

24  hand and affix my seal of office at Chicago,
```

1   Illinois, this 10th day of December, 2007.

2

3

4

5   C.S.R. Certificate No. 84-4161.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**INDEX**

BRUCE ROGERS,   NOVEMBER 13, 2007

```
 1                    I N D E X
 2  WITNESS                        EXAMINATION
 3  BRUCE ROGERS
 4       By Mr. Potter             4, 125, 138
 5       By Mr. Tefft              105, 138
 6       By Mr. Hull               134
 7
 8                  E X H I B I T S
 9  NUMBER                         PAGE/LINE
10  ROGERS EXHIBIT
11       NO. 1                        6
12       NO. 2                        50
13       NO. 3                        51
14       NO. 4                        55
15       NO. 5                        55
16       NO. 6                        67
17       NO. 7                        79
18       NO. 8                        91
19
20
21
22
23
24
```