IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| BRUCE ROGERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 06 L 005376 |
| | ) |
| ROTHBART PROPERTIES, PRECISION | ) |
| LABORATORIES, INC., ROTHERBART | ) |
| REALTY COMPANY, 977 NORTHPOINT | ) |
| VENTURES, LLC., a/k/a 977 NORTHPOINT | ) |
| VENTURES FUND, SLJ PROPERTIES, LLC, | ) |
| ROTHBART CONSTRUCTION COMPANY, | ) |
| INC. and ROTHBART CONSTRUCTION | ) |
| COMPANY, INC. a/k/a ROTHBART | ) |
| CONSTRUCTION REALTY | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE TO DEFEDANT PRECISION'S
MOTION FOR INVOLUNTARY DISMISSAL**

## I.    INTRODUCTION:

Plaintiff, BRUCE ROGERS, filed this case after sustaining a serious, permanent

job-ending injury as a result of a fall.   The injury was caused by a long standing

hazardous condition on one of the entranceways to the Precision premises.  This

hazardous condition, as well as the fact that delivery people such as the Plaintiff used the

entranceway that traversed the hazardous conditions was well known to Precision.  The

hazardous condition consisted of a drainage pipe that drained liquid and debris from a

sump pump pit inside the premises being leased by Precision.  The drainage pipe emptied

out onto the usual and customary entrance walkway for delivery people coming to the

Precision premises.  The discharge from the drainage pipe caused a build up of wet,

EXHIBIT
2

slippery dirt, debris and other material that created a dangerous and slippery hazard. In fact, Precision has confirmed in deposition testimony that it put up a sign that directed delivery people such as the Plaintiff to use a specific doorway. In order to use the specified doorway, Plaintiff and other Precision invitees used the walkway that crossed the area of the hazard caused by the drainage pipe. This walkway was part of the entranceway to the Precision premises and Precision was well aware that Plaintiff and other invitees would use this walkway and encounter the hazard.

Counts III and IV of Plaintiff's Complaint clearly allege facts that give rise to Precision's duty to provide a safe means of ingress and egress to its leased premises, a breach of that duty and proximately caused damages. These facts were confirmed and supported by the deposition testimony of Precision and Rothbart (the landlord/owner). Further, the allegations of Counts III and IV and the deposition testimony of the Precision witness directly contradict the arguments being made by Precision in support of its motion.

## II.      UNCONTESTED FACTS/ALLEGATIONS:

1.      Counts III and IV of the Complaint contain Plaintiff's allegations against Defendant Precision.

2.      Plaintiff alleges that on or about June 25, 2004, Plaintiff was lawfully on the premises for the purpose of making a delivery to Precision (Par. 6 of Count III, Par. 6 of Count IV of Complaint).

3.    Plaintiff alleges that at that time, Defendant Precision owed a duty to Plaintiff to provide a safe area for **entering** and **leaving** the premises and a duty to maintain the premises including walkways and **entranceways** (Par. 7 of Count III and Par. 7 of Count IV of Complaint).

4.    Plaintiff alleges that at the time Plaintiff was injured he was walking on the usual area for **entering** and **leaving** (Par. 8 of Count III and Par. 8 of Count IV of Complaint).

5.    Plaintiff alleges that Defendant Precision breached its duty to Plaintiff by alleging numerous breaches related to the **entranceways**, including, but not limited to, failure to warn delivery people such as Plaintiff of the unsafe condition caused by the drainage pipe and Defendant's failure to provide a safe pathway for ingress and egress to Precision (Par. 7 of Count III, Par. 7 of Count IV of Complaint).

6.    Terry Culp, currently the vice-president of Precision and, during the time period of the Complaint the Chief of Operations for Precision, testified under oath to the following:

1.    Precision has two "walk-in doors" for entering and leaving the Precision premises and one of those "walk-in" doors was used for access by delivery people (Culp Dep. P. 15 line 19-20; P. 19 line 13-14).

2.    The first "walk-in door" was locked and had a sign on it the day Plaintiff fell, which directed Plaintiff to go to the other "walk-in door" (Culp Dep. P. 21 line 6-24; P. 25 4-16).

3.    The route Precision expected the Plaintiff to take to the other "walk-in door" was the exact route the Plaintiff took and the route customarily used by delivery people such as Plaintiff (Culp Dep. P. 37, 38; P. 39 lines 1-13).

4.    This route caused Plaintiff to cross the area where the drainage pipe discharged (Culp Dep. P. 37, 38; P.39 line 1-13; P.58 line 6-13).

5.   The drainage pipe was connected to a sump pump pit inside Precision's leased premises (Culp Dep. P.28 line 9-24; P.29 line 1-18).

6.   Precision personnel had observed delivery drivers such as Plaintiff, prior to Plaintiff's fall, use the route Plaintiff took to enter the Precision premises on the day that he fell. (Culp Dep. P.37, 38; P.39 line 1-13).

7.   Gary Rothbart, principal of the various Rothbart defendants, testified under oath at his deposition to the following:

1.   Precision was a tenant in the building (Rothbart Dep P. 24-25).

2.   If materials come from inside a tenant's leased space, it is the tenant's responsibility to address any problem created by that even if the problem is created outside of the tenant's leased space (Rothbart Dep. P. 31 line 15-24; P.41 line 6-24; P.62 line 13-18; P.73 line 1-9; P.74 line 16-22; P.90 line 8-16).

3.   Several sections of the lease, attached as Exhibit A to Precision's motion put maintenance responsibility on the tenant (Precision) for areas outside of the specific leased premises (Rothbart Dep. P. 103-104).

8.   Question number 2, 3 and 4 of Plaintiff's interrogatories to Defendant Rothbart, et al contained the following definition, questions and answers by Rothbart:

*Definitions*

a.   *"Area in Question" shall mean the walkway referred to in Plaintiff's Complaint.*

Q:  2. Please state the name and address of the person, firm, entity or corporation which had the responsibility or duty for the maintenance of the area in question, at the time and place of the Plaintiff's fall and for the 30 days preceding the date of Plaintiff's fall.

Rothbart, the landlord, provided the following answer: "Objection, this question calls for a legal conclusion. Without waiving said objection, Precision Laboratories, Inc. an Illinois corporation, the tenant under the lease, had maintenance responsibilities.

3. Was the Defendant in control of the area in question at the time when the alleged occurrence happened?

ANSWER:    Objection, this question calls for a legal conclusion. Without waiving said objection no.

4.    If the Defendant was not in control of the area in question, please state the name and address or some identification of the person, firm or corporation in control of the area in question on the date of the Plaintiff's alleged occurrence.

ANSWER:    Objection, this question calls for a legal conclusion. Without waiving said objection, Precision Laboratories, Inc. an Illinois corporation.

9.    The lease, attached as <u>Exhibit A</u>, to Defendant Precision's motion states in Paragraph 9.A that the tenant [Precision] is responsible for maintaining and operating the "plumbing systems and fixtures".

10.    Both Rothbart and Precision admit that the drainage pipe referred to in Plaintiff's complaint is a drainage pipe that comes from a sump pump pit inside the premises leased by Precision and drains, after being pumped out of the sump pit, to the outside of the building (Culp Dep. P.28 line 9-24; P.29 line 1-18; Rothbart Dep. P.39 line 16-24; P. 40 line 1-6)

## III.    ARGUMENT

Precision has filed both a 2-615 and a 2-619 motion to dismiss. In deciding these motions the court is to take all well pleaded facts as true and in the light most favorable to Plaintiff.

Precision's duty to provide a safe means of ingress and egress from its leased premises is well settled under Illinois law. Under Illinois law defendant owed the

plaintiff, as an invitee, a duty of reasonable care to maintain its premises in a reasonably safe condition. Clifford v. Wharton Business Group, LLC, 353 Ill. App. 3d 34, 817 N.E. 2d 1207, 1214 (Ill. App. Ct. 2004).    One who occupies property, as a tenant is required to use reasonable and ordinary care to keep the property reasonably safe for the benefit of those who use it as an invitee. Ward v. Kmart Corp., 136 Ill. 2d 132, 554 N.E. 2d 223 (1990). An occupied property requires the tenant to use reasonable and ordinary care to keep the property safe from those who use it as an invitee. The rule also applies to one who owns and operates a business to which the public is invited, and as a result owes a duty to keep the premises and the surrounding area in a reasonably safe condition so that such invitees will not be injured by reason of any unsafe conditions that exist at the subject's location. Olinger v. Great Atlantic & Pacific Tea Co., 21 Ill. 2d 469, 173 N.E. 2d 443 (1961). A tenant therefore is required to inspect premises for defects so as to safeguard parties who come upon the property as invitees. Blue v. St. Clair County Club, 7 Ill. 2d 359, 131 N.E. 2d 31(1955).

Tenants are liable to invitees if the tenant knows or should know of a dangerous condition, realizes or should realize the condition involved is an unreasonable risk of injury to invitees, knows or should know that invitees are not likely to discover or realize the danger or to protect themselves from it, and fails to exercise reasonable care to protect them from the danger. Higgins v. White Sox Baseball Club, Inc. 787 F. 2d 1125 (7th Cir. 1986).

The Courts of Illinois have adopted Section 343 of the Restatement (Second) of Torts regarding liability for negligence on premises. The Restatement finds that "a possessor of land is liable to invitee if he or she: 1) knows or by the exercise of reasonable care should know of a condition on the land and should realize that it poses an unreasonable risk of harm; 2) should expect that the invitee will not discover or realize the danger or will fail to protect themselves from it; and 3) fails to exercise reasonable care to protect invitees from the danger." Helms v. Chicago Park Dist., 258 Ill. App. 3d 675, 630 N.E. 2d 1016, 1020 (Ill. App. Ct. 1994).

In Van Holt v. National R.R. Passenger Corp., 283 Ill. App. 3d 62, 669 N.E. 2d 1288 (1st Dist. 1996), appeal denied, 169 Ill. 2d 590, cert. denied, 117 S. Ct. 1694 (U.S. 1997) the court found that liability should be imposed where a business invitee was injured by slipping on a foreign substance on the business premises when the substance was placed there by the negligence of the proprietor or the substance was there for a sufficient period of time such that in the exercise of ordinary care the proprietorship should have discovered it. Again in La Fever v. Kemlite Co., 293 Ill. App. 3d 260, 688, N.E. 2d 309 (1st Dist. 1997) judgment affirmed in part, reversed in part on other grounds, 185 Ill. 2d 380, 706 N.E. 441 (1998) the court found that the owner of a fiberglass plant owed the duty of care to a driver of an industrial waste disposal truck, who was injured when he slipped on fiberglass debris and fell. The court found that while the debris was open and obvious, the driver could not avoid it, injury was foreseeable, and the burden of guarding against the injury on the part of the proprietor was slight. The same is applicable in the matter presently pending before the court. Plaintiff alleges, and Precision admits in its deposition that Precision was well aware of the discharge from the pipe onto the walkway where the plaintiff fell and further should have been aware that wet and slippery debris accumulated to the point of creating a slippery surface on the walkway which would have to be traversed by the plaintiff in delivering goods to the defendant. Moreover, the burden of guarding against the danger of injury by an adequate warning or, a flexible extension on the end of the drainage pipe to direct the discharge away from the walkway was slight.

It is well settled in Illinois that inviting one into your premises requires that the tenant maintain a safe mean of ingress and egress to the property, and one who is in charge of the property is liable to the invitee where he negligently fails to keep the premises and its approaches in a reasonably safe condition. Lotspiech v. Continental Illinois Nat. Bank & Trust Co. of Chicago, 316 Ill. App. 482, 45 N.E. 2d 530 (1st Dist. 1942). The court in Johnson v. Abbott Laboratories, Inc., 238 Ill. App.3d 898,605 N.E.2d 1098 (2d Dist. 1992) held that when the direction of ingress and egress is established by the possessor of the property it must give adequate warning of the danger or repair it. When the tenant is aware that the ingress and egress to its' place of business

is unsafe or has good reason to assume such a situation exists it will be liable to the person such as the plaintiff in this matter, one who entered the property without being aware of the danger and as a result suffers an injury. Steinberg v. Northern Illinois Telephone Co., 260 Ill. App. 538, (2d dist. 1931)

As set forth in Ward, Supra: "…occupiers duties towards his invitees is that of reasonable care." In Stephen v. Swiatkowski, 635 N.E. 2d 997, 1001 (Ill. App. 1st Dist. 1994), the court has stated "… an occupier of property has a duty to invitees to use reasonable care to maintain the premises in a reasonably safe condition.." Again in Branson v. R & L Invest. Inc. 196 Ill.App.3d 1088 ( 1st. Dist. 1990) it was held "When a means of ingress and egress is prescribed for invitees, it is the duty of the inviter to properly illuminate, give adequate warning of, or cause to be repaired a known, dangerous condition. Swett v. Village of Algonquin (1988), 169 Ill.App.3d 78, 87, 119 Ill.Dec. 838, 523 N.E.2d 594."

It is important to note that Plaintiff's allegations (now confirmed by deposition testimony) are that this was not a natural accumulation from the drainage pipe but rather one of which resulted from a discharge of a drainage pipe coming from **inside** the tenant's premises out onto the walkway in question.

In McLean v. Rockford Country Club, 352 Ill. App. 3d 229, 816 N.E. 2d 403 (Ill. App. 2d Dist. 2004), the courts stated: "… the operator of business has a duty to provide a safe means of ingress to and egress from its premises. Bloom, 304 Ill. App. 3d at 712, 710 N.E. 2d 121." The court further stated: "Indeed, Illinois courts have consistently imposed a duty upon property owners to provide reasonably safe means of ingress to and egress from their places of business and have explained that this duty is not abrogated by the presence of a natural accumulation of ice, snow or **water." (**emphasis supplied) Applying these rules to the case at bar the tenant cannot claim an immunity from liability to the plaintiff. The tenant admittedly knew of the accumulation from the discharge of the drainage pipe, knew that the drainage pipe drained onto the walkway,  and should have recognized the possibility of an injury to the plaintiff.

The tenant's claim of lack of liability as a result of the landlord's possible liability is misplaced. In Cochran v. Great Atlantic & Pacific Tea Co., Inc. 203 Ill. App.3d 935 (5th Dist. 1990) the court stated: "The issue before the circuit court was the common law duty of the lessee, not that of the landowner. Whether the landowner also had a duty to the plaintiff, or whether defendant could seek contribution from the landowner was not at issue.

There is no doctrine of "partial duty." Duty either exists or does not, and if it does, it is not diminished in any way because someone else simultaneously owes a like duty. (See 65 C.J.S. Negligence sec. 4(3), at 490.) Defendant had a duty to plaintiff. That duty is not to be diminished merely because the landowner also might have owed a like duty."

As a result of the foregoing, the motion by the tenant seeking to be relieved of responsibility should be denied.  Responsibilities and breaches of duty that may exist or have occurred on the part of and between the defendant/tenant and the landlord are fact questions for a jury.  However, at the present juncture there is more that sufficient basis for denying the Motion of the defendant/tenant to be relieved of responsibility.

## IV.    CONCLUSION

Count III and IV of Plaintiff's Complaint allege facts giving rise to the existence of a duty on Precisions part to provide a safe means of ingress and egress to the Precision premises; a breach of that duty and proximately caused damages.  These facts were confirmed by the deposition testimony of the Rothbart and Precision witnesses.  Further, the lease offered by Precision as its sole support for its 2-619 motion clearly states that Precision is responsible for maintaining and operating the "plumbing systems and fixtures".  Also, Defendant Rothbart, the landlord, testified that several sections of the lease, attached as Exhibit A to Precision's motion put maintenance responsibility on the tenant (Precision) for areas outside of the specific leased premises (Rothbart Dep. P. 103-104).

Illinois law is clear that tenants have a duty to provide a safe means of ingress and egress to their premises.  Precision does not present any law to counter this well-settled rule.  Further, rather than counter the facts alleged by Plaintiff Precision's witness confirmed the facts alleged by Plaintiff.

For the forgoing reasons, Plaintiff requests that this Court deny Precision's motion or in the alternative, grant Plaintiff leave to re-plead its allegations against Precision.

Respectfully submitted,

Bruce Rogers,

By: _____

One of his attorneys

CUTLER & HULL
70 West Madison St., Suite 3700
Chicago, Illinois 60602
(312) 726-0777
Firm No: 33718

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| BRUCE ROGERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 06 L 005376 |
| | ) | |
| ROTHBART PROPERTIES, PRECISION | ) | |
| LABORATORIES, INC., ROTHERBART | ) | |
| REALTY COMPANY, 977 NORTHPOINT | ) | |
| VENTURES, LLC., a/k/a 977 NORTHPOINT | ) | |
| VENTURES FUND, SLJ PROPERTIES, LLC, | ) | |
| ROTHBART CONSTRUCTION COMPANY, | ) | |
| INC. and ROTHBART CONSTRUCTION | ) | |
| COMPANY, INC. a/k/a ROTHBART | ) | |
| CONSTRUCTION REALTY | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFEDANT PRECISION'S**
**MOTION FOR INVOLUNTARY DISMISSAL**

I.    **Deposition of Terry Culp, Director of Operations for Precision Laboratories, Inc.**

1     STATE OF ILLINOIS    )
                           )    SS:
2     COUNTY OF COOK       )

3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - LAW DIVISION
4

5     BRUCE ROGERS,                    )
                                       )
6                        Plaintiff,    )
                                       )
7          vs.                         )   No. 06 L 5376
                                       )
8     ROTHBART PROPERTIES, PRECISION   )
      LABORATORIES, INC., ROTHBART     )
9     REALTY COMPANY, 977 NORTHPOINT   )
      VENTURES, LLC., a/k/a 977        )
10    NORTHPOINT VENTURES FUND, SLJ    )
      PROPERTIES, LLC, ROTHBART        )
11    CONSTRUCTION COMPANY, INC., and  )
      ROTHBART CONSTRUCTION COMPANY,   )
12    INC., a/k/a ROTHBART             )
      CONSTRUCTION REALTY,             )
13                                     )
                         Defendants.   )
14

15        The discovery deposition of **TERRY L. CULP**,

16    taken under oath on the 6th day of February 2007, at

17    Suite 3750, 70 West Madison Street, Chicago,

18    Illinois, pursuant to the Rules of the Supreme Court

19    of Illinois and the Code of Civil Procedure, before

20    Kerry L. Knapp, a notary public in and for the County

21    of Cook and State of Illinois, pursuant to notice.

22

23

24

                                                          1

```
1     APPEARANCES:

2           CUTLER & HULL, by
            MR. EDWIN J. HULL, III, ESQ.
3           70 West Madison Street
            Suite 3700
4           Chicago, Illinois 60602
                for the plaintiff;
5

6           LAW OFFICES of STEPHEN J. HASZTO, by
            MS. FRANCINE BAILEY
7           225 West Washington Street
            Suite 1400
8           Chicago, Illinois 60606
                for the defendants, Rothbart Realty,
9               977 Northpoint Realty, and SLJ
                Properties;
10

11          ADAMS SWATEK, LLC, by
            MS. MARTHA SWATEK
12          1250 Executive Place
            Suite 201
13          Geneva, Illinois 60134
                for Rothbart Construction;
14
            IWAN CRAY HUBER HORSTMAN & VanAUSDAL, LLC,
15          MR. RYAN F. FITZSIMMONS
            303 West Madison
16          Suite 2200
            Chicago, Illinois 60606
17              for Precision Laboratories.

18

19

20

21

22

23

24
```

2

I N D E X

WITNESS:                                          PAGE

TERRY L. CULP

  Examination by:

        MR. HULL.............................. 4
        MS. SWATEK............................ 47
        MS. BAILEY............................ 54


  Further Examination by:

        MR. HULL.............................. 60

E X H I B I T S

NUMBER                              FOR IDENTIFICATION

Culp Exhibit

No. 1.......................................59
No. 2.......................................59

3

1                          (Witness sworn.)

2                          TERRY L. CULP,

3    called as a witness herein, having been first duly

4    sworn, was examined and testified as follows:

5                          EXAMINATION

6                          BY

7                          MR. HULL:

8        Q.   Could you please state and spell your name

9    for the record, please.

10       A.   Terry L. Culp.  Last name is spelled

11   C-u-l-p.

12       Q.   All right.  First of all, let the record

13   reflect that this deposition is being taken pursuant

14   to notice and agreement of the parties, and pursuant

15   to all applicable provisions of the Illinois Code of

16   Civil Procedure and Supreme Court rules.

17            Mr. Culp, have you ever been deposed before?

18       A.   Yes, I have.

19       Q.   How many times?

20       A.   Less than five.

21       Q.   Okay.  What kind of cases?

22       A.   One was an employee-related case and another

23   case had to do with a licensing disagreement on a

24   product.

                                                          4

1      Q.   Okay.  All right.  So you're sort of

2  familiar with the process?

3      A.   I am.

4      Q.   I'm just going to explain a couple things so

5  we're clear.  Obviously, I'm going to ask you some

6  questions.  You're going to give me some answers.  If

7  at any time you don't understand one of my questions,

8  just tell me.  I'll be glad to rephrase it, ask a new

9  one, do something to make sure that we understand

10  each other.  Okay?

11      A.   Okay.

12      Q.   If you don't ask me, I'm just going to

13  assume that you do understand the question that I'm

14  asking.  Fair enough?

15      A.   That's fair.

16      Q.   Also, as I'm sure you know from your other

17  depositions, the court reporter is here to take down

18  what we say.  It's better for her and for all of us

19  if you let me finish my question before you give your

20  answer and I'll try to let you finish your answer

21  before I give you another question.  Okay?

22      A.   That's fine.

23      Q.   If we start talking over each other, she's

24  going to be throwing bricks at us.  Okay?  All right.

5

1          Then, lastly, as you also probably know from

2     your prior experience, she can only take down the

3     words that we say.  You know, the shrug of the

4     shoulder, nod of the head, point of the hand, things

5     like that she can't take down.

6          A.   Correct.

7          Q.   Okay.  So we need to answer everything out

8     loud with words.  Okay?

9          A.   Okay.

10         Q.   All right.  Great.

11              Mr. Culp, where do you currently live?

12         A.   254 Highland Road, Grays Lake, Illinois

13    60030.

14         Q.   And how long have you lived there?

15         A.   Two years.

16         Q.   Who do you live there with?

17         A.   My spouse.

18         Q.   And what's her name?

19         A.   Marian.

20         Q.   How long have you guys been married?

21         A.   24 years.

22         Q.   Good.  Congratulations.

23         A.   Yesterday.

24         Q.   Oh, congratulations.

6

1          Any children?

2     A.    Three.

3     Q.    Any of them live with you?

4     A.    Two.

5     Q.    At this address in Highland?

6     A.    Correct.

7     Q.    All right.  And how old are they?

8     A.    One is 20 and one is 16.

9     Q.    Okay.  And are you currently employed?

10     A.    Yes, I am.

11     Q.    Who are you employed by?

12     A.    Precision Laboratories, Inc.

13     Q.    And how long have you been with Precision?

14     A.    15 years.

15     Q.    And what's your current position --

16     A.    My current position --

17     Q.    -- with Precision?

18     A.    I'm sorry.  Vice president of the seed

19     enhancement business unit.

20     Q.    What is that?  What does that involve, if

21     you can give us a brief description?

22     A.    I have responsibility for all of our

23     activities, products, and activities related to

24     materials that go on seed for agricultural

7

1    applications.

2        Q.    Seed, meaning s-e-e-d?

3        A.    S-e-e-d as in the seed that goes in the

4    ground.

5        Q.    All right.  Okay.  And how long have you had

6    that job?

7        A.    Full-time, probably one year.

8        Q.    Okay.  And what was your previous position

9    before you took that job?

10        A.    I was -- the titles had varied; but most

11    recently, the chief operations officer for the

12    company.

13        Q.    When you say most recently, does that --

14    that doesn't include now?  Or what do you mean by

15    most recently?

16        A.    Well, the title has changed.  For the prior

17    10 years to what I'm doing now for the company, I had

18    responsibilities for the operations of the company.

19        Q.    Okay.  And during that time, the titles

20    changed, but your --

21        A.    Sometimes they were -- you know, had the

22    word "strategic" in them.  Sometimes they had

23    "manager." Sometimes they had "director."  Sometimes

24    they had "vice president."  Sometimes it was "chief

8

1    operations."

2         In small companies, the titles, you know,

3    evolve a little bit over time.

4         Q.   Yeah.  Okay.  And how big a company is

5    Precision?

6         A.   In terms of revenue or employees?

7         Q.   Both.  Start with revenue.

8         A.   Revenue, the company in calendar year 2006

9    generated right around $17 million in revenue.

10        Q.   And what about the number of employees?

11        A.   35 employees, typically.

12        Q.   And what about the office locations?

13        A.   We're presently officed -- the number of

14   office locations?

15        Q.   Yes.

16        A.   We only have one office location.

17        Q.   Has that been the case for the past

18   three years?

19        A.   No.

20        Q.   All right.  Tell me how it's been different.

21        A.   In September of 2004, we moved into a newly

22   constructed facility at 1429 South Shields in

23   Waukegan.  For the 13 months prior to that, we were

24   in leased facilities in the Northpoint Business Park.

9

1    And for the 20-plus years prior to that, we were in

2    owned facilities in Northbrook, Illinois.

3        Q.    All right.  So what is the -- if you know,

4    the period of time that you occupied the premises at

5    the Northpoint building in Waukegan?

6        A.    We signed a lease in -- I'm sorry.

7        We signed a lease in early August 2003.  It

8    was a 12-month lease.  It expired July 31st, 2004.

9    We extended that lease, I thought, just 30 days, but

10   maybe we extended it 45 days because we vacated that

11   premises over Labor Day Weekend 2004.

12       Q.    Were you the individual responsibility for

13   negotiating that lease for the Northpoint premises?

14       A.    Yes, I was.

15       Q.    And who did you deal with when you

16   negotiated that lease?

17       A.    I dealt with Rothbart Properties.  I can't

18   remember if I was dealing specifically with Gary

19   Rothbart or one of the subordinates.

20       Q.    Okay.  Do you remember who the lease is

21   signed with, who's the actual landlord on the lease?

22       A.    I don't recall the legal name.  I know

23   Rothbart Properties or -- Rothbart's name is in the

24   lease, I believe.

10

1        Q.    Okay.

2        A.    I would have to read the lease to answer

3    that question.

4        Q.    All right.  Did anyone else at Precision

5    have any responsibility in negotiating that lease?

6        A.    Well, the owner of the company and I

7    consulted on that process.

8        Q.    Who is the owner of the company?

9        A.    Richard Wohlner.  The last name is spelled

10    W-o-h-l-n-e-r.

11        Q.    Is he the only owner of Precision?

12        A.    Correct.

13        Q.    What was the nature of your consultation

14    with him?

15        A.    Primarily on an economic and functional

16    basis; would the space we were looking at to lease

17    meet our requirements for the operation and was it

18    financially fitting our capabilities and our budgets.

19        Q.    Okay.  Do you recall those negotiations for

20    that lease?

21        A.    I recall the negotiations in general.  The

22    specific details of which, you would have to ask me

23    what your -- what specifics you're looking for.

24        Q.    Do you recall any issues coming up during

11

1    the lease negotiations about anything?

2        A.   Primary discussions during the lease dealt

3    with HVAC issues, furnishings -- or the finishing

4    within the facility, and a doorway that we required

5    constructed -- to be constructed between two

6    facilities -- the two units we were renting.

7        Q.   All right.  Describe that for me, when you

8    say the two units you were renting.

9        A.   We rented two side-by-side units.  I think

10   they were 959 Northpoint and I think the other one

11   was 953 Northpoint.  They were stand-alone units of

12   about 11,000 square feet a piece.  We needed 20-plus

13   thousand square feet.  We rented two side-by-side

14   units.

15        And the office space, we had a door

16   connected to -- built -- you know, put in through the

17   wall to connect the two offices so we wouldn't have

18   to go outside from one side of the office to the

19   other side.

20        Q.   Because that was an internal -- a door

21   inside the demised premises?

22        A.   Correct.

23        Q.   Or the leased the premises, excuse me?

24        A.   Hm-hmm.

12

1        Q.   All right.  Do you recall that the

2    Northpoint building -- the footprint for the building

3    is essentially a rectangle?

4        A.   Correct.

5        Q.   And do you recall that there are these

6    separate units that go down the rectangle from one

7    side to the other?

8        A.   Yes.

9        Q.   All right.  The two that Precision leased,

10   where were those located in the rectangle?

11       A.   Our two units were in the center of the

12   building.

13       Q.   Do you recall how many units there were in

14   the whole building?

15       A.   I think there was six total units.

16       Q.   Okay.  So when you say the center, do you

17   mean two units on one side of you and two units on

18   the other side of you?  Or what do you mean?

19       A.   To the best of my recollection, there was --

20   I know that there was two companies to the east of

21   us, two units.  And I believe there were two units to

22   the west of us.  But it's possible there was only

23   one.  So there could have been five units or

24   six units.  I don't recall right now.

13

1    Q.   Just to clarify the record, when you say

2    east and west, you recall with the Northpoint

3    building that we're talking about, a portion of which

4    Precision occupied during this 13-month period of

5    time, there was a portion that's closer to the

6    entrance driveway?

7         A.   Correct.

8         Q.   And a portion that's farther away from the

9    entrance driveway?

10        A.   Correct.

11        Q.   Which is the east and west, in your

12   description?

13        A.   The entrance driveway was on the west side

14   of the building.  The east side of the building

15   bordered Highway 41.

16        Q.   All right.  Then also you recall that with

17   that same Northpoint building that we've been talking

18   about, in prior depositions it was referred to as a

19   front and a back of the building.

20             And I will tell you that in those prior

21   depositions, it was described the front -- or the

22   back was described where the truck loading docks are

23   and more of a larger parking area.  And the front was

24   the other side of that.  Is that your recollection?

14

1       A.   Yes.

2       Q.   Okay.   What do you recall about the front of

3   the building?   What kind of -- were there entrances?

4   What was on the front side?

5       A.   Yeah.   Each individual unit had its own

6   entrance.   Now, because our two units were side by

7   side, they had their own entry door, but it was a

8   combined architectural feature in the facade of the

9   building.

10       So each entry had its own -- each unit had

11   its own entry, and there was parking spaces in the

12   area probably for 100 cars.

13       Q.   Okay.   All right.   So let's go to what I

14   have been calling the back of this building.

15       A.   Okay.

16       Q.   How many entrances were there in the back of

17   the building to the Precision -- the space that

18   Precision leased during this period of time?

19       A.   We had two walk-in doors, two drive-in

20   doors, and three dock doors.

21       Q.   All right.   Distinguish for me those kinds

22   of doors as you're using those terms.

23       A.   As you move from east to west, the 959 unit,

24   I believe that was 959, there's a walk-in door like

                                                        15

1   this, a pedestrian door.  The very next door was a

2   drive-in door that would have been a 12-foot wide by

3   probably 14-foot tall door.

4      Q.   When you say drive-in door, you mean

5   somebody could drive a vehicle in that door?  Is that

6   why you use that term?

7      A.   That's correct.  It was a door that could be

8   used to drive into the building.

9      Q.   Okay.

10     A.   The next three openings in the rear of the

11  building were dock doors that were probably 10 feet

12  wide by 10 feet tall, traditional size dock doors

13  with dock levelers where trucks could back up to them

14  and we could drive forklifts into the truck.

15        Then we move -- because now we're into the

16  other unit.  We move to another drive-in door by

17  12-foot wide by 14-foot tall and then one last

18  pedestrian walk-in door.

19     Q.   All right.  And did Precision, during the

20  time that you guys occupied this building, did you

21  guys use all of those doors?

22     A.   Yes, we did.

23     Q.   You didn't have any of them blocked off or

24  locked off from the inside to the outside?

16

1        A.    No.

2        Q.    This is going to get a little cumbersome,

3   but I just want to just show you this to make sure

4   that we're talking about the same thing.

5           During Mr. Rothbart's deposition, there were

6   some photographs that we used.  I'm going to use

7   those same photographs.  And they were attached to

8   the deposition transcript of Mr. Rothbart.  And I'm

9   just going to refer to them the same way that they're

10  marked.

11          They're black and white.  I'll represent to

12  you that during the deposition, we had color

13  photographs.  I will also represent to you that my

14  paralegal who is not here right now has the other

15  half of the file and I couldn't find the color

16  photographs this morning.  So we're going to have to

17  use the black and white ones.

18          I just have a couple questions about the

19  photographs.  Okay?

20       A.    That's okay.

21       Q.    All right.  I think everybody else got color

22  copies of those photographs.

23          But, anyway, let me just show you what was

24  previously marked during the Rothbart deposition as

17

1      Rothbart Deposition 2B, 2A, 3A and 3B.  Oh.  We had

2      4A and 4B.

3           A.   Okay.

4           Q.   This is probably a little bit better.  Look

5      at 3A.  I'll direct your attention to 3A.  I will

6      represent to you that that is supposed to be the back

7      of the Northpoint building for the premises that was

8      occupied by Precision.  Okay?

9           A.   Okay.

10          Q.   You see depicted in here what, at least on

11     each side of the photograph, look to me like two

12     drive-in doors.  Is that what you were talking about?

13          A.   Those are the drive-in doors, yes.

14          Q.   Then the three openings in the middle are

15     the dock doors that you were talking about?

16          A.   That's correct.

17          Q.   Okay.  All right.  Then I'll point your --

18     direct you to Exhibit Rothbart 3 -- Deposition

19     Exhibit 3B.  You'll see that in the -- again, I'll

20     have the same representation; although, you can see

21     the 959.  Is that a portion that Precision leased?

22          A.   Yes, we occupied 959.

23          Q.   All right.  So, again, in here there seems

24     to be depicted a drive-in door and then another kind

                                                          18

1    of door in the center?

2         A.    That's a walk-in door.

3         Q.    Okay.  So that's the walk-in door that you

4    were talking about?

5         A.    Correct.

6         Q.    Okay.  All right.  I just want to ask you a

7    couple of questions about the walk-in doors.

8              The walk-in doors on the back of the

9    premises -- back of the building for the premises

10   that Precision leased during this period of time they

11   were in the Northpoint building, what were those

12   doors used for?

13        A.    Those doors were used for access by delivery

14   personnel.

15        Q.    And what do you mean by that?

16        A.    Carriers bringing products to our facility,

17   in order to determine which dock they would back up

18   to or to either discharge or pick up their freight,

19   would come to one of those doors and contact the

20   warehouse person for directions.

21        Q.    All right.  So a guy drives a truck up with

22   a load for Precision, he gets out of the truck, walks

23   up to one of those doors, and that door is for him to

24   go into and --

19

1          A.    Correct.

2          Q.    -- make contact with this freight --

3          A.    Actually, he couldn't go into the door.

4     There was -- I think there was a bell on the door

5     that he rang.

6          Q.    Okay.  And you'll see again in Rothbart

7     Deposition Exhibit 3B, there appears to be a -- you

8     see this white circle?  It looks to me like some sort

9     of sign that's on the outside of that door?

10         A.    Yes.

11         Q.    Do you recall signs being on the outside of

12    those doors?

13         A.    There was a sign on the outside of the door

14    identifying Precision Laboratories, Inc.  I do recall

15    that.

16         Q.    Okay.  Do you recall who put that sign up

17    there, the one that you do recall?

18         A.    That sign would have been placed by

19    Rothbart.

20         Q.    Would that have been part of the lease

21    negotiations?

22         A.    The lease called for signage on the front

23    and rear of the building.

24         Q.    Okay.  All right.  Do you have any

                                                              20

1    recollection as to whether any other signs or

2    notifications were placed on the outside of those

3    walk-in doors, again, during this time period that

4    we're talking about that Precision occupied the

5    Northpoint building?

6        A.    To my recollection, there was a sign

7    indicating truckdrivers to either knock or ring on

8    the bell for assistance.

9        Q.    All right.  Do you recall, again, using the

10   drive-in entrance for the Northpoint building, the

11   one closest to the entry road, the walk-in door

12   that's closest to that entry road, again, for the

13   premises that Precision occupied, do you recall at

14   any time during this time Precision occupied the

15   premises at Northpoint whether there was a sign or

16   notification on that door saying, Go to the other

17   walk-in door --

18       A.    I believe that's correct.

19       Q.    -- or something to that effect?

20       A.    I believe that's correct.

21       Q.    Would that have been a sign or a

22   notification that was placed there by Precision or a

23   Precision person?

24       A.    Correct.

21

1     Q.   Okay.  Not somebody from Rothbart?

2     A.   No.

3     Q.   Okay.  And why would Precision place

4     something like that, a notification like that on the

5     door?

6     A.   Because we operated two units.  And so that

7     carriers and truckdrivers could receive proper

8     attention, we wanted to direct them to one entry

9     point for assistance.

10    Q.   All right.  And do you recall that during

11    this time that Precision occupied the Northpoint

12    building, which of those walk-in doors Precision

13    wanted to direct these carriers or drivers to?

14    A.   We wanted to direct them to the west walk-in

15    door.

16    Q.   And, again, that's the walk-in door that's

17    farthest from this entry road to the Northpoint

18    building?

19    A.   That's correct.

20    Q.   All right.  Closest to --

21    A.   Route 41.

22    Q.   -- Route 41?

23    A.   Correct.

24    Q.   All right.  Do you recall whether that

22

1    notification about going to the other walk-in door

2    was there during the entire time that Precision

3    occupied the Northpoint building?

4         A.   I don't recall.

5         Q.   Do you recall whether that notification

6    was -- the notification that we've been talking about

7    was on that first walk-in door in the May, June, July

8    time period of 2004 when Precision occupied the

9    Northpoint building?

10        A.   Would you restate the question?

11        Q.   Sure.

12             Again, I want to direct your attention to

13   the time period May, June, and July of 2004, which

14   would have been toward the end of the time that you

15   told me Precision occupied the Northpoint building.

16        A.   Yes.

17        Q.   During that time, those three months -- that

18   three-month time period, do you recall whether this

19   notification was on the first walk-in door telling

20   the drivers or carriers to go to the other walk-in

21   door?

22        A.   I don't specifically recall it being there.

23   I don't have a specific recollection of it being

24   missing, however.

23

1        Q.   Okay.  If we showed you a picture with

2    that -- with that notification on that first walk-in

3    door, you wouldn't disagree that that was the same

4    notification that had been placed there by Precision,

5    would you?

6        A.   I would not.

7        Q.   Okay.  Was there a specific person for

8    Precision that the divers and carriers were supposed

9    to contact when they came with a delivery?

10       A.   Primarily, it would be our warehouse foreman

11   or manager.

12       Q.   And during the time period that Precision

13   occupied the Northpoint building, was that -- was

14   that position occupied by the same person?

15       A.   Yes, it was.

16       Q.   And who was that person?

17       A.   His name is Joe Simon.  The last name is

18   spelled S-i-m-o-n.

19       Q.   Did Mr. Simon have a specific desk or office

20   location in the Precision space that you leased at

21   the Northpoint building?

22       A.   Yes.

23       Q.   And where was that?

24       A.   It was in the rear of the 959 unit.

24

1          Q.   And is the 959 unit the one that's closer to

2     the 41 or the one that's farther away from 41?

3          A.   Farther away from 41.

4          Q.   Okay.  All right.  Then explain for me why

5     did Precision want the drivers and carriers to go to

6     the other door?

7          A.   We had our shipping desk and our UPS

8     shipping station staged inside that door.  And

9     primarily in the wintertime, we didn't want activity

10    through that door with carriers for a heat issue and

11    for a traffic issue in that area.

12         Q.   And the area you're talking about would be

13    the first walk-in door that you would come to as you

14    came into the parking lot on the back side of this

15    Northpoint building?

16         A.   That's correct.

17         Q.   Okay.  All right.  In your capacity as a

18    position that you held for -- with Precision during

19    this time period, August of 2003 through the

20    beginning of September of 2004 when Precision

21    occupied the Northpoint building or a portion of the

22    Northpoint building, did you have an understanding

23    during that time as to what portion of the Northpoint

24    building and property Precision was responsible for

25

1    maintaining and what portion Rothbart, the landlord,

2    was responsible for maintaining?

3        A.    Yes, I did.

4        Q.    All right.  What was your understanding of

5    who was responsible for what?

6        A.    I took care of the internal premises of the

7    building and kept the area immediately outside of

8    both our front and rear doors clear.

9        Q.    All right.  And what was Rothbart -- what

10   was your understanding of Rothbart's responsibility?

11       A.    Rothbart maintained the building and the

12   property.

13       Q.    When you say the property, what do you mean?

14       A.    The parking lots, the truck docks, the

15   driving areas.  They exercised the landscaping

16   contracts, the snow removal contracts, everything to

17   do with the exterior of the building.

18       Q.    Okay.  Let me -- something I didn't ask you

19   at the beginning of the deposition.  Let me ask you

20   now.

21            What did you do to prepare for this

22   deposition today?

23       A.    I reviewed the file that we had internally

24   for the lease and for information that I had obtained

26

1   at the time of the incident.  And I met with my

2   counsel for about an hour prior to our deposition.

3       Q.   Okay.  I don't want to know what you talked

4   about with him.  So be careful in answering your

5   questions.  And your counsel will be careful.  He's

6   very able.  So I don't have any concerns that you

7   will be -- go down the wrong path.

8           But did you have a chance to look at any

9   photographs in connection with your preparation?

10      A.   I looked at photographs that I had taken a

11  few months after the incident and photographs that I

12  again had taken in November of 2006 of the area when

13  I was first advised that this deposition may occur.

14      MR. HULL:  Okay.  All right.  And let me just --

15  did you guys produce any photographs to us?

16      MR. FITZSIMMONS:  We produced the first set.  I

17  just saw the set he took in November of 2006 today.

18  I'll get copies out.

19      MR. HULL:  Okay.  Great.

20  BY MR. HULL:

21      Q.   And what specifically did you take pictures

22  of in November?  What portions of the building or

23  property or grounds?

24      A.   I took portions -- I took photos of the area

27

1    of the rear of the building where the truck docks

2    were and the drainage areas related to that area.

3        Q.   Okay.  And are you familiar with -- again,

4    it's -- the walk-in door for the Precision premises

5    at the Northpoint building that is farther away

6    from -- that's farthest away from Route 41, the Route

7    41 side of the building.  Okay?

8        A.   Okay.

9        Q.   Are you familiar with a white PVC pipe that

10   appears to come out of the exterior wall of that --

11   near that door and down the railing that is adjacent

12   to the loading dock area?

13       A.   Yes, I am.

14       Q.   All right.  Can you tell me what is on the

15   inside of the building that discharges into that

16   pipe?

17       A.   The sump pump.

18       Q.   And how far from the inside of the building

19   where the pipe goes into the exterior of the building

20   is that sump pump on the inside?

21       A.   A matter of a couple feet.

22       Q.   All right.  And is it a sump pump pit that

23   the pipe connects to?

24       A.   Yes, it is.

28

1      Q.   How deep is that sump pump pit?

2      A.   I'm speculating that it is 5 to 6 feet deep.

3      Q.   And where does the drainage come from that

4    goes into that sump pump pit?

5      A.   It comes from the truck dock, the external

6    truck dock depression.

7      Q.   So there's an exterior drain in the truck

8    dock -- the depressed -- the depression area that

9    leads up to the truck docks, is that what you're

10   talking about?

11     A.   Yes.

12     Q.   And that exterior drain drains into an

13   interior sump pump area?

14     A.   That's correct, yes.

15     Q.   And then that -- and then, what, the sump

16   pump ejects out this white PVC pipe that we were

17   talking about?

18     A.   Correct.

19     Q.   All right.  Let's go back to that then as

20   far as responsibility for maintenance and control,

21   issues on that.

22          Do you have an understanding of who is

23   responsible for the pieces and parts of that, for

24   lack of a better term, drainage system that we just

29

1   talked about?

2       A.   Yes, I do.

3       Q.   And tell me, what's your understanding of

4   who is responsible for what parts of it?

5       A.   My understanding is that's the landlord's

6   responsibility.

7       Q.   That includes the interior sump pump that's

8   inside the client's premises?

9       A.   Yes, it does.

10      Q.   Okay.  And is there something in the lease

11  that you know says that or is that just your

12  understanding?  Where is the source of the

13  understanding, I guess, is a better question?

14      A.   Plumbing issues are addressed in the lease.

15  My interpretation -- and I'm not a lawyer, so my

16  interpretation of plumbing issues have to do with the

17  hot and cold water systems and the toilet systems and

18  all that within the building.

19           We did not have control over roof drains

20  that drain down or the sump pump that was handling

21  exterior water from the premises.

22      Q.   And the sump pump that handled exterior

23  water from the premises is the same sump pump we were

24  talking about that's --

30

1        A.    Correct.

2        Q.    -- that is in the sump pump pit that's just

3   inside where the white PVC pipe goes into the

4   building near the walk-in door that's furthest away

5   from Route 41 on the premises that Precision

6   occupied; correct?

7        A.    That's correct.

8        Q.    Okay.   During the time that Precision

9   occupied the Northpoint premises, who was responsible

10  for dealing with the landlord about any kind of

11  complaints that you might have had or services that

12  you needed or anything that you needed to have the

13  landlord do?

14       A.    My warehouse manager had primary maintenance

15  responsibilities.

16       Q.    And is your warehouse manager Joe Simon?

17       A.    Correct.

18       Q.    Do you know -- who did Mr. Simon report to?

19       A.    To myself.

20       Q.    All right.   Do you know whether Mr. Simon

21  had any -- made any requests or complaints to

22  Rothbart for services or about services that Rothbart

23  was supposed to render to Precision during the term

24  of its lease?

31