1      A.   Yes.

2      Q.   All right.  And what do you recall about

3  that?

4      A.   Are you asking for specific issues?

5      Q.   If you recall specific issues, yes.

6      A.   Whenever we had a maintenance issue with the

7  building, our first course was to call Rothbart.  And

8  then Rothbart either called their maintenance person

9  to deal with that or a third-party contractor was

10  brought in to deal with that.

11      So I know on several situations Rothbart was

12  called about a backup of water in the truck dock and

13  in -- inoperating condition or lack of sufficient

14  operation of the sump pump.

15    MS. SWATEK:  Ms. Court Reporter, can you read

16  that answer.

17              (Record read as follows:

18              "Whenever we had a maintenance issue

19              with the building, our first course

20              was to call Rothbart.  And then

21              Rothbart either called their

22              maintenance person to deal with that

23              or a third-party contractor was

24              brought in to deal with that.

32

1                        So I know on several situations

2                        Rothbart was called about a backup of

3                        water in the truck dock and in --

4                        inoperating condition or lack of

5                        sufficient operation of the sump

6                        pump.")

7    BY MR. HULL:

8        Q.    Do you remember how many times that kind of

9    complaint was made?

10       A.    I don't remember the specific number.

11       Q.    Do you know whether Precision has any files

12   that would contain any documents pertaining to those

13   kinds of requests or complaints?

14       A.    I can't recall.

15       Q.    Who might know that at Precision?

16       A.    Is your question whether or not somebody

17   might know if we have records?

18       Q.    Correct.  That's my question.

19       A.    The only people that would know if there are

20   records are myself or Joe Simon.

21       MR. HULL:  Ryan, if you could ask or have

22   Mr. Culp ask Mr. Simon if there are any files or

23   records that might exist on those issues.

24

33

1   BY MR. HULL:

2       Q.   Do you have any recollection about what, if

3   anything, Rothbart did in response to those

4   complaints or requests about this backing up of water

5   and sump pump issues?

6       A.   I do recall that the maintenance man came

7   and worked on the sump pump.

8       Q.   And when you say maintenance man, are you

9   talking about a Rothbart employee or do you know?

10      A.   It was a Rothbart employee.  Marty is his

11  first name.  I cannot recall his last name.

12      Q.   Was he -- did he only work at the Northpoint

13  building, do you know?

14      A.   He took care of a number of buildings under

15  Rothbart's control in that Northpoint Business Park.

16      Q.   Do you have any recollection or knowledge

17  about what he did with the sump pump on those

18  occasions?

19      A.   I do not.

20      Q.   Do you have any recollection of the sump

21  pump being replaced during that period of time that

22  Precision occupied the Northpoint building?

23      A.   I do not.

24      Q.   Do you remember -- or what can you tell me

34

1    about the facts surrounding -- or what happened --

2    strike that.

3         What happened to cause Mr. Simon or you to

4    communicate with Rothbart about this backup problem?

5        A.   To the best of my recollection, there was

6    several feet of water standing in that truck dock.

7    And that's not a desirable situation for the

8    building.

9        Q.   All right.  Was there -- do you recall any

10   problems that you -- that you -- and when I say you,

11   I mean Precision -- had with regard to the sump pump

12   pit inside of the building?

13       A.   No, I do not.

14       Q.   Do you recall any problems that -- with the

15   white PVC pipe that comes from that sump pump pit out

16   to the exterior area -- exterior -- the area -- the

17   exterior area adjacent to the Northpoint building

18   that we've been talking about?

19       A.   Is your question were there problems with

20   the pipe?

21       Q.   Correct.

22       A.   No.

23       Q.   There weren't any problems with the pipe, or

24   you don't recall whether there were any problems with

                                                        35

1  the pipe?

2      A.   Well, I'll answer your question in the sense

3  that it's a white PVC pipe that was attached to the

4  building and it traveled down the railing on the

5  concrete to where the slope then sloped to the

6  surface drain.

7          During the period of our occupancy, the pipe

8  was there when we moved in and the pipe was there

9  when we left.  And the pipe caused me no problems

10 during my time of occupying the facility.

11     Q.   Okay.  Well, then let me ask a couple more

12 questions about that then.

13         You have a recollection about water backing

14 up at the exterior drain down in the docking pit;

15 correct?

16     A.   Correct.

17     Q.   All right.  Do you have any knowledge as to

18 whether -- or any knowledge as to what caused that

19 backup?

20     A.   It would be speculation.

21     Q.   You don't have any specific knowledge about

22 it?

23     A.   Only what's been relayed to me by a third

24 party.

36

1        Q.    And who was the third party?

2        A.    Joe Simon.

3        Q.    And what did he relay to you?

4        A.    He relayed to me that the surface drain at

5    the base of the truck dock from time to time would

6    become clogged and that the blockage would also occur

7    inside that sump pump area.

8        Q.    The sump pump pit area?

9        A.    Correct.

10       Q.    Okay.  Anything else that he told you?

11       A.    No.

12       Q.    Okay.  He never said that the white PVC pipe

13   was blocked or anything like that?

14       A.    No.

15       Q.    All right.  During the time that you were

16   working at Precision and during the time Precision

17   occupied this Northpoint property that we've been

18   talking about, did you ever personally observe anyone

19   walk from that walk-in door that is furthest away

20   from Route 41 -- and I'm talking about walk from

21   the -- that walk-in door on any outside area surface

22   to get to the other walk-in door for Precision?

23       A.    Yes.

24       Q.    And about how many times did you observe

37

1   somebody doing that?

2       A.   That would be an impossibility to give you a

3   number.  We were in the facility for 13 months.  We

4   have a number of deliveries and pickups of products

5   daily.

6       Q.   So -- all right.  It's certainly more than

7   one?

8       A.   Absolutely.

9       Q.   All right.  And what route would you observe

10  people taking if they were going from the one door to

11  the other walk-in door?

12      A.   They would come out the -- along the truck

13  dock, they would traverse in front of the truck dock,

14  and they would come up to the other door.

15      Q.   All right.  So they'd walk along that

16  railing that's immediately adjacent to the truck

17  dock; is that correct?

18      A.   I would not characterize it as walking along

19  the railing.

20      Q.   Okay.  Walk next to the railing -- on the

21  surface of the ground --

22      A.   They would walk directly -- they would walk,

23  most likely, in an angle from the walk-in door at 959

24  out to the point that they could go directly east in

38

1    front of the truck docks.

2         So that walk-in door was on the other side

3    of the drive-in door.  And so I'm sure you and I

4    would take a diagonal path, as most of the

5    pedestrians would, to that point that they could

6    traverse cross the truck docks.

7         Q.   Okay.  And then back up to the other walk-in

8    door?

9         A.   Correct.

10        Q.   Okay.  And you observed people -- during

11   that time period we're talking about, you observed

12   people essentially take that same route?

13        A.   Correct.

14        Q.   All right.  During the time period that you

15   worked for Precision and Precision occupied this

16   Northpoint building that we've been talking about,

17   are you aware of any complaints or incidents

18   involving people falling down in the parking lot

19   area?

20        A.   No, I am not.

21        Q.   All right.  You're certainly aware of the

22   incident that brings us all here today, Mr. Rogers'

23   incident, aren't you?

24        A.   Yes, I am.

39

1          Q.   Okay.  Do you have any direct knowledge
2     about that incident?

3          A.   Define "direct."

4          Q.   Direct, meaning were you there and saw him
5     on the ground or anything like that?

6          A.   I did not.

7          Q.   Okay.  So any knowledge you have about it
8     was learned after the fact?

9          A.   That's correct.

10         Q.   Okay.  Just so the record is clear, I mean,
11    we're -- I'm not going to question him about that
12    because we're only talking about issues of control
13    and responsibility for this point of the deposition.
14    We might talk at some future time about all that
15    stuff.  Okay?

16         A.   I understand.

17         Q.   All right.  When we were talking about your
18    observations of people walking from the one walk-in
19    door for Precision to the other walk-in door and the
20    route that you generally described seeing them take,
21    that area that would be covered by a person taking
22    that route that you described just a little while
23    ago, what's your understanding of who's responsible
24    for the area that those people walked over?

40

1          And I'm talking about whether it's Precision

2    or whether it's the landlord.

3          A.   We performed no maintenance function past

4    the opening of the door or the area that our

5    dumpsters or trash receptacles were immediately

6    outside the drive-in doors.  So the responsibility

7    for maintenance of the area was the landlord's.

8          Q.   All right.  So for that area that we talked

9    about, other than those qualifications that you gave,

10   your answer would be that that would be Rothbart's

11   responsibility; correct?

12         A.   That is my understanding.

13         Q.   All right.  And, again, what's the source of

14   that understanding?

15         A.   It's really a basis of who was providing the

16   external maintenance on the building evidenced by the

17   landscaping, the -- and the snow removal that was

18   performed in all of those areas.

19              Of course, there was no landscaping, but

20   the -- as I recall, the landscapers would come in and

21   blow away debris and clean up the rear of the

22   building when they're blowing off from clippings in

23   the front.  And all of the snowplowing and snow

24   removal for that area, including the truck docks, was

                                                          41

1    provided by Rothbart.

2        Q.   Okay.  Was there anything about the lease or

3    the lease document that gives you -- that provides a

4    basis for this understanding as well?

5        A.   Well, I'm not an attorney, so I would have

6    to go back and reread the lease and give you a

7    layman's opinion on that.

8        Q.   Okay.  Let's go back to the white PVC pipe

9    that we were talking about that comes out of the --

10   that we now know is on the inside, comes out of the

11   sump pump pit that we described, and then runs along

12   down this railing that is adjacent to the docking

13   area.  Okay?

14       A.   Okay.

15       Q.   You get to the end of that PVC pipe and

16   there's a point where the -- whatever comes out of

17   that pipe is discharged; correct?

18       A.   That's correct.

19       Q.   All right.  Did you ever -- during your time

20   that you worked at Precision while Precision was at

21   this Northpoint building, did you ever observe

22   anything being discharged from the end of that pipe?

23       A.   Water was discharged from that pipe.

24       Q.   All right.  And how often would you observe

42

1    that?

2         A.    I was not back there on a daily basis; but

3    whenever there was rainfall, you would have

4    accumulation of water in the truck dock that would go

5    into the sump pump and it would be discharged out

6    that PVC pipe.

7         Q.    Okay.  But you did personally observe

8    discharges from the end of that PVC pipe?

9         A.    Yes.

10        Q.    You just can't recall when or how many?

11        A.    Let me -- if your question is did I

12   personally see water flowing from that pipe, I can't

13   recall seeing water flowing.

14             Did I see the residue that water had flowed

15   from the pipe, the answer would be yes.

16        Q.    Okay.  All right.  Fair enough.

17             And would you have seen that residue of

18   water -- or that -- as you -- read back -- I don't

19   want to -- whatever term you used?

20        MR. HULL:  Can you just read back his answer.  I

21   don't want to unduly confuse the record here.

22                  (Record read as follows:

23                  "Let me -- if your question is did I

24                  personally see water flowing from

                                                           43

1                          that pipe, I can't recall seeing

2                          water flowing.

3                          Did I see the residue that water had

4                          flowed from the pipe, the answer

5                          would be yes.")

6    BY MR. HULL:

7         Q.   Okay.  Can you recall whether you had seen

8    that residue that you described in answer to my

9    previous question prior to June of 2004?

10        MS. SWATEK:  I'm going to object to

11   mischaracterization of testimony.  He's testified

12   that he saw water discharge, not residue.

13        THE WITNESS:  Can you repeat the question?

14   BY MR. HULL:

15        Q.   Do you recall seeing what you described

16   seeing in the prior -- in your answer to my earlier

17   question about discharge from that white PVC pipe, do

18   you recall seeing what you described seeing prior to

19   June of 2004?

20        A.   Yes.

21        Q.   Do you recall how many times you saw that

22   prior to June of 2004?

23        A.   It would be difficult to estimate that.

24        Q.   Okay.  During the period of time that

44

1    Precision occupied the Northpoint building that we've

2    been talking about, how many times do you recall this

3    maintenance person for Rothbart being out to the

4    premises?

5         A.    He was generally in the vicinity.   The

6    specific visits to our leased properties was, you

7    know, I would estimate at most once a month.

8         Q.    Okay.  Did you want to add something?

9         A.    Yeah.   I will add that occasionally I would

10   see the maintenance man because he was working on

11   issues to deal with the entire building, not specific

12   to our unit.

13        Q.    All right.  So when you say the -- when you

14   were describing a once a month frequency, is that for

15   him to come to Precision or just generally on the

16   premises?

17        A.    Generally on the premises.

18        Q.    Okay.  Was it the same individual all the

19   time?

20        A.    Yes.

21        Q.    Would you recognize the same individual if

22   you saw him?

23        A.    I can't commit to that.

24        Q.    Okay.  All right.

                                                        45

1        A.    It's been a few years.

2        MR. HULL:  Okay.  I understand.  All right.

3            I don't think I have any more questions

4    right now.  Let me just check.  If anybody else has

5    any questions, why don't you go ahead.

6        MS. SWATEK:  Can we take a small break?

7        MR. HULL:  Sure.

8                (Recess taken.)

9        MR. HULL:  I do have another question that I

10   wanted to ask.

11   BY MR. HULL:

12       Q.    We received Answers to Interrogatories from

13   Precision worked on by your lawyers and presumably

14   people at Precision.  There's a name of an individual

15   who worked with them in answering the questions by

16   the name of Joe Jozaitis?

17       A.    Correct.

18       Q.    Am I pronouncing that correctly?

19       A.    Jozaitis.

20       Q.    And who is he?

21       A.    Joe was hired by the company in February

22   of 2006 to be our operations manager to allow me to

23   focus on some other responsibilities.

24       Q.    All right.  So he started in February of

46

1    2006?

2         A.   Yes.

3         MR. HULL:  Okay.  I don't have any other

4    questions right now.

5         MS. SWATEK:  I do have a couple questions for

6    you.

7                   EXAMINATION

8                   BY

9              MS. SWATEK:

10        Q.   My name is Marty Swatek.  I represent one of

11   the Rothbart entities.

12             Would it surprise you if in your review of

13   the lease that the actual landlord was 977 Northpoint

14   Venture?

15        A.   No, it would not.

16        Q.   Okay.  And you were the individual or at

17   least one of the individuals at Precision

18   Laboratories to negotiate that lease; correct?

19        A.   I was.

20        Q.   Okay.  It does appear from the lease that

21   the HVAC was one of the main concerns?

22        A.   It was.

23        Q.   Okay.  Did you also have a chance to review

24   what maintenance issues the tenant would be

47

1  responsible for?

2       A.   At what point in time?

3       Q.   During your negotiation of the lease.

4       A.   Yes.

5       Q.   Okay.  Are you aware that the tenant was

6  responsible for the maintenance of any of the

7  plumbing that was within its control?

8       A.   The clause in the contract does indicate

9  responsibility for plumbing.  And I already defined

10  my interpretation of that plumbing earlier in this

11  deposition.

12       Q.   Okay.  What area of this property was under

13  your control?

14       A.   The building.

15       Q.   Okay.

16       A.   The --

17       Q.   So all of the area within the actual walls

18  of the building was under the control of your

19  company; correct?

20       A.   That's correct.

21       Q.   Okay.  Did you also control some of the

22  property outside of the building?

23       A.   Can you tell me what you mean by control?

24       Q.   Did your lease cover property outside the

48

1    building, outside the actual walls of the building?

2         A.   I'd have to recall the lease.  I do not

3    recall the specific statement of control of an area

4    outside the building.

5         Q.   Okay.  Is it possible that the lease

6    included control of an area up until the end of a

7    railing outside of the building?

8         A.   I do not recall a clause specifically

9    stating that point.

10        Q.   Okay.  Is it possible that's within the

11   contract and you would leave that to lawyers for

12   interpretation?

13        A.   I would defer to my counsel for

14   interpretation.

15        Q.   At any point -- you had testified earlier in

16   the deposition that employees of Precision

17   Laboratories were responsible for clearing areas

18   immediately outside of the front and back doors; is

19   that correct?

20        A.   We would remove snow accumulation so that

21   our doors would operate.  And we would place outside

22   of our front door, you know, snow remover or ice

23   melting materials immediately outside of our door.

24        Q.   Did you do any other maintenance outside of

49

1    the building?

2        A.    Not to my recollection.

3        Q.    You did do garbage, though; correct?

4        A.    We had a dumpster outside of our door that

5    we would place our refuse in.  And so we policed the

6    immediate area around the dumpster.

7        Q.    So if there was any spillage of the garbage

8    outside of the garbage bin or garbage dumpster, you

9    would ensure that that was taken care of by your own

10   employees?

11       A.    That's correct.

12       Q.    So Precision Laboratories was responsible

13   for its garbage or refuse; correct?

14       A.    Correct.

15       Q.    And it would be responsible for the cleaning

16   up of any of its own garbage or refuse; correct?

17       A.    Yes.

18       Q.    To your knowledge, was any materials other

19   than of a natural origin, such as snow or rain, ever

20   placed within the sump pump pit itself?

21       A.    Not to my knowledge.

22       Q.    Okay.  You've described that the sump pump

23   handled exterior flow of water from a depressed dock

24   area; correct?

50

1          A.    That's correct.

2          Q.    Okay.  Was the drain at the base of the dock

3    area?

4          A.    Yes.

5          Q.    Okay.  And upon occasion, I would assume

6    that drain would just become clogged naturally;

7    correct?

8          A.    Accumulation of leaves and things would blow

9    down in there and you would get some blockage.

10          Q.    Okay.  Was that something -- that blockage,

11    was that ever handled by Precision Laboratory

12    employees in attempting to clear it and ensure that

13    the pathway of the drainage was clear?

14          A.    I can't answer your specific question.  I

15    can say that we would have attempted to make sure

16    none of our refuse was causing the problem and we

17    didn't have discharges of that -- materials that blew

18    around.

19                Whether or not an employee tried to clear

20    any blockage would be speculation on my part.

21          Q.    Okay.  Had you ever witnessed any of your

22    employees attempting to clear blockage from the drain

23    at the base of the depressed dock area?

24          A.    No, I did not witness.

51

1    Q.   Did you ever direct anyone to do that?

2    A.   No, I did not.

3    Q.   Do you know if any of your employees,

4    including Joe Simon, ever attempted to simply clear

5    the drain prior to contacting Rothbart?

6    A.   I do not know.

7    Q.   Do you have any other understanding as to

8    what could have clogged the drain other than leaves

9    causing a stand of water in this depressed area?

10   A.   No.

11   Q.   Okay.  And the standing water never crept up

12   into the actual flat area of the drive, did it?

13   A.   No.

14   Q.   Okay.  Did you ever get charged back by any

15   of the Rothbart entities for the maintenance that

16   they performed in your building?

17   A.   Yes.

18   Q.   Okay.  And was that pursuant to the lease?

19   A.   Yes.

20   Q.   And do you know why you would be charged

21   back?

22   A.   It would have been for items within the

23   building that, according to the lease, we were

24   responsible for the maintenance thereof.

52

1          Q.   Okay.  Do you have documentation as to what

2      items you were charged back?

3          A.   We would have records as provided by

4      Rothbart as to what they billed us for.

5          Q.   So there were some instances with -- excuse

6      me.  Strike that.

7               So there were some instances wherein a

8      Rothbart employee, such as this gentleman Marty you

9      described, would come out to the premises and

10     complete a performance but then charge it back to

11     Precision?

12         A.   Yes.

13         Q.   And, I'm sorry, did you say that -- and I

14     might just not have heard you.  To your knowledge,

15     was the sump pump at either of your buildings at this

16     location ever replaced?

17         A.   I do not recall the sump pump being

18     replaced.  I would clarify, to my knowledge, there

19     was only one sump pump to service the area.

20         MS. SWATEK:  Okay.  Thank you.  I don't have any

21     other questions at this time.

22         MS. BAILEY:  I'll try and keep it short.

23         THE WITNESS:  That's okay.

24

                                                          53

1                          EXAMINATION

2                          BY

3                          MS. BAILEY:

4          Q.   Just a few questions.

5               You said you didn't go into the back area

6     very often or every day.  Then which door did you use

7     when you went to work?

8          A.   I used the front door of the units.

9          Q.   Okay.  And then turning to the back door, is

10    that area well lit?

11         A.   I would say it is.

12         Q.   And then, you know, as the sun moves, is it

13    usually in shadow or is it usually pretty bright all

14    day?

15         A.   Well, the building ran east and west.  So in

16    the summertime, it was probably pretty much in full

17    sun.  In the wintertime, there would be some -- the

18    rear of our building faced north.  So in the

19    wintertime, there was a likelihood of some shade

20    along that side of the building.

21         Q.   Okay.  And is the back area where the PVC

22    pipe -- where it drains, is it usually wet or is it

23    dry?

24         A.   Well, I would answer your question by saying

                                                          54

1    that it's wet when it was discharging water.

2         Q.   Okay.  And I think you said that the rain

3    will affect it.  If it rained, then the water would

4    go into the building and the sump pump would

5    discharge it out; is that correct?

6         A.   That's correct.

7         Q.   Okay.  Were there other puddles after a rain

8    around the PVC pipe area?

9         A.   No.  I would say that the area was fairly

10   well drained.

11        Q.   Okay.  Just a couple questions about the

12   dumpster that you owned at the time.

13        A.   Okay.

14        Q.   Was garbage ever piled up outside the

15   dumpster if you had a shipment that day or if there

16   was just a lot of cleaning on the inside?

17        A.   Say that one more time.

18        Q.   Was garbage ever piled up outside of the

19   dumpster?  Say the dumpster was filled on a given

20   day.  Did you ever pile garbage around the outside

21   temporarily?

22        A.   Our practice was not to pile garbage around

23   the dumpster for pickup because the waste management

24   company would come with the truck and they would dump

55

1       it.

2              If we had excess refuse, it generally was

3       retained inside to be placed into the dumpster once

4       that dumpster was emptied.  We tried not to overflow

5       it.

6          Q.   And how about liquid refuse, how was that

7       thrown out?  Was it ever poured down the sump pit on

8       the inside of the building?

9          A.   No.

10         Q.   Okay.  As far as problems in the area both

11      inside and outside of the building, were checks ever

12      made by Precision?  Like, was there a routine

13      maintenance check where someone would just walk

14      around the inside and outside of the building to

15      check for problems?

16         A.   Inside the building, my warehouse manager

17      would do walk-throughs to look for issues.  As I walk

18      through the facility, I would observe issues.  We did

19      not do any routine inspection outside the building.

20         Q.   Okay.  How about the landlord, were there

21      routine inspections?

22         A.   I can't address that issue.

23         Q.   And have you or anyone at your company ever

24      complained about the area around the PVC pipe being

56

1  wet or filled with debris or slippery or any other

2  complaints?

3       A.   I don't recall.

4       Q.   And, to your knowledge, has anyone else ever

5  complained about the condition of the area where

6  pedestrians would walk?

7       A.   Anybody else as far as other tenants or --

8       Q.   Other tenants or even carriers when they

9  came to you, did they ever complain?

10      A.   I don't recall any other complaints.

11      Q.   And you said you weren't there when the

12  plaintiff fell; correct?

13      A.   I was not in the building at the time.

14      Q.   Okay.  Have you ever spoken with our client

15  about that fall?

16      A.   Mr. Rogers?

17      Q.   Rothbart, Mr. Rothbart.

18      A.   Oh, it was Rothbart.  At the time of the

19  incident, I called Rothbart, my contact person, who

20  advised them that the incident had occurred.

21      Q.   Would that be Joe Simon?

22      A.   No.  Joe Simon is my employee.

23      Q.   I'm sorry.  You called your contact person

24  at Rothbart?

57

1      A.   I personally called my contact person at

2   Rothbart -- I think Sue was the person I was dealing

3   with -- to advise her that a fall had occurred, that

4   paramedics had removed this truckdriver on the

5   premises.

6      Q.   Okay.  And do you know -- or, rather, were

7   you told, since you weren't there, where this fall

8   occurred?

9      A.   Yes.

10      Q.   Where was that?

11      A.   He fell at the -- on the area immediately to

12   the north of the discharge point of the white PVC

13   pipe.

14      Q.   And that would be to the north of the drain

15   in the cement; is that correct?

16      A.   The sewer drain in the cement?

17      Q.   The sewer drain.

18      A.   The sewer drain would have been north of

19   that point.  The PVC pipe discharged at a point

20   that's been identified on one of the pictures.  And

21   there was a slope running to the sanitary sewer --

22      Q.   Right.

23      A.   -- which was located north of that discharge

24   point.

58

1          Q.   Okay.  And if I showed you a picture, could

2     you point to that spot?

3          A.   Absolutely.

4          MS. BAILEY:  Okay.  I think it's this one.  Can

5     we mark this Culp Exhibit 1.

6                         (Whereupon, Culp Deposition

7                          Exhibit No. 1 was

8                          marked for identification

9                          as of this date.)

10    BY MS. BAILEY:

11         Q.   What is -- can you identify this picture?

12         A.   This is not our unit.  This is the unit next

13    door to us.

14         MS. BAILEY:  Okay.  Then I've got the wrong

15    picture.  Let's mark this Culp Exhibit 2.

16                        (Whereupon, Culp Deposition

17                         Exhibit No. 2 was

18                         marked for identification

19                         as of this date.)

20    BY MS. BAILEY:

21         Q.   Can you identify this picture?

22         A.   Yes, I can.  This appears to be standing

23    outside unit 959 looking to the north, showing the

24    PVC pipe that's been in discussion and the sanitary

59

1    sewer drain in the center of the driving area that we

2    were just most recently discussing.

3         Q.   Okay.  And on that picture, can you see the

4    spot where the plaintiff fell?

5         A.   I can see the area --

6         Q.   The area.

7         A.   -- in which the plaintiff fell, yes.

8         Q.   Okay.  Can you point to that area for me?

9         A.   Well, the area is just to the -- past this

10   railing right here.

11        Q.   Okay.  And will you circle it, draw a line

12   from the circle and initial that for me.

13        A.   Okay.  (Witness complying.)

14        MS. BAILEY:  Thank you very much.

15             I think those are all of my questions.

16   Thank you.

17        THE WITNESS:  You're welcome.

18        MR. HULL:  I have a couple questions.

19             FURTHER EXAMINATION

20             BY

21             MR. HULL:

22        Q.   Who told you about the plaintiff's fall?

23        A.   It was either Joe Simon or Phil Vaughn.

24        Q.   Or who?

                                                      60

1        A.    It was either Joe Simon, the warehouse

2    manager, or Phil Vaughn, the -- my purchasing manager

3    who was the person that did call the paramedics.

4        Q.    Okay.  Did either one of those gentlemen

5    tell you that they had witnessed the plaintiff

6    falling?

7        A.    No.

8        Q.    Did they tell you they didn't witness him

9    falling?

10       A.    Yes.

11       Q.    Okay.  Who told you what?

12       A.    Well, both of those gentlemen had told me

13   they did not see Mr. Rogers fall.

14       Q.    Okay.  Did either one of them -- or let's

15   stick with Mr. Vaughn first because I think he was

16   identified in the Answers to Interrogatories.

17            Was Mr. Vaughn the individual that -- the

18   Precision employee that first had contact with Mr. --

19       MS. SWATEK:  Can we go off the record for a just

20   for a second?  I hate to interrupt you, but can we

21   just very quickly go off the record?

22       MR. HULL:  Sure.

23            (Discussion off the record.)

24       MR. HULL:  Can you read my question again,

61

1     please.

2                         (Record read as follows:

3                         "Okay.  Did either one of them -- or

4                         let's stick with Mr. Vaughn first

5                         because I think he was identified in

6                         the Answers to Interrogatories.

7                         Was Mr. Vaughn the individual that --

8                         the Precision employee that first had

9                         contact with Mr. --")

10    BY MR. HULL:

11        Q.   Mr. Rogers.

12        A.   That is my understanding.

13        Q.   Okay.  Do you know why Mr. Vaughn went out

14    there to have contact with Mr. Rogers?

15        A.   I believe that he observed him laying on the

16    concrete.

17        Q.   Okay.  And that was why he went out there?

18        A.   Correct.

19        MR. HULL:  Okay.  All right.  No other questions

20    then.

21        MS. SWATEK:  No questions.

22

23

24

                                                      62

1        MR. FITZSIMMONS:  I have nothing.  We'll waive.

2        MR. HULL:  Mr. Culp, thank you very much.

3        THE WITNESS:  You're very welcome.

4            FURTHER DEPONENT SAITH NAUGHT

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

63

1    STATE OF ILLINOIS    )
                          )    SS:
2    COUNTY OF COOK       )

3         Kerry L. Knapp, License No. 084-003613, being

4    first duly sworn, on oath says that she is a

5    Certified Shorthand Reporter, that she reported in

6    shorthand the testimony given at the taking of said

7    deposition, that the deponent was duly sworn by her

8    and that the deposition is a true record of the

9    testimony given by said deponent.

10        And further, that she is not connected by

11   blood or marriage with any of the parties to this

12   action, nor is she a relative or employee or attorney

13   or counsel of any of the parties, or financially

14   interested directly or indirectly in the matter in

15   controversy.

16

17

18   _____
                                  _Kerry L. Knapp_
19              Certified Shorthand Reporter

20              Subscribed and sworn to
                before me this  20  day
21              of  February      2007.

22              _____
                Notary Public
23                        ┌─────────────────────────────┐
                          │      OFFICIAL SEAL          │
24                        │   RICHARD P. CAREY          │
                          │ NOTARY PUBLIC, STATE OF ILLINOIS │
                          │ MY COMMISSION EXPIRES 2-1-2011  │
                          └─────────────────────────────┘

                                                          64