1    A    I don't think a solid can get through it,

2  and I don't remember seeing a solid get through it.

3  And I don't remember -- again, not knowing what the

4  nature of the liquid would be, I have no idea.

5    Q    Okay.  All right.  Back to my same question

6  here, when you make these twice monthly

7  inspections --

8    A    Yeah.

9    Q    -- did you ever look at the end of these

10  pipes, the discharge point of these white pipes?

11    A    Sometimes, yes.

12    Q    All right.  At the times that you looked at

13  the discharge point, the end point -- the discharge

14  end point of these white pipes, what did you see on

15  the ground?

16    A    You're asking for a conclusion?

17    Q    I'm just asking what you saw.  I'm not

18  asking any kind of conclusion.  I'm asking what you

19  saw.

20    A    I, obviously, don't recall seeing anything

21  unusual.  I mean, again, I don't remember.  You're

22  asking me for a specific pipe at a specific time, and

23  a lot of it is natural conditions, so I don't recall.

24    Q    You don't recall anything about -- anything

51

1    coming out of the -- seeing anything at the end of

2    these pipes?

3        MR. POTTER:  Objection.  Mischaracterization.

4    You've been asking the question -- if you want to

5    give him another answer, you can, or you can stand on

6    your prior answer.

7        THE WITNESS:  If it's raining, I see water

8    coming out of them because the water is running into

9    the well.  Okay.

10            Otherwise, if it's dry, the odds of

11   something coming out of it are very remote.

12   BY MR. HULL:

13       Q   Okay.  All right.  Let's go to Exhibits 3A

14   and 3B. And I want to direct your attention in 3A to

15   the blue door; you see that, don't you?

16       A   Yes.

17       Q   What is the purpose of that door?

18       A   The purpose of that door is an exit, an

19   entrance and exit into the unit for help, garbage

20   removal, et cetera.

21       Q   What's on the other side of that door in

22   the area occupied by -- when Precision occupied that

23   area?

24       A   The inside of the building.

                                                52

1        Q    What is it?  Is it offices or is it --

2        A    It's the warehouse.

3        Q    Are there any other entrance or exit doors

4   for the space that was occupied by Precision other

5   than this one blue door?

6        A    There would be a front door.  Could be one

7   or two front doors, and there could be one or two of

8   this -- I don't know what they're called -- steel man

9   doors.

10       Q    Is that what this blue door is, a steel man

11  door?

12       A    Steel man door.  And there could be

13  depressed docks which can be used.  There's the

14  drive-in doors that can be used as an ingress and

15  egress if they're held open.  People can walk

16  through -- in the doors and those would tend to be

17  the access points.

18       Q    Do you know which of these blue man doors

19  or all of them that Precision used for an entrance

20  and an exit?

21       A    I don't know which they used of the ones

22  that were located within their unit.

23       Q    Who has keys to those doors, do you know?

24       A    Tenants.

53

1        Q    Does Rothbart have keys to them?

2        A    When the tenant is in occupancy?

3        Q    Correct.

4        A    No.

5        Q    Is there anything that you're aware of in

6    the lease that you had with Precision at the time

7    that Precision occupied a portion of this 977

8    Northpoint Ventures building which prohibits them

9    from putting up any kind of sign on the blue man

10   door?

11       A    What type of sign?

12       Q    That's what I'm trying to find out.  Is

13   there any prohibition against putting any kind of

14   sign up?

15       MR. POTTER:  If he doesn't give you enough

16   information for you to answer then, you know -- I'm

17   going to object.  He's saying he needs more

18   information.

19       MR. HULL:  Why don't you let the witness talk.

20       MR. POTTER:  I will make my objections as I

21   deem them appropriate.  As of right now, he has a

22   question for you as to what kind of sign.

23            That indicates to me that it is an

24   incomplete hypothetical.  If you want to give him a

54

1   more complete hypothetical, then he can provide an

2   answer.

3   BY MR. HULL:

4       Q    Well, let me go to a new question.  I

5   didn't give him a hypothetical.  I said is there --

6   first of all, are you familiar with the lease with

7   Precision?

8       A    Yes.  I'm familiar with the generalities of

9   the lease.

10      Q    Fine.  Is there anything in that lease that

11  you're aware of that would prohibit Precision from

12  putting up a sign on the outside of this blue man

13  door or either of the blue man doors that open into

14  the space that they lease?

15      MR. POTTER:  Objection.  Vague, and ambiguous.

16  If you cannot answer the question as it's posed to

17  you, do not answer it.

18      THE WITNESS:  What information do they want to

19  put on the sign?

20  BY MR. HULL:

21      Q    All right.  Let me give you a specific

22  hypothetical.  Okay?

23      A    Fine.

24      Q    Let's say Precision wanted to take an

                                              55

1    8-and-a-half-by-11 white sheet of paper.  They wanted

2    to print on that piece of paper, Don't use this door,

3    go to the other door; is that something that they're

4    allowed to put on the outside of that blue man door,

5    or does the lease prohibit that?

6        A    We would not have a problem with them doing

7    that.

8        Q    We're looking at six photographs.  We've

9    marked them 2A, 2B, 3A, 3B and 4A and 4B.  Generally,

10   they depict a portion of the outside area on what we

11   come to call the back of this 977 Northpoint Ventures

12   building, correct?

13       A    Yes.

14       Q    All right.  Who's responsible from the time

15   period the tenants started to occupy the building?

16   Who snow plows any of this parking area, depressed

17   dock, walkway, any of this cement area that's

18   depicted -- cement surface that's depicted in these

19   six photographs?

20       MR. POTTER:  Objection.  Relevance.  If you

21   have an answer, you can provide it.

22       THE WITNESS:  The snowplowing contractors are

23   taken care of by the management company.

24

                                                    56

1  BY MR. HULL:

2      Q    Was there a separate entity that snowplows,

3  or is it Rothbart Realty that snowplows?

4      A    Separate entity.

5      Q    They entered into a contract with the

6  management company, Rothbart Realty, that provides

7  snowplow services?

8      A    Yes.

9      Q    And is that a contract that Rothbart Realty

10  and Rothbart Construction company are responsible for

11  making sure it's in place?

12      A    Yes.

13      Q    Then again -- again, that same concrete

14  surface area that's depicted in these photographs

15  that we're looking at, who salts that area during the

16  winter months?

17      MR. POTTER:  Same objection as to relevance.

18  If you have an answer, you can provide it.

19      THE WITNESS:  The contractor that is taking

20  care of the snowplowing.

21      Q    Then, again with regard to the same

22  concrete surface area that's depicted in these

23  photographs that we've been talking about, who's

24  responsible for shoveling any of the areas close to

57

1    these blue man doors?

2        MR. POTTER:  I'm assume as to snow, same

3    objection as to relevance.  If you have an answer,

4    you can provide it.

5        MR. HULL:  And what's the relevance objection?

6        MR. POTTER:  How does snow removal in June have

7    anything to do with this?  How does salting in

8    June --

9        MR. HULL:  With the question of control over

10   the area.

11       MR. POTTER:  I don't see how in June was snow

12   removal and salting is at all relevant to this

13   question.

14            So I'm allowing him to answer it, but

15   I just -- I'm going to move in limine if you're going

16   to talk about snow removal in June.

17       MS. ADAMS:  I join in the objection.

18       MR. HULL:  So you don't think that's relevant

19   to the question of who exercises dominion and control

20   over the concrete surface areas?

21       MR. POTTER:  Well, first of all, are you, for

22   the purposes of this deposition, saying that this

23   gentleman fell in front of this blue door that you're

24   pointing to in these photos?  Is that where he fell?

58

1          MR. HULL:   I'm not saying anything about where
2     he fell.
3          MR. POTTER:   Well, that's the problem with this
4     deposition, and that's why I have an objection to all
5     of your questions because we don't know where the
6     accident occurred.
7               There are many issues that can arise.
8     What if one of these trucks was leaking oil?   When
9     you read the lease, it talks about the negligence of
10    the agents of the tenant.
11              You know, how do we -- we don't even
12    know what we're talking about.   We don't know what
13    we're talking about.   What's the substance that he
14    fell on?
15              In your complaint, you mention debris,
16    you mention water, you mention a liquid substance,
17    assumably something different than water.
18              What is the substance that he fell on?
19    Aren't we entitled to these answers before you can
20    pose to me these general questions about who
21    controlled what, and who is required to maintain
22    what.
23              And that's why we answered the
24    interrogatories this way.   And that's why I'm making

                                                      59

1   so many objections in this deposition because this is

2   a patently unfair way to proceed with this

3   litigation.

4           The motion was premature, and to go

5   ahead and depose someone before we know the facts

6   under which this case allegedly arises is just

7   patently unfair to this witness.

8       MR. HULL:  I don't disagree with you that the

9   motion was premature, but, unfortunately, they filed

10  it, and, unfortunately, we have to ask the questions

11  this way.

12      MR. POTTER:  And I further will point out that

13  your motion asked for depositions of Precision

14  people, not Mr. Rothbart, but here we are today in

15  good faith trying to work through the issues.

16      MR. HULL:  And I understand, and Mr. Rothbart's

17  been very cooperative.  He's been very cooperative.

18  All right.  Well, let's get back to this.

19  BY MR. HULL:

20      Q   I don't want to have to have you sit while

21  the lawyers go back and forth, but -- all right.

22          I'm going to tell you one thing.  And

23  then just for -- and everybody will wind up deposing

24  Mr. Rogers, and he'll tell you exactly where he fell,

60

1    but I will represent to you that photograph 2B --

2    this is the --  first of all, let me ask you a

3    question:

4                   Who was the tenant in the first part

5    of the building?  Do you remember at that time or

6    back there in whatever it was in 2004?

7         A    I believe the company -- I can't think of

8    the name offhand.

9         Q    But whoever occupied this front section of

10   the building was different than Precision, correct?

11        A    If you're saying who occupied the west end

12   of the building versus Precision being east of the

13   west end, the answer is yes.

14        Q    Okay.  Well, what you have correctly

15   pointed out is the west end of the building.  That

16   was occupied by somebody other than Precision?

17        A    Correct.

18        Q    Okay.  All right.  Then let me go to what I

19   was going to represent to you that at the white pipe

20   that comes out of the Precision area that we were

21   looking at in these other photographs comes out to

22   the end of this railing -- I suppose that's the best

23   thing we can call it -- Mr. Rogers fell right in that

24   area like just immediately to the end of the -- you

                                                        61

1    know, just outside the area of this discharge area --

2    discharge end of this white pipe.  Okay.

3           I'm going to tell you that's what

4    he'll tell you when he gets deposed, or that's what

5    he'll tell your lawyers when he gets deposed.

6           All right.  So, again, as I understand

7    your testimony, the responsibility for that area or

8    what might happen in that area -- that area, again,

9    is the area just south to the end of this --

10        A    It's to the north.

11        Q    It is to the north?

12        A    (Nodding).

13        Q    Yeah.  You're right.  Okay.  So to the

14   north of this -- end of this white pipe that comes

15   out of here (indicating) as I understand your

16   testimony, the responsibility for that area would be

17   dependent upon what came out of that pipe?

18        A    I would say that's a fair answer.

19        Q    Okay.  All right.  During the period of

20   time that tenants occupied the 977 Northpoint

21   Ventures building up until the time of Mr. Roger's

22   fall, which, unfortunately, I don't have the date

23   with me.  That was in July of --

24        MR. POTTER:  June 25, 2004, according to your

62

1   complaint.

2   BY MR. HULL:

3       Q    Okay.  All right.  June of 2004.  Thank

4   you.  During that period of time -- again, from the

5   time tenants first began to occupy the 977 Northpoint

6   Ventures building up until that June 25th, 2004 date,

7   did Rothbart Realty or Rothbart Construction Company

8   ever receive any complaints about these white

9   discharge pipes of any kind?

10      A    Don't know.

11      Q    Would you have records that would indicate

12  whether there were any complaints by tenants?

13      A    Possibility.

14      Q    And would those record be at the Techny

15  address?

16      A    If we have them, yes.

17      Q    Earlier in the deposition you talked about

18  other records that might be there would be work

19  orders submitted by tenants to Rothbart Realty or

20  Rothbart Construction; do you remember that?

21      A    Yes.

22      MR. POTTER:  I'm going to object to the

23  characterization.  I don't think that's an accurate

24  characterization, but that's fine.

                                              63

1    BY MR. HULL:

2        Q   If I misremembered, I'm not trying to trick

3    you.  I'm just trying to --

4        MR. POTTER:  I'm not sure if the tenants

5    created the work order or if they called and you

6    generated them.

7        MR. HULL:  That's what I'm going to try to find

8    out.

9        THE WITNESS:  Can I ask a favor?  The coffee

10   has gone through me.

11       MR. HULL:  All right.  No problem.

12                          (Whereupon, a recess was taken.)

13                          (Whereupon, the record was read

14                           as requested.)

15   BY MR. HULL:

16       Q   Let's just go back to the -- you had

17   mentioned the term "work orders" earlier in the

18   deposition.  What are those?

19       A   If a tenant would call in and request some

20   work done in their unit, that would be a work order,

21   or if there was something on the outside that would

22   be a work order, or if we noticed something during

23   our inspections that had to be done, that would be a

24   work order.

64

1        Q    So if you -- if Rothbart or Rothbart Realty

2    or Rothbart Construction noticed something during its

3    inspections; is that a work order that you would

4    generate or is that something that you tell the

5    tenant, and then they generate a work order?

6        A    It depends.

7        Q    It depends on what?

8        A    If I'm at a space, and I'm walking through

9    and the tenant says, Hey, this is wrong.  I would

10   say, Do me a favor, fax it in.  Where if I'm out, and

11   I see something, I could call it in.

12       Q    And who do you call it in to?

13       A    Someone in the office, person who handles

14   those in the office.

15       Q    And this is the Techny address office?

16       A    Yes.  Yes.

17       Q    Okay.  All right.  Do you have a file or

18   files at the Rothbart offices at the Techny address

19   that would contain copies of any of these work

20   orders?

21       MR. POTTER:  Objection.  Asked and answered.

22   You can answer again.

23       THE WITNESS:  Yes, if we have the work orders,

24   and they have not been thrown out, we would have

65

1    copies of them.

2    BY MR. HULL:

3        Q    Does Rothbart have something specific to

4    document construction procedures?

5        A    We tend to get rid of stuff after one or

6    two years, stuff like this or, again, it depends.

7        Q    But you or someone on your behalf could go

8    and look and see whether those records exist?

9        A    Yes.

10       MR. POTTER:  And I have already asked them to

11   give those records to me, and then, I'll respond

12   accordingly.

13   BY MR. HULL:

14       Q    All right.  Mr. Rothbart, the time period

15   that I want to use is the time from when tenants

16   first started occupying the 977 Northpoint Ventures

17   building up until this June 25, 2004 date.  Okay.

18   The next few questions I'm going to ask you relate to

19   that time period.  All right?

20       A    Yes.

21       Q    Are you aware of any other accidents of any

22   type that occurred at the property during that period

23   of time?

24       A    To my knowledge, no.

                                                    66

1      Q    How did you first learn of Mr. Rogers'

2    fall?

3      A    We received either a fax, I believe, from

4    the tenant acknowledging that someone had fallen at

5    the building.

6      Q    Do you remember when that came?

7      A    No.

8      Q    And what did you do with that fax?

9      A    I think our first reaction was to -- again,

10   I know one thing I did was --

11     MR. POTTER:   I think he wants to know

12   physically what did you do with the piece of paper.

13   BY MR. HULL:

14     Q    That's my first question, yeah.

15     A    Once we received it, we acted on it

16   accordingly.

17     Q    What did you do with the piece of paper?

18   Did you stick it in a file?  Did you throw it away?

19     A    No, we didn't throw it away.

20     Q    Okay.  So it's still in existence

21   somewhere?

22     A    Somewhere.

23     MR. POTTER:   I don't think we have it.  So if

24   you can find that and send that to me, I would

67

1    appreciate it.

2    BY MR. HULL:

3         Q    Yeah, we don't have it.

4         A    Okay.  Let me make a note.

5         MR. POTTER:  That would be great.

6    BY MR. HULL:

7         Q    Do you remember how soon after June 25,

8    2004, you received that fax?

9         A    No.

10        Q    Do you remember whether it was a matter of

11   days, weeks or months after that date?

12        A    I have no recollection.

13        MR. POTTER:  And are we focusing on the control

14   issues with this dep or are we bringing Mr. Rothbart

15   back in?

16        MR. HULL:  No, my understanding is that we're

17   going to be bringing him back in.

18        MR. POTTER:  Okay.

19        MR. HULL:  And the reason I ask about prior

20   accidents -- I asked about when he first learned

21   about the Bruce Rogers incident, is all for the

22   purposes of his control.  What did he do?  What did

23   Rothbart do?

24        MR. POTTER:  Well, I'm willing to let you

68

1    explore this a little bit, but I don't see the

2    connection between control and his notice of the

3    accident, and what he did in response to that notice.

4    But I'm going to let this go a little ways.

5    BY MR. HULL:

6        Q    When you said you acted on it accordingly,

7    what did you do?

8        A    Well, I know one thing we did was shoot the

9    letter off to our carrier.

10        MR. POTTER:  Any communications other than

11    physically sending the letter, that's fine.  But any

12    communications between your insurance companies or

13    your attorneys is privileged.

14              So I'm instructing you not to

15    volunteer any information regarding those

16    conversations with your insurance people or your

17    attorney.

18        THE WITNESS:  Okay.  And then I -- again, I

19    don't recall.  I don't think I went up to the

20    property thereafter, but I don't know who may or may

21    not have gone up from my office.

22    BY MR. HULL:

23        Q    Do you remember that somebody did go up or

24    that nobody went up?

69

1        A    I can't answer that.

2        Q    Did you have any conversations with anybody

3   at Precision about the incident when you received

4   this fax?

5        A    I don't recall.

6        Q    With regard to the lease with

7   Precision -- the lease between -- or strike that.

8   Precision's lease for this property that they

9   occupied at the 977 Northpoint Ventures uilding, was

10  that a lease they had with Rothbart or is the

11  landlord considered to be 977 Northpoint Ventures,

12  LLC?

13       A    The landlord is 977 Northpoint Ventures,

14  LLC.

15       Q    All right.  So then I'm going to ask you a

16  few questions about the lease, the actual lease

17  document between Precision and 977 Northpoint

18  Ventures, LLC for this portion of the building that

19  they occupied.  Okay?

20       A    (Nodding.)

21       Q    All right.  Who negotiated that lease on

22  behalf of the landlord, if you know?

23       A    I did.

24       Q    All right.  Who drafted the lease?

                                                    70

1        A    I did.

2        Q    Do you have any records at your office with

3    regard to any of those discussions or negotiations

4    with Precision about that lease?

5        A    I'd have to check.

6        Q    Again, if you do have any, would they be at

7    the Techny address?

8        A    Yes.

9        Q    All right.  If you could check, I'd

10    appreciate it.  Do you have any recollection during

11    those negotiations with Precision for the lease that

12    we're talking about?

13            Do you have any recollection or any

14    discussions with Precision regarding maintenance

15    responsibilities?

16        A    Specifically, no.

17        Q    Almost finished here, Mr. Rothbart.

18    Earlier in the deposition -- and, again, I'm not

19    trying to trick you, and I probably don't remember

20    your words exactly, but I just want to refer you to a

21    point in the deposition where you mentioned to me

22    something that if the tenants -- the tenants have the

23    responsibility -- the tenants of the building -- of

24    this 977 Northpoint Ventures building -- have

                                                           71

1    responsibility for something that might have been

2    generated on the inside of their building that

3    somehow got to the outside of the building; do you

4    remember that?

5         A    Vaguely, but go ahead.

6         Q    Okay.  Is that a correct statement or if

7    it's not, is there a better way to put that?  That

8    responsibility that you were talking about?

9         MR. POTTER:  Just on the way you worded this

10   question, I object, asked and answered.  If you have

11   an answer to that, that's fine.  I'm not clear if

12   you're asking for a clarification of his prior answer

13   or...

14   BY MR. HULL:

15        Q    Well, I want to go back to that and ask a

16   couple questions about it.  And I don't want to

17   mislead you or anything, so I'm trying to --

18        A    Well, why don't you ask me the questions,

19   and let me see if I can answer it.

20        Q    All right.  If something is generated by

21   the tenant in the 977 Northpoint Ventures building on

22   the inside of the building -- when I mean the inside,

23   I mean inside the demising walls --

24        A    Okay.

                                                      72

1          Q    -- and somehow that item, substance,

2     whatever it might be, finds its way to the outside of

3     the building, whether it'd be through this white pipe

4     that we've been talking about or otherwise, is the

5     deposit of that substance on the outside of the

6     building the responsibility of the tenant?

7          A    I would view that as the responsibility of

8     the tenant because it was generated from his internal

9     premises.

10         MR. POTTER:   I'm just going through --

11         MR. HULL:   You're welcome to look at the lease

12    that we're talking about.

13         MR. POTTER:   No, I'm going to go through it

14    after everybody's done, just so you know.

15         THE WITNESS:   And on the same token, if the

16    tenant did something i. e. in the dock area -- let's

17    say they washed their car or they washed a truck or

18    they did whatever, I would view that as a maintenance

19    issue with the tenant, too.

20    BY MR. HULL:

21         Q    And why would that be?

22         A    Because they're taking an area that in

23    theory is there under their exclusive dominion and

24    control, and they're using it for a purpose that

                                                    73

1    benefits the building -- their use of the premise.

2    And, therefore, that is a direct

3    result of their actions, and, therefore, that should

4    be under their control.

5    Q    All right, then with regard to the --

6    again, back to my question about items.

7    A substance that's generated on the

8    inside of the demising walls for this 977 Northpoint

9    Venture building that then finds its way to the

10    outside of the building, whether it'd be through this

11    white pipe or otherwise, would you consider items, or

12    whatever might be contained in the sump pit that

13    we've been talking about, something that was

14    generated on the inside of the building?

15    A    Very well could be.

16    Q    And so items that come from that sump pit

17    that find their way outside of the building, which,

18    at least, according to your testimony would come

19    through this white pipe that we talked about is

20    something, again, that you would consider their

21    responsibility?

22    A    It could very well be their responsibility.

23    MR. HULL:  All right.  I don't have any more

24    questions right now.

74

1          MR. FITZSIMMONS:  I have a few.

2                    EXAMINATION

3                    BY

4               MR. FITZSIMMONS:

5          Q    My name is Ryan Fitzsimmons.  I represent

6    Precision Laboratories.  Since we're on the sump

7    pump, staying on it, is the sump pit open inside?

8          A    Typically, there's a metal -- piece of

9    metal covering it, which can be removed very easily.

10         Q    It's not a grated piece of metal.  It's an

11   actual --

12         A    Yeah.

13         Q    -- metal covering?

14         A    Yeah.

15         Q    Is it latched down or locked down?

16         A    Don't know.

17         Q    But in order to put anything in the sump

18   pit, you have to remove the metal lid to dump stuff

19   in and put the lid back on if you were doing it

20   inside the building?

21         A    Yeah.

22         Q    Otherwise --

23         A    There could be -- there's openings in there

24   for where the wires -- for where the pipe comes

                                                       75

1    through, and they could just throw whatever they want

2    in those openings also.

3        Q    Okay.  Opening in the actual pipe?

4        A    In the actual metal grate.

5        Q    In the metal --

6        A    Metal piece of protection over the hole.

7        Q    Okay.  And that would eventually find its

8    way into the pit --

9        A    Yes.

10       Q    -- it wouldn't just sit --

11       A    No, no.

12       Q    -- outside of the pit then?

13       A    No.

14       Q    With the exception of either removing the

15   lid or pouring stuff through the grate holes, is the

16   only access to the sump pit through the -- at the end

17   of the dock that we've been referring to?

18            I guess we're calling it a depressed

19   docking area, and at the end of that, there's a sewer

20   or some type of --

21       A    I don't see -- I would tend to presume

22   there has to be.

23       Q    Okay.  Is that besides the two ways that

24   you just mentioned the only way to get stuff --

76

1    liquids into the sump pit?

2         A    Yes -- wait, repeat your question again.

3         Q    Is the grating -- or the sewer hole at the

4    end of the depressed ramp --

5         A    Yeah.

6         Q    -- the only entrance into the sump pump and

7    sump pit mechanism with the exception of either

8    removing the lid and pouring liquid in?

9         A    I believe so.

10        Q    To your knowledge did anyone from Precision

11   ever pour anything into the sump pit?

12        A    No, I have no idea.

13        Q    977 Rothbart -- or 977 Northpoint is the

14   landlord, correct?

15        A    977 Northpoint Venture, LLC is the

16   landlord.

17        Q    And they do -- they're responsible for

18   contracting out jobs such as removing snow, cleaning

19   or mowing lawns, those sort of things?

20        A    The management company that is hired by

21   the -- from the -- the management company that is

22   hired -- 977 hires, contracts out to snow removal,

23   etc.

24        Q    Okay.  You've lost me, so 977 doesn't

                                                    77

1    contract for the snow removal.  Rothbart Realty as

2    the management company --

3         A    Yes.

4         Q    Does Rothbart Realty use the same -- I

5    assume Rothbart Realty is the management company for

6    more than one property; is that correct?

7         A    Yes.

8         Q    Do they use the same maintenance crew for

9    each property?

10        A    It depends on --

11        MR. POTTER:  Well, I'm going to object.  The

12   question's beyond the property at issue.  I don't see

13   how it's relevant to this case.  Do you have some

14   basis that it's relevant?

15        MR. FITZSIMMONS:  I'm just trying to figure out

16   if he's going to know the identity of that company.

17        MR. POTTER:  Oh, ask him the identity.  I'm

18   sure he does, but I don't want to go beyond the

19   property -- again, this isn't an asset deposition.  I

20   don't want to go beyond the property that we have

21   here.

22   BY MR. FITZSIMMONS:

23        Q    Do you know the name of the company that

24   cleans up snow on the property we've been discussing?

                                                        78

1        A    Yes.

2        Q    What is the name?

3        A    I believe it's American Brick and Paving.

4        Q    Can you say that again.

5        A    American Brick and Paving.

6        Q    And just in terms of the property we're

7   talking about, does American Brick and Paving do any

8   other jobs besides removing snow and as you said

9   putting salt on?

10       A    No.

11       Q    Is there another company that mows the

12  lawns on that property?

13       A    Yes.

14       Q    Do you know the name of that company?

15       A    That, I'm not too sure.  We use a couple

16  different landscapers.

17       Q    Would that company be responsible in the

18  fall for coming in and raking up the leaves and

19  things of that nature?

20       A    There are no trees that -- it's hard to

21  say.

22       Q    Now, going back to your interrogatories if

23  you recall, you were asked about Interrogatory No. 2,

24  where you said that without waiving your objection,

79

1   Precision, who is the tenant on the lease, was

2   responsible for maintaining the area where the

3   plaintiff fell?

4       MR. POTTER:  I object.  It does not say that.

5   It says the tenant under the lease had maintenance

6   responsibilities --

7       MR. FITZSIMMONS:  Right.

8       MS. ADAMS:  -- but not as vague as the

9   question, which we don't know where the incident

10  occurred or what the substance was.

11  BY MR. FITZSIMMONS:

12      Q   Okay.  Your speaking objection aside, what

13  I'm asking is:  You gave an answer -- the question

14  is --

15      MR. POTTER:  That's not a speaking objection,

16  you misquoted the answer, and I think I'm entitled --

17      MR. FITZSIMMONS:  Your objection is an

18  objection quoting anything -- anything beyond that

19  actually is a speaking objection, which you stated --

20      MR. POTTER:  Okay.  Let me restate my

21  objection.  Objection.  Misquoting the statement.

22  Don't answer the question.

23  BY MR. FITZSIMMONS:

24      Q   The question that was asked in the

                                                    80

1    interrogatory is:  Who had the responsibility and

2    duty -- or duty do maintain the area in question at

3    the time and place where the plaintiff fell?

4        MR. POTTER:  Objection.  We don't know the

5    place.  Don't answer the question as it's phrased.

6    BY MR. FITZSIMMONS:

7        Q    I actually haven't asked my question.  I

8    was going to say is that what the question says, the

9    gist of it, that the question asked in the

10   interrogatory was:  Who had the duty to maintain the

11   area in question at the time and place where the

12   plaintiff fell and for the 30 days before the

13   plaintiff fell; is that Interrogatory No. 2?

14       MR. POTTER:  Can you please read back the

15   question.

16       MR. FITZSIMMONS:  I agree to strike, and I'll

17   ask a new question.  Can we do that?

18       MR. POTTER:  Sure.

19   BY MR. FITZSIMMONS:

20       Q    Interrogatory No. 2, would you agree asked

21   who had the responsibility or duty for maintaining

22   the area in question at the time and place of

23   plaintiff's fall and for the 30 days preceding that

24   fall?

81

1        MR. POTTER:  Hold on a second.  I need you to

2    read it back because I think you're changing the

3    question.

4                        (Whereupon, the record was read

5                         as requested.)

6        MR. POTTER:  I object.  It's not verbatim, but

7    you can provide an answer to that.

8        THE WITNESS:  I think it's -- A is the answer

9    to -- the interrogatory states one of them was

10   Precision Laboratories.

11   BY MR. FITZSIMMONS:

12       Q    I'm not asking for your answer.  I'm just

13   asking on question number 2, if you understand it as

14   it's written?  Do you understand the question as it's

15   written?

16       MR. POTTER:  It's been asked and answered.  You

17   can answer it again, but you already said yes.

18       THE WITNESS:  Okay.  Yes.

19   BY MR. FITZSIMMONS:

20       Q    And your answer to question number 2 was

21   that Precision Labs had maintenance responsibilities,

22   correct?

23       A    Yes, may have had maintenance

24   responsibilities.

                                                      82

1      Q    Well, you didn't say had.

2      A    Had maintenance responsibility.

3      Q    And if I understand your testimony

4  correctly -- and I'm not trying to put words in your

5  mouth, sir.

6           Is your testimony that this question

7  was answered this way because in your opinion, the

8  question was unduly vague, and so you are unsure

9  about what area the plaintiff was asking who had

10  control of?

11     MR. POTTER:  As well as what the substance was

12  that allegedly caused the fall.

13     MR. FITZSIMMONS:  Well, there's no substance in

14  the question.

15     MR. POTTER:  Well, but the substance

16  specific -- if you want me to instruct him not to

17  answer it, fine.

18          Otherwise, I got to give you a -- I've

19  got to explain to you why.  The substance is integral

20  in the maintenance responsibilities; for example, if

21  it's garbage, you see a dumpster out there.  That's

22  your client's responsibility.

23     MR. FITZSIMMONS:  I'm asking your client when

24  he answered this question, if he answered the

83

1    question because he did not understand where the area

2    in question was, and that his understanding of

3    question 2 was that it was vague as to where the area

4    in question was the question of maintenance was

5    referring to?

6         MR. POTTER:  Do you understand the question?

7         THE WITNESS:  I think I do.

8         MR. POTTER:  Okay.  If you understand it, you

9    can answer it.

10        THE WITNESS:  A, it was vague.  B, as I have

11   said over and over during this thing, there is some

12   issues of exterior maintenance that is the tenant's

13   when it's generated from the --

14   BY MR. FITZSIMMONS:

15        Q    Okay.  Is there a question -- in question

16   2, is there anything to do with the -- the question

17   is about an area, right?

18             Not who was in control of a certain

19   substance or needed to maintain or clean up their own

20   personal discharge or water; is that correct?

21             The question just refers to an area on

22   the property?

23        MR. POTTER:  Objection.  It's been asked and

24   answered, and it's a mischaracterization, but you can

84

1    answer it.

2        THE WITNESS:  It depends where the area is.

3    BY MR. FITZSIMMONS:

4        Q    Okay.  I'm not trying to put -- I'm trying

5    to find out because you, in your answer, claim that

6    we are responsible for the maintenance; is that

7    correct?

8        MR. POTTER:  Objection.  Mischaracterization,

9    he is responsible for the maintenance, and vague.

10   BY MR. FITZSIMMONS:

11       Q    In your answer to 2, you put Precision had

12   maintenance responsibilities?

13       MR. POTTER:  Objection.  That's different from

14   Precision was responsible for the maintenance, and

15   maintenance is a vague and ambiguous term.

16   BY MR. FITZSIMMONS:

17       Q    Okay.  Is the reason that you point to

18   Precision in your answer is that, generally,

19   Precision had maintenance responsibilities, or you're

20   unsure of where the area in question is, so that

21   Precision may have been responsible for that area?

22       A    Both.

23       Q    So would a fair statement be that you are

24   unsure of exactly who was supposed to maintain the

                                                      85

1    area exactly where plaintiff fell, and you're unsure
2    because you're not sure where plaintiff fell?

3        A    And I am not sure where plaintiff fell,
4    which, therefore, I'm not able to make a decision as
5    to who was the ultimate one responsible for the
6    maintenance of that area.

7        MR. FITZSIMMONS:  Okay.  Thank you.  I have
8    nothing further.

9        MR. POTTER:  Do you have anything else?

10       MR. HULL:  I didn't know if you had any
11   questions.

12       MR. POTTER:  I think we're going to follow up
13   after.

14       MR. HULL:  Okay.  I do have a couple questions.

15                 EXAMINATION

16                 BY

17                 MR. HULL:

18       Q    Mr. Rothbart, directing your attention to
19   the photographs here and specifically Rothbart 2A,
20   again, this white pipe that we now know connects to
21   the sump pit inside the building, and that extends
22   out along this railing; what would you call that
23   pipe?

24       A    White PVC discharge pipe.

                                                      86

1        Q    Just some sort of discharge pipe.  If I
2    refer to it as discharge pipe, you'd understand what
3    I'm talking about?
4        A    Yeah.
5        Q    Okay.  And you would call it the discharge
6    pipe because it facilitates the discharge from the
7    sump pit; is that correct?
8        A    Yes.
9        Q    I know we've been over this ground, but,
10   obviously, you know this is an area of intense
11   interest by all lawyers involved in this case so far.
12   But let's go again to the -- where was that
13   photograph -- 2B, Rothbart 2B.
14            Again, what we're looking at -- and
15   the area I'm directing your attention to is the end
16   of that white discharge pipe that comes from the
17   portion of the premises that Precision leased at the
18   time, not the west end, or the tenant that was in the
19   west end because you can see two of them in there.
20   That's why I'm pointing to -- in other words --
21        MR. POTTER:  It's one in the distance.
22        MR. HULL:  There's one in the distance.  And
23   then there's one that would be closer to you.
24        MR. POTTER:  It's hard to tell where this one

87

1    is, but go ahead.

2         THE WITNESS:  Go ahead.  Go ahead.

3    BY MR. HULL:

4         Q    But, anyway -- all right -- if you take the

5    end of that pipe, the end of that discharge pipe and

6    use that as the center of a circle and then construct

7    a 5-foot circle of concrete surface area around

8    that --

9         A    (Nodding.)

10        Q    -- that's the area that we're trying to

11   find out who has maintenance responsibilities for.

12        MR. POTTER:  And that's a statement or is that

13   a question?

14        MR. HULL:  That's a statement.  Okay.

15        MR. POTTER:  That's a hypothetical, I think,

16   or...

17   BY MR. HULL:

18        Q    Well, yeah, anyway, that's -- I'm trying to

19   direct him to a specific area on that photograph.

20   That's what I'm trying to do.  All right.

21             Am I correct in understanding that who

22   has maintenance responsibilities for that 5-foot area

23   using that end of the white discharge pipe as the

24   center of that circular area that I'm describing,

                                                      88

1   part of what determines that is what might be

2   discharged from that discharge pipe; is that correct?

3       A   I'm listening.  Go ahead.

4       Q   No, that's the question.

5       MR. POTTER:  Do you agree with that?

6       THE WITNESS:  Yes.

7   BY MR. HULL:

8       Q   Part of that determination as to who's

9   responsible, again, for that same circular area that

10  I described in my previous statement also depends on

11  exactly which part of that area that we're talking

12  about; is that correct?

13      A   Yeah.

14      Q   And the reason I asked that is because

15  under my carving out of a circular area, some part of

16  that is inside this railing --

17      A   Dock.

18      Q   -- right, this depressed dock area, so that

19  would help tell us who might be responsible for a

20  portion of it.

21          Is there anything else that would tell

22  us who's responsible for that area that I have carved

23  out, this circular area using the center or that --

24      A   It's the only two parties.

89