1          MR. POTTER:  Just making a general objection as

2     to the whole vagueness as to what we're dealing with,

3     but you can go ahead and answer the question.

4          THE WITNESS:  If it's not -- it's either

5     Precision Laboratories or it's the landlord per se

6     that's really responsible for that area.

7     BY MR. HULL:

8          Q    All right.  And what I'm trying to

9     understand is what are all the factors that we would

10    look at to determine who's responsible for that?

11         MR. POTTER:  Again, objection as to the general

12    vagueness.  You can answer it if you know.

13         THE WITNESS:  I would have to say that one of

14    the things you would have to look at is the source of

15    the product or the liquid or whatever that is being

16    discharged within that area.

17    BY MR. HULL:

18         Q    Okay.  All right.  So that's one thing.

19    Then we know that another thing is the exact portion

20    of that circular area whether inside this depressed

21    dock or outside the depressed dock, that's another

22    factor that we would look at, correct?

23         A    Yes.

24         Q    Are there any other factors besides those

90

1   two that we would look at?

2        A    What kind of other -- there could be debris

3   that's being spewed from the tenant inside or

4   wherever, too, so that from here, you can't tell, but

5   you don't know at the time the condition of the

6   accident.

7        Q    Now, again, now, we know that we would also

8   look at whether debris was coming from the end of

9   that pipe that was generated inside --

10       A    Or debris in the dock from the tenant.

11       Q    Or debris in the dock area from the tenant?

12       A    Absolutely.

13       Q    Okay.  Anything else?

14       A    Have to think about it.

15       Q    Okay.  Feel feel to think about it.

16       A    Housekeeping of the tenant, general

17  housekeeping of the tenant.  If you noticed over

18  here, (indicating) you have skids.  Who knows at the

19  time the skids could have been at the other side.

20            There could have been trash, garbage.

21  You don't know.  These pictures -- no idea when these

22  pictures were taken.

23       Q    I think there's a date on it.

24       MR. POTTER:  July.

                                              91

1        THE WITNESS:  I don't know when that --

2        MR. POTTER:  That could have been developed

3    date.  We don't know.

4        THE WITNESS:  We don't know what it is, but I'm

5    saying at the time, there's nothing to reflect the

6    housekeeping of the area at the time of the accident.

7    BY MR. HULL:

8        Q    All right.  And whoever conducted that

9    housekeeping might be one of the factors that would

10   go into determining who's responsible for --

11       A    Yes, in my estimation --

12       Q    That's what I'm trying to understand.  All

13   right.  Anything else that you want to add?

14       A    Hm-hmm.

15       Q    Okay.  All right.  Then let me direct your

16   attention to picture -- or yeah, photograph 2A,

17   again, the infamous pipe we keep talking about, the

18   white pipe that comes down.  All right.

19            This area right in that -- immediately

20   adjacent to the white pipe; is that a walkway area?

21       MR. POTTER:  If you can tell from the photo.  I

22   don't --

23       THE WITNESS:  Define a walkway area.

24

92

1  BY MR. HULL:

2      Q    It's a place where people walk on some

3  regular basis.

4      A    Put it this way:  The area is concrete, you

5  know, if someone wants to walk on it, they could

6  walk.

7      Q    Okay.  There's nothing to prevent them from

8  walking on that area?

9      A    No.

10     Q    There's nothing that you know of with

11  regard to the property that says to people don't walk

12  on that area, is there?

13     A    No.

14     Q    Okay.  All right.  Then with regard to the

15  railings, again, looking at the same photographs,

16  these blue colored -- looks to me, at least, blue

17  colored metal railings; you see those?

18     A    Mm-hmm.

19     Q    What's the purpose of those?

20     A    Purpose of those are that people who are in

21  the west of the railing do not see the depressed dock

22  area and do not fall into the area.

23     Q    Okay.  And that would include somebody who

24  might be walking as well as someone in a vehicle,

93

1    correct?

2        MR. POTTER:  For the record, we're looking at

3    2A.

4        THE WITNESS:  2A.  Did I say 2B?

5        MR. POTTER:  I don't know.  I don't remember.

6        MR. HULL:  Yeah, you guys said the same

7    photograph.  That's what I was --

8    BY MR. HULL:

9        Q    Were these railings part of the original

10   design of the property?

11       A    I have to say I think so.

12       Q    Okay.  All right.  Then I want to direct

13   your attention to Rothbart Group 3A.  Again, it, at

14   least, looks to me like one of the best pictures we

15   have of the blue man doors that we talked about, you

16   see that?

17       A    Yes, sir.

18       Q    Were the placement of these blue man doors

19   part of the original design of the building?

20       A    Yes.

21       Q    When a tenant moves into the property at

22   977 Northpoint Ventures, who puts their name on these

23   blue man doors?

24       A    We do.

94

1     Q    We meaning?

2     A    The landlord.

3     Q    So 977 --

4     A    Yes.

5     Q    -- Northpoint Ventures, LLC --

6     A    Yes.  Yes.

7     Q    -- put's that up?

8     A    Yes.

9     Q    All the numbers that we've seen on the
10  building over the garages and that are on some of the
11  blue man doors as we looked at these photographs, are
12  those something that were present when the building
13  was built or are those added later?

14     A    Those were added upon completion of the
15  building for signage purposes.

16     Q    Okay.  All right.  I don't have a picture
17  of it.  I think you guys produced a picture, but it
18  was just kind of an unclear black and white
19  photograph.

20           If we go to the west end of the
21  building, the one -- that's at the end of the
22  building that's closest to the road, correct?  Am I
23  right on that, or am I getting my east and west mixed
24  up again?

95

1          MR. POTTER:  Looking at 2B, you're looking to

2     the west, correct?

3          THE WITNESS:  Are you looking at the road

4     closest to this orange building?

5     BY MR. HULL:

6          Q    Yeah, that's what I'm talking about.

7          A    Okay.  Go ahead.

8          Q    On the east end of the building, there

9     isn't a highway or a road, is there?

10         A    Well, there's 41.  You never know if

11    someone wants to jump over the fence.

12         Q    There's certainly no access from 41 onto

13    the property here?

14         A    If someone wants to hurdle, they can get

15    there.

16         Q    I mean, there's no curb cuts or anything

17    like that?

18         A    No.

19         Q    All right.  So I'm talking about then this

20    west end of the building here (indicating).  This

21    road that's over here as you indicated towards the

22    orange building.  What kind of signage is out there

23    for the building?

24         A    There's a sign in the middle of the parkway

                                                      96

1    approximately mid field between the building giving

2    the address of the property.

3            I think it says 953 to 977.  And there

4    is a sign a little to the north of that, which says,

5    Truck entrance.

6        Q    Okay.

7        A    You know, this isn't --

8        MR. POTTER:  That's not it.

9        THE WITNESS:  No, there's one in the middle.

10   BY MR. HULL:

11       Q    And when you say one in the middle; is that

12   as you're approaching the building -- whatever this

13   area is.  This direction is -- is that from the --

14       A    It's coming from the north to the south.

15       Q    From the north to the south.  So as you're

16   approaching the building from the north to the south

17   on this road down here (indicating) by the orange

18   building, there's a sign before you get to the

19   driveway entrance to the building that's in the

20   median; is that the sign you were talking about?

21       A    There is -- it depends if you're coming

22   from the north to the south, the address sign is

23   south of the driveway.

24            If you're coming from the south to the

                                                          97

1    north, the address sign is north -- is, again, south

2    of the driveway.

3         Q    Okay.

4         A    And what I'm referring to is this sign

5    right there (indicating) which gives you the address

6    of the property.

7         Q    Okay.  All right.  So that -- so when you

8    were saying in the median, what did you mean --

9         A    I was talking --

10        Q    -- because that's confusing me.

11        A    I was talking about that sign right there

12   (indicating) that's the address.

13        Q    Okay.  You weren't talking about something

14   that was in between --

15        A    No.

16        Q    -- the lanes --

17        A    No.

18        Q    -- and the roads that --

19        A    No.

20        Q    -- approaches the --

21        A    No.  No.  I know.  No.  No.

22        Q    All right.  That's what confused me.  All

23   right.  I was familiar -- all right.

24                Again, if you're coming -- all right.

                                                        98

1    Help me again just a minute.  If I'm coming this way

2    (indicating), what am I coming from?  The north to

3    the south?

4         A    If you're traveling like this (indicating)?

5         Q    Yeah.

6         A    You're going north to south.

7         Q    All right.  If I'm going from north to

8    south toward the 977 Northpoint --

9         A    Yes.

10        Q    -- Ventures building --

11        A    Yeah.

12        Q    -- what's the first sign I come to before I

13   come to this driveway entrance?  Is there one?

14        A    There may be a truck entrance sign on the

15   north side of this driveway.

16        Q    Okay.  And does that -- do you recall

17   whether that sign has the address of the building

18   on --

19        A    Probably does not.  Just says, Truck

20   entrance.

21        Q    Then, again, going to this sign that we

22   were looking at earlier that's in the --

23        A    Yes.

24        Q    -- just off the edge of the road that we've

                                                         99

1    been pointing to, what's contained on that sign?

2         A    Address.

3         Q    Address only?

4         A    Address only.

5         Q    And what does it say about the address?

6         A    I believe it says 953 dash 977.

7         Q    Does that name the street or just those

8    numbers?

9         A    Just those numbers.

10        Q    Okay.  All right.  Then this other

11   photograph that your attorney pulled out, this sort

12   of whatever -- it's shaped -- it has all the --

13        A    Directory.  Directory.

14        Q    All right.  The directory.  Where is that

15   sign?

16        A    That is on the south end of the building,

17   north of the south entry.

18        Q    Okay.  Is that visible from this driveway

19   entrance that we were looking at that goes into this

20   back area where we have been talking about all day?

21        A    I would presume it's visible; readable, I

22   question.

23        MR. HULL:  Okay.  All right.  I don't think I

24   have any other questions.

                                                      100

1          MR. POTTER:  You have anything else?

2          MR. FITZSIMMONS:  No.

3          MR. POTTER:  Why don't I go first.

4          MS. ADAMS:  Hmm?

5          MR. POTTER:  You mind if I go first?

6          MS. ADAMS: (Shaking head.)

7                    EXAMINATION

8                    BY

9                    MR. POTTER:

10      Q    So, when we were answering these

11   interrogatories, we had a copy of the complaint,

12   correct?

13      A    Yes.

14      Q    And in the complaint under section -- Count

15   1, paragraph 9, it talks about how the plaintiff

16   slipped and fell on a walkway and parking lot area of

17   the premises, right?

18      A    Yes.

19      Q    So now, we have a walkway and a parking lot

20   area as potential areas where the fall occurred,

21   correct?

22      A    Per the complaint, yes.

23      Q    Right.  And per the complaint, we also have

24   reference to a drainage pipe that directed water,

                                                        101

1    liquids and debris.  So we have three possible things

2    coming out of the drainage pipe, correct?

3         A    Per the complaint, yes.

4         Q    Presumably, it looks like per the complaint

5    that liquids and water might be something different

6    because they're both in the answer, correct?

7         A    Yes.

8         Q    Then looking under paragraph -- Count 1,

9    paragraph 10H, it discusses an accumulation of

10   moisture, water, liquids, debris and growth.

11             So now, we have, per the complaint,

12   potentially four causes of -- alleged causes of the

13   slip and fall, correct?

14        A    Yes.

15        Q    And then if we go on to Count 3 under

16   paragraph 8, it talks about how the plaintiff was

17   walking in a common and usual area for entering and

18   leaving the premises when he slipped and fell on an

19   unnatural accumulation of water, debris, and we have

20   dirt now, and growth located on the walkway; you see

21   that, right?

22        A    Yes.

23        Q    And these are going through your mind as

24   you're answering these interrogatories, correct?

                                                      102

1       A    Yes.

2       Q    Now, let's hypothetically assume that one

3  of the delivery people for the tenant backs a truck

4  into the loading dock area, and there's oil leaking

5  out of the truck, and the oil then leaks down to the

6  base of the dock, goes into the sump pump and is

7  discharged out of this pipe, that would be the

8  tenant's -- due to the tenant's agent's negligence,

9  correct?

10      A    Yes.

11      Q    And if you look at the lease under the

12  maintenance by landlord section, the very first

13  sentence says, Except for damage caused by any

14  negligence or intentional act or omission of the

15  tenant or of the tenant's agents, employees or

16  invitees, which would include a delivery person,

17  correct?

18      A    Yes.

19      Q    So this a caveat that would then throw

20  maintenance and control issues back to the tenant's

21  invitees or agents or employees, correct?

22      A    Yes.

23      Q    Now, also there is under the maintenance

24  obligations of the tenant, it talks about rubbish

103

1    removal, correct?

2        A    Yes.

3        Q    And we saw dirt and debris referenced in

4    the complaint as allegedly causes to this fall,

5    correct?

6        A    Yes.

7        Q    Now, we look at the photos and outside of

8    the unit, Precision had a dumpster, right?

9        A    Correct.

10       Q    And next to that dumpster, they have debris

11   in the form of pallets, correct?

12       A    Yes.

13       Q    All right.  So if the tenant negligently

14   threw away its garbage, and it was strewn about this

15   parking lot that would be the tenant's maintenance

16   responsibility, correct?

17       A    Yes.

18       Q    And that would be an indication of the

19   tenant exerting some form of control over the area in

20   question, correct?

21       A    Yes.

22       Q    Now --

23       MR. HULL:  What's the area in question?

24       MR. POTTER:  I don't know.  That's the problem.

                                                      104

1       MR. HULL:  Well, you asked the question.

2   That's why I wanted to know.

3   MR. POTTER:

4       Q    Yeah, and that's one of the problems here

5   is we don't know the area in question, right?

6       A    Yes.

7       Q    Now, the substance that came out of this

8   pipe is also potentially -- or strike that.

9            The substance that the plaintiff fell

10  on is also a potential issue as to maintenance and

11  control because number 1, we don't know where the

12  substance came from as indicated in this complaint,

13  correct?

14      A    Yes.

15      Q    And, certainly, number two, if it was a

16  cleaning product that was used inside and improperly

17  dumped into the sump, or if it was out of the

18  dumpsters, and it was improperly thrown away, or it

19  was one of these delivery people dropping something

20  as they made a delivery, or if there was say oil

21  coming out of one of the trucks, or some other

22  substance, all of those could come into play with the

23  maintenance and control issues, right?

24      A    Yes.

105

1       Q      Another option that you talked about is if

2    the tenant were to say, damage this pipe that could

3    indicate who's responsible for maintenance and

4    control of that pipe for that issue, correct?

5       A      Yes.

6       Q      Or if they damaged any other areas adjacent

7    to the pipe or associated with the area where the

8    plaintiff fell that could come into play with

9    maintenance and control, correct?

10      A      Yes.

11      Q      So in answering these interrogatories, all

12   of these issues were involved in you formulating

13   those answers?

14      A      Yes, they were.

15      MR. POTTER:   You have anything?

16      MS. ADAMS:   No.

17      MR. POTTER:   That's all I have.

18                  EXAMINATION

19                  BY

20             MR. FITZSIMMONS:

21      Q      If the landlord has control of an area to

22   maintain it, that is their maintenance duty that may

23   eviscerated by some other factor; would you agree

24   with that?

                                                      106

1        A    Yes.

2        Q    So if the area in question becomes a

3   concrete area, the sign, from an eviscerated reason,

4   the maintenance of that area, would be known

5   immediately, correct?

6        A    I don't understand your question.

7        Q    You'd agree that; for example, the parking

8   lot is controlled by the landlord, correct?

9        A    I didn't say --

10       Q    I'm asking you.

11       A    Well, it depends.  Is it the parking lot in

12  front of the building or the parking lot in back?

13       Q    All right.  Let's go with the parking lot

14  in the back.

15       A    Is it controlled by the --

16       MR. POTTER:  I'm going to object to the

17  vagueness and the over-reaching nature of the

18  question.  If you have an answer, you can answer it.

19       THE WITNESS:  I'm sorry.  I can't really answer

20  it.  It depends.

21  BY MR. FITZSIMMONS:

22       Q    I'm saying with the parking lot, is that

23  under the lease just on its face who would be in

24  charge of maintaining the parking lot?

107

1        MR. POTTER:  Objection.  It's been asked and

2   answered.  I'll let you answer it one more time.

3        THE WITNESS:  My counsel objects.  I don't have

4   to answer it.

5   BY MR. FITZSIMMONS:

6        Q    Say that again.

7        MR. POTTER:  It's been asked and answered, so

8   he's standing on his former --

9        MR. FITZSIMMONS:  When was it asked if the

10  landlord is responsible under the lease to maintain

11  the parking lot?

12       MR. POTTER:  First five minutes of this

13  deposition and throughout the deposition.  We've been

14  talking about the parking lot in general, and the

15  number of factors that go into the maintenance and

16  control issues associated with it.

17            And he just also had told you that he

18  cannot answer this question.  It depends on where in

19  the parking lot and under what circumstances.  It was

20  just two minutes ago, the prior answer.

21  BY MR. FITZSIMMONS:

22       Q    And the first question I asked in this

23  series of questions:  Would you agree that the

24  landlord or tenant has responsibility for specific

108

1   areas, unless there is some reason that eviscerates

2   that responsibility?

3              And your answer to that question was,

4   Yes, I agree.  Do you remember me asking that, and

5   you giving that answer?

6       A    Yes, sir.

7       Q    Okay.  What I'm asking is:  So for the

8   parking lot if under the terms of the lease, the

9   landlord was responsible, the landlord then has

10  maintenance responsibility for that area, unless

11  something comes in to eviscerate it; do you agree

12  with that?

13      MR. POTTER:  I think it's been asked and

14  answered, but you can answer it again.

15      THE WITNESS:  I would say yes.

16      MR. FITZSIMMONS:  That's all I have.

17      MR. POTTER:  Anything, anyone?

18              On the record, Mr. Rothbart, reserves

19  signature.  If this is ordered by somebody, I will

20  purchase a copy and please send me the errata sheet,

21  and the signature page, and I will personally handle

22  signature.

23              FURTHER DEPONENT SAITH NAUGHT. . .

24

109

1  STATE OF ILLINOIS    )

2                       )  SS:

3  COUNTY OF COOK       )

4

5      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

6           COUNTY DEPARTMENT - LAW DIVISION

7

8

9  BRUCE ROGERS,                 )

10                               )

11           Plaintiff,          )

12                               )

13   vs.                         ) No. 06 L 005376

14                               )

15  ROTHBART PROPERTIES, et al., )

16                               )

17           Defendants.         )

18

19         This is to certify that I have read the

20  transcript of my deposition taken on the 14th day of

21  November 2006 in the foregoing cause, and that the

22  foregoing transcript accurately states the questions

23  asked and the answers given by me, with the changes

24  or corrections, if any, made on the Errata Sheet(s)

                                                   110

1    attached hereto.

2

3

4                              _____

                             Gary B. Rothbart

5                              Subscribed and sworn to

6                              before me this _____ day

                             of _____ 2006.

7

8                              _____

                             Notary Public

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

                                             111

1    STATE OF ILLINOIS    )
                          )  SS:
2    COUNTY OF COOK       )

3

4        Adrienne White, being first duly sworn on

5    oath, says that she is a Certified Shorthand

6    Reporter, that she reported in shorthand the

7    testimony given at the taking of said deposition and

8    that the foregoing is a true and correct transcript

9    of her shorthand notes so taken as aforesaid and

10   contains all the testimony given by the deponent at

11   said deposition.

12

13       And further, that she is not connected by

14   blood or marriage with any of the parties to this

15   action, nor is she a relative or employee or attorney

16   or counsel of any of the parties, or financially

17   interested directly or indirectly in the matter in

18   controversy.

19

20       That the preceding deposition shall be

21   read by said deponent, and any and all corrections

22   which the deponent desires to make shall be duly made

23   by the deponent on the enclosed errata sheet(s),

24   indicating page and line to be corrected, and that

                                                   112

1  the explanation, if any, given by the deponent for

2  said corrections shall be thereon noted.

3

4  _____

5  Certified Shorthand Reporter
   License No. 084-004614

6  Subscribed and sworn to

7  before me this ____ day
   of _____ 2006.

8  _____

9  Notary Public

10

11  OFFICIAL SEAL
    MARK JOHNSEN
    NOTARY PUBLIC STATE OF ILLINOIS
    MY COMMISSION EXPIRES 12-16-2009

12

13

14

15

16

17

18

19

20

21

22

23

24

113

JWP/rm/9/11/06                                    Attorney No. 36284

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

BRUCE ROGERS,

      Plaintiff,

vs.                                              NO. 06 L 005376

ROTHBART PROPERTIES, PRECISION
LABORATORIES, INC., ROTHBART
REALTY COMPANY, 977 NORTHPOINT
VENTURES, LLC., a/k/a 977
NORTHPOINT VENTURES FUND, SLJ
PROPERTIES, LLC, ROTHBART
CONSTRUCTION COMPANY, INC. and
ROTHBART CONSTRUCTION
COMPANY, INC. a/k/a ROTHBART
CONSTRUCTION REALTY,

      Defendants,

## DEFENDANTS ROTHBART REALTY CO., 977 NORTHPOINT VENTURES, LLC, and SLJ PROPERTIES' ANSWER TO PLAINTIFF'S INTERROGATORIES

NOW COMES Defendants, ROTHBART REALTY CO., 977 NORTHPOINT

VENTURES, L.L.C., and SLJ PROPERTIES' by and through their attorneys, LAW OFFICES,

STEPHEN J. HASZTO, MANAGING ATTORNEY, and makes the following Answer to

Plaintiff's Interrogatories.

      1.     Please identify yourself, giving your full name, residence business and address
and occupation, and if the Defendant is a corporation, please state the office you hold with the
Defendant.

**ANSWER:**
      Gary B. Rothbart
      1945 Techny Road, Suite #6
      Northbrook, IL 60062



Rothbart
DEPOSITION
EXHIBIT
1
11-14-06

Real Estate Development and Management

Operating Manager. 977 and SLJ
President-Rothbart Realty
Vice President-Rothbart Construction

2.    Please state the name and address of the person, firm, entity or corporation which had the responsibility or duty for the maintenance of the area in question, at the time and place of the Plaintiff's fall and for the 30 days preceding the date of Plaintiff's fall.

**ANSWER:**

Objection, this question calls for a legal conclusion. Without waiving said objection, Precision Laboratories, Inc. an Illinois Corporation, the tenant under the lease, had maintenance responsibilities.

3.    Was the Defendant in control of the area in question at the time when the alleged occurrence happened?

**ANSWER:**

Objection, this question calls for a legal conclusion. Without waiving said objection, no.

4.    If the Defendant was not in control of the area in question, please state the name and address or some identification of the person, firm or corporation in control of the area in question on the date of the Plaintiff's alleged occurrence.

**ANSWER:**

Objection, this question calls for a legal conclusion. Without waiving said objection, Precision Laboratories, Inc. an Illinois Corporation.

5.    Please state each and every what precaution, if any, taken by you or any agent or employee of the Defendant, on the date of, and prior to, the Plaintiff's alleged occurrence, to prevent injuries to users of the area in question.

**ANSWER:**

Objection, form. This question does not make sense.

6.      Please identify each and every person who observed, or was present in the area in question at or about the time of the occurrence, giving the name and address of each such person if known to you.

**ANSWER:**

None known at this time.

7.      Please describe the area in question where the occurrence happened, as it existed at the date and time of the Plaintiff's fall, by indicating: (a) the condition of the walking surface; (b) the condition of the piping adjacent to the area of walking surface; (c) whether any water or other liquid, or debris was on such surface area.

**ANSWER:**

Objection, this interrogatory calls for a narrative answer which is better suited for an oral deposition.

8.      Were there any warnings signs provided in connection with the walking surface in the area in question at the time of such occurrence?

**ANSWER:**
No.

9.      If your answer to the preceding interrogatory is in the affirmative, please indicate: (a) the working of such warning; (b) the approximate date it was installed; (c) its location with respect to the area in question.

**ANSWER:**
Not applicable.

10.      Please state whether you or any agent or employee of the Defendant made any examination or inspection of the area in question within a 24-hour period prior to the alleged occurrence.

**ANSWER:**

Regular inspections to the premises are made, although this defendant has insufficient knowledge as to whether an inspection was made within 24 hours of the accident.

11.   Please state whether you or any agent or employee of the Defendant made any examination or inspection of the place or area in question <u>subsequent</u> to the alleged occurrence.

**ANSWER:**

Objection, relevance. Without waiving said objection, yes.


12.   If your answer to preceding Interrogatories No. 14 and No. 15 is in the affirmative, please give the following information with regard to the most recent examination or inspection of the are in question just prior to and after the happening of the occurrence: (a) the date and time of day of such examination or inspection; (b) the identification, including the name and address, of the person or persons making such examination or inspection; (c) what such examination or inspection consisted of; (d) what such examination or inspection revealed or showed; (e) each and every act or activity done or undertaken by you or any agent or employee of the Defendant as a result of any condition or circumstance disclosed by such examination or inspection.

**ANSWER:**

Objection, this question does not make sense.


13.   At or about the date of alleged occurrence, describe in detail any and all established procedures(s) for the inspection of the area in question.

**ANSWER:**

Objection, this interrogatory calls for a narrative answer which is more properly the subject of an oral deposition.


14.   Was the area in question regularly or otherwise patrolled or supervised by you or any agent or employee of the Defendant at the time of the occurrence? If so, state the name and address of each and every person assigned to patrol or supervise the area for a period of one month prior to the alleged occurrence, up to and including the date of the occurrence.

**ANSWER:**

Objection to the terms "Patrolled," "regularly" and "supervised." Without waving said objection, Martin Gangler and Mary Pat Sergenian, 1945 Techny Ave. Suite 6, Northbrook, IL 60062 inspected the premises on a regular basis, as did other individuals including myself.

15.    If any maintenance, repairs or alterations were made (including changes to superstructures or drains or piping) to the area in question, subsequent to the alleged occurrence, please state fully and in complete detail: (a) what such maintenance, repairs or changes consisted of; (b) the name and address of the persons who performed such repairs, maintenance or changes; (c) the date and time that such changes were made; and (d) when did the maintenance, repairs or changes were made.

**ANSWER:**
(a-d)    None.


16.    Please describe the lighting conditions at the area in question, at the time of the occurrence.

**ANSWER:**

Objection, this interrogatory calls for a narrative answer which is more properly the subject of an oral deposition. Without waiving said objection, Defendant states that this accident allegedly occurred in the daytime, and therefore the lighting was excellent.


17.    Please state fully the substance of each conversation which took place, just after the Plaintiff's alleged occurrence, between the Plaintiff and you or any agent or employee of the Defendant including the identity of such persons.

**ANSWER:**

None.


18.    Did any agent or employee of the Defendant ever take or receive any statement, either oral or written, from any person or party who had any information of knowledge or report relating to the occurrence as alleged in Plaintiff's Complaint? If so, identify each statement and report state the name and address of the person who has possession of said statement, the date of said statement was made and recorded, and the name and address of the person who took said statement or report.

**ANSWER:**

No.


19.    Does any agent or employee of the Defendant have possession or control of, or know of the existence of, any maps, reports, pictures, photographs, plats, drawing, diagrams physical evidence, measurements or written descriptions of the alleged occurrence, or of the

areas or persons involved; if so, state the name and address of the person(s) in possession of same.

**ANSWER:**
Yes.

20.     If your answer to the preceding interrogatory is in the affirmative, please state for each such item: (a) its nature; (b) its specific subject matter; (c) the date and time it was made or taken and who now has possession of same; (d) the identification, including name, address and present whereabouts of the person making or taking it.

**ANSWER:**

Defendant's attorney(s) are in possession of 30 digital photographs of the scene of the alleged occurrence taken on 11/4/04 and 6/9/05 by a representative of his insurance company.

21.     State the last known name and address of any and all persons or entities which provided maintenance or clearing services for the area in question for the thirty (30) day period to the date of the occurrence set forth in the Complaint.

**ANSWER:**

Rothbart Realty
1945 Techny Avenue, Suite 6
Northbrook, IL 60062

22.     State the last known name and address of any and all persons who have personal knowledge or information of any and all maintenance or clearing performed on or near the area in question for the 14 day period prior to the date of the occurrence set forth in the Complaint.

**ANSWER:**

Martin Gangler
1945 Techny Avenue, Suite 6
Northbrook, IL 60062

23.     If your answer is affirmative to Interrogatory No. 29 above, state the last known name and address of any and all known persons or entities who have knowledge of such maintenance and clearing.

**ANSWER:**

Not applicable.

24.    Identify all persons, or entities that have personal knowledge or information about the Plaintiff's fall, and state the last known name and address of any such persons or entities.

**ANSWER:**

Michael Rothbart
Gary Rothbart
Mary Pat Sergenian
Martin Gangler
1945 Techny Avenue, Suite 6
Northbrook, IL 60062

Defendant's attorney(s) and insurer.

25.    Please identify any and all governmental permits of any type or kind that approved the construction and placement of the piping that directed water or other liquids onto or near the area in question.

**ANSWER:**

Village of Waukegan building and engineering department.

Gary B. Rothbart

## VERIFICATION BY CERTIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil

Procedure, the undersigned certifies that the statements as set forth in this Answers to

Interrogatories are true and correct, except as to matters therein stated to be on information and

belief and as to such matters the undersigned certifies as aforesaid the he verily believes the same

to be true.

Date: ____9 / 18 / 06____          _____

                                      Gary B. Rothbart

John W. Potter Esq.
Law Offices, Stephen J. Haszto,
Managing Attorney
225 West Washington Street, Suite 1400
Chicago, IL 60606
312-827-2300





Rothbart
DEPOSITION
EXHIBIT
2B
11-14-06  AW
PENGAD 800-631-6989





Rothbart
DEPOSITION
EXHIBIT
2A
11-14-06  AW
PENGAD 800-631-6989





Rothbart
DEPOSITION
EXHIBIT
3B
11-14-06 AW

Rothbart
DEPOSITION
EXHIBIT
34
11-14-06 AW





Rothbart
DEPOSITION
EXHIBIT
4A
11-14-06  AW
PENGAD 800-631-6989





Rothbart
DEPOSITION
EXHIBIT
4B
11-14-06  AW
PENGAD 800-631-6989

