Attorney No: 33718

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

BRUCE ROGERS,                          )
                                       )
            Plaintiffs,                )
                                       )
      v.                               )    No.  06 L 5376
                                       )
ROTHBART PROPERTIES, et al.            )
                                       )
            Defendants.                )

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS
MOTION TO RECONSIDER THE COURT'S RULING ON DEFENDANT PRECISION
LABORATORY INC'S MOTION TO DISMISS PURSUANT TO 735 ILCS 5/2-619(A)(9)**

## I. INTRODUCTION

This Court granted Defendant Precision's motion to dismiss because the Plaintiff did not

fall on Precision's leased premises.  This ruling must be reconsidered because the allegations of

Plaintiff's complaint and the supporting evidence submitted by Plaintiff in opposition to the

motion demonstrate that Plaintiff fell on the **entranceway** to Precision's leased premises; the

very **entranceway** that Precision directed the Plaintiff to use.

Illinois law is well settled that an occupier of land has a duty to provide a safe means of

ingress and egress to its premises.  As importantly, the law is clear that the duty does not end at

the property line.  Plaintiff's complaint sets out clear allegations of fact concerning this duty, the

breaches by Precision of that duty and that Plaintiff's injuries were proximately caused by the

breaches.

Additionally, this court's ruling must be reconsidered because the allegations of

Plaintiff's complaint and the supporting evidence submitted by Plaintiff demonstrate that the

EXHIBIT

tabbies

5

liquid that created the hazard that caused the plaintiff to fall came from inside Precision's leased premises. Precision cannot escape liability, merely because the liquid was pumped out of its premises and onto the entranceway to its premises.

Finally, the ruling must be reconsidered because the Court's ruling demonstrates that the Court resolved issues of fact in granting Precision's motion, something it cannot do on a motion to dismiss. Specifically, Plaintiff's complaint alleges that both Precision and the other Defendants have responsibility for the area where Plaintiff fell. The interrogatory answers from Precision and Rothbart (the landlord) and the deposition testimony from the Rothbart and Precision witnesses raise a clear question of fact about that issue. Each party says that the other party is responsible. The Court's stated basis for granting Precision's motion demonstrates that the Court decided this factual issue because the Court's basis for its decision was that Precision did not have responsibility for the area where Plaintiff fell. The Court came to this conclusion despite the allegations of Plaintiff's complaint, the interrogatory answers from Rothbart and deposition testimony of Rothbart and Precision all of which are contrary to the Court's conclusion or which, at the very least, raised a genuine issue of material fact.

## II. OCCUPIERS OF LAND HAVE A DUTY TO PROVIDE SAFE INGRESS AND EGRESS FROM THEIR PREMISES.

Illinois law is well settled on this point. Occupiers of land have a clear duty to provide a safe means of ingress and egress to their premises. McDonald v Frontier Lanes, Inc. 1 Ill. App 3d 345, 272 N.E. 2d 369 (1971); Bloom v Bistro Restaurant Ltd., 304 Ill. App. 3d 707, 710 N.E. 2d 121 (1999); McLean v Rockford Country Club, 352 Ill. App. 3d 229, 816 N.E. 2d 403 (2004).

Further, the duty to provide a safe means of ingress and egress extends beyond naked and precise property lines. Cooley v Makse 46 Ill. App. 2d 25, 196 N.E. 2d 396; McDonald v Frontier Lanes, Inc. 1 Ill. App 3d 345, 272 N.E. 2d 369 (1971).

The facts of *Frontier* are very similar to the present case. In Frontier plaintiff did not fall on premises owned by defendant. Rather plaintiff fell on a parkway, owned by the city of Elgin, which was separated from defendant's premises by a city sidewalk. Defendant Frontier made a motion for directed verdict or Judgement *nov* based on the fact that plaintiff did not fall on property owned or occupied by Defendant. The trial court denied the motion because the area where plaintiff fell was an entranceway to Defendant's premises. In upholding the trial court's denial of defendant Frontier's motion for directed verdict or Judgement *nov* the appellate court held, with many citations, that an occupier of premises has a duty to provide a reasonable safe means of ingress and egress both within the confines of the premises owned or controlled and beyond the precise boundaries of the premises. *Frontier 1 Ill. App. 3d 345 at 349.*

In *Cooley* plaintiff was injured in a fall on a defective city owned sidewalk that was not owned or controlled by the defendant tavern. In that case the court described the rule as follows:

"We think the duty of the defendants to use due care not to negligently injure invitees upon their premise carries with it a corollary duty to get such invitees safely on or off their premises....the duty of the defendants in this case to their invitees extends beyond naked and precise property lines. Having prescribed the route to their invitees for ingress and egress to and from their building, it was the their duty to properly illuminate, give adequate warning of, or cause to be repaired a known dangerous condition." Cooley 46 Ill. App. 2d 25 at 30.

Here Plaintiff clearly alleges that he fell on the entranceway to Precision's premises. In subsequent deposition testimony Precision admits the location of Plaintiff's fall was on the entranceway to its premises. And finally, Precision's witness admits that it was the entranceway Precision expected Plaintiff to take after reading the sign Precision put up directing drivers such as plaintiff to use its other door. In granting Precision's motion the court's only stated basis was that plaintiff did not fall on Precision's leased premises. Respectfully, under the well settled law of Illinois that fact alone is not enough to sustain Precision's motion to dismiss at the pleading stage. That is particularly true where, as is the case here, Plaintiff's fall occurred on an admitted **entranceway** and on the **entranceway** which Precision directed plaintiff to use to enter its premises.

## III. THE LIQUID WHICH CREATED THE HAZARD ON WHICH PLAINTIFF FELL CAME FROM THE INSIDE OF PRECISION'S LEASED PREMISES.

There is no dispute that an occupier of premises has duty to keep those premises safe. McDonald v Frontier Lanes, Inc. 1 Ill. App 3d 345, 272 N.E. 2d 369 (1971). This court's ruling makes it clear that Precision is responsible for its own premises. Here the allegations of Plaintiff's complaint and the deposition testimony demonstrate that the liquid that created the hazard came from inside Precision's leased premises. The mere fact that the liquid was pumped outside does not relieve Precision of liability for hazards created by that liquid. If that were the rule all defendants would have to do is make sure problem liquids or materials were dumped or placed on its neighbor's property to escape liability for injuries caused by those materials.

The allegations of Plaintiff's complaint and the deposition testimony of both Precision

and Rothbart show that the liquid came from a sump pump pit located inside the Precision premises.  See Exhibit A attached hereto.

## IV.  THE COURT CANNOT RESOLVE FACTUAL ISSUES IN DECIDING A MOTION TO DISMISS.

On a motion to dismiss, a complaint should be dismissed for failure to state a cause of action only when it clearly appears that no set of facts could be proved under the pleadings that would entitle plaintiff to relief.  In ruling on a motion to dismiss, the complaint's factual allegations are to be interpreted in the light most favorable to the plaintiff.  Lake County Grading Co. v Advance Mechanical Contractors, Inc., 275 Ill. App. 3d 452, 654 N.E. 2d 1109 (1995). Moreover, the Court is not to decide genuine issues of material fact in deciding a motion to dismiss.

The Court should reconsider its ruling on Defendant's motion because in making that ruling the Court necessarily resolved genuine issues of material fact which it cannot do on a motion to dismiss. Plaintiff's complaint alleged that both Precision and Rothbart are responsible for the area where Plaintiff fell.  Precision's witness testified that Rothbart was responsible. Rothbart stated in answers to interrogatories that Defendant Precision was in control of the area where Plaintiff fell. (See page 5 of Plaintiff's Brief in Opposition to defendant Precision's Motion).  In addition,  Gary Rothbart, the principal of the  various Rothbart defendants, testified under oath at his deposition to the following:

        a.      Precision was a tenant in the building. (Rothbart dep. pp 24-25)

b.    If materials come from inside a tenant's leased to space, it is the tenant's responsibility to address any problem created by that even if it is created outside of the tenant's leased space. (Rothbart dep. p 31, lines 15-24; p 41, lines 6-24; p 62, line 13-18; p 73, line 1-9; p 74, line 16-22; p 90, line 8-16).

c.    Several sections of the lease, attached as Exhibit A to Precision's motion put maintenance responsibility on the tenant (Precision) for areas outside of the specific leased premises. (Rothbart dep. pp 103-104).

The allegations of Plaintiff's complaint, the answers to interrogatories and the deposition testimony submitted by Plaintiff in opposition to Precision's motion raise genuine issues of material fact about who was responsible for and who was in control of the area where plaintiff fell.

The Court's stated basis for granting Precision's motion to dismiss was that Precision was not responsible for the area where plaintiff fell. The Court came to this conclusion despite the fact issue created by the allegations of Plaintiffs complaint, the deposition testimony of Rothbart and Precision and Rothbart's answers to interrogatories.

## V. Conclusion

For the foregoing reasons Plaintiff respectfully requests that the Court reconsider its ruling on Defendant Precision's motion to dismiss and that the Court deny Defendant Precision's Motion to Dismiss.

Respectfully submitted,

Bruce Rogers

By one of his attorneys

Cutler & Hull
Three First National Plaza
70 West Madison, Suite 3700
Chicago, Illinois 60602
Attorney No.   33718

Atty. No. 33718

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| BRUCE ROGERS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. |
| | ) | |
| ROTHBART PROPERTIES; | ) | |
| PRECISION LABORATORIES, INC, | ) | |
| ROTHBART REALTY COMPANY, | ) | |
| 977 NORTHPOINT VENTURES, LLC | ) | |
| a/k/a 977 NORTHPOINT VENTURES FUND, | ) | |
| SLJ PROPERTIES, LLC, ROTHBART | ) | |
| CONSTRUCTION COMPANY, INC. and | ) | |
| ROTHBART CONSTRUCTION | ) | |
| COMPANY, INC a/k/a ROTHBART | ) | |
| CONSTRUCTION REALTY | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' BRIEF IN SUPPORT OF HIS MOTION TO RECONSIDER THE
COURT'S RULLING ON DEFENDANT PRECISION LABORATORY INC'S
MOTION TO DISMISS PURSUANT TO 735 ILCS 5/2-619(A)(9)**

## EXHIBIT A:  UNCONTESTED FACTS/ALLEGATIONS:

1.      Counts III and IV of the Complaint contain Plaintiff's allegations against
Defendant Precision.

2.      Plaintiff alleges that on or about June 25, 2004, Plaintiff was
lawfully on the premises for the purpose of making a delivery to Precision (Par. 6 of
Count III, Par. 6 of Count IV of Complaint).

3.      Plaintiff alleges that at that time, Defendant Precision owed a

duty to Plaintiff to provide a safe area for **entering** and **leaving** the premises and a duty to maintain the premises including walkways and **entranceways** (Par. 7 of Count III and Par. 7 of Count IV of Complaint).

4.    Plaintiff alleges that at the time Plaintiff was injured he was walking on the usual area for **entering** and **leaving** (Par. 8 of Count III and Par. 8 of Count IV of Complaint).

5.    Plaintiff alleges that Defendant Precision breached its duty to Plaintiff by alleging numerous breaches related to the **entranceways**, including, but not limited to, failure to warn delivery people such as Plaintiff of the unsafe condition caused by the drainage pipe and Defendant's failure to provide a safe pathway for ingress and egress to Precision (Par. 7 of Count III, Par. 7 of Count IV of Complaint).

6.    Terry Culp, currently the vice-president of Precision and, during the time period of the   Complaint the Chief of Operations for Precision, testified under oath to the following:

    1.    Precision has two "walk-in doors" for entering and leaving the Precision premises and one of those "walk-in" doors was used for access by delivery people (Culp Dep. P. 15 line 19-20; P. 19 line 13-14).

    2.    The first "walk-in door" was locked and had a sign on it the day Plaintiff fell, which directed Plaintiff to go to the other "walk-in door" (Culp Dep. P. 21 line 6-24; P. 25 4-16).

    3.    The route Precision expected the Plaintiff to take to the other "walk-in door" was the exact route the Plaintiff took and the route customarily used by delivery people such as Plaintiff (Culp Dep. P. 37, 38; P. 39 lines 1-13).

    4.    This route caused Plaintiff to cross the area where the drainage pipe discharged (Culp Dep. P. 37, 38; P.39 line 1-13; P.58 line 6-13).

5.  The drainage pipe was connected to a sump pump pit inside Precision's leased premises (Culp Dep. P.28 line 9-24; P.29 line 1-18).

6.  Precision personnel had observed delivery drivers such as Plaintiff, prior to Plaintiff's fall, use the route Plaintiff took to enter the Precision premises on the day that he fell. (Culp Dep. P.37, 38; P.39 line 1-13).

7.  Gary Rothbart, principal of the various Rothbart defendants, testified under oath at his deposition t

Precision was a tenant in the building (Rothbart Dep P. 24-25).

If materials come from inside a tenant's leased space, it is the tenant's responsibility to address any problem created by that even if it created outside of the tenant's leased space (Rothbart Dep. P. 31 line 15-24; P.41 line 6-24; P.62 line 13-18; P.73 line 1-9; P.74 line 16-22; P.90 line 8-16).

3.  Several sections of the lease, attached as Exhibit A to Precision's motion put maintenance responsibility on the tenant (Precision) for areas outside of the specific leased premises (Rothbart Dep. P. 103-104).

8.  Question number 2, 3 and 4 of Plaintiff's interrogatories to Defendant Rothbart, et al contained the following definition, questions and answers by Rothbart:

Definitions

a.  "Area in Question" shall mean the walkway referred to in Plaintiff's Complaint.

Q:  2.  Please state the name and address of the person, firm, entity or corporation which had the responsibility or duty for the maintenance of the area in question, at the time and place of the Plaintiff's fall and for the 30 days preceding the date of Plaintiff's fall.

Rothbart, the landlord, provided the following answer: "Objection, this question calls for a legal conclusion. Without waiving said objection, Precision Laboratories, Inc. an Illinois corporation, the tenant under the lease, had maintenance responsibilities.

3. Was the Defendant in control of the area in question at the time when the alleged occurrence happened?

ANSWER:     Objection, this question calls for a legal conclusion. Without waiving said objection no.

4.      If the Defendant was not in control of the area in question, please state the name and address or some identification of the person, firm or corporation in control of the area in question on the date of the Plaintiff's alleged occurrence.

ANSWER:    Objection, this question calls for a legal conclusion.  Without waiving said objection, Precision Laboratories, Inc. an Illinois corporation.

9.      The lease, attached as <u>Exhibit A</u>, to Defendant Precision's motion states in Paragraph 9.A that the tenant [Precision] is responsible for maintaining and operating the "plumbing systems and fixtures".

10.     Both Rothbart and Precision admit that the drainage pipe referred to in Plaintiff's complaint is a drainage pipe that comes from a sump pump pit inside the premises leased by Precision and drains to the outside of the building (Culp Dep. P.28 line 9-24; P.29 line 1-18; Rothbart Dep. P.    )

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| BRUCE ROGERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No.: 06 L 005376 |
| | ) |
| ROTHBART PROPERTIES, PRECISION | ) |
| LABORATORIES, INC., ROTHERBART | ) |
| REALTY COMPANY, 977 NORTHPOINT | ) |
| VENTURES, LLC., a/k/a 977 NORTHPOINT | ) |
| VENTURES FUND, SLJ PROPERTIES, LLC, | ) |
| ROTHBART CONSTRUCTION COMPANY, | ) |
| INC. and ROTHBART CONSTRUCTION | ) |
| COMPANY, INC. a/k/a ROTHBART | ) |
| CONSTRUCTION REALTY | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS MOTION TO RECONSIDER THE
COURT'S RULING ON DEFENDANT PRECISION LABORATORY INC'S
MOTION TO DISMISS PURSUANT TO 735 ILCS 5/2-619(A)(9)**

I.      **Deposition of Terry Culp, Director of Operations for Precision Laborotories, Inc.**

1   STATE OF ILLINOIS      )
                           )   SS:
2   COUNTY OF COOK         )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT - LAW DIVISION
4

5   BRUCE ROGERS,                        )
                                         )
6                     Plaintiff,         )
                                         )
7           vs.                          )   No. 06 L 5376
                                         )
8   ROTHBART PROPERTIES, PRECISION       )
    LABORATORIES, INC., ROTHBART         )
9   REALTY COMPANY, 977 NORTHPOINT       )
    VENTURES, LLC., a/k/a 977            )
10  NORTHPOINT VENTURES FUND, SLJ        )
    PROPERTIES, LLC, ROTHBART            )
11  CONSTRUCTION COMPANY, INC., and      )
    ROTHBART CONSTRUCTION COMPANY,       )
12  INC., a/k/a ROTHBART                 )
    CONSTRUCTION REALTY,                 )
13                                       )
                      Defendants.        )
14

15          The discovery deposition of **TERRY L. CULP**,

16  taken under oath on the 6th day of February 2007, at

17  Suite 3750, 70 West Madison Street, Chicago,

18  Illinois, pursuant to the Rules of the Supreme Court

19  of Illinois and the Code of Civil Procedure, before

20  Kerry L. Knapp, a notary public in and for the County

21  of Cook and State of Illinois, pursuant to notice.

22

23

24

                                                          1

```
 1      APPEARANCES:

 2              CUTLER & HULL, by
                MR. EDWIN J. HULL, III, ESQ.
 3              70 West Madison Street
                Suite 3700
 4              Chicago, Illinois 60602
                    for the plaintiff;
 5

 6              LAW OFFICES of STEPHEN J. HASZTO, by
                MS. FRANCINE BAILEY
 7              225 West Washington Street
                Suite 1400
 8              Chicago, Illinois 60606
                    for the defendants, Rothbart Realty,
 9                  977 Northpoint Realty, and SLJ
                    Properties;
10

11              ADAMS SWATEK, LLC, by
                MS. MARTHA SWATEK
12              1250 Executive Place
                Suite 201
13              Geneva, Illinois 60134
                    for Rothbart Construction;
14
                IWAN CRAY HUBER HORSTMAN & VanAUSDAL, LLC,
15              MR. RYAN F. FITZSIMMONS
                303 West Madison
16              Suite 2200
                Chicago, Illinois 60606
17                  for Precision Laboratories.

18

19

20

21

22

23

24
```

2

1

I N D E X

2

WITNESS:                                                        PAGE

3

TERRY L. CULP

4

   Examination by:

5

       MR. HULL............................... 4
       MS. SWATEK............................ 47

6

       MS. BAILEY........................... 54

7

   Further Examination by:

8

       MR. HULL.............................. 60

9

10

11

12

13

E X H I B I T S

14

NUMBER                                          FOR IDENTIFICATION

15

Culp Exhibit

16

No. 1......................................................59

17

No. 2......................................................59

18

19

20

21

22

23

24

3

1                (Witness sworn.)

2                TERRY L. CULP,

3    called as a witness herein, having been first duly

4    sworn, was examined and testified as follows:

5                EXAMINATION

6                BY

7                MR. HULL:

8        Q.    Could you please state and spell your name

9    for the record, please.

10       A.    Terry L. Culp.  Last name is spelled

11   C-u-l-p.

12       Q.    All right.  First of all, let the record

13   reflect that this deposition is being taken pursuant

14   to notice and agreement of the parties, and pursuant

15   to all applicable provisions of the Illinois Code of

16   Civil Procedure and Supreme Court rules.

17            Mr. Culp, have you ever been deposed before?

18       A.    Yes, I have.

19       Q.    How many times?

20       A.    Less than five.

21       Q.    Okay.  What kind of cases?

22       A.    One was an employee-related case and another

23   case had to do with a licensing disagreement on a

24   product.

4

1    Q.   Okay.  All right.  So you're sort of
2    familiar with the process?

3    A.   I am.

4    Q.   I'm just going to explain a couple things so
5    we're clear.  Obviously, I'm going to ask you some
6    questions.  You're going to give me some answers.  If
7    at any time you don't understand one of my questions,
8    just tell me.  I'll be glad to rephrase it, ask a new
9    one, do something to make sure that we understand
10   each other.  Okay?

11   A.   Okay.

12   Q.   If you don't ask me, I'm just going to
13   assume that you do understand the question that I'm
14   asking.  Fair enough?

15   A.   That's fair.

16   Q.   Also, as I'm sure you know from your other
17   depositions, the court reporter is here to take down
18   what we say.  It's better for her and for all of us
19   if you let me finish my question before you give your
20   answer and I'll try to let you finish your answer
21   before I give you another question.  Okay?

22   A.   That's fine.

23   Q.   If we start talking over each other, she's
24   going to be throwing bricks at us.  Okay?  All right.

5

1          Then, lastly, as you also probably know from

2    your prior experience, she can only take down the

3    words that we say.  You know, the shrug of the

4    shoulder, nod of the head, point of the hand, things

5    like that she can't take down.

6        A.   Correct.

7        Q.   Okay.  So we need to answer everything out

8    loud with words.  Okay?

9        A.   Okay.

10       Q.   All right.  Great.

11            Mr. Culp, where do you currently live?

12       A.   254 Highland Road, Grays Lake, Illinois

13   60030.

14       Q.   And how long have you lived there?

15       A.   Two years.

16       Q.   Who do you live there with?

17       A.   My spouse.

18       Q.   And what's her name?

19       A.   Marian.

20       Q.   How long have you guys been married?

21       A.   24 years.

22       Q.   Good.  Congratulations.

23       A.   Yesterday.

24       Q.   Oh, congratulations.

6

1            Any children?

2       A.   Three.

3       Q.   Any of them live with you?

4       A.   Two.

5       Q.   At this address in Highland?

6       A.   Correct.

7       Q.   All right.  And how old are they?

8       A.   One is 20 and one is 16.

9       Q.   Okay.  And are you currently employed?

10      A.   Yes, I am.

11      Q.   Who are you employed by?

12      A.   Precision Laboratories, Inc.

13      Q.   And how long have you been with Precision?

14      A.   15 years.

15      Q.   And what's your current position --

16      A.   My current position --

17      Q.   -- with Precision?

18      A.   I'm sorry.  Vice president of the seed

19   enhancement business unit.

20      Q.   What is that?  What does that involve, if

21   you can give us a brief description?

22      A.   I have responsibility for all of our

23   activities, products, and activities related to

24   materials that go on seed for agricultural

7

1  applications.

2      Q.   Seed, meaning s-e-e-d?

3      A.   S-e-e-d as in the seed that goes in the

4  ground.

5      Q.   All right.  Okay.  And how long have you had

6  that job?

7      A.   Full-time, probably one year.

8      Q.   Okay.  And what was your previous position

9  before you took that job?

10     A.   I was -- the titles had varied; but most

11  recently, the chief operations officer for the

12  company.

13     Q.   When you say most recently, does that --

14  that doesn't include now?  Or what do you mean by

15  most recently?

16     A.   Well, the title has changed.  For the prior

17  10 years to what I'm doing now for the company, I had

18  responsibilities for the operations of the company.

19     Q.   Okay.  And during that time, the titles

20  changed, but your --

21     A.   Sometimes they were -- you know, had the

22  word "strategic" in them.  Sometimes they had

23  "manager." Sometimes they had "director."  Sometimes

24  they had "vice president."  Sometimes it was "chief

8

1    operations."

2          In small companies, the titles, you know,

3    evolve a little bit over time.

4          Q.    Yeah.   Okay.   And how big a company is

5    Precision?

6          A.    In terms of revenue or employees?

7          Q.    Both.   Start with revenue.

8          A.    Revenue, the company in calendar year 2006

9    generated right around $17 million in revenue.

10          Q.    And what about the number of employees?

11          A.    35 employees, typically.

12          Q.    And what about the office locations?

13          A.    We're presently officed -- the number of

14    office locations?

15          Q.    Yes.

16          A.    We only have one office location.

17          Q.    Has that been the case for the past

18    three years?

19          A.    No.

20          Q.    All right.   Tell me how it's been different.

21          A.    In September of 2004, we moved into a newly

22    constructed facility at 1429 South Shields in

23    Waukegan.   For the 13 months prior to that, we were

24    in leased facilities in the Northpoint Business Park.

9

1    And for the 20-plus years prior to that, we were in

2    owned facilities in Northbrook, Illinois.

3        Q.    All right.    So what is the -- if you know,

4    the period of time that you occupied the premises at

5    the Northpoint building in Waukegan?

6        A.    We signed a lease in -- I'm sorry.

7            We signed a lease in early August 2003.    It

8    was a 12-month lease.    It expired July 31st, 2004.

9    We extended that lease, I thought, just 30 days, but

10   maybe we extended it 45 days because we vacated that

11   premises over Labor Day Weekend 2004.

12       Q.    Were you the individual responsibility for

13   negotiating that lease for the Northpoint premises?

14       A.    Yes, I was.

15       Q.    And who did you deal with when you

16   negotiated that lease?

17       A.    I dealt with Rothbart Properties.    I can't

18   remember if I was dealing specifically with Gary

19   Rothbart or one of the subordinates.

20       Q.    Okay.    Do you remember who the lease is

21   signed with, who's the actual landlord on the lease?

22       A.    I don't recall the legal name.    I know

23   Rothbart Properties or -- Rothbart's name is in the

24   lease, I believe.

10

1          Q.   Okay.

2          A.   I would have to read the lease to answer

3     that question.

4          Q.   All right.  Did anyone else at Precision

5     have any responsibility in negotiating that lease?

6          A.   Well, the owner of the company and I

7     consulted on that process.

8          Q.   Who is the owner of the company?

9          A.   Richard Wohlner.  The last name is spelled

10    W-o-h-l-n-e-r.

11         Q.   Is he the only owner of Precision?

12         A.   Correct.

13         Q.   What was the nature of your consultation

14    with him?

15         A.   Primarily on an economic and functional

16    basis; would the space we were looking at to lease

17    meet our requirements for the operation and was it

18    financially fitting our capabilities and our budgets.

19         Q.   Okay.  Do you recall those negotiations for

20    that lease?

21         A.   I recall the negotiations in general.  The

22    specific details of which, you would have to ask me

23    what your -- what specifics you're looking for.

24         Q.   Do you recall any issues coming up during

11

1    the lease negotiations about anything?

2        A.   Primary discussions during the lease dealt

3    with HVAC issues, furnishings -- or the finishing

4    within the facility, and a doorway that we required

5    constructed -- to be constructed between two

6    facilities -- the two units we were renting.

7        Q.   All right.  Describe that for me, when you

8    say the two units you were renting.

9        A.   We rented two side-by-side units.  I think

10   they were 959 Northpoint and I think the other one

11   was 953 Northpoint.  They were stand-alone units of

12   about 11,000 square feet a piece.  We needed 20-plus

13   thousand square feet.  We rented two side-by-side

14   units.

15           And the office space, we had a door

16   connected to -- built -- you know, put in through the

17   wall to connect the two offices so we wouldn't have

18   to go outside from one side of the office to the

19   other side.

20       Q.   Because that was an internal -- a door

21   inside the demised premises?

22       A.   Correct.

23       Q.   Or the leased the premises, excuse me?

24       A.   Hm-hmm.

                                                    12

1     Q.   All right.  Do you recall that the

2   Northpoint building -- the footprint for the building

3   is essentially a rectangle?

4     A.   Correct.

5     Q.   And do you recall that there are these

6   separate units that go down the rectangle from one

7   side to the other?

8     A.   Yes.

9     Q.   All right.  The two that Precision leased,

10   where were those located in the rectangle?

11     A.   Our two units were in the center of the

12   building.

13     Q.   Do you recall how many units there were in

14   the whole building?

15     A.   I think there was six total units.

16     Q.   Okay.  So when you say the center, do you

17   mean two units on one side of you and two units on

18   the other side of you?  Or what do you mean?

19     A.   To the best of my recollection, there was --

20   I know that there was two companies to the east of

21   us, two units.  And I believe there were two units to

22   the west of us.  But it's possible there was only

23   one.  So there could have been five units or

24   six units.  I don't recall right now.


13

1       Q.   Just to clarify the record, when you say

2   east and west, you recall with the Northpoint

3   building that we're talking about, a portion of which

4   Precision occupied during this 13-month period of

5   time, there was a portion that's closer to the

6   entrance driveway?

7       A.   Correct.

8       Q.   And a portion that's farther away from the

9   entrance driveway?

10      A.   Correct.

11      Q.   Which is the east and west, in your

12  description?

13      A.   The entrance driveway was on the west side

14  of the building.  The east side of the building

15  bordered Highway 41.

16      Q.   All right.  Then also you recall that with

17  that same Northpoint building that we've been talking

18  about, in prior depositions it was referred to as a

19  front and a back of the building.

20          And I will tell you that in those prior

21  depositions, it was described the front -- or the

22  back was described where the truck loading docks are

23  and more of a larger parking area.  And the front was

24  the other side of that.  Is that your recollection?

14

1      A.   Yes.

2      Q.   Okay.   What do you recall about the front of

3    the building?   What kind of -- were there entrances?

4    What was on the front side?

5      A.   Yeah.   Each individual unit had its own

6    entrance.   Now, because our two units were side by

7    side, they had their own entry door, but it was a

8    combined architectural feature in the facade of the

9    building.

10         So each entry had its own -- each unit had

11   its own entry, and there was parking spaces in the

12   area probably for 100 cars.

13     Q.   Okay.   All right.   So let's go to what I

14   have been calling the back of this building.

15     A.   Okay.

16     Q.   How many entrances were there in the back of

17   the building to the Precision -- the space that

18   Precision leased during this period of time?

19     A.   We had two walk-in doors, two drive-in

20   doors, and three dock doors.

21     Q.   All right.   Distinguish for me those kinds

22   of doors as you're using those terms.

23     A.   As you move from east to west, the 959 unit,

24   I believe that was 959, there's a walk-in door like

15

1    this, a pedestrian door.  The very next door was a

2    drive-in door that would have been a 12-foot wide by

3    probably 14-foot tall door.

4        Q.    When you say drive-in door, you mean

5    somebody could drive a vehicle in that door?  Is that

6    why you use that term?

7        A.    That's correct.  It was a door that could be

8    used to drive into the building.

9        Q.    Okay.

10        A.    The next three openings in the rear of the

11    building were dock doors that were probably 10 feet

12    wide by 10 feet tall, traditional size dock doors

13    with dock levelers where trucks could back up to them

14    and we could drive forklifts into the truck.

15            Then we move -- because now we're into the

16    other unit.  We move to another drive-in door by

17    12-foot wide by 14-foot tall and then one last

18    pedestrian walk-in door.

19        Q.    All right.  And did Precision, during the

20    time that you guys occupied this building, did you

21    guys use all of those doors?

22        A.    Yes, we did.

23        Q.    You didn't have any of them blocked off or

24    locked off from the inside to the outside?

16

1      A.   No.

2      Q.   This is going to get a little cumbersome,

3   but I just want to just show you this to make sure

4   that we're talking about the same thing.

5          During Mr. Rothbart's deposition, there were

6   some photographs that we used.  I'm going to use

7   those same photographs.  And they were attached to

8   the deposition transcript of Mr. Rothbart.  And I'm

9   just going to refer to them the same way that they're

10  marked.

11         They're black and white.  I'll represent to

12  you that during the deposition, we had color

13  photographs.  I will also represent to you that my

14  paralegal who is not here right now has the other

15  half of the file and I couldn't find the color

16  photographs this morning.  So we're going to have to

17  use the black and white ones.

18         I just have a couple questions about the

19  photographs.  Okay?

20     A.   That's okay.

21     Q.   All right.  I think everybody else got color

22  copies of those photographs.

23         But, anyway, let me just show you what was

24  previously marked during the Rothbart deposition as

17

1    Rothbart Deposition 2B, 2A, 3A and 3B.  Oh.  We had

2    4A and 4B.

3         A.    Okay.

4         Q.    This is probably a little bit better.  Look

5    at 3A.  I'll direct your attention to 3A.  I will

6    represent to you that that is supposed to be the back

7    of the Northpoint building for the premises that was

8    occupied by Precision.  Okay?

9         A.    Okay.

10        Q.    You see depicted in here what, at least on

11   each side of the photograph, look to me like two

12   drive-in doors.  Is that what you were talking about?

13        A.    Those are the drive-in doors, yes.

14        Q.    Then the three openings in the middle are

15   the dock doors that you were talking about?

16        A.    That's correct.

17        Q.    Okay.  All right.  Then I'll point your --

18   direct you to Exhibit Rothbart 3 -- Deposition

19   Exhibit 3B.  You'll see that in the -- again, I'll

20   have the same representation; although, you can see

21   the 959.  Is that a portion that Precision leased?

22        A.    Yes, we occupied 959.

23        Q.    All right.  So, again, in here there seems

24   to be depicted a drive-in door and then another kind

18

1    of door in the center?

2         A.    That's a walk-in door.

3         Q.    Okay.  So that's the walk-in door that you

4    were talking about?

5         A.    Correct.

6         Q.    Okay.  All right.  I just want to ask you a

7    couple of questions about the walk-in doors.

8              The walk-in doors on the back of the

9    premises -- back of the building for the premises

10   that Precision leased during this period of time they

11   were in the Northpoint building, what were those

12   doors used for?

13        A.    Those doors were used for access by delivery

14   personnel.

15        Q.    And what do you mean by that?

16        A.    Carriers bringing products to our facility,

17   in order to determine which dock they would back up

18   to or to either discharge or pick up their freight,

19   would come to one of those doors and contact the

20   warehouse person for directions.

21        Q.    All right.  So a guy drives a truck up with

22   a load for Precision, he gets out of the truck, walks

23   up to one of those doors, and that door is for him to

24   go into and --

19

1    A.    Correct.

2    Q.    -- make contact with this freight --

3    A.    Actually, he couldn't go into the door.

4    There was -- I think there was a bell on the door

5    that he rang.

6    Q.    Okay.  And you'll see again in Rothbart

7    Deposition Exhibit 3B, there appears to be a -- you

8    see this white circle?  It looks to me like some sort

9    of sign that's on the outside of that door?

10    A.    Yes.

11    Q.    Do you recall signs being on the outside of

12    those doors?

13    A.    There was a sign on the outside of the door

14    identifying Precision Laboratories, Inc.  I do recall

15    that.

16    Q.    Okay.  Do you recall who put that sign up

17    there, the one that you do recall?

18    A.    That sign would have been placed by

19    Rothbart.

20    Q.    Would that have been part of the lease

21    negotiations?

22    A.    The lease called for signage on the front

23    and rear of the building.

24    Q.    Okay.  All right.  Do you have any

20

1    recollection as to whether any other signs or

2    notifications were placed on the outside of those

3    walk-in doors, again, during this time period that

4    we're talking about that Precision occupied the

5    Northpoint building?

6        A.    To my recollection, there was a sign

7    indicating truckdrivers to either knock or ring on

8    the bell for assistance.

9        Q.    All right.  Do you recall, again, using the

10   drive-in entrance for the Northpoint building, the

11   one closest to the entry road, the walk-in door

12   that's closest to that entry road, again, for the

13   premises that Precision occupied, do you recall at

14   any time during this time Precision occupied the

15   premises at Northpoint whether there was a sign or

16   notification on that door saying, Go to the other

17   walk-in door --

18       A.    I believe that's correct.

19       Q.    -- or something to that effect?

20       A.    I believe that's correct.

21       Q.    Would that have been a sign or a

22   notification that was placed there by Precision or a

23   Precision person?

24       A.    Correct.

21

1    Q.    Okay.    Not somebody from Rothbart?

2    A.    No.

3    Q.    Okay.    And why would Precision place

4    something like that, a notification like that on the

5    door?

6    A.    Because we operated two units.    And so that

7    carriers and truckdrivers could receive proper

8    attention, we wanted to direct them to one entry

9    point for assistance.

10    Q.    All right.    And do you recall that during

11    this time that Precision occupied the Northpoint

12    building, which of those walk-in doors Precision

13    wanted to direct these carriers or drivers to?

14    A.    We wanted to direct them to the west walk-in

15    door.

16    Q.    And, again, that's the walk-in door that's

17    farthest from this entry road to the Northpoint

18    building?

19    A.    That's correct.

20    Q.    All right.    Closest to --

21    A.    Route 41.

22    Q.    -- Route 41?

23    A.    Correct.

24    Q.    All right.    Do you recall whether that

22

1  notification about going to the other walk-in door

2  was there during the entire time that Precision

3  occupied the Northpoint building?

4      A.  I don't recall.

5      Q.  Do you recall whether that notification

6  was -- the notification that we've been talking about

7  was on that first walk-in door in the May, June, July

8  time period of 2004 when Precision occupied the

9  Northpoint building?

10     A.  Would you restate the question?

11     Q.  Sure.

12         Again, I want to direct your attention to

13  the time period May, June, and July of 2004, which

14  would have been toward the end of the time that you

15  told me Precision occupied the Northpoint building.

16     A.  Yes.

17     Q.  During that time, those three months -- that

18  three-month time period, do you recall whether this

19  notification was on the first walk-in door telling

20  the drivers or carriers to go to the other walk-in

21  door?

22     A.  I don't specifically recall it being there.

23  I don't have a specific recollection of it being

24  missing, however.


23

1    Q.    Okay.  If we showed you a picture with

2    that -- with that notification on that first walk-in

3    door, you wouldn't disagree that that was the same

4    notification that had been placed there by Precision,

5    would you?

6    A.    I would not.

7    Q.    Okay.  Was there a specific person for

8    Precision that the divers and carriers were supposed

9    to contact when they came with a delivery?

10    A.    Primarily, it would be our warehouse foreman

11    or manager.

12    Q.    And during the time period that Precision

13    occupied the Northpoint building, was that -- was

14    that position occupied by the same person?

15    A.    Yes, it was.

16    Q.    And who was that person?

17    A.    His name is Joe Simon.  The last name is

18    spelled S-i-m-o-n.

19    Q.    Did Mr. Simon have a specific desk or office

20    location in the Precision space that you leased at

21    the Northpoint building?

22    A.    Yes.

23    Q.    And where was that?

24    A.    It was in the rear of the 959 unit.

24

1    Q.   And is the 959 unit the one that's closer to

2    the 41 or the one that's farther away from 41?

3    A.   Farther away from 41.

4    Q.   Okay.  All right.  Then explain for me why

5    did Precision want the drivers and carriers to go to

6    the other door?

7    A.   We had our shipping desk and our UPS

8    shipping station staged inside that door.  And

9    primarily in the wintertime, we didn't want activity

10   through that door with carriers for a heat issue and

11   for a traffic issue in that area.

12   Q.   And the area you're talking about would be

13   the first walk-in door that you would come to as you

14   came into the parking lot on the back side of this

15   Northpoint building?

16   A.   That's correct.

17   Q.   Okay.  All right.  In your capacity as a

18   position that you held for -- with Precision during

19   this time period, August of 2003 through the

20   beginning of September of 2004 when Precision

21   occupied the Northpoint building or a portion of the

22   Northpoint building, did you have an understanding

23   during that time as to what portion of the Northpoint

24   building and property Precision was responsible for

25

1     maintaining and what portion Rothbart, the landlord,

2     was responsible for maintaining?

3          A.   Yes, I did.

4          Q.   All right.  What was your understanding of

5     who was responsible for what?

6          A.   I took care of the internal premises of the

7     building and kept the area immediately outside of

8     both our front and rear doors clear.

9          Q.   All right.  And what was Rothbart -- what

10    was your understanding of Rothbart's responsibility?

11         A.   Rothbart maintained the building and the

12    property.

13         Q.   When you say the property, what do you mean?

14         A.   The parking lots, the truck docks, the

15    driving areas.  They exercised the landscaping

16    contracts, the snow removal contracts, everything to

17    do with the exterior of the building.

18         Q.   Okay.  Let me -- something I didn't ask you

19    at the beginning of the deposition.  Let me ask you

20    now.

21              What did you do to prepare for this

22    deposition today?

23         A.   I reviewed the file that we had internally

24    for the lease and for information that I had obtained

                                                        26

1    at the time of the incident.  And I met with my

2    counsel for about an hour prior to our deposition.

3         Q.  Okay.  I don't want to know what you talked

4    about with him.  So be careful in answering your

5    questions.  And your counsel will be careful.  He's

6    very able.  So I don't have any concerns that you

7    will be -- go down the wrong path.

8         But did you have a chance to look at any

9    photographs in connection with your preparation?

10        A.  I looked at photographs that I had taken a

11   few months after the incident and photographs that I

12   again had taken in November of 2006 of the area when

13   I was first advised that this deposition may occur.

14        MR. HULL:  Okay.  All right.  And let me just --

15   did you guys produce any photographs to us?

16        MR. FITZSIMMONS:  We produced the first set.  I

17   just saw the set he took in November of 2006 today.

18   I'll get copies out.

19        MR. HULL:  Okay.  Great.

20   BY MR. HULL:

21        Q.  And what specifically did you take pictures

22   of in November?  What portions of the building or

23   property or grounds?

24        A.  I took portions -- I took photos of the area

27

1    of the rear of the building where the truck docks

2    were and the drainage areas related to that area.

3        Q.    Okay.   And are you familiar with -- again,

4    it's -- the walk-in door for the Precision premises

5    at the Northpoint building that is farther away

6    from -- that's farthest away from Route 41, the Route

7    41 side of the building.   Okay?

8        A.    Okay.

9        Q.    Are you familiar with a white PVC pipe that

10   appears to come out of the exterior wall of that --

11   near that door and down the railing that is adjacent

12   to the loading dock area?

13       A.    Yes, I am.

14       Q.    All right.   Can you tell me what is on the

15   inside of the building that discharges into that

16   pipe?

17       A.    The sump pump.

18       Q.    And how far from the inside of the building

19   where the pipe goes into the exterior of the building

20   is that sump pump on the inside?

21       A.    A matter of a couple feet.

22       Q.    All right.   And is it a sump pump pit that

23   the pipe connects to?

24       A.    Yes, it is.

28

1    Q.   How deep is that sump pump pit?

2    A.   I'm speculating that it is 5 to 6 feet deep.

3    Q.   And where does the drainage come from that

4    goes into that sump pump pit?

5    A.   It comes from the truck dock, the external

6    truck dock depression.

7    Q.   So there's an exterior drain in the truck

8    dock -- the depressed -- the depression area that

9    leads up to the truck docks, is that what you're

10   talking about?

11   A.   Yes.

12   Q.   And that exterior drain drains into an

13   interior sump pump area?

14   A.   That's correct, yes.

15   Q.   And then that -- and then, what, the sump

16   pump ejects out this white PVC pipe that we were

17   talking about?

18   A.   Correct.

19   Q.   All right.   Let's go back to that then as

20   far as responsibility for maintenance and control,

21   issues on that.

22        Do you have an understanding of who is

23   responsible for the pieces and parts of that, for

24   lack of a better term, drainage system that we just

29

1    talked about?

2         A.   Yes, I do.

3         Q.   And tell me, what's your understanding of

4    who is responsible for what parts of it?

5         A.   My understanding is that's the landlord's

6    responsibility.

7         Q.   That includes the interior sump pump that's

8    inside the client's premises?

9         A.   Yes, it does.

10        Q.   Okay.  And is there something in the lease

11   that you know says that or is that just your

12   understanding?  Where is the source of the

13   understanding, I guess, is a better question?

14        A.   Plumbing issues are addressed in the lease.

15   My interpretation -- and I'm not a lawyer, so my

16   interpretation of plumbing issues have to do with the

17   hot and cold water systems and the toilet systems and

18   all that within the building.

19             We did not have control over roof drains

20   that drain down or the sump pump that was handling

21   exterior water from the premises.

22        Q.   And the sump pump that handled exterior

23   water from the premises is the same sump pump we were

24   talking about that's --

30