1    whatever that is.  Nobody ever produced that.  All I

2    have here to show you -- and I, unfortunately, only

3    have the one copy -- is a lease.

4         A    Mm-hmm.

5         Q    But feel free to look at that.

6         A    Well, this doesn't show the unit that

7    this -- it shows numerically the unit that they

8    leased.  It does not show the layout of the unit that

9    they leased.

10        Q    All right.  So you would need to, at least,

11   see something besides this --

12        A    Yes.

13        Q    -- written document in order to tell you

14   that?

15        A    Exactly.  What you want me to deem their

16   premises.

17        Q    Okay.  All right.

18             When we were talking earlier, you

19   mentioned that the tenants of the building at the 977

20   Northpoint Venture building would occupy as leased

21   space the space inside the demising walls and then

22   the depressed dock, you called it.

23             Tell me what you mean by the depressed

24   dock?

26

1          A     There is an area that abuts the exterior of

2     the building that provides a truck well for a dock --

3     for a truck to deposit their goods, ingress and

4     egress.

5          MR. POTTER:  I have no problem with him marking

6     a photo, or I can show him photos if you want to --

7          MR. HULL:  I'm asking what it means to him.

8          THE WITNESS:  That's what it means.

9     BY MR. HULL:

10         Q     All right.  So does it -- how much of the

11    space outside the wall of the building does it

12    encompass when you called it the depressed dock?

13         A     It abuts the building.  In this case it

14    abuts the building.

15         Q     What abuts the building?

16         A     The end of the depressed dock.

17         Q     Where is the beginning of the depressed

18    dock?

19         A     In the middle of the parking lot area.

20         Q     Is that the area where the depressed dock

21    rises back up to the parking lot level?

22         A     Yes.

23         Q     Is there some -- is there any marking or

24    structure or anything that indicates that that's the

                                                            27

1    beginning part of the --

2        A    Yes.

3        Q    And what is that?

4        A    There is a railing that marks the

5    indication of a railing.

6        Q    That marks the what?

7        A    Beginning and the end of it.

8        Q    Okay.  Mr. Rothbart, I want to show you --

9        MR. HULL:  Here, why don't you go ahead and

10   mark one of these.  We can call it Rothbart 1.

11                          (Whereupon, Rothbart Deposition

12                           Exhibit No. 1 was marked for

13                           identification.)

14   BY MR. HULL:

15       Q    Mr. Rothbart, I want to show you what we've

16   marked as Rothbart 1, which I understand to be your

17   Answers to Interrogatories -- or Answers to

18   Interrogatories prepared, at least, in part by you,

19   but, certainly, signed by you on the verification

20   page at the very end.

21            So take a minute and look at those and

22   make sure I've got the right document.

23       A    Yes.

24       Q    Is that your signature on the last page of

                                                    28

1  that document?

2       A    Yes, it is.

3       Q    Do you remember preparing these?

4       A    Yes.

5       Q    It was with your attorney preparing them, I

6  assume?

7       A    Yes.

8       Q    Anybody else work with you in preparing

9  these answers?

10      A    No.

11      Q    What I want to do is point you to question

12  number 2 on page 2.  Take a look at that.  It says,

13  Please state the name and address of the person, firm

14  entity, or corporatopm which had the responsibility

15  or duty for the maintenance of the area in question

16  at the time and place of the plaintiff's fall and for

17  the 30 days preceding the date of the plaintiff's

18  fall; you see that?

19      A    Mm-hmm.

20      Q    All right.  I will tell you --

21  unfortunately, she did not copy the first page of our

22  interrogatory that we sent, which had the definition

23  of the area in question.

24            And what it was was the -- I'll

29

1   represent to you the area in question was the area

2   where the plaintiff fell.  Okay.  Which is outside

3   near one of those railings that you just talked about

4   by the depressed dock, the beginning of the depressed

5   dock.  Okay.

6           I see that your answer to this --

7   subject to the objection properly raised by your

8   attorney -- is Precision Laboratories, an Illinois

9   Corporation, a tenant under the lease, had

10  maintenance responsibilities.

11          What do you mean by that answer?

12      MR. POTTER:  I have an objection.  We have not

13  deposed the plaintiff.  We do not know where

14  specifically you're referencing.

15          With that objection, if you have an

16  answer, you can provide an answer.

17      MS. ADAMS:  I join in the objection.  Maybe you

18  can give him a little bit more information concerning

19  how close to the railing or the depressed dock the

20  plaintiff fell because at this point in time, we

21  don't have any information to indicate that.

22      MR. POTTER:  Or even which railing.  Because as

23  I understand, there are two railings.  And they run

24  for some distance.

30

1  BY MR. HULL:

2      Q    All right.  Mr. Rothbart, did you answer

3  this question?

4      A    I answered these with my counsel.

5      Q    All right.  I'm asking you.  The answer

6  that you gave here, I'm asking you what you mean by

7  that?

8      A    I refer to my counsel.

9      MR. POTTER:  Yeah, there are maintenance

10  responsibilities for Precision Laboratories under

11  this lease.

12          Given the limited information we have,

13  that's the best answer we can provide in good faith.

14  BY MR. HULL:

15      Q    Are you familiar with the maintenance

16  responsibilities for Precision under this lease?

17      A    Yes, I am.

18      Q    What are they?

19      A    They are responsible for interior

20  maintenance and repair.  However, the question that

21  comes up is:  They also have a responsibility for any

22  items they may deposit outside of their unit or their

23  garbage outside the unit.  And I don't know where any

24  of this is.

31

1          They are responsible for garbage

2   removal, so I have no idea what was here or not here,

3   so they do have a maintenance obligation.

4          Q    All right.  Then why don't we go to this --

5   so let me ask you a question:  Are you telling me

6   that you didn't understand the question number 2 when

7   you answered it?

8          MR. POTTER:  Objection.

9          MR. HULL:  How can you object to that?

10         MR. POTTER:  What gives you an indication that

11  he didn't understand it?  He answered it.

12         MR. HULL:  I just asked him, I said are you

13  telling me --

14         MR. POTTER:  Did you understand the question?

15         THE WITNESS:  Yes.

16  BY MR. HULL:

17         Q    All right.  So you understood the question?

18         A    Yes.

19         Q    All right.  And the answer as given --

20  subject to the objection -- is an accurate answer,

21  isn't it?

22         A    Yes.

23         Q    Okay.  All right.  Now, let's go to

24  question number 3.  Did you understand that question?

32

1      A    Yes.

2      Q    And is the answer that you gave -- subject

3   to the objection -- an accurate answer?

4      A    Yes.

5      Q    All right.  Let's look at question number

6   4.  Did you understand that question when you

7   answered it?

8      A    Yes.

9      Q    And subject to the objection, is the answer

10  that you gave an accurate answer?

11     A    Yes.

12                      (Whereupon, Rothbart Deposition

13                       Exhibits Nos. 2, 3, and 4 were

14                       marked for identification.)

15  BY MR. HULL:

16     Q    Okay.  Mr. Rothbart, let me just show

17  you -- all right.  I'm going to show you two

18  photographs that we've marked as Rothbart Group 3,

19  and tell me if you recognize those or recognize

20  what's depicted in those?

21     A    Yes.

22     Q    That's a portion of this 977 Northpoint

23  Ventures Building; isn't it?

24     A    The top one is, yes.  Bottom one, I can't

33

1    read the numbers over the door.  My glasses aren't

2    sharp enough.

3           Q    Okay.

4           MR. POTTER:  Is there a number on the back of

5    this photo?

6           MR. HULL:  That's the one --

7           MR. POTTER:  No. 3.

8           MR. HULL:  -- No. 3.

9           MR. POTTER:  And this is the top one that you

10   referred to, correct?

11          THE WITNESS:  Yes.

12   BY MR. HULL:

13          Q    Your attorney can certainly look at them,

14   too.  I mean I see 965 and 959 over the two garage

15   doors here.

16          A    Okay.  If that's the case, then it is the

17   977 Northpoint Building.

18          Q    All right.  And let me -- if you can just

19   set those down for a minute.  I just want to ask you

20   a couple of questions.  Looking again at --

21          MR. HULL:  You know, we're going to have to

22   mark these Group 3A and B.  I'm just going to go

23   ahead and do that right now.  And that way we won't

24   get confused as we're talking here.

34

1    BY MR. HULL:

2         Q    Looking at 3B, this railing here

3    (indicating) is this the railing you were talking

4    about earlier?

5         A    Yes.

6         Q    So the depressed dock is that area that

7    goes down by these three entrances I'm pointing to on

8    the photograph; is that correct?

9         A    Yes.

10        Q    All right.  Now, I want to show you two

11   other photographs that we've marked as Rothbart 2A

12   and 2B?

13        A    Hold on one second, please.

14        Q    Sure.  Take your time.

15        MR. POTTER:  You don't want -- if you're

16   writing your own personal notes, that's fine.  If you

17   want to talk to me, we can leave the room and talk.

18   I don't want you writing notes to me in this dep.

19        THE WITNESS:  Okay.

20        MR. POTTER:  Okay.  Just so you know.

21        THE WITNESS:  All right.  Fine.

22   BY MR. HULL:

23        Q    All right.  Let me show you 2A and 2B and

24   again --

35

1        MR. POTTER:  The problem is he might object and

2   want to see your notes, and I don't want any of our

3   communications --

4        THE WITNESS:  Okay.  Fine.  No problem.

5   BY MR. HULL:

6        Q    All right.  You see in 2A -- you see this

7   white pipe that goes down?  And it comes out of the

8   building and then it goes down along the side of this

9   railing --

10       A    Yes.

11       Q    -- I'm pointing to.  What does that pipe

12  connect to on the inside of the building?

13       A    It connects to nothing on the -- it

14  connects to a sump pit on the inside of the building,

15  which is the discharge of the water that is in the

16  dock well.

17       MR. POTTER:  And this is 2A that we're

18  referring to, correct?

19       MR. HULL:  Right.  2A.

20  BY MR. HULL:

21       Q    So if you can just describe a little bit

22  better for me, so if we go on the other side of this

23  wall where this white pipe goes in?

24       A    Mm-hmm.

                                                      36

1    Q    -- where is this sump pit?  Is it at the

2    level here (indicating) where this pipe goes into the

3    wall, or is it down at the level where the bottom of

4    the dock is or this depressed dock is?  Again, in the

5    same picture?

6    A    It's the --

7    MR. POTTER:  And you're asking him where the

8    top portion of the sump pit is located, at what

9    level; is that what you're asking?

10    MR. HULL:  That's where I'm starting, yes.

11    THE WITNESS:  I don't know what the top level

12    is, but I know what it is.

13    BY MR. HULL:

14    Q    Okay.  Well, tell me what you know then.

15    A    It's called a sump pit.  And it discharges

16    water and other items that have accumulated in the

17    depressed dock.

18    Q    And the depressed dock, are we talking

19    about this depressed dock that's on the outside of

20    this outer wall of the building?

21    A    Yes.

22    Q    And, again, correct me if I'm wrong, is

23    there some sort of drain down here in the bottom of

24    this (indicating)?

37

1        A    I presume there is.  Where, I'm not too

2    sure based on how these pictures --

3        Q    But that's your recollection?

4        A    Yes.

5        Q    That there's a drain down there in the

6    outside portion of this depressed dock?

7        A    Yes.

8        Q    And that drains into this sump?

9        A    The inside portion of this depressed dock,

10   not on the outside.

11       Q    Inside meaning inside the --

12       A    Inside the dock -- the railings.

13       Q    Right.  Inside the railing, but outside of

14   this wall that shows these three doors on it?

15       A    Yes.

16       Q    Not inside the building?

17       A    Correct.

18       Q    But the sump pit, is that inside the

19   building?

20       A    Yes.

21       Q    And is that something that a tenant would

22   have access to?

23       A    Yes.

24       Q    So that sump pit would be within these

                                                        38

1    demised walls that we talked about at the beginning

2    of the deposition?

3         A    Yes.

4         Q    Is there a separate sump pit for each of

5    the five spaces that accommodate tenants in this

6    building?

7         A    Yes.

8         Q    Is there a -- does that sump pit receive

9    water and other materials from the drain that's

10   outside the depressed dock for that particular

11   tenant's space?

12        A    That's the way it's designed.

13        MR. POTTER:  Okay.  Yeah, that's the way it's

14   designed.

15   BY MR. HULL:

16        Q    Is there some sort of pump or pumping

17   mechanism inside the building that pumps the water

18   and other debris out of the sump pit into this white

19   pipe that we've been looking at?

20        A    Yes.

21        Q    And what is it?  Is it a sump pump or is it

22   some other kind of mechanism?

23        A    Sump pump.

24        Q    And who's responsible for maintaining that

                                                        39

1    sump pump?

2        A    Tenant.

3        Q    So material that's pumped out of the sump

4    pit is pumped into this white pipe and then expelled

5    at the end of that pipe?

6        A    Yes.

7        Q    The material that comes out of the end of

8    that white pipe, again, that we're looking at in

9    photograph 2A; is that material that the tenant is

10   responsible for cleaning up or is Rothbart

11   responsible for cleaning that up?

12       MR. POTTER:  Again, I'm just going to raise an

13   objection.  I think this is an ultimate issue for the

14   jury, but if you have an answer, you can provide

15   that.

16       THE WITNESS:  I don't have an answer.

17   BY MR. HULL:

18       Q    All right.  Let me show you a photo that

19   we've marked as Rothbart 2B, and I want to direct

20   your attention to the end of the railing right here

21   (indicating) where it at least looks to me like the

22   end of this white pipe that we're looking at ends;

23   you see that?

24       A    Mm-hmm.

40

1          Q    All right.  This area that's right at the
2     end of that white pipe --
3          MR. POTTER:  What photo are we looking at here?
4          MR. HULL:  This is 2A.
5     BY MR. HULL:
6          Q    This is area that's at the end of that
7     white pipe, who is responsible for that area?
8          MR. POTTER:  Objection to the broad nature of
9     the question.  If you have an answer, you can provide
10    it.  That's 2B.  Did he say 2B?
11         MR. HULL:  You're right.  I called it 2A.
12    That's 2B that we're looking at.
13         THE WITNESS:  I can go both ways.
14    BY MR. HULL:
15         Q    Well, then go both ways for me.
16         A    Depending on what may have been discharged
17    into the area from the interior of the unit -- and
18    there could be a lot of items -- they could have
19    washed the floors; they could have had spills, then
20    it would be the tenant's responsibility.
21              If it was natural run off coming from
22    water, I would probably have to say it could be our
23    responsibility depending on the nature of what is
24    being claimed was being discharged from that pipe.

                                                         41

1    Q    Okay.  How would water or other items from
2    the tenant's cleaning the floor inside the building
3    get into this sump pit?
4    A    Because what they could do is while they're
5    cleaning the floors, wipe and throw the excess into
6    the sump pit, and then in turn, it's discharged onto
7    the parking lot --
8    Q    In your experience --
9    A    -- or they could have washed a car in the
10   parking -- in the depressed dock.  And the water
11   discharged is then put into the sump pit and then
12   discharged onto the parking lot.
13   Q    And have you seen those things going on at
14   this building?
15   A    I've seen those things going on at a lot of
16   buildings.
17   Q    And your recollection about them going on
18   at this building?
19   A    Not offhand.
20   Q    Okay.
21   A    But that's not to say it didn't happen.
22   Q    I understand.  I'm just trying to find out
23   what you recall.  All right.  Let's go back to 2A,
24   where we have a picture of this pipe -- this white

42

1    pipe that's coming out that we now know is connected

2    to this pumping mechanism that ultimately connects to

3    the sump pit.  Okay.

4                    Was this pipe present when the

5    building -- when the 977 Northpoint Ventures building

6    was built?

7           A    Yes.

8           Q    Was that part of the original design?

9           A    Yes, approved by the City.

10          Q    Was there a separate permit for that

11   particular pipe, or was it just part of the overall

12   plans?

13          A    Overall plans.

14          Q    To your knowledge has that pipe ever been

15   replaced since it was installed when the building was

16   built?

17          A    I have to refresh my recollection.

18          Q    And what might refresh your recollection?

19          A    I have to check records.

20          Q    Are these records that you have at Rothbart

21   Realtor offices?

22          A    It may or may not be.  I don't know.  I

23   would have to say as a property manager if this pipe

24   had been broken or damaged, we would have repaired

                                                        43

1   it.

2        Q    Okay.  And you might have records that

3   would indicate whether that has been --

4        A    I don't know.

5        Q    Okay.

6        MR. POTTER:  This lady can't take you both down

7   at the same time.

8        THE WITNESS:  Okay.  I'm sorry.

9        MR. POTTER:  I know what he's going to ask, and

10  you know what he's going to ask --

11       THE WITNESS:  I'm sorry.

12       MR. POTTER:  -- everybody does that, but just

13  let him finish his question first.

14       THE WITNESS:  Okay.

15  BY MR. HULL:

16       Q    Who is responsible for maintaining that

17  pipe?

18       A    I'll come back again, and I will say it

19  could go both ways depending on what happens.  Okay.

20            What happens if they have a truck

21  that's pulling in there, and they're using the

22  drive-in door that looks like it's to the west of

23  that pipe, and the guy's a terrible driver and runs

24  over the pipe?  I mean, it's the result of the

                                                    44

1  tenant.

2      Q    So then it's the tenant's responsibility?

3      A    In that case I would say it's the tenant's

4  responsibility.  If you're asking how the pipe gets

5  broken, that could be a reason.

6      Q    Mm-hmm.  What might be a circumstance under

7  which Rothbart Realty or Rothbart Construction is

8  responsible for maintaining that pipe?

9      A    If we drove by, and let's say we saw that

10  it was disconnected, or there was some cracks in it,

11  or there was water coming out of some other spots, we

12  would fix it as a matter of course.

13     Q    Would you keep any records of any work like

14  that that you did?

15     A    May or may not.

16     Q    But if you did keep records, would they be

17  at this Techny address that we talked about?

18     A    If we did have them, they could be, yes.

19  If we did have them, they would be at Techny.

20     Q    There's no other place that you would keep

21  records?

22     A    No.

23     Q    Okay.  Do you know whether this pipe is

24  part of the water system of the building?

45

1       MR. POTTER:  He's asking for your definition of

2   the water system of the building; does it include the

3   pipe, I think.

4       THE WITNESS:  It's not part of the water

5   system.  It's part of the engineering system.

6   BY MR. HULL:

7       Q   Okay.  And what encompasses the engineering

8   system, does that include the plumbing and the water?

9       A   Now, that would be the exterior drainage of

10   the site.

11       Q   Okay.  All right.  Then let's look at --

12   let me show you one other thing.  Let me get this out

13   of the way.  This is what we've marked as Rothbart 4A

14   and 4B.  Okay.

15            I'll tell you my understanding of

16   what's depicted in those pictures, and you tell me if

17   it's something different.

18            My understanding is that that is the

19   portion of the 977 Northpoint Ventures building that

20   is away from the road.  So if you went all the way --

21   you know, from the road being in  the front, you go

22   all the way -- that's the back end of the building.

23       A   This is the eastern end of the building.

24       Q   Yeah, I don't have my north, south, east,

46

1    west --

2         A    This is the eastern end of the building.

3         Q    Okay.   That's the end of the building

4    that's currently occupied by the dry foods business?

5         A    I believe, Quick Dry, yes.

6         Q    Again, let me point in this picture to

7    the -- again, we see this white pipe --

8         A    Mm-hmm.

9         Q    -- coming out.   And then we see what I know

10   to be -- but, again, in the photograph it looks to be

11   a collapsible or flexible black plastic extender

12   that's attached onto the end of the white pipe going

13   out some feet further toward wherever -- out in the

14   parking lot; did you see that?

15        A    Yes.

16        Q    Is that something that was attached by

17   Rothbart Realty or Rothbart Construction?

18        A    No idea.

19        Q    Do you know whether it was attached by

20   Quick Dry?

21        A    No idea.

22        Q    Have you ever seen this kind of attachment

23   on any of these white pipes other than down there by

24   Quick Dry?

47

1          MR. POTTER:  I'm going to object because this

2     is a photo taken from a very far distance, but if you

3     have an answer, you can provide it.

4          THE WITNESS:  Repeat the question.

5     BY MR. HULL:

6          Q    Have you ever seen -- we talked before

7     about each of the tenant spaces having the depressed

8     dock?

9          A    Mm-hmm.

10         Q    And then each of them having this white

11    pipe coming out from the sump pit --

12         A    Mm-hmm.

13         Q    -- that's in the interior space within the

14    demised walls.  Does something like this exist for

15    each of the tenants down the line in this building?

16         A    You mean this extension?

17         Q    No, no, just this white pipe connecting to

18    the sump pit near the depressed dock setup that we've

19    talked about?

20         A    Well, you see right here (indicating) if

21    it's -- on this dock, it's the same as the one

22    you're --

23         Q    And that's all I'm saying is that each one

24    of these tenants down the line has that same kind of

                                                          48

1    setup?

2         A    Yes.

3         Q    All right.  So my question is:  Have you

4    ever seen at this building attached to the end of

5    these white pipes that come out, this kind of black

6    flexible plastic pipe other than down there by Quick

7    Dry?

8         A    Don't recall.

9         Q    How many times do you go to the building?

10        A    I go on the average about twice a month.

11        Q    And has that been the case since tenants

12   started to occupy the building?

13        A    Yes.  Yes.

14        Q    And what's your purpose in going there?

15        A    I drive around to look and see for possible

16   maintenance issues or condition of the property, the

17   way tenants are keeping it clean, landscaping, et

18   cetera.

19        Q    Are you just looking at exterior things or

20   are you like also going inside their space?

21        A    Purely exterior.

22        Q    If you wanted to do anything other than

23   drive around, do you get out and walk around?

24        A    Sometimes, I do both.

49

1      Q    All right.  During the course of these
2    approximately twice monthly inspections that you just
3    told us about, do you ever recall seeing anything
4    other than liquid being discharged from the end of
5    these white pipes?

6      A    I don't understand the question.

7      Q    All right.  Is there anything -- when you
8    made these inspections, twice monthly inspections,
9    have you seen anything other than what appeared to
10   you to be water being discharged from the end of
11   these white pipes?  Any other kind of debris or...

12     A    Well, it would be a liquid debris, because
13   a solid debris couldn't go through those.

14               And, you know, again, on account of
15   the soil, I don't know the composure of the liquid.

16     Q    Is there a reason that solid can't go
17   through those pipes?

18     A    It's due to the size of the pipe.

19     Q    How big is the pipe?

20     A    It's probably about an inch, inch and a
21   half.  And it's got to get through the sump, too,
22   remember that.

23     Q    I understand that.  So it's your testimony
24   that no solid of any kind --

                                                        50

1     A    I don't think a solid can get through it,

2   and I don't remember seeing a solid get through it.

3   And I don't remember -- again, not knowing what the

4   nature of the liquid would be, I have no idea.

5     Q    Okay.  All right.  Back to my same question

6   here, when you make these twice monthly

7   inspections --

8     A    Yeah.

9     Q    -- did you ever look at the end of these

10  pipes, the discharge point of these white pipes?

11    A    Sometimes, yes.

12    Q    All right.  At the times that you looked at

13  the discharge point, the end point -- the discharge

14  end point of these white pipes, what did you see on

15  the ground?

16    A    You're asking for a conclusion?

17    Q    I'm just asking what you saw.  I'm not

18  asking any kind of conclusion.  I'm asking what you

19  saw.

20    A    I, obviously, don't recall seeing anything

21  unusual.  I mean, again, I don't remember.  You're

22  asking me for a specific pipe at a specific time, and

23  a lot of it is natural conditions, so I don't recall.

24    Q    You don't recall anything about -- anything

                                                        51

1  coming out of the -- seeing anything at the end of

2  these pipes?

3  MR. POTTER: Objection. Mischaracterization.

4  You've been asking the question -- if you want to

5  give him another answer, you can, or you can stand on

6  your prior answer.

7  THE WITNESS: If it's raining, I see water

8  coming out of them because the water is running into

9  the well. Okay.

10  Otherwise, if it's dry, the odds of

11  something coming out of it are very remote.

12  BY MR. HULL:

13  Q  Okay. All right. Let's go to Exhibits 3A

14  and 3B. And I want to direct your attention in 3A to

15  the blue door; you see that, don't you?

16  A  Yes.

17  Q  What is the purpose of that door?

18  A  The purpose of that door is an exit, an

19  entrance and exit into the unit for help, garbage

20  removal, et cetera.

21  Q  What's on the other side of that door in

22  the area occupied by -- when Precision occupied that

23  area?

24  A  The inside of the building.

52

1      Q    What is it?  Is it offices or is it --

2      A    It's the warehouse.

3      Q    Are there any other entrance or exit doors

4   for the space that was occupied by Precision other

5   than this one blue door?

6      A    There would be a front door.  Could be one

7   or two front doors, and there could be one or two of

8   this -- I don't know what they're called -- steel man

9   doors.

10     Q    Is that what this blue door is, a steel man

11  door?

12     A    Steel man door.  And there could be

13  depressed docks which can be used.  There's the

14  drive-in doors that can be used as an ingress and

15  egress if they're held open.  People can walk

16  through -- in the doors and those would tend to be

17  the access points.

18     Q    Do you know which of these blue man doors

19  or all of them that Precision used for an entrance

20  and an exit?

21     A    I don't know which they used of the ones

22  that were located within their unit.

23     Q    Who has keys to those doors, do you know?

24     A    Tenants.

53

1          Q      Does Rothbart have keys to them?

2          A      When the tenant is in occupancy?

3          Q      Correct.

4          A      No.

5          Q      Is there anything that you're aware of in

6     the lease that you had with Precision at the time

7     that Precision occupied a portion of this 977

8     Northpoint Ventures building which prohibits them

9     from putting up any kind of sign on the blue man

10    door?

11         A      What type of sign?

12         Q      That's what I'm trying to find out.  Is

13    there any prohibition against putting any kind of

14    sign up?

15         MR. POTTER:  If he doesn't give you enough

16    information for you to answer then, you know -- I'm

17    going to object.  He's saying he needs more

18    information.

19         MR. HULL:  Why don't you let the witness talk.

20         MR. POTTER:  I will make my objections as I

21    deem them appropriate.  As of right now, he has a

22    question for you as to what kind of sign.

23              That indicates to me that it is an

24    incomplete hypothetical.  If you want to give him a

                                                              54

1    more complete hypothetical, then he can provide an

2    answer.

3    BY MR. HULL:

4        Q   Well, let me go to a new question.   I

5    didn't give him a hypothetical.  I said is there --

6    first of all, are you familiar with the lease with

7    Precision?

8        A   Yes.  I'm familiar with the generalities of

9    the lease.

10       Q   Fine.  Is there anything in that lease that

11   you're aware of that would prohibit Precision from

12   putting up a sign on the outside of this blue man

13   door or either of the blue man doors that open into

14   the space that they lease?

15       MR. POTTER:  Objection.  Vague, and ambiguous.

16   If you cannot answer the question as it's posed to

17   you, do not answer it.

18       THE WITNESS:  What information do they want to

19   put on the sign?

20   BY MR. HULL:

21       Q   All right.  Let me give you a specific

22   hypothetical.  Okay?

23       A   Fine.

24       Q   Let's say Precision wanted to take an

                                                    55

1    8-and-a-half-by-11 white sheet of paper.  They wanted

2    to print on that piece of paper, Don't use this door,

3    go to the other door; is that something that they're

4    allowed to put on the outside of that blue man door,

5    or does the lease prohibit that?

6         A    We would not have a problem with them doing

7    that.

8         Q    We're looking at six photographs.  We've

9    marked them 2A, 2B, 3A, 3B and 4A and 4B.  Generally,

10   they depict a portion of the outside area on what we

11   come to call the back of this 977 Northpoint Ventures

12   building, correct?

13        A    Yes.

14        Q    All right.  Who's responsible from the time

15   period the tenants started to occupy the building?

16   Who snow plows any of this parking area, depressed

17   dock, walkway, any of this cement area that's

18   depicted -- cement surface that's depicted in these

19   six photographs?

20        MR. POTTER:  Objection.  Relevance.  If you

21   have an answer, you can provide it.

22        THE WITNESS:  The snowplowing contractors are

23   taken care of by the management company.

24

56

1    BY MR. HULL:

2        Q    Was there a separate entity that snowplows,

3    or is it Rothbart Realty that snowplows?

4        A    Separate entity.

5        Q    They entered into a contract with the

6    management company, Rothbart Realty, that provides

7    snowplow services?

8        A    Yes.

9        Q    And is that a contract that Rothbart Realty

10   and Rothbart Construction company are responsible for

11   making sure it's in place?

12       A    Yes.

13       Q    Then again -- again, that same concrete

14   surface area that's depicted in these photographs

15   that we're looking at, who salts that area during the

16   winter months?

17       MR. POTTER:  Same objection as to relevance.

18   If you have an answer, you can provide it.

19       THE WITNESS:  The contractor that is taking

20   care of the snowplowing.

21       Q    Then, again with regard to the same

22   concrete surface area that's depicted in these

23   photographs that we've been talking about, who's

24   responsible for shoveling any of the areas close to

                                                    57

1    these blue man doors?

2         MR. POTTER:  I'm assume as to snow, same

3    objection as to relevance.  If you have an answer,

4    you can provide it.

5         MR. HULL:  And what's the relevance objection?

6         MR. POTTER:  How does snow removal in June have

7    anything to do with this?  How does salting in

8    June --

9         MR. HULL:  With the question of control over

10   the area.

11        MR. POTTER:  I don't see how in June was snow

12   removal and salting is at all relevant to this

13   question.

14             So I'm allowing him to answer it, but

15   I just -- I'm going to move in limine if you're going

16   to talk about snow removal in June.

17        MS. ADAMS:  I join in the objection.

18        MR. HULL:  So you don't think that's relevant

19   to the question of who exercises dominion and control

20   over the concrete surface areas?

21        MR. POTTER:  Well, first of all, are you, for

22   the purposes of this deposition, saying that this

23   gentleman fell in front of this blue door that you're

24   pointing to in these photos?  Is that where he fell?

                                                      58

1    MR. HULL:  I'm not saying anything about where

2    he fell.

3    MR. POTTER:  Well, that's the problem with this

4    deposition, and that's why I have an objection to all

5    of your questions because we don't know where the

6    accident occurred.

7            There are many issues that can arise.

8    What if one of these trucks was leaking oil?  When

9    you read the lease, it talks about the negligence of

10   the agents of the tenant.

11           You know, how do we -- we don't even

12   know what we're talking about.  We don't know what

13   we're talking about.  What's the substance that he

14   fell on?

15           In your complaint, you mention debris,

16   you mention water, you mention a liquid substance,

17   assumably something different than water.

18           What is the substance that he fell on?

19   Aren't we entitled to these answers before you can

20   pose to me these general questions about who

21   controlled what, and who is required to maintain

22   what.

23           And that's why we answered the

24   interrogatories this way.  And that's why I'm making

59

1   so many objections in this deposition because this is

2   a patently unfair way to proceed with this

3   litigation.

4              The motion was premature, and to go

5   ahead and depose someone before we know the facts

6   under which this case allegedly arises is just

7   patently unfair to this witness.

8        MR. HULL:  I don't disagree with you that the

9   motion was premature, but, unfortunately, they filed

10  it, and, unfortunately, we have to ask the questions

11  this way.

12       MR. POTTER:  And I further will point out that

13  your motion asked for depositions of Precision

14  people, not Mr. Rothbart, but here we are today in

15  good faith trying to work through the issues.

16       MR. HULL:  And I understand, and Mr. Rothbart's

17  been very cooperative.  He's been very cooperative.

18  All right.  Well, let's get back to this.

19  BY MR. HULL:

20       Q   I don't want to have to have you sit while

21  the lawyers go back and forth, but -- all right.

22              I'm going to tell you one thing.  And

23  then just for -- and everybody will wind up deposing

24  Mr. Rogers, and he'll tell you exactly where he fell,

60

1   but I will represent to you that photograph 2B --

2   this is the --  first of all, let me ask you a

3   question:

4                   Who was the tenant in the first part

5   of the building?  Do you remember at that time or

6   back there in whatever it was in 2004?

7       A    I believe the company -- I can't think of

8   the name offhand.

9       Q    But whoever occupied this front section of

10  the building was different than Precision, correct?

11      A    If you're saying who occupied the west end

12  of the building versus Precision being east of the

13  west end, the answer is yes.

14      Q    Okay.  Well, what you have correctly

15  pointed out is the west end of the building.  That

16  was occupied by somebody other than Precision?

17      A    Correct.

18      Q    Okay.  All right.  Then let me go to what I

19  was going to represent to you that at the white pipe

20  that comes out of the Precision area that we were

21  looking at in these other photographs comes out to

22  the end of this railing -- I suppose that's the best

23  thing we can call it -- Mr. Rogers fell right in that

24  area like just immediately to the end of the -- you

61

1    know, just outside the area of this discharge area --

2    discharge end of this white pipe.  Okay.

3              I'm going to tell you that's what

4    he'll tell you when he gets deposed, or that's what

5    he'll tell your lawyers when he gets deposed.

6              All right.  So, again, as I understand

7    your testimony, the responsibility for that area or

8    what might happen in that area -- that area, again,

9    is the area just south to the end of this --

10        A    It's to the north.

11        Q    It is to the north?

12        A    (Nodding).

13        Q    Yeah.  You're right.  Okay.  So to the

14   north of this -- end of this white pipe that comes

15   out of here (indicating) as I understand your

16   testimony, the responsibility for that area would be

17   dependent upon what came out of that pipe?

18        A    I would say that's a fair answer.

19        Q    Okay.  All right.  During the period of

20   time that tenants occupied the 977 Northpoint

21   Ventures building up until the time of Mr. Roger's

22   fall, which, unfortunately, I don't have the date

23   with me.  That was in July of --

24        MR. POTTER:  June 25, 2004, according to your

                                                        62

1    complaint.

2    BY MR. HULL:

3        Q    Okay.  All right.  June of 2004.  Thank

4    you.  During that period of time -- again, from the

5    time tenants first began to occupy the 977 Northpoint

6    Ventures building up until that June 25th, 2004 date,

7    did Rothbart Realty or Rothbart Construction Company

8    ever receive any complaints about these white

9    discharge pipes of any kind?

10       A    Don't know.

11       Q    Would you have records that would indicate

12   whether there were any complaints by tenants?

13       A    Possibility.

14       Q    And would those record be at the Techny

15   address?

16       A    If we have them, yes.

17       Q    Earlier in the deposition you talked about

18   other records that might be there would be work

19   orders submitted by tenants to Rothbart Realty or

20   Rothbart Construction; do you remember that?

21       A    Yes.

22       MR. POTTER:  I'm going to object to the

23   characterization.  I don't think that's an accurate

24   characterization, but that's fine.

63

1    BY MR. HULL:

2      Q    If I misremembered, I'm not trying to trick

3   you.  I'm just trying to --

4      MR. POTTER:  I'm not sure if the tenants

5   created the work order or if they called and you

6   generated them.

7      MR. HULL:  That's what I'm going to try to find

8   out.

9      THE WITNESS:  Can I ask a favor?  The coffee

10   has gone through me.

11      MR. HULL:  All right.  No problem.

12                (Whereupon, a recess was taken.)

13                (Whereupon, the record was read

14                   as requested.)

15   BY MR. HULL:

16      Q    Let's just go back to the -- you had

17   mentioned the term "work orders" earlier in the

18   deposition.  What are those?

19      A    If a tenant would call in and request some

20   work done in their unit, that would be a work order,

21   or if there was something on the outside that would

22   be a work order, or if we noticed something during

23   our inspections that had to be done, that would be a

24   work order.

64

1        Q    So if you -- if Rothbart or Rothbart Realty
2    or Rothbart Construction noticed something during its
3    inspections; is that a work order that you would
4    generate or is that something that you tell the
5    tenant, and then they generate a work order?
6        A    It depends.
7        Q    It depends on what?
8        A    If I'm at a space, and I'm walking through
9    and the tenant says, Hey, this is wrong.  I would
10   say, Do me a favor, fax it in.  Where if I'm out, and
11   I see something, I could call it in.
12       Q    And who do you call it in to?
13       A    Someone in the office, person who handles
14   those in the office.
15       Q    And this is the Techny address office?
16       A    Yes.  Yes.
17       Q    Okay.  All right.  Do you have a file or
18   files at the Rothbart offices at the Techny address
19   that would contain copies of any of these work
20   orders?
21       MR. POTTER:  Objection.  Asked and answered.
22   You can answer again.
23       THE WITNESS:  Yes, if we have the work orders,
24   and they have not been thrown out, we would have

65

1    copies of them.

2    BY MR. HULL:

3        Q    Does Rothbart have something specific to

4    document construction procedures?

5        A    We tend to get rid of stuff after one or

6    two years, stuff like this or, again, it depends.

7        Q    But you or someone on your behalf could go

8    and look and see whether those records exist?

9        A    Yes.

10       MR. POTTER:   And I have already asked them to

11   give those records to me, and then, I'll respond

12   accordingly.

13   BY MR. HULL:

14       Q    All right.   Mr. Rothbart, the time period

15   that I want to use is the time from when tenants

16   first started occupying the 977 Northpoint Ventures

17   building up until this June 25, 2004 date.   Okay.

18   The next few questions I'm going to ask you relate to

19   that time period.   All right?

20       A    Yes.

21       Q    Are you aware of any other accidents of any

22   type that occurred at the property during that period

23   of time?

24       A    To my knowledge, no.

                                                    66

1        Q     How did you first learn of Mr. Rogers'

2    fall?

3        A     We received either a fax, I believe, from

4    the tenant acknowledging that someone had fallen at

5    the building.

6        Q     Do you remember when that came?

7        A     No.

8        Q     And what did you do with that fax?

9        A     I think our first reaction was to -- again,

10   I know one thing I did was --

11        MR. POTTER:  I think he wants to know

12   physically what did you do with the piece of paper.

13   BY MR. HULL:

14        Q     That's my first question, yeah.

15        A     Once we received it, we acted on it

16   accordingly.

17        Q     What did you do with the piece of paper?

18   Did you stick it in a file?  Did you throw it away?

19        A     No, we didn't throw it away.

20        Q     Okay.  So it's still in existence

21   somewhere?

22        A     Somewhere.

23        MR. POTTER:  I don't think we have it.  So if

24   you can find that and send that to me, I would

67

1    appreciate it.

2    BY MR. HULL:

3         Q    Yeah, we don't have it.

4         A    Okay.  Let me make a note.

5         MR. POTTER:  That would be great.

6    BY MR. HULL:

7         Q    Do you remember how soon after June 25,

8    2004, you received that fax?

9         A    No.

10        Q    Do you remember whether it was a matter of

11   days, weeks or months after that date?

12        A    I have no recollection.

13        MR. POTTER:  And are we focusing on the control

14   issues with this dep or are we bringing Mr. Rothbart

15   back in?

16        MR. HULL:  No, my understanding is that we're

17   going to be bringing him back in.

18        MR. POTTER:  Okay.

19        MR. HULL:  And the reason I ask about prior

20   accidents -- I asked about when he first learned

21   about the Bruce Rogers incident, is all for the

22   purposes of his control.  What did he do?  What did

23   Rothbart do?

24        MR. POTTER:  Well, I'm willing to let you

                                                        68

1    explore this a little bit, but I don't see the
2    connection between control and his notice of the
3    accident, and what he did in response to that notice.
4    But I'm going to let this go a little ways.
5    BY MR. HULL:
6         Q    When you said you acted on it accordingly,
7    what did you do?
8         A    Well, I know one thing we did was shoot the
9    letter off to our carrier.
10        MR. POTTER:  Any communications other than
11   physically sending the letter, that's fine.  But any
12   communications between your insurance companies or
13   your attorneys is privileged.
14              So I'm instructing you not to
15   volunteer any information regarding those
16   conversations with your insurance people or your
17   attorney.
18        THE WITNESS:  Okay.  And then I -- again, I
19   don't recall.  I don't think I went up to the
20   property thereafter, but I don't know who may or may
21   not have gone up from my office.
22   BY MR. HULL:
23        Q    Do you remember that somebody did go up or
24   that nobody went up?

69

1          A    I can't answer that.

2          Q    Did you have any conversations with anybody

3     at Precision about the incident when you received

4     this fax?

5          A    I don't recall.

6          Q    With regard to the lease with

7     Precision -- the lease between -- or strike that.

8     Precision's lease for this property that they

9     occupied at the 977 Northpoint Ventures uilding, was

10    that a lease they had with Rothbart or is the

11    landlord considered to be 977 Northpoint Ventures,

12    LLC?

13         A    The landlord is 977 Northpoint Ventures,

14    LLC.

15         Q    All right.  So then I'm going to ask you a

16    few questions about the lease, the actual lease

17    document between Precision and 977 Northpoint

18    Ventures, LLC for this portion of the building that

19    they occupied.  Okay?

20         A    (Nodding.)

21         Q    All right.  Who negotiated that lease on

22    behalf of the landlord, if you know?

23         A    I did.

24         Q    All right.  Who drafted the lease?

                                                     70

1          A    I did.

2          Q    Do you have any records at your office with

3    regard to any of those discussions or negotiations

4    with Precision about that lease?

5          A    I'd have to check.

6          Q    Again, if you do have any, would they be at

7    the Techny address?

8          A    Yes.

9          Q    All right.  If you could check, I'd

10   appreciate it.  Do you have any recollection during

11   those negotiations with Precision for the lease that

12   we're talking about?

13              Do you have any recollection or any

14   discussions with Precision regarding maintenance

15   responsibilities?

16         A    Specifically, no.

17         Q    Almost finished here, Mr. Rothbart.

18   Earlier in the deposition -- and, again, I'm not

19   trying to trick you, and I probably don't remember

20   your words exactly, but I just want to refer you to a

21   point in the deposition where you mentioned to me

22   something that if the tenants -- the tenants have the

23   responsibility -- the tenants of the building -- of

24   this 977 Northpoint Ventures building -- have

71

1   responsibility for something that might have been

2   generated on the inside of their building that

3   somehow got to the outside of the building; do you

4   remember that?

5       A    Vaguely, but go ahead.

6       Q    Okay.  Is that a correct statement or if

7   it's not, is there a better way to put that?  That

8   responsibility that you were talking about?

9       MR. POTTER:  Just on the way you worded this

10  question, I object, asked and answered.  If you have

11  an answer to that, that's fine.  I'm not clear if

12  you're asking for a clarification of his prior answer

13  or...

14  BY MR. HULL:

15      Q    Well, I want to go back to that and ask a

16  couple questions about it.  And I don't want to

17  mislead you or anything, so I'm trying to --

18      A    Well, why don't you ask me the questions,

19  and let me see if I can answer it.

20      Q    All right.  If something is generated by

21  the tenant in the 977 Northpoint Ventures building on

22  the inside of the building -- when I mean the inside,

23  I mean inside the demising walls --

24      A    Okay.

72

1    Q    -- and somehow that item, substance,
2    whatever it might be, finds its way to the outside of
3    the building, whether it'd be through this white pipe
4    that we've been talking about or otherwise, is the
5    deposit of that substance on the outside of the
6    building the responsibility of the tenant?
7    A    I would view that as the responsibility of
8    the tenant because it was generated from his internal
9    premises.
10   MR. POTTER:  I'm just going through --
11   MR. HULL:  You're welcome to look at the lease
12   that we're talking about.
13   MR. POTTER:  No, I'm going to go through it
14   after everybody's done, just so you know.
15   THE WITNESS:  And on the same token, if the
16   tenant did something i. e. in the dock area -- let's
17   say they washed their car or they washed a truck or
18   they did whatever, I would view that as a maintenance
19   issue with the tenant, too.
20   BY MR. HULL:
21   Q    And why would that be?
22   A    Because they're taking an area that in
23   theory is there under their exclusive dominion and
24   control, and they're using it for a purpose that

73

1    benefits the building -- their use of the premise.

2              And, therefore, that is a direct

3    result of their actions, and, therefore, that should

4    be under their control.

5         Q    All right, then with regard to the --

6    again, back to my question about items.

7              A substance that's generated on the

8    inside of the demising walls for this 977 Northpoint

9    Venture building that then finds its way to the

10   outside of the building, whether it'd be through this

11   white pipe or otherwise, would you consider items, or

12   whatever might be contained in the sump pit that

13   we've been talking about, something that was

14   generated on the inside of the building?

15        A    Very well could be.

16        Q    And so items that come from that sump pit

17   that find their way outside of the building, which,

18   at least, according to your testimony would come

19   through this white pipe that we talked about is

20   something, again, that you would consider their

21   responsibility?

22        A    It could very well be their responsibility.

23        MR. HULL:  All right.  I don't have any more

24   questions right now.

                                                    74

1          MR. FITZSIMMONS:  I have a few.

2                    EXAMINATION

3                    BY

4               MR. FITZSIMMONS:

5     Q    My name is Ryan Fitzsimmons.  I represent

6    Precision Laboratories.  Since we're on the sump

7    pump, staying on it, is the sump pit open inside?

8     A    Typically, there's a metal -- piece of

9    metal covering it, which can be removed very easily.

10    Q    It's not a grated piece of metal.  It's an

11   actual --

12    A    Yeah.

13    Q    -- metal covering?

14    A    Yeah.

15    Q    Is it latched down or locked down?

16    A    Don't know.

17    Q    But in order to put anything in the sump

18   pit, you have to remove the metal lid to dump stuff

19   in and put the lid back on if you were doing it

20   inside the building?

21    A    Yeah.

22    Q    Otherwise --

23    A    There could be -- there's openings in there

24   for where the wires -- for where the pipe comes

                                                  75