1    through, and they could just throw whatever they want

2    in those openings also.

3        Q    Okay.  Opening in the actual pipe?

4        A    In the actual metal grate.

5        Q    In the metal --

6        A    Metal piece of protection over the hole.

7        Q    Okay.  And that would eventually find its

8    way into the pit --

9        A    Yes.

10       Q    -- it wouldn't just sit --

11       A    No, no.

12       Q    -- outside of the pit then?

13       A    No.

14       Q    With the exception of either removing the

15   lid or pouring stuff through the grate holes, is the

16   only access to the sump pit through the -- at the end

17   of the dock that we've been referring to?

18             I guess we're calling it a depressed

19   docking area, and at the end of that, there's a sewer

20   or some type of --

21       A    I don't see -- I would tend to presume

22   there has to be.

23       Q    Okay.  Is that besides the two ways that

24   you just mentioned the only way to get stuff --

76

1    liquids into the sump pit?

2        A    Yes -- wait, repeat your question again.

3        Q    Is the grating -- or the sewer hole at the

4    end of the depressed ramp --

5        A    Yeah.

6        Q    -- the only entrance into the sump pump and

7    sump pit mechanism with the exception of either

8    removing the lid and pouring liquid in?

9        A    I believe so.

10       Q    To your knowledge did anyone from Precision

11   ever pour anything into the sump pit?

12       A    No, I have no idea.

13       Q    977 Rothbart -- or 977 Northpoint is the

14   landlord, correct?

15       A    977 Northpoint Venture, LLC is the

16   landlord.

17       Q    And they do -- they're responsible for

18   contracting out jobs such as removing snow, cleaning

19   or mowing lawns, those sort of things?

20       A    The management company that is hired by

21   the -- from the -- the management company that is

22   hired -- 977 hires, contracts out to snow removal,

23   etc.

24       Q    Okay.  You've lost me, so 977 doesn't

                                                    77

1    contract for the snow removal.  Rothbart Realty as

2    the management company --

3         A    Yes.

4         Q    Does Rothbart Realty use the same -- I

5    assume Rothbart Realty is the management company for

6    more than one property; is that correct?

7         A    Yes.

8         Q    Do they use the same maintenance crew for

9    each property?

10        A    It depends on --

11        MR. POTTER:  Well, I'm going to object.  The

12   question's beyond the property at issue.  I don't see

13   how it's relevant to this case.  Do you have some

14   basis that it's relevant?

15        MR. FITZSIMMONS:  I'm just trying to figure out

16   if he's going to know the identity of that company.

17        MR. POTTER:  Oh, ask him the identity.  I'm

18   sure he does, but I don't want to go beyond the

19   property -- again, this isn't an asset deposition.  I

20   don't want to go beyond the property that we have

21   here.

22   BY MR. FITZSIMMONS:

23        Q    Do you know the name of the company that

24   cleans up snow on the property we've been discussing?

78

1      A    Yes.

2      Q    What is the name?

3      A    I believe it's American Brick and Paving.

4      Q    Can you say that again.

5      A    American Brick and Paving.

6      Q    And just in terms of the property we're

7 talking about, does American Brick and Paving do any

8 other jobs besides removing snow and as you said

9 putting salt on?

10     A    No.

11     Q    Is there another company that mows the

12 lawns on that property?

13     A    Yes.

14     Q    Do you know the name of that company?

15     A    That, I'm not too sure.  We use a couple

16 different landscapers.

17     Q    Would that company be responsible in the

18 fall for coming in and raking up the leaves and

19 things of that nature?

20     A    There are no trees that -- it's hard to

21 say.

22     Q    Now, going back to your interrogatories if

23 you recall, you were asked about Interrogatory No. 2,

24 where you said that without waiving your objection,

79

1    Precision, who is the tenant on the lease, was

2    responsible for maintaining the area where the

3    plaintiff fell?

4         MR. POTTER:  I object.  It does not say that.

5    It says the tenant under the lease had maintenance

6    responsibilities --

7         MR. FITZSIMMONS:  Right.

8         MS. ADAMS:  -- but not as vague as the

9    question, which we don't know where the incident

10   occurred or what the substance was.

11   BY MR. FITZSIMMONS:

12        Q    Okay.  Your speaking objection aside, what

13   I'm asking is:  You gave an answer -- the question

14   is --

15        MR. POTTER:  That's not a speaking objection,

16   you misquoted the answer, and I think I'm entitled --

17        MR. FITZSIMMONS:  Your objection is an

18   objection quoting anything -- anything beyond that

19   actually is a speaking objection, which you stated --

20        MR. POTTER:  Okay.  Let me restate my

21   objection.  Objection.  Misquoting the statement.

22   Don't answer the question.

23   BY MR. FITZSIMMONS:

24        Q    The question that was asked in the

80

1   interrogatory is:  Who had the responsibility and

2   duty -- or duty do maintain the area in question at

3   the time and place where the plaintiff fell?

4        MR. POTTER:  Objection.  We don't know the

5   place.  Don't answer the question as it's phrased.

6   BY MR. FITZSIMMONS:

7        Q    I actually haven't asked my question.  I

8   was going to say is that what the question says, the

9   gist of it, that the question asked in the

10  interrogatory was:  Who had the duty to maintain the

11  area in question at the time and place where the

12  plaintiff fell and for the 30 days before the

13  plaintiff fell; is that Interrogatory No. 2?

14       MR. POTTER:  Can you please read back the

15  question.

16       MR. FITZSIMMONS:  I agree to strike, and I'll

17  ask a new question.  Can we do that?

18       MR. POTTER:  Sure.

19  BY MR. FITZSIMMONS:

20       Q    Interrogatory No. 2, would you agree asked

21  who had the responsibility or duty for maintaining

22  the area in question at the time and place of

23  plaintiff's fall and for the 30 days preceding that

24  fall?

81

1          MR. POTTER:  Hold on a second.  I need you to

2   read it back because I think you're changing the

3   question.

4                          (Whereupon, the record was read

5                          as requested.)

6          MR. POTTER:  I object.  It's not verbatim, but

7   you can provide an answer to that.

8          THE WITNESS:  I think it's -- A is the answer

9   to -- the interrogatory states one of them was

10  Precision Laboratories.

11  BY MR. FITZSIMMONS:

12     Q    I'm not asking for your answer.  I'm just

13  asking on question number 2, if you understand it as

14  it's written?  Do you understand the question as it's

15  written?

16         MR. POTTER:  It's been asked and answered.  You

17  can answer it again, but you already said yes.

18         THE WITNESS:  Okay.  Yes.

19  BY MR. FITZSIMMONS:

20     Q    And your answer to question number 2 was

21  that Precision Labs had maintenance responsibilities,

22  correct?

23     A    Yes, may have had maintenance

24  responsibilities.

                                                    82

1        Q     Well, you didn't say had.

2        A     Had maintenance responsibility.

3        Q     And if I understand your testimony

4    correctly -- and I'm not trying to put words in your

5    mouth, sir.

6              Is your testimony that this question

7    was answered this way because in your opinion, the

8    question was unduly vague, and so you are unsure

9    about what area the plaintiff was asking who had

10   control of?

11        MR. POTTER:  As well as what the substance was

12   that allegedly caused the fall.

13        MR. FITZSIMMONS:  Well, there's no substance in

14   the question.

15        MR. POTTER:  Well, but the substance

16   specific -- if you want me to instruct him not to

17   answer it, fine.

18              Otherwise, I got to give you a -- I've

19   got to explain to you why.  The substance is integral

20   in the maintenance responsibilities; for example, if

21   it's garbage, you see a dumpster out there.  That's

22   your client's responsibility.

23        MR. FITZSIMMONS:  I'm asking your client when

24   he answered this question, if he answered the

                                                    83

1    question because he did not understand where the area

2    in question was, and that his understanding of

3    question 2 was that it was vague as to where the area

4    in question was the question of maintenance was

5    referring to?

6        MR. POTTER:  Do you understand the question?

7        THE WITNESS:  I think I do.

8        MR. POTTER:  Okay.  If you understand it, you

9    can answer it.

10       THE WITNESS:  A, it was vague.  B, as I have

11   said over and over during this thing, there is some

12   issues of exterior maintenance that is the tenant's

13   when it's generated from the --

14   BY MR. FITZSIMMONS:

15       Q    Okay.  Is there a question -- in question

16   2, is there anything to do with the -- the question

17   is about an area, right?

18            Not who was in control of a certain

19   substance or needed to maintain or clean up their own

20   personal discharge or water; is that correct?

21            The question just refers to an area on

22   the property?

23       MR. POTTER:  Objection.  It's been asked and

24   answered, and it's a mischaracterization, but you can

84

1   answer it.

2        THE WITNESS:  It depends where the area is.

3   BY MR. FITZSIMMONS:

4        Q    Okay.  I'm not trying to put -- I'm trying

5   to find out because you, in your answer, claim that

6   we are responsible for the maintenance; is that

7   correct?

8        MR. POTTER:  Objection.  Mischaracterization,

9   he is responsible for the maintenance, and vague.

10  BY MR. FITZSIMMONS:

11       Q    In your answer to 2, you put Precision had

12  maintenance responsibilities?

13       MR. POTTER:  Objection.  That's different from

14  Precision was responsible for the maintenance, and

15  maintenance is a vague and ambiguous term.

16  BY MR. FITZSIMMONS:

17       Q    Okay.  Is the reason that you point to

18  Precision in your answer is that, generally,

19  Precision had maintenance responsibilities, or you're

20  unsure of where the area in question is, so that

21  Precision may have been responsible for that area?

22       A    Both.

23       Q    So would a fair statement be that you are

24  unsure of exactly who was supposed to maintain the

85

1    area exactly where plaintiff fell, and you're unsure

2    because you're not sure where plaintiff fell?

3         A    And I am not sure where plaintiff fell,

4    which, therefore, I'm not able to make a decision as

5    to who was the ultimate one responsible for the

6    maintenance of that area.

7         MR. FITZSIMMONS:  Okay.  Thank you.  I have

8    nothing further.

9         MR. POTTER:  Do you have anything else?

10        MR. HULL:  I didn't know if you had any

11   questions.

12        MR. POTTER:  I think we're going to follow up

13   after.

14        MR. HULL:  Okay.  I do have a couple questions.

15                  EXAMINATION

16                  BY

17                  MR. HULL:

18        Q    Mr. Rothbart, directing your attention to

19   the photographs here and specifically Rothbart 2A,

20   again, this white pipe that we now know connects to

21   the sump pit inside the building, and that extends

22   out along this railing; what would you call that

23   pipe?

24        A    White PVC discharge pipe.

86

1          Q    Just some sort of discharge pipe.  If I

2     refer to it as discharge pipe, you'd understand what

3     I'm talking about?

4          A    Yeah.

5          Q    Okay.  And you would call it the discharge

6     pipe because it facilitates the discharge from the

7     sump pit; is that correct?

8          A    Yes.

9          Q    I know we've been over this ground, but,

10    obviously, you know this is an area of intense

11    interest by all lawyers involved in this case so far.

12    But let's go again to the -- where was that

13    photograph -- 2B, Rothbart 2B.

14              Again, what we're looking at -- and

15    the area I'm directing your attention to is the end

16    of that white discharge pipe that comes from the

17    portion of the premises that Precision leased at the

18    time, not the west end, or the tenant that was in the

19    west end because you can see two of them in there.

20    That's why I'm pointing to -- in other words --

21         MR. POTTER:  It's one in the distance.

22         MR. HULL:  There's one in the distance.  And

23    then there's one that would be closer to you.

24         MR. POTTER:  It's hard to tell where this one

87

1   is, but go ahead.

2        THE WITNESS:  Go ahead.  Go ahead.

3   BY MR. HULL:

4        Q    But, anyway -- all right -- if you take the

5   end of that pipe, the end of that discharge pipe and

6   use that as the center of a circle and then construct

7   a 5-foot circle of concrete surface area around

8   that --

9        A    (Nodding.)

10       Q    -- that's the area that we're trying to

11   find out who has maintenance responsibilities for.

12       MR. POTTER:  And that's a statement or is that

13   a question?

14       MR. HULL:  That's a statement.  Okay.

15       MR. POTTER:  That's a hypothetical, I think,

16   or...

17   BY MR. HULL:

18       Q    Well, yeah, anyway, that's -- I'm trying to

19   direct him to a specific area on that photograph.

20   That's what I'm trying to do.  All right.

21            Am I correct in understanding that who

22   has maintenance responsibilities for that 5-foot area

23   using that end of the white discharge pipe as the

24   center of that circular area that I'm describing,

88

1    part of what determines that is what might be

2    discharged from that discharge pipe; is that correct?

3           A     I'm listening.  Go ahead.

4           Q     No, that's the question.

5           MR. POTTER:  Do you agree with that?

6           THE WITNESS:  Yes.

7    BY MR. HULL:

8           Q     Part of that determination as to who's

9    responsible, again, for that same circular area that

10   I described in my previous statement also depends on

11   exactly which part of that area that we're talking

12   about; is that correct?

13          A     Yeah.

14          Q     And the reason I asked that is because

15   under my carving out of a circular area, some part of

16   that is inside this railing --

17          A     Dock.

18          Q     -- right, this depressed dock area, so that

19   would help tell us who might be responsible for a

20   portion of it.

21                Is there anything else that would tell

22   us who's responsible for that area that I have carved

23   out, this circular area using the center or that --

24          A     It's the only two parties.

                                                          89

1     MR. POTTER:  Just making a general objection as

2   to the whole vagueness as to what we're dealing with,

3   but you can go ahead and answer the question.

4     THE WITNESS:  If it's not -- it's either

5   Precision Laboratories or it's the landlord per se

6   that's really responsible for that area.

7   BY MR. HULL:

8     Q    All right.  And what I'm trying to

9   understand is what are all the factors that we would

10  look at to determine who's responsible for that?

11    MR. POTTER:  Again, objection as to the general

12  vagueness.  You can answer it if you know.

13    THE WITNESS:  I would have to say that one of

14  the things you would have to look at is the source of

15  the product or the liquid or whatever that is being

16  discharged within that area.

17  BY MR. HULL:

18    Q    Okay.  All right.  So that's one thing.

19  Then we know that another thing is the exact portion

20  of that circular area whether inside this depressed

21  dock or outside the depressed dock, that's another

22  factor that we would look at, correct?

23    A    Yes.

24    Q    Are there any other factors besides those

90

1   two that we would look at?

2          A    What kind of other -- there could be debris

3   that's being spewed from the tenant inside or

4   wherever, too, so that from here, you can't tell, but

5   you don't know at the time the condition of the

6   accident.

7          Q    Now, again, now, we know that we would also

8   look at whether debris was coming from the end of

9   that pipe that was generated inside --

10         A    Or debris in the dock from the tenant.

11         Q    Or debris in the dock area from the tenant?

12         A    Absolutely.

13         Q    Okay.  Anything else?

14         A    Have to think about it.

15         Q    Okay.  Feel feel to think about it.

16         A    Housekeeping of the tenant, general

17  housekeeping of the tenant.  If you noticed over

18  here, (indicating) you have skids.  Who knows at the

19  time the skids could have been at the other side.

20              There could have been trash, garbage.

21  You don't know.  These pictures -- no idea when these

22  pictures were taken.

23         Q    I think there's a date on it.

24         MR. POTTER:  July.

91

1          THE WITNESS:  I don't know when that --

2          MR. POTTER:  That could have been developed

3     date.  We don't know.

4          THE WITNESS:  We don't know what it is, but I'm

5     saying at the time, there's nothing to reflect the

6     housekeeping of the area at the time of the accident.

7     BY MR. HULL:

8          Q    All right.  And whoever conducted that

9     housekeeping might be one of the factors that would

10    go into determining who's responsible for --

11         A    Yes, in my estimation --

12         Q    That's what I'm trying to understand.  All

13    right.  Anything else that you want to add?

14         A    Hm-hmm.

15         Q    Okay.  All right.  Then let me direct your

16    attention to picture -- or yeah, photograph 2A,

17    again, the infamous pipe we keep talking about, the

18    white pipe that comes down.  All right.

19              This area right in that -- immediately

20    adjacent to the white pipe; is that a walkway area?

21         MR. POTTER:  If you can tell from the photo.  I

22    don't --

23         THE WITNESS:  Define a walkway area.

24

92

BY MR. HULL:

 Q It's a place where people walk on some regular basis.

 A Put it this way:  The area is concrete, you know, if someone wants to walk on it, they could walk.

 Q Okay.  There's nothing to prevent them from walking on that area?

 A No.

 Q There's nothing that you know of with regard to the property that says to people don't walk on that area, is there?

 A No.

 Q Okay.  All right.  Then with regard to the railings, again, looking at the same photographs, these blue colored -- looks to me, at least, blue colored metal railings; you see those?

 A Mm-hmm.

 Q What's the purpose of those?

 A Purpose of those are that people who are in the west of the railing do not see the depressed dock area and do not fall into the area.

 Q Okay.  And that would include somebody who might be walking as well as someone in a vehicle,

93

1   correct?

2       MR. POTTER:  For the record, we're looking at

3   2A.

4       THE WITNESS:  2A.  Did I say 2B?

5       MR. POTTER:  I don't know.  I don't remember.

6       MR. HULL:  Yeah, you guys said the same

7   photograph.  That's what I was --

8   BY MR. HULL:

9       Q   Were these railings part of the original

10   design of the property?

11       A   I have to say I think so.

12       Q   Okay.  All right.  Then I want to direct

13   your attention to Rothbart Group 3A.  Again, it, at

14   least, looks to me like one of the best pictures we

15   have of the blue man doors that we talked about, you

16   see that?

17       A   Yes, sir.

18       Q   Were the placement of these blue man doors

19   part of the original design of the building?

20       A   Yes.

21       Q   When a tenant moves into the property at

22   977 Northpoint Ventures, who puts their name on these

23   blue man doors?

24       A   We do.

94

1        Q    We meaning?

2        A    The landlord.

3        Q    So 977 --

4        A    Yes.

5        Q    -- Northpoint Ventures, LLC --

6        A    Yes.  Yes.

7        Q    -- put's that up?

8        A    Yes.

9        Q    All the numbers that we've seen on the
10   building over the garages and that are on some of the
11   blue man doors as we looked at these photographs, are
12   those something that were present when the building
13   was built or are those added later?

14        A    Those were added upon completion of the
15   building for signage purposes.

16        Q    Okay.  All right.  I don't have a picture
17   of it.  I think you guys produced a picture, but it
18   was just kind of an unclear black and white
19   photograph.

20              If we go to the west end of the
21   building, the one -- that's at the end of the
22   building that's closest to the road, correct?  Am I
23   right on that, or am I getting my east and west mixed
24   up again?

95

1           MR. POTTER:  Looking at 2B, you're looking to

2      the west, correct?

3           THE WITNESS:  Are you looking at the road

4      closest to this orange building?

5      BY MR. HULL:

6           Q    Yeah, that's what I'm talking about.

7           A    Okay.  Go ahead.

8           Q    On the east end of the building, there

9      isn't a highway or a road, is there?

10          A    Well, there's 41.  You never know if

11     someone wants to jump over the fence.

12          Q    There's certainly no access from 41 onto

13     the property here?

14          A    If someone wants to hurdle, they can get

15     there.

16          Q    I mean, there's no curb cuts or anything

17     like that?

18          A    No.

19          Q    All right.  So I'm talking about then this

20     west end of the building here (indicating).  This

21     road that's over here as you indicated towards the

22     orange building.  What kind of signage is out there

23     for the building?

24          A    There's a sign in the middle of the parkway

                                                        96

1    approximately mid field between the building giving

2    the address of the property.

3              I think it says 953 to 977.  And there

4    is a sign a little to the north of that, which says,

5    Truck entrance.

6         Q    Okay.

7         A    You know, this isn't --

8         MR. POTTER:  That's not it.

9         THE WITNESS:  No, there's one in the middle.

10   BY MR. HULL:

11        Q    And when you say one in the middle; is that

12   as you're approaching the building -- whatever this

13   area is.  This direction is -- is that from the --

14        A    It's coming from the north to the south.

15        Q    From the north to the south.  So as you're

16   approaching the building from the north to the south

17   on this road down here (indicating) by the orange

18   building, there's a sign before you get to the

19   driveway entrance to the building that's in the

20   median; is that the sign you were talking about?

21        A    There is -- it depends if you're coming

22   from the north to the south, the address sign is

23   south of the driveway.

24              If you're coming from the south to the

                                                      97

1    north, the address sign is north -- is, again, south

2    of the driveway.

3         Q    Okay.

4         A    And what I'm referring to is this sign

5    right there (indicating) which gives you the address

6    of the property.

7         Q    Okay.  All right.  So that -- so when you

8    were saying in the median, what did you mean --

9         A    I was talking --

10        Q    -- because that's confusing me.

11        A    I was talking about that sign right there

12   (indicating) that's the address.

13        Q    Okay.  You weren't talking about something

14   that was in between --

15        A    No.

16        Q    -- the lanes --

17        A    No.

18        Q    -- and the roads that --

19        A    No.

20        Q    -- approaches the --

21        A    No.  No.  I know.  No.  No.

22        Q    All right.  That's what confused me.  All

23   right.  I was familiar -- all right.

24              Again, if you're coming -- all right.

                                                      98

1    Help me again just a minute.  If I'm coming this way

2    (indicating), what am I coming from?  The north to

3    the south?

4        A    If you're traveling like this (indicating)?

5        Q    Yeah.

6        A    You're going north to south.

7        Q    All right.  If I'm going from north to

8    south toward the 977 Northpoint --

9        A    Yes.

10       Q    -- Ventures building --

11       A    Yeah.

12       Q    -- what's the first sign I come to before I

13   come to this driveway entrance?  Is there one?

14       A    There may be a truck entrance sign on the

15   north side of this driveway.

16       Q    Okay.  And does that -- do you recall

17   whether that sign has the address of the building

18   on --

19       A    Probably does not.  Just says, Truck

20   entrance.

21       Q    Then, again, going to this sign that we

22   were looking at earlier that's in the --

23       A    Yes.

24       Q    -- just off the edge of the road that we've

                                                          99

1    been pointing to, what's contained on that sign?

2         A    Address.

3         Q    Address only?

4         A    Address only.

5         Q    And what does it say about the address?

6         A    I believe it says 953 dash 977.

7         Q    Does that name the street or just those

8    numbers?

9         A    Just those numbers.

10        Q    Okay.  All right.  Then this other

11   photograph that your attorney pulled out, this sort

12   of whatever -- it's shaped -- it has all the --

13        A    Directory.  Directory.

14        Q    All right.  The directory.  Where is that

15   sign?

16        A    That is on the south end of the building,

17   north of the south entry.

18        Q    Okay.  Is that visible from this driveway

19   entrance that we were looking at that goes into this

20   back area where we have been talking about all day?

21        A    I would presume it's visible; readable, I

22   question.

23        MR. HULL:  Okay.  All right.  I don't think I

24   have any other questions.

                                                  100